David W. Kesselman (SBN 203838)
*dkesselman@kbslaw.com*
Amy T. Brantly (SBN 210893)
*abrantly@kbslaw.com*
KESSELMAN BRANTLY STOCKINGER LLP
1600 Rosecrans Ave., Bldg. 7, Ste. 320
Manhattan Beach, CA 90266
Tel.: 310-307-4555 | Fax: 310-307-4570

*Attorneys for Applicant*
CANADA (COMMISSIONER OF COMPETITION)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re *Ex Parte* Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782, by<br><br>CANADA (COMMISSIONER OF COMPETITION),<br><br>Applicant. | CASE NO.<br><br>**DECLARATION OF KRISTEN MCLEAN IN SUPPORT OF *EX PARTE* APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** |

**DECLARATION OF KRISTEN MCLEAN**

I, Kristen McLean, hereby declare as follows:

1. I am a Senior Competition Law Officer with the Competition Bureau of the City of Montreal, in the Province of Quebec, Canada. I submit this declaration in support of the Commissioner of Competition's *Ex Parte* Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782.

2. The Commissioner of Competition oversees the Competition Bureau of Canada ("Bureau") and enforces compliance with the Competition Act ("Act"). Non-criminal proceedings are heard by an administrative panel of adjudicators appointed to the Competition Tribunal, who act as independent adjudicators and who have the power to impose penalties and injunctive relief.

3. I have been employed by the Bureau since December 2017. I lead the Bureau's case team reviewing allegations that Google has engaged and is engaging in anti-competitive conduct contrary to Part VIII of the Act. I have personal knowledge of matters set forth herein, except where based on information and belief. Where my knowledge is based on information and belief, I have identified the source of my information and belief and believe it to be true.

4. On November 28, 2024, the Commissioner of Competition filed an application with the Competition Tribunal pursuant to section 79 of the Act. On June 27, 2025, the Commissioner amended the Notice of Application ("Amended Notice of Application"). A true and correct copy of the Amended Notice of Application is attached as **Exhibit A**.

5. The Amended Notice of Application alleges that Google is the largest provider across the ad tech stack for web advertising and it has abused its dominant position through conduct intended to ensure that it would maintain and entrench its market power. Specifically, the Amended Notice of Application alleges that Google has engaged in a practice of anti-competitive acts, through a series of interrelated and interdependent actions that have had cumulative and synergistic anticompetitive effects, and include:

a. conditioning publishers' access to the repository of advertisers available through Google's advertiser ad network ("Google Ads") on the use of

Google's ad exchange ("AdX");

b. conditioning publishers' access to AdX on the use of Google's publisher ad server ("DFP");

c. giving AdX preferred positions in the ad inventory auction process ("Dynamic Allocation"), namely a right of first refusal ("First Look") and a right of last refusal ("Last Look");

d. using negative margins on Google Ads to win more auctions; and

e. restricting publishers' ability to price their inventory on AdX differently from rival ad exchanges ("Unified Pricing Rules").

6. The Amended Notice of Application alleges that, by implementing this anticompetitive conduct, Google has been able to entrench its dominance, prevent rivals from competing, inhibit innovation, inflate advertising costs and reduce publishers' revenues.

7. Based on the case team's review of thousands of records, the conduct at issue in the Amended Notice of Application is transnational and emanates from Google's operations in the United States.

8. On January 24, 2023, the United States Department of Justice, along with several state attorneys general, filed a civil antitrust suit against Google LLC in the United States District Court for the Eastern District of Virginia ("EDVA"), alleging that Google LLC monopolized several markets related to digital advertising through a series of mutually reinforcing anticompetitive and exclusionary actions ("EDVA Action"). A true and correct copy of the operative complaint in the EDVA Action is attached as **Exhibit B**.

9. The EDVA Action included allegations that Google engaged in anticompetitive conduct by:

a. acquiring competitors: engaging in a pattern of acquisitions to obtain control over key ad tech tools used by publishers to sell advertising space;

b. forcing adoption of Google's ad tech tools: locking in publishers to its ad tech tools by restricting its unique, must-have advertiser demand to its ad exchange, and in turn, conditioning effective real-time access to its ad

exchange on the use of its publisher ad server;

c. distorting auction competition: limiting real-time bidding on publisher inventory to its ad exchange, and impeding rival ad exchanges' ability to compete on the same terms as Google's ad exchange; and

d. auction manipulation: manipulating auction mechanics across several of its products to insulate Google from competition, deprive rivals of scale, and halt the rise of rival technologies.

10. On April 17, 2025, after a three-week bench trial, the United States District Court for the EDVA found that Google LLC violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market and unlawfully tied its publisher ad server and ad exchange in violation of Sections 1 and 2 of the Sherman Act. I attended and observed parts of the bench trial, during which the court heard evidence from over 60 experts and witnesses, including from more than 20 current and former Google employees. A true and correct copy of the publicly available decision in the EDVA Action is attached as **Exhibit C**.

11. Although not all the allegations overlap, the alleged conduct in the Amended Notice of Application is substantially the same as the conduct at issue in the EDVA Action.

12. Former Google employees that testified during the course of the EDVA Action include the individuals at issue in this *ex parte* application, Eisar Lipkovitz and Brad Bender. These employees have special knowledge of the topics for which they provided evidence, for a number of reasons, including because: (a) they were the author of a document, (b) they were the recipient of a document, and/or (c) they had responsibility over the programs or products at issue at the relevant time.

13. The Commissioner of Competition obtained deposition transcripts and trial transcripts from the EDVA Action. Attached as **Exhibit D** is a table identifying some of the key material testimony from Messrs. Lipkovitz and Bender in the EDVA Action. This testimony is summarized below.

a. **Eisar Lipkovitz.** On September 10, 2024, Mr. Lipkovitz appeared as a witness in the EDVA Liability Hearing. Mr. Lipkovitz worked for Google LLC until February 2019. Between 2014 and 2019, Mr. Lipkovitz was the Vice President of Engineering for Display and Video Ads at Google. Mr. Lipkovitz's evidence relates to the Commissioner's alleged product markets, Google's alleged dominance in the publisher ad server market, Google's alleged First Look and Last Look advantage, and the alleged tie between Google Ads and AdX, among other things. Mr. Lipkovitz's evidence is material to the issues raised in, among others, paragraphs 82, 86, 93, 95, 100, 127, 159, 162, 168, 173, 177, 178, and 182 of the Amended Notice of Application and paragraph 197 of Google's Response. A true and correct copy of an excerpt of Mr. Lipkovitz's trial evidence is attached as **Exhibit E**.

b. **Brad Bender.** On September 11, 2024, Mr. Bender appeared as a witness in the EDVA Liability Hearing. Mr. Bender worked for Google LLC until November 2022. Between 2008 and 2022, Mr. Bender worked on Google's advertiser-facing ("buyside") business, including as the Director of Product Management and Vice President Product for Display and Video Ads, where his responsibility included Google Ads. Mr. Bender's evidence relates to the Commissioner's alleged product markets, Google's alleged First Look and Last Look advantage, and the alleged tie between Google Ads and AdX, among other things. Mr. Bender's evidence is material to the issues raised in, among others, paragraphs 58, 82, 86, 93, 95, 100, 123, 151, 160, and 177 of the Amended Notice of Application and paragraph 197 of Google's Response. A true and correct copy of an excerpt of Mr. Bender's trial evidence is attached as **Exhibit F**.

14. On November 5, 2025, counsel for the Commissioner sent emails to Messrs. Lipkovitz and Bender in an attempt to secure their cooperation to provide evidence before the Competition Tribunal in respect of the Commissioner's Amended Notice of Application. True

and correct copies of the emails are attached as **Exhibits G** and **H.**

15. After being informed by Google that Messrs. Lipkovitz and Bender were represented by lawyers, counsel for the Commissioner sent, on February 12, 2026, correspondence to the lawyers representing them. True and correct copies of the correspondence are attached as **Exhibits I** and **J.**

16. Neither Mr. Lipkovitz nor Mr. Bender has agreed to testify voluntarily, and their counsel have not responded to the Commissioner.

17. On May 5, 2026, the Commissioner brought a motion before the Competition Tribunal to examine, out of court, seven former Google employees who provided evidence in the American Proceedings ("Commissioner's Motion").

18. The Commissioner’s Motion was granted and the Competition Tribunal issued an order from the Canadian Competition Tribunal permitting the out of court examination of Messrs. Lipkovitz and Bender, as well as commissions and letters rogatory permitting him to seek the assistance of this Court to give effect to the Competition Tribunal’s order.

19. A true and correct copy of the Order for Commission and Letters Rogatory pertaining to Mr. Lipkovitz is attached as **Exhibit K**.

20. A true and correct copy of the Commission pertaining to Mr. Lipkovitz is attached as **Exhibit L**.

21. A true and correct copy of the Letters Rogatory pertaining to Mr. Lipkovitz is attached as **Exhibit M**.

22. A true and correct copy of the Order for Commission and Letters Rogatory pertaining to Mr. Bender is attached as **Exhibit N**.

23. A true and correct copy of the Commission pertaining to Mr. Bender is attached as **Exhibit O**.

24. A true and correct copy of the Letters Rogatory pertaining to Mr. Bender is attached as **Exhibit P**.

25. The Commissioner's Motion was not opposed. Canadian legal counsel to Google and Google Canada Corporation, as well as Canadian legal counsel to six of the seven former

Google employees commented on the form of the orders sought by the Commissioner.

26. Chairperson Justice Andrew D. Little is an experienced jurist. He has decades of experience in a wide variety of competition-related litigation and regulatory matters. He was appointed to the Federal Court on April 28, 2020. He also serves as a judicial member and Chair of the Competition Tribunal. His qualifications are described on the website of the Federal Court of Canada at https://www.fct-cf.ca/en/pages/about-the-court/members-of-the-court/judges/the-honourable-andrew-d-little. Attached as **Exhibit Q** is a true and correct copy of that website as it appeared on August 12, 2026.

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed ____August 21____, 2026, at ____Montreal, Quebec____. Canada.

[signature]

Kristen McLean

# EXHIBIT A

**CT-2024-**

**THE COMPETITION TRIBUNAL**

**IN THE MATTER OF** the *Competition Act*, R.S.C. 1985, c. C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application by the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

**BETWEEN:**

**COMMISSIONER OF COMPETITION**

**Applicant**

**– and –**

**GOOGLE CANADA CORPORATION AND GOOGLE LLC**

**Respondents**

---

# NOTICE OF APPLICATION

---

**TAKE NOTICE** that the Applicant, the Commissioner of Competition (the "**Commissioner**"), will make an application to the Competition Tribunal (the "**Tribunal**") pursuant to section 79 of the *Competition Act* (the "**Act**") for an order pursuant to subsection 79 of the Act for:

a) an order pursuant to subsections 79(1), 79(2) and 79(3.1) of the Act:

   a. requiring Google Canada Corporation and Google LLC (collectively, "**Google**") to divest Google's publisher ad server, DFP, and Google's ad exchange, AdX, along with any additional structural relief as needed to restore competition and overcome the effects of Google's anti-competitive practice in Canada;

   b. otherwise, prohibiting Google from continuing to engage in the anti-competitive practice described herein and from engaging in any other practices with the same purpose and effect in Canada; and

   c. requiring Google to pay an administrative monetary penalty in such an amount as the Tribunal decides is appropriate~~directing Google to pay an administrative monetary penalty equal to three times the value of the benefit derived from Google's anti-competitive practice, or if that amount cannot be reasonably determined, 3% of Google's worldwide gross revenues~~;

b) directing Google to pay costs; and

c) such other relief as the Tribunal may consider appropriate.

**AND TAKE NOTICE** that the timing and place of hearing of this matter shall be fixed in accordance with the practice of the Tribunal;

**AND TAKE FURTHER NOTICE** that the Applicant has attached hereto as Schedule "A" a concise statement of the economic theory of the case.

**THE ADDRESSES FOR SERVICE ARE:**

For Google Canada Corporation and Google LLC:

Davies Ward Phillips & Vineberg LLP
Barristers & Solicitors
155 Wellington Street West
Toronto, ON M5V 3J7
Tel: (416) 367-7450 / (416) 367-7623

Attention: Elisa Kearney
Chenyang Li

For the Commissioner of Competition:

Attorney General of Canada
Department of Justice Canada
Competition Bureau Legal Services (CBLS)
Place du Portage, Phase I
50 Victoria Street, 22nd Floor
Gatineau, QC K1A 0C9
Tel: (613) 296 4470
Fax: (819) 953-9267

Attention: Alexander M. Gay
Donald Houston
John Syme
Ian Clarke
Katherine Rydel
Adam Rossiter

The Applicant proposes that the hearing of this matter be held in Ottawa, Ontario and that it be heard in English and French.

## STATEMENT OF GROUNDS AND MATERIAL FACTS

## I. OVERVIEW

1. Google claims its mission is "to organize the world's information and make it universally accessible and useful." Previously, it embraced an even simpler ethos: "Don't be evil." But the choices Google has made in building its digital advertising technology business reveal a more self-serving agenda. Through a series of calculated decisions, taken over the course of multiple years, Google has excluded competitors and entrenched itself at the center of online advertising — establishing and reinforcing its dominance by controlling the main tools used both by online publishers who sell digital ad space and advertisers who buy it ("**ad tech**").

2. The Commissioner brings this application for an order that will restore competition in Canada, wresting away from Google some of the pervasive market power that it has used to improperly funnel transactions through its own ad tech products and thereby subvert rivals' ability to gain scale and otherwise compete with Google's products. Specifically, the Commissioner seeks an order from the Tribunal requiring Google to divest its publisher ad server and ad exchange (along with any additional structural relief needed to remedy the anti-competitive harm) and an administrative monetary penalty. The Commissioner asserts that this order is minimally necessary to restore competition and to promote Google's conformity with the law in the future.

3. Over the past decade, publishers have increasingly relied on digital ad revenue to support their publications. The viability of virtually all online publishers, big and small, rests in their ability to monetize their content. To help drive this revenue stream, many publishers create and design their websites with dedicated space set aside where ads can be placed. The ads in these spaces can take different forms, but one common and distinct type is **"web"** ads — which

refers to the ads that appear above, alongside or beneath the content on a publisher's webpage.

4. Unlike print, radio, and television advertising, where the purchase and sale of advertising space can be a tedious, manual process, web ad inventory is increasingly bought and sold "**programmatically**" in enormous volumes and at near instantaneous speeds through a series of automated auctions involving sophisticated software platforms (informally "**ad tech tools**"), collectively referred to as the "**ad tech stack**."

5. At a high-level, the ad tech stack is generally understood to be comprised of sell-side tools (i.e., "**publisher ad servers**"), used by publishers to manage their ad inventory and online advertising sales; buy-side tools (i.e., "**advertiser ad networks**" and "**demand-side platforms**"), used by advertisers to buy available ad space; and the tools that serve as the intermediary between the sell- and buy-side tools (i.e., "**ad exchanges**"), allowing publisher ad servers to offer available ad space and advertiser ad networks and demand-side platforms ("**DSPs**") to bid on that inventory through automated auctions.



6. Google is the largest provider of ad tech tools across the ad tech stack for web advertising in Canada, having positioned its products to be the "go to" tools used by both publishers and advertisers alike. Google is dominant in the publisher ad server, ad exchange and advertiser ad network markets in Canada. In the publisher ad server market, measured by web impressions transacted, Google's DoubleClick for Publishers ("**DFP**")[1] holds an over 90% market share. In the advertiser ad network market, Google Ads[2] commands an over 70% share. Google is also the largest provider of DSP and ad exchange services in Canada. In the DSP market, Google's Display & Video 360 ("**DV360**")[3] commands an over 60% share. In the ad exchange market, Google's AdX is the largest ad exchange with a market share of over 50% (the closest competing ad exchange has a 6% market share). No other single ad tech provider has Google's scale or reach across the ad tech stack, with over 200 billion Canadian web ad transactions flowing through its ad tech tools in 2022.

7. Google's near-total control of the ad tech stack is a function of premeditated design and conduct, rather than superior competitive performance or happenstance. Through a series of interrelated and interdependent actions, which have had cumulative and synergistic anti-competitive effects, Google has unlawfully tied together its different ad tech products, hamstrung rivals' ability to compete on the merits, and purposely restrained and deprecated innovative technologies that stood to threaten its market power. In particular, Google has:

a) made its advertiser ad network's unique, must-have advertiser demand (originating from its pre-existing relationship with advertisers that purchase search advertising) available only to its own ad exchange, and in turn, compelled publishers to use its publisher ad server in order to access that demand by means of real-

[1] Also sometimes referred to as "**DRX**".
[2] Also sometimes referred to as Google Display Network "**GDN**", Google Content Network "**GCN**" or AdWords.
[3] Also sometimes referred to as DoubleClick Bid Manager or "**DBM**".

time bids from its ad exchange. Put differently, Google has tied its different ad tech products (i.e., Google Ads, AdX, and DFP) together to increase and maintain its market dominance; and

b) used its dominant position across the ad tech stack to distort auction dynamics by (i) giving its own ad exchange preferential access to valuable ad inventory, (ii) taking negative margins to win more transactions, and (iii) dictating the terms on which its own publisher-customers could transact with rival ad exchanges.

8. By implementing these anti-competitive policies and practices, Google has been able to maintain, entrench and increase its market power by raising barriers to entry and expansion, suppressing innovation and excluding rivals, thus insulating itself from competition. Google's conduct has had serious consequences for publishers and advertisers — manifesting in a substantial prevention and lessening of competition, the magnitude, duration and scope of which is compounded by the economies of scale and network effects endemic to digital platforms. But for Google's conduct, publishers and advertisers would have benefitted from greater choice, more innovation and lower prices.

9. The Commissioner brings this application to put a decisive end to Google's structural dominance and anti-competitive practice, restore competition to important digital advertising markets, and safeguard against further harm to competition in the future. Absent an order from this Tribunal, Google will continue to engage in the anti-competitive practice and conduct that has facilitated its exercise of new or increased market power and preserved its existing market power. Google will thus be able to continue, unchecked, to reduce the rivalry between it and those competitors who remain in the relevant markets, as well as prevent new competition from materializing. Competition in the markets in question will continue to be substantially lessened and prevented, thereby raising costs, reducing choice, and stifling innovation, to the detriment of publishers, advertisers and Canadians more generally.

## II. MATERIAL FACTS

### A. THE PARTIES

10. The Commissioner is an officer appointed by the Governor in Council under section 7 of the Act and is responsible for the administration and enforcement of the Act.

11. Google LLC is a multinational limited liability company incorporated under the laws of the State of Delaware. It is a wholly owned subsidiary of Alphabet Inc., a publicly traded company also incorporated under the laws of the State of Delaware. Google LLC has a Canadian subsidiary, Google Canada Corporation, which is incorporated in the province of Nova Scotia and facilitates its business in Canada.

12. Google offers various internet-related services and products, including services and products used by online publishers and advertisers to buy and sell digital ads (i.e., ad tech tools). Google's offerings of ad tech tools are remarkably extensive, encompassing a range of software platforms that extend beyond the immediate focus of this application (e.g., Google AdMob, Google AdSense, and Google Marketing Platform).

13. This application focuses on three of Google's ad tech tools: its publisher ad server, DFP; its advertiser ad network, Google Ads; and its ad exchange, AdX. Taken together, these ad tech tools are essential elements of the ad tech stack and are tools that publishers and advertisers use to buy and sell web ads, described below, and the exchange on which the ads trade. Google markets these tools in Canada, North America, and globally.

14. In 2023, Google reported $307.4 billion USD in revenue, $31.3 billion USD of which was derived from its ad tech tools' revenue, which include DFP, Google Ads and AdX.

### B. INDUSTRY BACKGROUND

15. This application addresses Google's conduct that has harmed (and continues to harm) competition in the markets for ad tech tools used to programmatically buy and sell web ads through open channels (or "open web ads"). This section provides important background information to assist in understanding how Google's actions over the years have adversely affected competition. In particular, this section introduces several key concepts, including the differences between web ads and other forms of digital advertising; the contrast between advertising sold through closed channels and open channels; and the difference between buying and selling ads *via* direct deals versus programmatically.

16. For additional context, this section also provides a description of the three ad tech tools that are at issue in this application (i.e., publisher ad servers, ad exchanges and advertiser ad networks), with reference to the products offered by Google and its rivals, and describes how the sale of web ads has changed over time.

#### ***1. What is digital advertising?***

17. As consumers have shifted their attention from traditional to digital media, advertisers have responded by increasing their budgets for digital advertising. Beyond simply following their audience, advertisers embracing digital advertising have learned of its unique benefits. These benefits include more immediate engagement with consumers (e.g., allowing users to click on an ad and be redirected to the advertiser's website), highly specific audience targeting, and enhanced tracking that allows for quick adjustments based on real-time campaign performance. For most advertisers, digital advertising has become an essential part of any ad campaign, complementary to their non-digital or offline efforts.

18. For online publishers, digital advertising serves a different (albeit no less important) role. Like traditional publishers, online publishers can monetize their content by displaying ads to their audiences. For many online publishers, digital advertising represents a vital source of revenue for sustaining their operations and providing valuable content to their users. In some instances, it can be the difference between consumers being able to access freely available content and content locked behind paywalls.

***a) There are different types of digital ads***

19. Digital ads can be broadly categorized into the following main types:[4]

a) **Search ads**: are ads that are shown alongside search results from a user query using a general or specialized search engine;

b) **Web ads**: are ads that appear above, alongside or beneath the content of a webpage;

c) **In-stream video ads**: are video ads that play before or during online video content;

d) **In-app ads**: are ads that appear within a mobile app; and

e) **Social ads**: are ads that appear within a user's social media feed.

20. Each type of ad is meaningfully distinct from the others, from both the perspective of a publisher and advertiser. For publishers, the distinction can be as simple as the ad space being offered for sale based on the type of online content they produce. For example, a search engine (e.g., Google) can sell search ads linked to a certain word or phrase to appear as "sponsored" links at the top or side of search results; a publisher of online videos (e.g., a content creator on YouTube) can sell in-stream video ad space to play before, during, or after their online video content; an app developer (e.g., a gaming app like

[4] Ads that are not linked to a search are commonly referred to as "display ads".

Candy Crush) can sell in-app ad space to appear within their mobile app; a social media platform (e.g., Meta) can sell social ad space to appear within a user's social media feed; and a website publisher (e.g., a news publisher like the Toronto Star) can sell web ad space to appear alongside the content on its website.

21. For advertisers, the distinction might be owing to a myriad of reasons: e.g., the goals of their ad campaign, their target demographics, budget considerations, desired return on investment, key performance indicators, creative assets (i.e., the media elements of the ad), and the availability of specific ad tech tools.

22. Where they can, online advertisers typically run digital ad campaigns that incorporate a diverse array of digital ad formats. This allows them to leverage the strengths of each ad type, reach a broader audience, enhance brand engagement, and fulfill a broader variety of campaign objectives. In fact, for most advertisers, each of the different ad types are often considered to be important complements to their overall marketing strategies and are therefore often used together as part of a holistic effort to maximize advertising performance.

### *b) Our focus is on "web" ads*

23. Web ads are ads that internet users see when they visit a website. This subset of ads is comprised of banner ads (image or text-based ads appearing at the top, bottom, and down the sides of webpages) and outstream video ads (video ads shown outside a traditional video player, such as in a popup or embedded within a banner ad of an online article) shown on websites.[5]

24. Web ads, which often come in a set of predetermined formats and sizes, are distinguishable from other types of digital ads by the unique features of the associated creative assets and placement strategies. For example, web ads are

[5] Outstream ads are not embedded in other video content like in-stream video ads (e.g. an ad which plays on YouTube before or in the middle of a YouTube video).

typically recognizable by virtue of their eye-catching visuals, placements in high-visibility areas, and standardized sizing. An example of a web ad as it would appear to a reader of an online publication is included below:




25. An advertiser might choose web ads as part of their marketing campaign as a complement to other digital ad formats for several reasons. The characteristics of web ads make them particularly good for raising brand awareness, increasing reach (i.e., the number of people who see the ad) and getting user engagement (*via* clickable links). Web ads often accomplish this at a lower cost than other types of digital ads and are more amenable to integration or placement across multiple websites.

26. Google and other market participants, including publishers and advertisers, track the sale of web ads as a distinct inventory category in the ordinary course. The underlying technological requirements for serving web ads are distinct from other types of digital advertising, as is the competitive landscape for the

provision of ad tech tools. For example, unlike web ads, in-app ads are often served using what are known as software develop kits ("**SDKs**"), and Google (Google AdMob) and other market participants offer tools specifically designed to sell in-apps ads.

### *2. Marketing channels for web advertising*

#### *a) Our focus is on web ads traded through open channels*

27. The way advertisers buy digital ad space depends on how a publisher chooses to sell its inventory: through closed channels or open channels.

28. "Closed channel" publishers, often referred to as "walled gardens", are so-called because advertising on their properties is sold directly to advertisers through their own systems. Typically, advertising inventory on large social media platforms (e.g., Meta, LinkedIn, and TikTok) can only be bought and sold through their own integrated, internally supplied advertising software. These tools cannot be used to buy or sell advertising on any other publisher's platform or website.

29. In contrast, "open channel" publishers monetize their ad inventory through third-party ad tech tools — i.e., software they do not own themselves. This model, which most online publishers use, allows publishers to avoid developing their own tools or otherwise arduously managing their ad inventory, which for all but the largest publishers would be impractical. For advertisers, buying ad inventory through open channels affords a diverse range of ad space across various websites, and is therefore an important source of ad inventory for campaign strategies not tied to a single website or platform (e.g., ad campaigns that extend beyond the walls of Facebook).

### *b) Our focus is on open web ads traded programmatically*

30. Publishers and advertisers have two primary options for buying and selling digital ad inventory: direct deals and programmatic trading. Direct deals involve negotiating agreements directly for the purchase of ad inventory on the publishers' websites. These agreements typically cover key elements such as campaign start and end dates, ad types, frequency, rates, and fees. Direct deals are typically more resource intensive for both advertisers and publishers in that they require, among other things, sales teams and administrative support. Direct deals are more commonly used for large volumes of inventory, making them suitable for publishers of websites that have large audiences, a particular brand image, or that attract an audience specifically targeted by advertisers.

31. Almost no publisher (big or small) can practicably sell their entire ad inventory *via* pre-negotiated direct deals. Remaining inventory (i.e., ad space not allocated to an advertiser by way of a direct deal) is usually bought and sold indirectly — through a set of automated processes designed to buy and sell ad inventory on an impression-by-impression basis. Indirect transactions happen during the split seconds when a user loads a website and typically occur through high-speed auctions (known as "programmatic" trading) facilitated by ad tech tools.

32. While most programmatic ad sales take place in an auction setting, some transactions are the result of ad tech tools automating the terms of negotiated direct deals. Referred to as programmatic guaranteed sales, this manner of buying and selling ads allows advertisers to maintain greater control and more effectively target specific audiences, while publishers benefit from filling premium inventory at negotiated prices.

### 3. *The ad tech tools used to buy and sell open web ads programmatically*

#### a) *Publisher ad servers*

33. Web publishers wanting to monetize their websites use software known as a "publisher ad server" to manage and track the sale of their ad inventory across different demand sources (e.g., ad exchanges) and transaction types (e.g., direct and indirect deals). Publisher ad servers connect publishers to the broader ad tech stack and most importantly make real-time decisions about what ads to show on their websites. From the publisher perspective, a publisher ad server would typically allow the publisher to set rules, including regarding what ad will be served on its site, as well as regarding through which exchanges (i.e., marketplaces) their ad space would be offered for sale.

34. In addition to their core function (managing ad inventory in real-time), publisher ad servers offer valuable monitoring and reporting features to help publishers track their monetization performance through metrics such as impressions, clicks, and payout rates.

35. Most publishers opt to use a single publisher ad server to manage their web inventory (referred to as "single homing"). This, in part, simplifies the sale (and coordination) of inventory across multiple websites and demand sources, reduces training time for sales teams, and lessens the technical and resource-intensive integration demands associated with publisher ad servers.

36. Switching between publisher ad servers is time-consuming and burdensome. This is for several reasons, including the technical complexity of integrating a new publisher ad server with a publisher's webpages and back-end billing systems; the financial implications of migration (including potential downtime and new software licenses); the need to invest in training of staff on new software; and, challenges in transferring historical data and ensuring continuity in reporting. Internally, Google describes publisher ad servers as "sticky".

37. Publisher ad servers for programmatic open web advertising in Canada include Google's DFP, Equativ, Monetize (Microsoft) and Kevel. As of 2022, Google's market share of the publisher ad server market exceeded 90% of web impressions for Canadian publishers.

### *b) Advertiser buying tools*

38. Advertisers wanting to buy web ad inventory from publishers programmatically use software products known as advertiser ad networks, or products known as DSPs. Both tools can be used by advertisers to transact in the ad tech stack and buy ads programmatically in "real-time" (i.e., per impression). That said, there are important differences between advertiser ad networks and DSPs.

39. Advertiser ad networks typically offer a more automated (less complex) ad buying experience for advertisers who either lack the technical proficiency or resources to utilize more complex tools (i.e., DSPs) or simply want a more "hands-off" solution. Smaller advertisers tend to use advertiser ad networks exclusively.

40. Some larger advertisers might also (or alternatively) use enterprise buying tools known as DSPs. Compared to the self-serve advertiser ad networks used by smaller advertisers, DSPs provide advertisers with a wider array of user targeting options (i.e., technically advanced and highly customizable features) that can require significant technical expertise to manage effectively. Unlike advertiser ad networks, DSPs often require advertisers to commit to a minimum monthly spend.

41. Examples of advertiser ad networks for programmatic open web advertising include Google Ads and Criteo, and examples of DSPs for programmatic open web advertising include Google's DV360 and The Trade Desk. In 2022, based on web impressions shown to Canadian users, Google Ads' share of the advertiser ad network market was at least 70% and DV360's share of the DSP market was 60%.

### c) *Ad exchanges*

42. Ad exchanges (also referred to as supply-side platforms or "**SSPs**") are the software intermediaries that run real-time auctions for web ad inventory in response to bid requests received from publisher ad servers. To that end, ad exchanges stand between publisher ad servers and advertiser buying tools, serving as the digital auction-driven marketplace where advertisers can bid in real-time on ad inventory made available by publishers.

43. In addition to their marketplace function, ad exchanges also permit some degree of control to both publishers and advertisers: publishers can set price floors for their inventory and manage which advertisers are allowed to purchase the inventory; and advertisers can target particular publisher and consumer characteristics at a specific per-impression price.

44. A key feature of an ad exchange is that it facilitates real-time auctions (known as real-time bidding or "**RTB**"). RTB involves buying and selling ad inventory in real-time, on a per-impression basis and at a variable price. RTB allows for faster and more efficient buying by advertisers. RTB makes it possible to leverage real-time user data in the auction process, allowing advertisers to have more control over when, where and to whom an ad is shown. This increases the efficiency of an advertiser's ad spend and return on investment. For publishers, RTB can increase the value of their ad inventory, improve their sell-through rate and generate more revenue.

45. Many publishers connect with multiple ad exchanges through their publisher ad server, and advertisers typically value advertiser ad networks and DSPs that can connect to (or bid into) as many ad exchanges as possible. Publishers and advertisers that are limited in their ability to connect with or benefit from interoperability between multiple ad tech tools are disadvantaged.

46. Examples of ad exchanges for programmatic open web advertising include Google's AdX, Magnite, Index Exchange, and PubMatic. As of 2022, Google's

market share of the ad exchange market was over 50% of web impressions shown to Canadian users, roughly 6 times that of its next closest ad exchange competitor.

### *4. Understanding the mechanics of a programmatic auction*

47. Website publishers use the ad tech stack to programmatically sell their remaining (i.e., unsold through direct sales) ad inventory, while advertisers depend on the same stack to buy it. The exact ad tech tools and steps involved in any given programmatic trade of web ads can differ from one transaction to another. Alongside the previously mentioned ad tech tools, publishers and advertisers might also choose to use other ancillary tools such as data management platforms, creative management platforms, ad verification tools, attribution tools, to name a few. That said, and despite the idiosyncrasies of any particular trade, the basic steps in the programmatic trading of web ads involve, minimally, the engagement of a publisher ad server, one or more ad exchanges, and one or more advertiser buying tools (i.e., advertiser ad networks and DSPs), as depicted in the simplified illustration below:




48. The process begins when a user visits a webpage where there is web ad inventory available to be filled. The user's visit causes the webpage to load the publisher ad server's "tag" which triggers the publisher ad server to identify the

user and route any available web ad space on the webpage to one or more pre-selected ad exchanges (an "**ad request**"). An ad request generally contains information about the ad inventory (e.g., what size or format the inventory is, or what type of page is being viewed) and any information that the publisher might have about the user who is visiting the webpage.

49. On receipt of an ad request, the ad exchange will send its own request to any and all ad buying tools (e.g., advertiser ad networks and DSPs) qualified to bid on the inventory, soliciting them to return a bid for the space (a "**bid request**"). As part of its bid request, the ad exchange will include information about the ad space (e.g., size, location), the page address, and any additional information available about the user visiting the webpage.

50. Each buying tool that receives a bid request will undertake an automated process of assessing potential bid responses based on pre-configured parameters set by its advertiser users. Once the tool identifies which of its advertisers is willing to pay the most for the impression, it will return the bid back to the ad exchange (a "**bid response**").

51. Each ad exchange then evaluates all of the bid responses it receives against eligibility criteria set by the publisher, holds an auction in real-time to select the highest eligible bid response received, picks the winning bid, and then returns it to the publisher ad server. The publisher ad server picks a winning bid and sends the ad creative to the publisher's webpage to be displayed to the user.

52. At each step of the process, the different ad tech tools deduct from advertiser bids the fees associated with using the ad tech tool. By the time the winning ad is served (displayed) to the user, the publisher receives the value of the winning bid less fees paid to each ad tech intermediary used to facilitate the transaction. Advertiser ad network, DSP and ad exchange fees are often based on a percentage of the price of the winning bid and are referred to as the "revenue share" or "take rate", which is only charged if the advertiser wins the

impression. Publisher ad servers generally offer publishers licence-based pricing, or charge a fee based on impressions served.

53. The entire process happens in a fraction of a second, without the user's knowledge and before the webpage loads.

### *a) Evolution of the auction process: a brief overview*

54. In the earliest inceptions of the auction process, publishers used their publisher ad servers to sell ad inventory by requesting bids from ad exchanges or other demand sources sequentially, one at a time — a process called a "waterfall". When an impression became available, the publisher ad server would call the first ad exchange in the waterfall to solicit bids from advertisers on that exchange. If no bid from an advertiser on that exchange met the publisher's price floor (i.e., the minimum price the publisher was willing to accept) the publisher ad server would then proceed to the next exchange. This cycle would continue until either a qualifying bid was found or all the sequenced exchanges had been canvassed. If, at some point, the publisher ad server received a bid matching or exceeding the publisher's floor price, the waterfall process would end.

55. Typically, publishers sequenced demand sources in the waterfall based on a measure of the ad exchange's past performance and payment (i.e., historical average price offered for impressions by the exchange). So, for example, if a particular ad exchange historically generated a higher average price for impressions, it would be given priority in the waterfall ahead of the ad exchanges that historically generated a lower average price for impressions.

56. The waterfall process was inefficient and could result in a publisher receiving less for a given impression than the market was willing to pay. In particular, it was possible for an ad exchange called by the publisher ad server to win the available inventory based on its historical pricing, even though another ad exchange further down the waterfall would have been able to offer a higher

price for the same ad space. By way of example, the illustration below depicts that the ad exchange with the highest bid (ad exchange 4) was never called, resulting in the publisher missing out on an additional $0.70 in revenue:




57. When Google relaunched AdX in 2009 (internally referred to as "AdX 2.0"), it introduced Dynamic Allocation, which allowed AdX (and only AdX) to bypass competition in the waterfall process by giving AdX a right of first refusal (or "First Look") ahead of all other ad exchanges in the waterfall.[6] In other words, Google gave its own ad exchange preferential treatment whereby it would always be first in line, regardless of where it would have ranked based on the price it historically generated relative to other ad exchanges. Therefore, even if under the old waterfall process AdX would have ranked *lower* than one or more other ad exchanges, with Dynamic Allocation, as gatekeeper, Google moved AdX to the front of the line. That meant that AdX could (and did) win impressions that without First Look it would have lost. AdX (and Google's) gain was other ad exchanges' loss.

[6] In 2014, Google launched "Enhanced Dynamic Allocation", a new version of Dynamic Allocation with additional functionalities. Despite this change, Google's advantageous First Look remained a defining feature of Enhanced Dynamic Allocation.

58. Partly to circumvent Google's restrictions (i.e., Dynamic Allocation/ First Look advantage) and to generate real-time competition among multiple demand sources, in or around 2015, publishers began adopting a technology called "header bidding." Header bidding allowed ad exchanges to compete against each other at the same time (in real-time), as opposed to being relegated to a waterfall and/ or subjected to Google's First Look advantage.

59. In technical terms, header bidding worked by publishers inserting a piece of JavaScript code into the header sections of their website. As soon as a user visited the website, the JavaScript code would route the website's ad space to a publisher-selected set of ad exchanges simultaneously, *before* Google's publisher ad server initiated the waterfall process (with Google's First Look advantage).

60. In practice, header bidding worked as follows: an internet user would click on and begin to load a publisher's website and, as the page was loading, the user's browser would send out bid requests to pre-selected ad exchanges, which would submit real-time bids in return. The browser would then select the best bid from among those made and send it to the publisher's ad server for consideration.

61. Adoption of header bidding by publishers was widespread and swift. By 2016 publishers were reporting 20-40% increases in revenue because of header bidding. Google employees themselves recognized the competitive significance and threat that header bidding represented: "[h]eader tag and [h]eader [w]rapper technology and adoption has grown rapidly in the past 12 months, representing an existential threat to our business, and necessitating a response that maintains DRX's "[m]ust [c]all" status in the ecosystem".

62. When header bidding emerged, Google's First Look advantage under Dynamic Allocation was, in effect, transformed into a "Last Look" advantage. Under Last Look, AdX was able to use the winning bid from the header bidding auction as a floor price in its own auction, effectively enabling it to compete against other

exchanges and secure impressions after rival bids from those other exchanges had already been submitted (i.e., AdX had the opportunity to bid on inventory after having full access to the bids submitted by rivals through the header bidding auction). Thus, while header bidding expanded competition somewhat, it did not undo the competitive advantage that Google had created for AdX (and itself) with Dynamic Allocation. In short, AdX continued to enjoy a preferred position, albeit via Last Look, rather than First Look.

63. With its widespread adoption by publishers, Google saw header bidding as an "existential threat" to its businesses — despite its Last Look advantage. Google responded in 2018 by co-opting header bidding technology and introducing its Open Bidding (also referred to as Exchange Bidding) product as a header bidding alternative. Open Bidding incorporated aspects of header bidding (e.g., allowing pre-approved rival ad exchanges to bid simultaneously for ad inventory), and removed Google's Last Look advantage, but only for ad exchanges that used Google's Open Bidding product, not for those that continued to use conventional header bidding. This meant that only rival ad exchanges using Open Bidding could compete simultaneously alongside AdX, but those that chose to use header bidding would continue to be subject to Last Look.

64. Bids from rival ad exchanges that opted to participate in Open Bidding were (and are) subject to a 5% fee for web ads, borne by the publisher. That same fee is not levied against AdX bids. This means that, to be competitive, bids from rival ad exchanges must be 5% higher than bids from AdX, all else being equal. For example, a bid from an advertiser using an ad exchange other than AdX who was willing to pay $1.00 for an impression, would lose to a bid from an advertiser using AdX who bid 96 cents for that same impression. In other words, the impression would be won by an advertiser who valued that impression less, because of the fee imposed by Google.

65. In 2019, Google removed its Last Look advantage in response to competition/regulatory concerns. Simultaneously with giving up its Last Look advantage, Google launched its Unified First Price Auction ("**UFPA**"). Prior to 2019, all AdX auctions were run as second-price auctions, whereby the highest bidder would win the auction but only pay one cent more than the higher of the second-highest bidder's bid or the publisher's reserve (floor) price. Under UFPA, AdX auctions are run as first-price auctions where the highest bid pays the price of its bid. With the knowledge that this would be a welcomed (and long-overdue) change from the perspective of market participants, Google took the opportunity to simultaneously push through other changes to its ad tech products. Chief among them was the introduction of Unified Pricing Rules ("**UPR**"), which prohibited publishers from setting different floor prices for different ad exchanges. Prior to UPR, publishers would often set higher price floors for AdX than other ad exchanges, in order to, among other things, reduce their dependence on AdX. This led to rival exchanges winning more impressions. Under UPR, Google's AdX would be guaranteed to receive a floor price no higher than any other ad exchange being called. Publishers thus became more dependent on AdX and rival exchanges lost opportunities to win more impressions.

66. The size and scale of AdX increases the value of the platform to advertisers and publishers, relative to other ad exchanges. By implementing programs intended to advantage AdX, while disadvantaging its rivals, Google ensured that AdX was able to maintain its scale advantage. Predictably, these programs created "network effects", where the increased number of people or participants making use of a digital platform increases its value to users on both sides of the platform. As discussed below, very few publishers and advertisers could afford not to rely on Google's ad tech tools.

### *b) Network effects in ad tech*

67. One of the core characteristics of ad tech, like other platforms that connect buyers and sellers, is the presence of network effects. Network effects occur where a user's value of a given platform depends on the number of other users on the platform. Network effects can be either positive or negative, direct or indirect.

68. Network effects are positive when additional users of a platform bring a positive benefit to existing users. This occurs, for example, in a social network platform such as Meta. In this instance, users value being able to access the posts of other users such that the more users there are, the more content and connections that a person can initiate and experience. Network effects are negative when additional users of a platform reduce the benefit of the platform to existing users. This may occur, for example, in the case of dating or employment platforms where users looking for a good match (in mates or jobs) find it harder when other users similar to them join the platform and compete for these matches.

69. Network effects are direct when the effect occurs among users on the same side of a platform. Both examples provided above are examples of direct network effects; positive for the case of a social media platform and negative for the case of a dating (or job matching) platform. Network effects are indirect when the effect occurs among users on different sides of the platform. This occurs, for example, in an ad exchange that connects advertisers with website publishers. In this instance, advertisers value the ad exchange more as the number of publishers selling inventory on the ad exchange increases. More inventory makes it more likely that an advertiser will find opportunities to serve its ads to viewers who are disposed to purchasing its products or services. Similarly, publishers value the ad exchange increasingly as the number of advertisers that are looking to buy advertising space on websites increases. As the number of

advertisers increases, demand for a publisher's inventory is likely to increase and prices for that inventory are likely to be bid up.

70. The existence of positive network effects makes it important for a digital platform to grow its number of users as this increases the value of the platform for its customers. In addition to increasing its absolute number of users, from a competitive perspective, network effects also make it highly desirable for a platform to be larger (i.e., have more users) than rival platforms. Everything else equal, greater size relative to rivals means that a platform will more likely be chosen by users since the largest platform brings the most benefits. Because of the importance of scale (absolute and relative), an important objective for a platform is to grow by both: (i) encouraging new customers to adopt it over rivals, and (ii) inducing users of rival platforms to switch.

71. The significance of network effects (both direct and indirect) on a platform can be reduced if users on one or both sides are able to "multi-home". Users multi-home when they use multiple platforms rather than just one. For this to be the case, the cost[7] to the user of moving from one platform to another must be low. The ability to move seamlessly across platforms allows a user to benefit from the network effects created by all platforms. (e.g., all riders and drivers on all ride sharing apps being able to move without cost from one platform to another). In this instance, the user can experience network effects at the market level, i.e., each user can benefit from all users who are using platforms collectively, rather than those on any one platform. In competition among platforms, all else being equal, platforms of smaller relative size value having their users be able to multi-home or interoperate with larger platforms as this diminishes the competitive disadvantage they face from their smaller size. Conversely, platforms of larger relative size benefit from preventing

[7] In this context, costs include financial expenditures as well as the time and effort of the user to use more than one platform.

interoperability since this allows them to experience the competitive benefits from their larger size.

72. Of particular importance to digital platforms is the collection of data from internet users, such as their past browsing behaviour, their demographic information and their interests. More users generate more data, which enables digital platforms to offer better customer targeting as well as better optimize their algorithms to improve the quality of their products. This creates a flywheel effect, where more users lead to more data, which leads to better performance, which in turn attracts more users through network effects.

73. In addition to higher user value through network effects, a platform with more users also benefits from economies of scale. It is typical for digital platforms to face high fixed costs and low marginal costs. Fixed costs include things such as the costs to set-up the platform, write computer code for algorithms and invest in digital infrastructure. Marginal costs are the incremental costs to a platform to serve one additional customer or complete one extra transaction. Given this cost structure, a platform has incentives to increase its number of users as this lowers its average costs. The combination of lower average costs and higher user value from positive network effects gives greater scope for a platform to earn greater profits. If these two effects are of sufficient magnitude, absent the ability of users to multi-home, over time markets can "tip", such that a single platform comes to dominate the market. In such an instance, competition among platforms is time limited, with the market in time becoming dominated by one platform, with the attendant substantial negative effects on competition.

74. As discussed below, the effects of Google's practice of anti-competitive acts are exacerbated by network effects, which serve to raise barriers to entry and fortify Google's dominance.

## III. GOOGLE'S ABUSE OF ITS DOMINANT POSITION IN AD TECH MARKETS

75. Google is the largest provider of ad tech across the entire ad tech stack. No other provider has comparable scale or reach. Google has substantial market power in the publisher ad server, ad exchange and advertiser ad network markets for open web advertising in Canada, with an estimated 90%+, 50%+ and 70%+ market share (as measured by impressions transacted) in Canada, respectively. In the comparatively "less" concentrated ad exchange and DSP markets, Google still holds a 50%+ share and a 60%+ share respectively, and its next closest rivals are only a fraction of Google's size.

76. Google's dominance in each market is exacerbated by the different markets' interconnectedness within the ad tech ecosystem, and the compounding effects of scale and network effects. In other words, Google's substantial market power in each relevant market is mutually reinforcing of its position across the other ad tech markets, such that its power in any given market is stronger than if it were only dominant in a single market.

77. Google's market position is not simply due to superior products or competition on the merits; instead, it stems from years of deliberate and purposefully opaque actions, designed to seize control of the essential ad tech tools used by publishers and advertisers. Moreover, Google's dominant positions across the ad tech stack over time have allowed it, and continue to allow it to gather huge amounts of enormously valuable data, which provide it with a significant competitive advantage over rivals and potential rivals.

78. Through its conduct, Google has positioned itself at the centre of the ad tech ecosystem and used its control across the ad tech stack to unlawfully leverage its market power with one product to strengthen its position with its others, creating a self-reinforcing cycle of dominance. Specifically, Google has engaged in conduct that reduces demand (i.e., advertiser spend) and supply (i.e.,

publisher ad inventory) for rival ad tech products, thereby limiting the competitiveness of its rivals and the likelihood of entry of new ones.

79. There is no legitimate justification for Google's conduct. Yet the harm of Google's conduct is clear: competition on the merits is reduced, publishers earn less, advertisers pay more, and Canadians are likely faced with higher subscription fees and lower quality content.

## A. The Relevant Markets

80. Market definition is a tool for analyzing competition concerns. This can include helping to identify any market power a firm might have or exercise over a product or range of products, as well as the real or potential effects of any exclusionary conduct. To accomplish this, market definition involves assessing whether (in an otherwise competitive environment) a firm is constrained by its competitors or potential competitors, because consumers can switch to alternative products.

81. This application implicates three relevant product markets relating to the sale of programmatic open web advertising: publisher ad servers, advertiser ad networks, and ad exchanges. Canada, or alternatively North America or the world, is the relevant geographic market for all three product markets. For each of these products, there are no reasonable alternatives that could impose a competitive constraint on a hypothetical monopolist in response to a small but significant and non-transitory increase in price (or degradation of quality) above competitive levels.

### *1. Programmatic open web display advertising properly defines the boundaries of the relevant product markets*

82. Web ads traded programmatically through open channels are an important and distinct form of advertising for publishers and advertisers. For the reasons described above at paragraphs 20-22, publishers and advertisers that rely on

programmatic open web advertising are limited in their ability to switch away to other forms of advertising. They are therefore limited to using ad tech products that are capable of transacting programmatic open web ads, and cannot readily substitute to products that lack that functionality.

83. For publishers seeking to monetize their web content, tools for buying and selling non-web ad space or ad space in walled gardens are not substitutable products. For example, ad tech tools designed to only sell and serve in-stream video ads or in-app ads, cannot be used as alternatives for publishers to serve web ads on their websites (regardless of whether web ads tools became no longer available or unreasonably priced). Similarly, proprietary tools for selling and serving ad space in walled gardens, like Facebook, are also not alternatives.

84. For advertisers, different types of digital ads are complements. Advertisers typically adopt a multi-channel approach when incorporating digital advertising into their campaigns. Each type of ad (e.g., search ad, web ad, in-stream video ad, in-app ad, social ad) serves distinct purposes and targets audiences in various contexts, making them complementary rather than substitutable. For example, web ads are particularly effective for raising brand awareness, increasing reach (i.e., the number of people who see the ad) and getting user engagement (via clickable links), often at a lower cost than other types of digital ads. Alternatively, in-stream video ads are more costly than web ads but tend to be more effective at capturing a viewer's attention; in-app ads are particularly relevant to gaming and at driving app downloads; search ads are ideal for reaching users who are already searching for a product or service; and social ads allow for two-way communication and engagement between businesses and their audiences. While they contribute significantly to an overall campaign, web ads are not readily substitutable for other formats as each brings unique strengths that enhance an overall marketing strategy. For advertisers looking to incorporate web ads into their campaign, ad tech tools not designed to transact webs ads are not a viable alternative.

85. Considering the foregoing, it follows that only ad tech tools that support trading web ads are viable alternatives for publishers or advertisers wanting to buy and sell web ads through open channels. Similarly, sales of non-web ads on ad tech tools that transact other ad formats, in addition to web ads, are excluded from the markets for the above-mentioned reasons.

### *2. Publisher ad servers are a relevant product market*

86. Publisher ad servers used in the programmatic sale of web ads through open channels are a relevant product market for purposes of this application (hereafter, the "**Publisher Ad Server market**"). Google offers DFP as a product in this market.

87. Publisher ad servers serve a unique and important function for open channel web publishers: they are the primary means by which publishers manage, sell and track their ad inventory. Publishers use publisher ad servers to select ads to fill their inventory spaces in real-time. The evaluation and decision-making functions of publisher ad servers (sometimes referred to as the "decision engine") allow publishers to automate and manage their direct and programmatic ad sales. For the latter, the publisher ad server is responsible for sending ad requests to various ad exchanges, receiving back bids, and comparing those bids to decide which ad to serve the website user.

88. Publisher ad servers also typically (and uniquely) have functionality that allows publishers to collect and use targeting information, engage in inventory forecasting, and track ad performance and monetization across multiple exchanges.

89. Other ad tech tools (e.g., publisher ad networks and header bidding) are not reasonable substitutes for publisher ad servers as they do not offer the same functionality, and, to a significant degree, serve different needs for publishers. A sole profit-maximizing publisher ad server seller (i.e., a hypothetical monopolist) could profitably impose and sustain a small but significant and

non-transitory increase in price above competitive levels (or degradation in service) in the sale or supply of publisher ad server services.

90. Since 2019, Google has degraded the functionality of its publisher ad server, DFP, by adopting UPR and prohibiting publishers from setting different floor prices for different ad exchanges. Despite significant protest by publishers over the imposed change, Google's publisher ad server has continued to maintain a market share of more than 90%.

91. Google, and industry participants consider publisher ad servers to be differentiated products from other ad tech tools. For example, DFP is marketed by Google as being separate and distinct from its publisher ad network offering, Google AdSense. Though Google introduced Google Ad Manager ("**GAM**") in 2018, which contains both its DFP and AdX products, it still internally identifies its publisher ad server as a separate product and prices the DFP component of GAM separately.

92. Publisher ad servers are designed as a single service to organize and manage a publisher's entire advertising inventory. Owing to practicality and operational efficiency, publishers generally only use one publisher ad server at a time and rarely incur the high costs to switch from one to another due to engineering integration costs and significant disruptions caused by switching. In-house alternatives to publisher ad servers are equally not feasible options for most publishers because of the associated costs and technological requirements.

### *3. Advertiser ad networks are a relevant product market*

93. Advertiser ad networks used in the programmatic buying of web ads through open channels are another relevant product market for the purpose of this application (hereafter, the "**Advertiser Ad Network market**"). Google offers Google Ads as a product in this market.

94. Advertiser ad networks are simple ad tech buying tools used by advertisers to buy available ad inventory. They serve to aggregate ad inventory (i.e., available ad inventory) from various supply-side sources, and provide advertisers with a means of automating their bidding on the inventory (based on terms set by the advertiser, such as targeting, budget, etc.) as it becomes available.

95. Compared to other ad buying tools (e.g., DSPs), advertiser ad networks generally provide a more easy-to-use, turnkey or automated experience. This distinction is reflected in their different cost-structures, with advertiser ad networks typically charging advertisers on a cost-per-click ("**CPC**") basis rather than on a cost-per-mille ("**CPM**" or cost per thousand impressions) basis. Consequently, advertiser ad networks are most often the exclusive ad buying tool used by smaller, less-sophisticated advertisers who, for example, might have less technical expertise and/or a smaller advertising budget. For larger advertisers, advertiser ad networks are a distinct and complementary ad buying tool (often used in conjunction with DSPs).

96. Many advertisers that use advertiser ad networks as their ad buying tool for web advertising are limited in their ability to switch to alternative ad tech products. DSPs, the other major ad buying tool, require buyers to directly manage their ad campaigns using complex interfaces, often require buyers to use their own proprietary data to bid effectively on inventory, and can require minimum monthly spend levels. This makes these tools not reasonably accessible to smaller and less-sophisticated advertisers.

97. A sole profit-maximizing seller could profitably impose and sustain a small but significant and non-transitory increase in price (or degradation in service) above competitive levels in the sale or supply of the services provided by advertiser ad networks. In 2014, Google experimented with increasing Google Ads' fee from 14 to 15% (a 7% increase[8]) and found that this would increase Google

[8] $[(15 - 14) \div 14] \times 100 = 7$

Ads' profit by 5.3%. Google then implemented this price increase. And in 2018, Google performed simulations that altered Google Ads' fee and found that it could profitably increase its take rate from 15% up to 20% (a 33% increase). However, it ultimately decided not to impose the increase due to reputational and legal concerns.

98. To the detriment of its advertiser customers, Google, through Google Ads, has severely restricted advertisers' ability to bid on third party ad exchanges (i.e., ad exchanges other than AdX), where they could access additional publisher inventory. In fact, until 2016, Google Ads routed its advertisers' bids *only* to AdX and today 85% of the ad impressions it purchases on behalf of advertisers, are purchased through AdX. In short, Google has deliberately curtailed the functionality of Google Ads (to the benefit of AdX) by restricting the publisher inventory available for its advertisers to bid on. In spite of this, Google has been able to maintain its "captive" advertiser base without a significant number of advertisers substituting away to other products.

99. Google recognizes advertiser ad networks as a distinct product market as compared to other ad tech tools (e.g., DSPs), with distinct competitors. In marketing its Google Ads and DV360 products, Google notes that the two tools "serve distinctly different customer sets". In describing the distinct customer segmentation of its ad buying tools, Google describes Google Ads users as "[t]ypically smaller and mid-sized marketers who are able to satisfy their display needs with a simple, low-touch solution with minimal customization" and DV360 users as "[l]arge display buyers interested in consolidating their display buying across channels and deploying a strategy with a single view of a customer".

### *4. Ad Exchanges are a relevant product market*

100. Ad exchanges used in the programmatic trading of web ads through open channels are another relevant product market for the purpose of this application.

(hereafter, the "**Ad Exchange market**") Google offers AdX as a product in this market.

101. Ad exchanges are the ad tech products that facilitate the programmatic selling of ad inventory by connecting publisher ad servers with demand sources, including advertiser ad networks. Ad exchanges provide publishers with a way to offer their ad inventory for sale to a large number of advertisers in real-time (impression by impression), and in so doing access real-time bids from multiple demand sources. Similarly, ad exchanges provide advertisers (through their buying tools) with real-time access to a large supply of ad inventory on which they can bid.

102. Within the ad tech stack, the ad exchange is *the* intermediary layer between publishers and advertisers (i.e., the trading platform) for indirect ad sales. A sole profit-maximizing seller could profitably impose and sustain a small but significant and non-transitory increase in price (or degradation in service) above competitive levels in the sale or supply of ad exchange services.

103. Google's AdX has been able to charge a take rate of 20%, which it recognizes as being significantly above competitive levels (reflecting the lack of reasonable substitutes). Google has characterized its take rates, which have been at or around the same level since 2012, as being "not long term defensible" and "double the price" as compared with competitors.

104. While there are some limited ways in which publisher ad servers can connect directly with advertiser buying tools (ostensibly obviating the need for an ad exchange), these mechanisms are limited in nature and not reasonable alternatives to the functionality offered by ad exchanges.

105. Direct deals between publishers and advertisers are not a reasonable alternative to indirect programmatic sales. Publishers and advertisers cannot reasonably substitute away from ad exchanges by increasing their reliance on direct deals. Publishers and advertisers view direct deals as complements to auction-based

programmatic sales. Direct deals require significant resources from all parties to negotiate agreements and are therefore used by larger publishers and advertisers mainly for high-volume or high-value impressions. Moreover, it is impractical for publishers to sell all of their ad inventory directly, without the use of programmatic auctions (which rely on ad exchanges).

106. Google, and industry participants consider ad exchanges to be differentiated products from other ad tech tools.

***5. The relevant geographic market is Canada, North America, or global***

107. The relevant geographic market for the purpose of this application is Canada, or in the alternative North America, or in the further alternative, the world. Google is dominant under any approach to geographic market.

108. Indicia of a Canadian specific market include the following. First, ad tech tools operating within Canada are subject to Canadian regulatory requirements, including language, privacy and data sharing laws. These requirements are reflected in the tools themselves, which have been developed to enable full compliance with Canadian laws. Second, a successful ad tech firm requires the ability to market its products and services to its customers. To meet the unique needs of their Canadian customers, ad tech providers must have access to Canadian inventory and targeting data. Google and other market participants employ Canadian sales teams, track Canada-specific performance and sales targets, and compete based on unique competitive dynamics in the Canadian market.

109. A sole profit-maximizing seller of the relevant products (i.e., publisher ad servers, advertiser ad networks, or ad exchanges) to customers in Canada could profitably impose and sustain a small but significant and non-transitory increase in price (or degradation in service) above competitive levels, and would not be

constrained by prices charged by ad tech tools available only to customers located outside of Canada.

110. For publisher ad servers, Google can charge different prices to publishers located in different countries, including in Canada. And for advertiser ad networks and ad exchanges, Google can dynamically adjust the fees collected by its Google Ads and AdX products across publishers. This ability to charge different prices to different customers without constraint implies that Google, or a hypothetical monopolist, could likewise charge supra-competitive prices within a more limited geographic region (i.e., Canada).

111. Certain elements of the relevant products suggest a geographic market that is global, excluding countries and regions where the competitive dynamics are materially different because of laws, sanctions, or other similar factors (e.g., China, North Korea, Russia). Publishers and advertiser users of ad tech are in countries around the world and transact across national and regional boundaries. Publishers can use ad tech to sell ad inventory around the world and advertisers can use ad tech to buy impressions around the world.

112. The main ad tech providers in each relevant product market are present in multiple geographic regions, and benefit from network effects and scale that are not limited to any one country or region. Many of these providers, including Google, report on their ad tech performance metrics across regions broader than a single-country (e.g., North America, Europe and Asia-Pacific).

### B. Google Substantially or Completely Controls the Publisher Ad Server, Ad Exchange and Advertiser Ad Network Markets

113. By any measure, Google is the largest provider of ad tech services across the entirety of the ad tech stack, and has a substantial degree of market power in the Publisher Ad Server, Ad Exchange and Advertiser Ad Network markets. Indeed, Google's pervasive and persistent market power has enabled it to

implement programs and policies that have distorted competition within the relevant markets by, among other things: steering users to its own ad tech tools through an improper tie; impeding its customers from working with rivals; and, otherwise denying rivals scale necessary to compete effectively.

114. Google's dominance in each market is exacerbated by the different markets' interconnectedness within the ad tech ecosystem, and the compounding effects of scale and network effects. In other words, Google's substantial market power in each relevant market is mutually reinforcing of its position across the other ad tech markets, such that its power in any given market is stronger than if it were only dominant in a single market.

115. To date, Google's ability to exercise its market power has not been meaningfully constrained by either existing or potential competition. Barriers to entry and expansion are high across the ad tech stack. Though the costs of offering an ad tech service vary depending on the tool and the circumstances, there are certain associated costs that are generally understood to always be high. These include the costs for housing any requisite data centres, internet and cloud computing costs, research and development costs, regulatory and compliance costs, partnership and integration fees, maintenance costs, marketing and user acquisition costs, and staffing costs.

116. Additionally, there are several common structural barriers that have and are likely to impede any meaningful entry or expansion. These include access to a sufficient volume of first- or third-party consumer data, which established firms use to optimize auctions and improve targeting and campaign effectiveness on behalf of their advertiser and publisher customers, creating a competitive advantage. It also includes access to sufficient scale and diversity to make it possible to integrate with other ad tech services and meet a minimum value proposition for potential advertisers and publishers.

117. Lastly, Google's tie across the ad tech stack further deters entry. Google's substantial market power has enabled it to engage in conduct that has imposed barriers to effective competition. Industry participants recognize that Google has made it near impossible, under current conditions, to gain sufficient scale to compete meaningfully or pose a serious competitive constraint on Google.

### *1. Google is dominant in the Publisher Ad Server market*

118. Direct and indirect indicia of Google's substantial market power demonstrates that Google substantially or completely controls the Publisher Ad Server market in Canada.

#### *a) Direct indicia of substantial market power*

119. Google itself considers DFP dominant, internally describing it as: "the *de facto*, preferred ad server of choice for 90% of publishers", "must call" for publishers, and having a "monopoly on the ad server".

120. Google is generally able to dictate the terms upon which it sells or supplies its DFP product and services. Google's 2019 introduction of UPR is an illustrative example. This change degraded a highly valued functionality of DFP by impairing publishers' ability to set lower price floors for rival (i.e., non-Google) ad exchanges compared to AdX. Internally, Google acknowledged that this feature was valuable to publishers who were "willing to tolerate some revenue loss in exchange for reduced dependence on Google as a whole" and appreciated that its removal would not be well-received. Nevertheless, Google implemented UPR. Though unhappy, publishers did not switch away to another publisher ad server, largely because there are simply no viable alternatives.

121. Further, in a 2019 internal analysis, Google concluded that DFP could profitably impose a price increase of "10% or more", further reflecting its position of dominance in this market.

### *b) Indirect indicia of substantial market power*

122. Google's DFP has an estimated 90%+ share of the Publisher Ad Server market in Canada, as measured by impressions transacted. This share is stable, having been above 90% since at least 2019.

123. Google faces weak competitive constraints due to high barriers to entry, high switching costs, and the prevalence of publishers who "single home" (i.e., use only one publisher ad server). Google's market power is evidenced by, and persists despite, its intentional degradation of its publisher ad server services.

124. Google's market power in the Publisher Ad Server market is enhanced by the tie it has created and maintained between Google Ads, AdX and DFP. DFP is the only publisher ad server that provides unrestricted access to real-time bids from AdX, which in turn is the near-exclusive source of Google Ads' unique, must-have advertiser demand. The Google Ads/AdX tie gives DFP a unique advantage over all other publisher ad servers, and (by necessity) makes it the default publisher ad server for publishers. DFP has a 100% adoption rate amongst large publishers in Canada.

125. Google's position in this market is further reinforced by DFP being the industry-leading "full stack" ad server. Web publishers with a range of ad format inventory for sale will prioritize a publisher ad server that is able to serve different ad types.

126. Publishers lack countervailing power against Google's market dominance, as no single publisher or group constitutes a significant portion of Google's revenues.

127. As described above at paragraph 115, there are significant barriers to entry and expansion in ad tech markets, including the Publisher Ad Server market. Among other things, these barriers include the costs and time of building the requisite infrastructure, developing and maintaining publisher relationships,

accessing ad exchanges and advertiser demand and scale. Google states that DFP's "global footprint across ad serving and access to inventory is the largest by far".

128. The prevalence of single-homing publisher ad servers and high switching costs create additional barriers to entry and expansion, and thereby further maintain Google's market power. In the words of a former Google executive, "[n]othing has such high switching costs. […] Switching platforms is a nightmare. Takes an act of God to do it." Due to the central role played by a publisher ad server, multi-homing or migrating ad servers is impracticable. In terms of switching, Google and publishers recognize that the process is complex, disruptive, lengthy and expensive.

129. The Publisher Ad Server market has seen no significant entry or expansion by rivals in several years. To the contrary, there has been considerable exit and consolidation. The few remaining rival publisher ad servers survive by competing on the market's periphery and do not constrain Google's unbridled ability to exercise substantial market power.

### *2. Google is dominant in the Advertiser Ad Network market*

130. Direct and indirect indicia of Google's substantial market power demonstrates that Google substantially or completely controls the Advertiser Ad Network market in Canada.

#### *a) Direct indicia of substantial market power*

131. Google Ads can dictate the terms upon which it sells its services, and has itself described its advertiser demand as "captive" and acknowledged that it has "virtually no margin or inventory sourcing constraints".

132. Google targets a 15% margin for its Google Ads product when it bids into an AdX auction. In 2014, Google Ads profitably imposed a fee increase of more than 5% without meaningful constraint from advertisers switching to alternative

products. On several occasions, Google has experimented or simulated material fee increases (e.g., 15% raised to 20%) and concluded that raising its margins would increase profits. For example, in 2018 Google performed simulations demonstrating Google's ability to profitably increase margins on AdX from 15% to 20%. However, it ultimately decided not to impose the increase, not because it was concerned about advertisers switching away from Google Ads, but rather due to reputational and legal concerns.

133. Google's market power is further evidenced by the fact that it can offer advertisers an inferior quality advertiser ad network, without losing a meaningful number of advertisers. For example, Google has long restricted Google Ads' ability to bid into rival ad exchanges, at a cost to advertisers in the form of inferior matches, but at a benefit to AdX (and Google) – as one Google executive described it: "artificially handicapping our buyside (GDN) to boost the attractiveness of our sell-side (AdX)".

***b) Indirect indicia of substantial market power***

134. Google Ads has a market share of at least 70% in the Advertiser Ad Network market in Canada, as measured by impressions.

135. As with the Publisher Ad Server market, Google faces weak competitive constraints in the Advertiser Ad Network market due to high barriers to entry, high switching costs, and the prevalence of advertisers who "single-home" (i.e., use one ad buying tool). Google's market power is evidenced by, and persists despite, its intentional degradation of its advertiser ad network.

136. Google's market power in the Advertiser Ad Network market originates from its pre-existing relationship with advertisers that purchase search advertising. At Google Ads' inception, Google was able to leverage its significant position in general internet search to convert its largest-in-the-world, unique source of advertiser demand over to its web advertising business. Today, Google's search advertising service is provided through Google Ads. This means any advertiser

purchasing search advertising through Google Ads can readily and easily also purchase web advertising through the same tool.

137. This scale and diversity in demand, in turn, has given Google Ads significant advantages over its competitors, and made entry or expansion into this market difficult, bordering on impossible. It has also had the resulting effect of further driving publisher supply towards Google Ads. As Google describes, Google Ads "reaches over 95% of global internet users and is the world's largest ad network".

138. Many advertisers (and most small advertisers) only use one ad buying tool (e.g., advertiser ad network) for their web advertising needs. Using one advertiser ad network is less costly than multi-homing and simplifies any needed or desired ad management functionality. Consequently, for single-homing advertisers who advertise on Google search and also want to transact in web ads, there are no realistic alternatives to Google Ads. The scale and diversity of Google's integrated ad tech products means that Google can offer these advertisers (large and small) unparalleled advantages in the form of publisher supply and access to data.

139. As described above, there are significant barriers to entry and expansion in ad tech markets, including the Advertiser Ad Network market. Among other things, these barriers include access to publisher inventory — necessary for attracting advertisers and compelling them to connect to a new buying tool — and sufficient access to data to facilitate optimal matches for their advertising customers.

140. For web publishers, Google Ads represents a unique, "must have" source of advertising demand without which they would face a significant drop in revenue. Internal analysis conducted by Google in 2014 found that publishers would lose over 60% in revenue from AdX without Google Ads. As one Google executive described, Google Ads demand is: "a substantial source of diversified

demand in the Canadian market, and on its own larger than the sum of all demand on other exchanges. AdWords is incredibly successful in driving auction intensity, which equates to higher bids and yield for publisher inventory".

141. The Advertiser Ad Network market has seen minimal entry or expansion over the past decade. To the contrary, there has been considerable consolidation, as well as exit by large tech firms like Meta.[9] The few rival advertiser ad networks that remain do so by competing on the market's periphery and do not constrain Google's ability to exercise market power.

### *3. Google is dominant in the Ad Exchange market*

142. Direct and indirect indicia of Google's substantial market power demonstrates that Google substantially or completely controls the Ad Exchange market in Canada. In the alternative, Google has a strong market position in the Ad Exchange market in Canada.

#### *a) Direct indicia of substantial market power*

143. AdX can dictate the terms upon which it sells its services, and has been able to charge supra-competitive fees for over a decade, despite most ad exchanges offering lower fees or reducing their fees (as described in paras 216-217).

144. Google's ability to charge supra-competitive fees on AdX is primarily a result of AdX's unique access to Google Ads demand (as described in para 161).

145. Google's market power is also evidenced by the fact that it can restrict the use of its ad exchange to bolster its position in the Publisher Ad Server market (as described in para 166).

[9] In 2020, Meta's advertiser ad network (Facebook Audience Network or "**FAN**") stopped bidding on open web ad inventory, but continues to bid on in-app ad inventory.

#### *b) Indirect indicia of substantial market power*

146. AdX has a market share of at least 50% in the Ad Exchange market in Canada, as measured by impressions transacted. This market share is nearly 6 times higher than its next closest competitor (as described in para 46).

147. Additionally, as described in paragraph 66 of the Application, Google faces weak competitive constraints in the Ad Exchange market due to high barriers to entry resulting from scale and network effects. Rival ad exchanges do not constrain Google's ability to exercise its market power (as described in paras 216-217).

### C. GOOGLE HAS ENGAGED IN A PRACTICE OF ANTI-COMPETITIVE ACTS

148. For over a decade, Google has pursued a systematic campaign of interrelated and interdependent anti-competitive actions, designed to and with the effect of facilitating the exercise of new or increased market power and entrenching and enhancing its existing market power in the relevant markets. By leveraging its market power in one market to strengthen its position in others, Google has been able to purposefully and effectively reduce advertiser demand and publisher inventory supply available for rivals in the targeted markets. This not only diminishes the competitiveness of its rivals but also discourages new entrants from entering the market. Additionally, due to indirect network effects and the benefits to users for different ad tech products to interoperate, weakening competitors in one market also reduces the appeal of non-Google alternatives in other ad tech markets.

149. Though Google has taken various anti-competitive actions and implemented a number of anti-competitive programs, which changed and evolved over time, all these actions and programs have a unifying quality: they were all intended to exclude Google's rivals and potential rivals across the ad tech stack and, more generally, to have an adverse effect on competition.

150. Google began to leverage its position across markets soon after it acquired DoubleClick in 2008, which included DFP and AdX. Almost immediately, Google began tying those products to Google's advertiser ad network, Google Ads. By conditioning effective access to any one of its ad tech tools on the use of its other tools, Google began locking-in publishers.

151. Subsequent to the tie being put in place, Google undertook a series of actions designed to further distort competition and entrench its dominance across the ad tech stack. Using DFP's market power, Google undertook to systematically advantage its ad tech tools and steer transactions away from rivals. Google did this in several ways including:

a) DFP granting AdX advantageous access to its ad inventory over rival exchanges through its Dynamic Allocation feature, which gave AdX an exclusive "first look" and later "last look" bid advantage;

b) using negative take rates to steer impressions towards Google Ads and away from other AdX buyers through a program Google internally called Project Bernanke (as detailed below, at paragraphs 179-185); and

c) implementing Unified Pricing Rules, which restricted publishers' ability to price AdX differently from rival ad exchanges.

152. Along the way, Google purposely identified, restrained, and deprecated innovative technologies that stood to benefit publishers and advertisers, but threatened its dominance.

153. Google's conduct has had (and is having) the intended effect of distorting competition and foreclosing to rival ad tech providers important access to transactions, scale and customers necessary to mount effective competition against Google's dominance. Each of DFP, AdX, and Google Ads have as a result become the default tools for publishers and advertisers — not because the

tools are superior to those of Google's rivals, but because Google has been able to leverage its market power in each market such that using its suite of tools became the only viable option for a significant majority of publishers and advertisers.

154. The conduct described herein constitutes a practice of anti-competitive acts that Google has and continues to engage in to preserve and enhance its dominant position across the ad tech stack.

### *1. Google locks publishers into its ad tech tools*

155. Before its acquisition of DoubleClick in 2008, Google already had a large captive base of advertiser demand through its position in search advertising. With the acquisition of DoubleClick, Google added DFP and its sizeable pool of publishers to its customer base, and AdX, a then-nascent ad exchange. Not long thereafter Google began taking steps to lock publishers into its publisher ad server, DFP. This was done to secure its position not only in the Publisher Ad Server market, but also to cement its place in the Ad Exchange market.

156. Google knew that by leveraging its market power in the Publisher Ad Server market, it could strengthen its position in the Ad Exchange market. In effect, Google left publishers and advertisers with no choice but to transact through Google's own ad tech stack, and not with its rivals. The actions taken by Google to tie its products together manifested in two ways, as described below.

#### *a) Google conditions access to Google Ads demand on the use of AdX*

157. Since 2008, Google has substantially restricted advertisers using Google Ads from bidding on rival ad exchanges' inventory. If publishers want access to the millions of advertisers who use Google Ads' to purchase web advertising, they have no choice but to auction their inventory through AdX. Google thereby

coerces publishers into using AdX, not because it is the superior product, but because failing to do so means losing access to essential advertiser demand.

158. Google possesses the technology to enable Google Ads to bid on rival exchanges. However, Google understood that denying access to its unique advertiser demand would hinder its rivals' ability to compete on the merits. Without this access, publisher payouts on rival exchanges would dwindle, making those platforms less attractive to publishers. By conditioning access to Google Ads' demand on the use of AdX, Google deprived rival ad exchanges of the necessary transactions and scale to compete meaningfully and also raised barriers to entry. As one Google executive described: "I believe if we keep AdWords [Google Ads] demand to ourselves, it will be hard for another marketplace to develop even if they have lower margins".

159. Without the tie between Google Ads and AdX, Google understood that publishers would avail themselves of rival ad tech tools. In 2011, Google conducted an experiment to assess what would happen if it allowed its advertisers to bid freely into rival ad exchanges (i.e., if Google had to compete on the merits). The outcome revealed that AdX would "lose 20 to 30% of its publishers", and DFP would "lose 20% of its publishers". Google understood that "if publishers can gain the same AdWords RTB demand from any yield management/exchange partner, there is a risk that many publishers would terminate their AdX relationship in favor of their preferred alternate vendor".

160. Google has maintained this tie, despite recognizing that its Google Ads advertisers have unspent advertising budgets and that opening up bidding to other ad exchanges could increase their access to inventory (and increase Google's revenue). Despite this clear benefit to advertisers (and revenue boost for Google), Google instead prioritized a long-term strategy of consolidating its market power across the ad tech stack by excluding rivals, which it knew would have an adverse effect on competition, and position Google for greater profits in a less competitive environment at the expense of its advertisers. The buy-side

of Google's business which runs Google Ads was unhappy with this strategy. As one buy-side Google executive said: "[m]ore importantly, we do not like the idea of AdWords being given a disadvantage compared to the other buyers in order to strengthen the publisher pitch (e.g. uphold the 20% margin)".

161. Google recognized that by allowing Google Ads advertisers to bid freely on other ad exchanges, AdX would be forced to compete on the merits and be unable to sustain its supra-competitive fees. As one Google executive stated: "we are NOT seeing pressure on the AdX 20%, but I am making a statement that it is because it provides nearly exclusive access to GDN demand. If GDN bought liberally through all 3PEs [third party exchanges], I think the 20% would crater. What I am suggesting is that 'comparing two bids and running an auction' is proven to not be worth 20%".

162. In 2016, Google began allowing a limited portion of its advertiser demand to bid outside of AdX. This initiative, known as AWBid, offered some marginal benefit to Google Ads advertisers by allowing them to (minimally) access inventory outside of AdX. However, Google implemented measures to disadvantage bids originating from Google Ads made on rival ad exchanges. Google Ads charges take rates between 32-50% on rival ad exchanges compared to 15% on AdX, effectively lowering bids on rival ad exchanges relative to AdX, to the detriment of its advertisers. Google knows that this asymmetrical fee structure will result in bids made to rival exchanges being less competitive, resulting in those exchanges winning fewer auctions, and consequently being less attractive to advertisers and publishers.

163. Despite the introduction of AWBid, Google continues to tell publishers that the only way to access the majority of Google Ads' demand is through AdX. Today, nearly 90% of Google Ads impressions are transacted on AdX.

### *b) Google conditions access to AdX on the use of DFP*

164. The second part of the tie involves Google conditioning real-time bids from AdX on the use of DFP. Specifically, if publishers want to receive real-time bids from AdX (and critical access to Google Ads' unique advertiser demand) they must use DFP. Publishers using other publisher ad servers are effectively locked out of accessing real-time bids from AdX. This restriction effectively forces publishers into adopting DFP as their publisher ad server, undermining rival publisher ad servers' ability to attract publisher customers and thereby gain scale and meaningfully compete. In essence, publishers are compelled to use DFP not because it offers superior functionality, but because publishers require the must-have advertiser demand on Google Ads that is accessible through real-time bidding from AdX. By doing so, Google has leveraged its market power throughout the ad tech ecosystem to maintain, entrench and enhance its dominance.

165. The ability to receive and compare real-time bids from ad exchanges is crucial for publishers. Real-time bidding enhances revenue by allowing publishers to sell ad inventory at variable prices as it becomes available. Recognizing this, Google tied DFP to real-time bidding from AdX, effectively "locking in" publishers to DFP. By restricting real-time bidding from AdX, Google discourages the use of rival publisher ad servers, harming their competitiveness and ability to attract and retain customers.

166. Google has technology to enable real-time bids from AdX to rival publisher ad servers with "minimal effort", which would have resulted in increased revenue for AdX, but chose not to use it in order to maintain DFP's market position. In the words of one Google executive, enabling real-time bids from AdX to rival publisher ad servers would "delete one of the major arguments to use [DFP]".

167. In 2017, Google further solidified this approach by requiring publishers to sign a combined contract for both AdX and DFP. Google has maintained a

superficial method for publishers to access AdX through other publisher ad servers (referred to as "AdX Direct"), which Google internally acknowledges is simply a "concept for antitrust". However, Google, publishers and other market participants all agree that AdX Direct tags, which do not provide real-time bids from AdX, are not a viable option for publishers. Today, over 99% of AdX impressions are transacted via DFP.

### *c) Google's tie is intentional*

168. Google has unlawfully tied its three distinct ad tech products together: its unique, must-have advertiser demand (on Google Ads) is accessible only through its ad exchange (AdX), while real-time bidding from its ad exchange is contingent upon using DFP, its publisher ad server. In other words, publishers must use both AdX and DFP or risk losing effective access to this must-have advertiser demand.

169. This tie was neither accidental nor designed to benefit its customers. It was intended to lock publishers and advertisers into Google's tools within the ad tech stack, and thereby create barriers to entry and expansion for rivals and potential rivals.

170. With this tie, publishers are deprived of the opportunity to access and compare real-time bids from multiple ad exchanges; and advertisers of the ability to bid into rival ad exchanges due to restrictions on Google Ads, which could lead to higher-quality matches. Google's actions are part of a coordinated and deliberate effort to compel both publishers and advertisers to use AdX and DFP, leaving them with no choice but to use only Google's ad tech products. As one Google executive put it: "they should realize that AdX is still the only source to get access to all of GDNs demand. If they chose another monetization partner they loose [sic] access to all of GDN."

171. Google's true intentions have been exemplified through its deliberate stalling, stifling and deprecating of innovative technologies that stood to benefit

publishers and advertisers, to maintain its tie. In 2011, Google acquired AdMeld and deprecated technology that could have facilitated real-time bids from AdX to other publisher ad servers, which it viewed as a "disintermediation" risk. In 2016, Google undertook to suppress the growth of header bidding technology, which stood to benefit advertisers and publishers. Google viewed the growth of header bidding as an existential threat to the "must call" status of AdX and DFP, because it had the potential to weaken the effects of Google's tie by aggregating enough advertiser demand and thereby diminish the need for publishers to use AdX and DFP. Google sought to protect its tie and remain the "only way to get Google demand" by not supporting header bidding or real-time bids from AdX to rivals' publisher ad servers.

172. By conditioning publishers and advertisers to transact through its ad tech tools, Google has stifled competition among publisher ad servers and ad exchanges. Rivals in these markets are denied scale/transactions (i.e., customers), making them less desirable alternatives to Google and less able to meaningfully compete. Publishers who use rival ad exchanges are unable to access Google's advertiser demand; as a result, these publishers are diverted away from rival ad exchanges and steered towards AdX. Similarly, the inability for publishers using competing publisher ad servers to access real-time bids from AdX corralled publishers away from rival publisher ad servers and towards DFP. Google's success was due to its anti-competitive tie, rather than the inherent merits of its products. As one Google executive described: "unlike our competitors, pubs have been viewing us as a necessary evil, instead of a responsive, innovative partner".

***2. Google gives AdX a "First Look" and "Last Look" advantage***

173. Since 2009, through a "feature" called Dynamic Allocation, Google leveraged DFP's substantial market power to funnel transactions to AdX, thereby further strengthening the position of its ad exchange, relative to other exchanges. This feature required publishers to offer their ad inventory to AdX before offering it

to rival ad exchanges. In effect, AdX was given a right of first refusal on all inventory, allowing it to "cherry pick" high value queries (i.e., inventory that advertisers were willing to bid more for), while leaving competitors with fewer and less desirable impressions, ultimately reducing publishers' and advertisers' incentives to work with rival exchanges.

174. Historically, publishers wanting to auction ad inventory to multiple ad exchanges used a method known as the "waterfall." Under this approach, publisher ad servers sent ad requests to exchanges sequentially, typically based on their average historical performance, until an exchange met the publisher's price floor.

175. Through Dynamic Allocation, AdX was given a "First Look" advantage. First Look gave AdX the right of first refusal on ad inventory by putting it at the top of the waterfall, regardless of where it would have ranked in the waterfall based on historical prices. Consequently, AdX could secure impressions even if there were other exchanges that were able to generate higher bids than AdX. As one Google executive indicated, that meant that "[p]ublishers lose every time the third-party exchange has higher payout than the average".

176. Google recognized that First Look would deprive rival ad exchanges of valuable inventory, adversely affecting their performance. This, in turn, would lead publishers to rank those rivals lower in the waterfall, resulting in a self-reinforcing cycle of diminished inventory for Google's competitors.

177. Partly to circumvent First Look, in or around 2015, publishers began adopting a technology called "header bidding." Header bidding allowed publishers to send ad requests and receive real-time bids from multiple ad exchanges outside of Google's DFP (and Dynamic Allocation). Header bidding involved embedding JavaScript in a website's code that, once a user visited the site, routed information about the website's ad space pre-selected ad exchanges simultaneously, before DFP was engaged and First Look executed. By

bypassing Google's First Look, publishers significantly increased participation in the market by third party ad exchanges. This led to a substantial increase in publisher ad revenue. As one Google executive described "[p]ublishers felt locked-in by dynamic allocation in DFP, which only gave AdX ability to compete, so HB [header bidding] was born. HB [header bidding] gives many publishers better yield, so it's a no-brainer for a publisher to adopt it".

178. With the introduction of header bidding, Google's First Look advantage became a "Last Look" advantage. Through Last Look, AdX was given a right of last refusal in respect of bids from rival exchanges. During the header bidding process, third-party ad exchanges submitted bids simultaneously and did not know what their rivals were bidding. But Google, through DFP, disclosed the highest real-time bid from the header-bidding exchanges to AdX, allowing AdX to use that bid as the price floor in its own auction. That way, Last Look enabled AdX to outbid competitors, only requiring a minimal increased margin. As described internally at Google: "AdX can observe all the other exchange bids, and can strategically lower its bid to be the smallest amount sufficient to win… This is referred to as the last-look advantage for AdX: Essentially, it can determine its bid after looking at the bids of other auction candidates".

179. Last Look allowed AdX to win inventory by bidding one penny more than the highest bid from rival ad exchanges. As a result, Last Look had no material benefit to publishers and publishers could not opt-out. As one Google executive described "last look…only benefits us [Google]". In fact, the removal of Last Look was one of the "biggest requests" Google got from the publisher community.

180. In 2014, Google introduced a program known as Sell-Side Dynamic Revenue Share ("**SSDRS**") to further bolster AdX's ability to win auctions by dynamically adjusting its 20% take rate. SSDRS, coupled with Last Look, allowed AdX to adjust its 20% take rate after seeing the highest competing bid from rival ad exchanges. For example, AdX could reduce its take rate (e.g.,

10%) to win an impression and increase its take rate (e.g., 30%) on another impression and maintain an average 20% take rate.

181. Rival exchanges could not compete with AdX because they did not have AdX's Last Look advantage and the ability to thereafter adjust their take rates through a program such as SSDRS. As a result, Google's AdX was able to win more auctions at the expense of its rivals, not because AdX was a better product, but because it was able to leverage its market power to deprive rival exchanges of critical transactions, scale, and customers, as well as distort competition. Google internally acknowledged that SSDRS was "just yet another way for AdX to exploit the last look advantage", which other ad exchanges could not replicate because, unlike AdX, they could not see bids from other ad exchanges.

182. Google understood that Last Look conferred an unfair advantage to AdX and was met with criticism from publishers. Nevertheless, Google recognized that in a header bidding environment, Last Look gave AdX "a significant informational advantage". Through Dynamic Allocation and the related First and Last Look features, Google restricted publishers' ability to multi-home and denied rivals essential revenue and scale, thereby reinforcing its market power across the ad tech stack — regardless of the impact these "features" had on ad matching quality for its customers.

183. As previously described at paragraph 165, Google also intentionally suppressed and deprecated innovative technologies that stood to benefit publishers and advertisers, including those aimed at facilitating real-time competition between ad exchanges, such as AdMeld's RTB technology, and later header bidding. Header bidding increased publisher revenue by as much as 20-40% by enabling real-time competition between ad exchanges. Yet, instead of embracing this innovative technology from which their publisher customers stood to gain, Google took steps to stall and suppress the growth of header bidding to protect the unfair advantages Dynamic Allocation bestowed on AdX.

184. In 2019, Google moved to a unified first price auction and got rid of its Last Look advantage. Internally, Google acknowledged that this was done proactively and bundled with other beneficial changes for Google (e.g., Unified Pricing Rules, described below beginning at paragraph 186) to avoid being forced by regulators to remove Last Look under disadvantageous terms.

### *3. Google uses negative take rates to win more auctions*

185. In 2013, Google realized that other ad buying tools were lowering their take rates to win more impressions, resulting in a "worrisome" trend of other ad buying tools on AdX growing at the expense of Google Ads.

186. In response, Google introduced a program it referred to internally as Project Bernanke,[10] which adjusted Google Ads' fixed take rate of 14% to win more ad impressions, while maintaining an average take rate of 14% per publisher.[11] This secret program allowed Google Ads to bid such that it earned a lower margin (including using negative take rates) in certain competitive auctions, and a higher margin in non-competitive auctions.

187. Google's manipulation of its bids was done covertly and with the intention of reinforcing its dominant position in the relevant markets. Through Project Bernanke, Google steered more ad spend towards Google Ads and AdX, and away from rival buying tools and ad exchanges. In instances where Google took a negative take rate to boost its bid above the advertiser's maximum willingness to pay, Google's advertisers were winning impressions that another advertiser, using a different ad buying tool, might have valued more highly and but for Google's take rate manipulation, would have won. In some instances, Google Ads lowered its take rate by as much as -300% to inflate bids on AdX relative

[10] Project Bernanke was named after former US Federal Reserve Chairman Ben Bernanke, because it allowed Google to win more impressions through "quantitative easing" on AdX.
[11] As a precursor to Project Bernanke, Google ran Dynamic Revenue Share ("**DRS**"), which also adjusted Google Ads' fixed take rate of 14% per impression to win more ad impressions, while still maintaining an average take rate of 14% per publisher. With DRS, Google would lower its take rate to zero in some instances but, in contrast to Project Bernanke, never lower than zero.

to other ad exchanges. It also meant that publishers were being given distorted market signals in that in some cases the prices that they were receiving for their inventory did not reflect advertisers' willingness to pay.

188. Internally, Google initially estimated that Project Bernanke would reduce the number of auctions rival ad buying tools won on AdX by 18% and rival spend on AdX by 8%. In practice, Google later realized that Project Bernanke was exceeding its expectations and had resulted in boosting Google Ads win rate by 20% (at the expense of rival buying tools).

189. Google Ads' use of negative take rates reduced price competition and the ability of rival ad buying tools to compete for and win ad impressions, making them less attractive to advertisers. By allowing Google Ads to win more high value impressions than it would have otherwise won, Project Bernanke reinforced Google Ads' market power and by extension, the market power of AdX and DFP.

190. Under the initial version of Project Bernanke, Google Ads targeted an average take rate on a per publisher basis. In a later version, called Global Bernanke, Google Ads began to target an average take rate across all AdX publishers, creating pools of "winning" publishers on whose inventory Google would charge a less than average a take rate and "losing" publishers on whose inventory Google would charge a more than average take rate. Through Global Bernanke, Google exploited captive publishers it deemed to be "non-competitive" due to their lower quality inventory by charging them take rates above average and using those funds to subsidize "competitive" publishers with higher quality inventory.

191. In 2019, the mechanics of Project Bernanke were adjusted to function in a first-price auction. Today, this updated form of Project Bernanke is referred to as The Alchemist. The Alchemist continues to target an average take rate and

continues to use negative take rates to advantage Google Ads relative to rival ad buying tools.

### *4. Google restricts publishers' ability to transact with rival exchanges on their own terms*

192. In 2019, Google began leveraging its market power in the Publisher Ad Server market to reinforce its position in the Ad Exchange market by removing publishers' ability to set lower price floors for rival (i.e., non-Google) ad exchanges compared to AdX through a program called UPR. Google came to the realization that for the reasons set out below, publishers were setting higher price floors for AdX, which led to rival exchanges winning more impressions. To thwart their publisher customers initiative, Google unilaterally imposed UPR, forcing publishers to set the same price floor across all exchanges for any given impression.

193. Prior to UPR, DFP had offered functionality that allowed publishers to set different price floors for different ad exchanges and demand sources. Publishers valued and used this functionality for a number of reasons, including to adjust for ad quality, revenue diversity (i.e., not being overly reliant on Google) and to increase yield.

194. To limit the number of low-quality ads showing up on their websites, publishers could set a high price floor for certain exchanges associated with lower quality ads. Google was aware that publishers used high floors on AdX to reduce the risk of lower quality ads coming from Google Ads. As one Google executive described: "[a] publisher might set a lower floor for HB [header bidding] knowing that the risk of low-quality creatives coming through that channel is much lower than the risk of similar creatives coming through AdX (mostly because of AdWords)".

195. Google was also aware of publishers using price floors to diversify their revenue streams, promote competition and reduce their reliance on AdX. In

explaining why some publishers choose to place higher floors in AdX, one Google executive described: "[p]ubs are also rationale [sic] when they decide to diversify their source of revenues. It help [sic] them to keep Google at bay and put pressure on us (similar to any industry)."

196. Google adopted UPR knowing that it would be viewed as a loss of functionality by publishers and that it could negatively impact publisher revenue. Realizing this, Google decided to bundle its launch of UPR with other changes to make it more "stomachable" and mask the negative effects. Google was aware that the removal of its Last Look advantage was going to have a negative impact on AdX, so it bundled it with the launch of UPR to offset the effects.

197. As expected, publishers were unhappy with the loss of control resulting from UPR, but had little recourse as they could not afford to lose access to Google Ads demand and had no viable alternatives to DFP. Despite complaints from publishers – for example, due to an increase in bad ads (i.e., fraudulent and/or spam ads) – Google did not afford publishers the option to opt-out of UPR. Publishers were captive and Google knew it.

198. Through UPR, Google has abused its market power in the Publisher Ad Server market by degrading the quality of DFP and taking away a feature that publishers valued. Google did not improve AdX or reduce its take rate to better compete with rival ad exchanges. Google unilaterally restricted the ability for publishers using DFP to set different price floors for ad exchanges for its own gain.

199. UPR denies publishers the ability to prioritize their preferred ad exchanges and deprives rival ad exchanges of the ability to differentiate their services on non-price dimensions and gain scale. Google's internal analysis confirmed that UPR had a negative effect on rival ad exchanges, which began losing share, and led to more spend flowing through AdX.

## D. GOOGLE'S PRACTICE LESSENS AND PREVENTS COMPETITION SUBSTANTIALLY

200. Google's practice of anti-competitive acts, as described above, has had, is having and is likely to have the effect of preventing and lessening competition substantially in the Publisher Ad Server, Ad Exchange and Advertiser Ad Network markets in Canada. But for Google's practice of anti-competitive acts, the Publisher Ad Server, Ad Exchange and Advertiser Ad Network markets would be substantially more competitive, including by way of lower prices, enhanced innovation and higher service quality.

201. In the absence of Google's practice, significant new entry and expansion into the Publisher Ad Server, Ad Exchange and Advertiser Ad Network markets would likely have occurred or would likely occur in the future. Google's conduct has raised barriers to entry and expansion, deprived rivals of scale and insulated it from competition, enabling it to exercise a materially greater degree of market power, through materially higher prices and materially lower levels of service quality, than would otherwise prevail in the absence of Google's practice.

202. Enhanced rivalry from new entry and/or expansion would likely have resulted and would in the future result, in substantially more competitive Publisher Ad server, Ad Exchange and Advertiser Ad Network markets in Canada. The ability of publishers and advertisers to seek publisher ad server, ad exchange and advertiser ad network alternatives to DFP, AdX and Google Ads respectively would likely have resulted and would in the future result in materially lower prices and materially greater service, product quality and innovation.

203. Google's conduct has undermined the ability for publishers and advertisers to make informed choices and exacerbates problems of adverse selection in the auction process, leading to lower quality matches.

204. But for Google's practice, publishers and advertisers would benefit from greater choice, more innovation and lower prices. Google's conduct restricts the ability of publishers and advertisers to effectively multi-home, limiting their ability to take advantage of higher-quality and/or lower-priced services. Because of Google's conduct, advertisers pay more for advertising and publishers receive less. Google's practice has intentionally stalled, stifled and deprecated innovative technologies that stood to benefit publishers and advertisers to preserve and enhance its market power.

***1. Publisher Ad Server market***

205. But for Google's practice of anti-competitive acts, barriers to entry and expansion in the Publisher Ad Server market would have been lower and significant entry and expansion, or the threat of significant entry and expansion, would likely have occurred. New entry would lead to more vigorous competition in the Publisher Ad Server market, offering publishers higher-quality and more innovative services, including better functionality and controls.

206. Google's practice has virtually eliminated the ability of rival publisher ad servers to attract and retain publishers — allowing DFP to entrench its market power, leaving few viable competitors. The Publisher Ad Server market has seen no meaningful entry and several exits in the past decade. Those firms that have exited found that publishers wanted to use their publisher ad server, but could not forgo access to AdX due to, among other things, the commercial imperative to have access to Google Ads demand and the data-rich environment created by AdX's scale. Those firms which remain in the market today are small and struggle to gain and maintain publisher customers without effective access to AdX and Google Ads demand.

207. But for Google's conduct, barriers to switching in the Publisher Ad Server market would have been substantially lower and publishers would have availed

themselves of higher-quality or lower-priced alternatives. Google's tie increases barriers to publishers switching away from DFP as publishers are unable to forgo access to AdX. As a result, rates of switching in Canada are very low.

208. Google is not forced to compete through new, improved and innovative products and services. Publishers have been faced with reduced product quality and functionality in the Publisher Ad Server market, for example through the elimination of the ability to set price floors to manage their inventory the way they prefer, with no recourse. Publishers view Google not as an innovative partner, but instead as a "necessary evil".

### *2. Ad Exchange market*

209. But for Google's practice of anti-competitive acts, barriers to entry and expansion in the Ad Exchange market would have been substantially lower, allowing rival ad exchanges to gain the scale necessary to effectively compete and offer publishers and advertisers lower-priced and higher-quality services. Publishers and advertisers, who have been subject to higher take rates, poorer quality matches and lower levels of innovation, would have gained the ability to effectively multi-home ad exchanges and realize the benefits of doing so.

210. Google's practice has restricted the ability of publishers to effectively multi-home ad exchanges and forced more ad sales to flow through AdX than would have otherwise prevailed in a competitive market. This has deprived rival ad exchanges of the ability to gain sufficient scale to meaningfully compete and collect data, which is critical to optimizing and improving their auctions. Over time, the impact of that reduced volume has been compounded by indirect network effects, making rival ad exchanges less attractive to both advertisers and publishers.

211. AdX has benefitted from the preferential treatment which Google has afforded it, at the centre of Google's ad stack between Google Ads and DFP, which has

artificially suppressed the competitive process, depriving rival ad exchanges of scale and publishers of revenue.

212. In 2019, when Google finally got rid of its Last Look advantage, Google's internal analysis found that the elimination of Last Look would create a more competitive environment with third parties, whose share of ad spend would increase while AdX's share of spend would decrease, and increase publisher yield. For example, one internal analysis conducted by Google found that the removal of Last Look would result in a 7% decrease in impressions for AdX. However, the implementation of UPR together with the elimination of Last Look led to *more* ad impressions being diverted from other ad exchanges to AdX, all without AdX having to compete harder on price, quality or innovation and without the support of publishers. One internal analysis estimated a 32% increase in impressions won by AdX as a result of UPR.

213. Google's anti-competitive practice has resulted in price competition in the Ad Exchange market being significantly diminished. Despite efforts from rival ad exchanges to gain share by differentiating their services and/or lowering their take rates, AdX has been able to maintain a supra-competitive take rate all while continuing to gain share. Over time, as ad exchanges that reduce their take rate and/or innovate in order to win more impressions are unsuccessful in doing so, their incentive to continue to reduce their take rate and/or innovate is diminished, to the detriment of publishers and advertisers.

214. But for Google's practice, prices in the Ad Exchange market would be substantially lower and publishers and advertisers would be free to avail themselves of higher-quality or lower-priced alternatives.

215. Google's distortion of the competitive process via Dynamic Allocation, Project Bernanke and UPR has had and continues to have the effect of forcing more transactions through AdX than would otherwise prevail in a competitive

market. Those transactions are then subject to AdX's supra-competitive take rate, which means that advertisers pay more, and publishers receive less.

216. Google's internal predictions that header bidding would challenge the "must call" status of AdX and DFP (flowing from the tie with Google Ads) and drive down ad exchange fees to between 5-15% have not materialized because of actions taken by Google to blunt the competitive threat header bidding represented. AdX's take rate for open auction ad sales has remained remarkably stable at 20% and AdX continues to gain share. In 2022, AdX's market share was nearly 6 times higher than its next closest competitor. Google describes being at a "comfortable point when it comes to HB [Header Bidding]".

217. Google executives consistently describe AdX's take rate as significantly higher than its rivals and not justified based on AdX's functionality, with one Google executive describing that they are "continuing to extract irrationally high rent from the AdX". But for its exclusive access to Google Ads demand and ownership of the publisher ad server, AdX could not sustain a 20% take rate and publishers would shift spend to other ad exchanges. Internally, as Google acknowledges, AdX is more difficult to do business with than other ad exchanges and that without its exclusive access to Google Ads and privileged position within Google's ad stack, it would be forced to compete on service and would likely lose.

### *3. Advertiser Ad Network market*

218. But for Google's practice of anti-competitive acts, barriers to entry and expansion in the Advertiser Ad Network market would have been lower, allowing new rival advertiser ad networks to enter the market and existing rivals to expand and gain the scale necessary to effectively compete and offer advertisers lower-priced and higher-quality services.

219. Google's practice has allowed Google Ads to entrench its dominance, making rival advertiser ad networks less attractive to advertisers.

220. Given that Google Ads is one of the largest buyers on AdX, the advantages enjoyed by AdX, such as First Look, Last Look and UPR, have also accrued to Google Ads. For example, the implementation of UPR resulted in the average price floor for Google Ads decreasing from over $3.00 to just over $1.00, thereby increasing the number of ad impressions Google Ads is eligible to bid on. This deprived rival advertiser ad networks of the ability to differentiate their services on non-price dimensions and gain scale, and restricted publishers' ability to use price floors to avoid low quality ads from Google Ads.

221. Project Bernanke, and particularly Google Ads' use of negative take rates, reinforced Google Ads' dominant market position. Google's distortion of the competitive process excluded rivals by reducing price competition with other advertiser buying tools. Google's use of negative take rates has allowed it to boost bids from Google Ads above its advertisers' maximum willingness to pay, allowing a Google Ads advertiser to win an impression that another advertiser, using a different advertiser buying tool, might value more highly. Google's records show that Project Bernanke increased Google Ads' win rate and "starved out some AdX buyers of growth". Google found that Bernanke would lead to a 23% reduction in impressions won by other buyers on AdX and a 10% reduction in spend.

### E. Conclusion

222. An order of the Tribunal is necessary and appropriate in the circumstances, including for the following reasons:

a) Google's practice has had, is having and is likely to have the effect of preventing or lessening competition substantially in the Advertiser Ad Network, Ad Exchange and Publisher Ad Server markets in Canada;

b) an order, and more particularly, the relief sought by the Commissioner herein, is reasonable and necessary to overcome the

anti-competitive effects of Google's practice in the Advertiser Ad Network, Ad Exchange and Publisher Ad Server markets in Canada and to restore competition in the market;

c) an enforceable mechanism is necessary to prevent Google from engaging in the same or similar conduct likely to have the effect of preventing or lessening competition substantially in the Advertiser Ad Network, Ad Exchange and Publisher Ad Server markets in Canada; and

d) an order will indicate to the Canadian marketplace more broadly that the actions described by the Commissioner herein are anti-competitive.

### F. RELIEF SOUGHT

223. For all the reasons provided above, the Commissioner seeks an order from this Tribunal:

a) pursuant to subsections 79(1), 79(2) and 79(3.1) of the Act:

i. requiring Google to divest Google's publisher ad server, DFP, and Google's ad exchange, AdX, along with any additional structural relief as needed to restore competition and overcome the effects of Google's anti-competitive practice in Canada;

ii. otherwise, prohibiting Google from continuing to engage in the anti-competitive practice described herein and from engaging in any other practices with the same purpose and effect in Canada; and

iii. requiring Google to pay an administrative monetary penalty in such an amount as the Tribunal decides is appropriate; ~~directing Google to pay an administrative monetary penalty equal to three~~

~~times the value of the benefit derived from Google's anti-competitive practice, or if that amount cannot be reasonably determined, 3% of Google's worldwide gross revenues;~~

a. directing Google to pay costs; and

b. such other relief as the Tribunal may consider appropriate.

DATED AT Gatineau, Quebec, this 28th day of November 2024.

Matthew Boswell
Commissioner of Competition
Competition Bureau
Place du Portage, Phase I
50 Victoria Street
Gatineau, QC K1A OC9

## SCHEDULE "A"

## CONCISE STATEMENT OF ECONOMIC THEORY

1. Google is dominant in three ~~two~~ markets: the market for the supply of publisher ad servers used by publishers to sell programmatic open web advertising (the "**Publisher Ad Server market**"), ~~and~~ the market for the supply of advertiser ad networks used by advertisers to buy programmatic open web advertising (the "**Advertiser Ad Network market**"),~~. Google also holds a strong market position in other markets for the supply of ad tech tools used by both advertisers and publishers for programmatic open web advertising, including in~~ and the market for the tools that serve as the intermediary between the sell- and buy-side tools (the "**Ad Exchange market**").

2. Through a series of interrelated and interdependent anti-competitive actions, which have had cumulative and synergistic anti-competitive effects, Google has unlawfully tied together its different ad tech products and hamstrung rivals' ability to compete on the merits. In particular, Google has:

   a) Made its advertiser ad network's unique, must-have advertiser demand available only to its own ad exchange, and in turn, compelled publishers to use its publisher ad server in order to access real-time bidding through its ad exchange;

   b) Used its dominant position within the Publisher Ad Server market to: (i) provide its own ad exchange preferential access to valuable ad inventory, and (ii) deny publishers the ability to shift ad inventory sales to non-Google ad exchanges to foster greater competition in the Ad Exchange market; and

   c) Artificially increased Google Ads' win rate on AdX by incurring losses on certain transactions which deprived rival ad-buying tools of scale, hindering their ability to compete.

3. In implementing these anti-competitive interrelated and interdependent actions, Google has been able to entrench its dominance, deprive rivals of scale, decrease incentives for innovation, insulate itself from competition, inflate advertising costs, and reduce revenues for publishers. Google's conduct, in whole or in part, has had (and, if left unchecked, will continue to have) serious consequences for publishers, advertisers, rivals, and ultimately consumers — manifesting in a substantial preventing and lessening of competition, the magnitude, duration and scope of which is compounded by the economies of scale and network effects endemic to ad tech.

4. Google Ads' advertising demand is comprised of many small- and medium-sized advertisers that value the advertiser ad network's ease of use, its data that Google provides to target audiences, and its ability to conduct effective search advertising. For many Google Ads advertisers, Google Ads is the only ad-buying tool they use to buy programmatic open web advertising. Given this fact, Google's advertiser ad network serves as a bottleneck – in order to access the total advertising demand from these advertisers, publishers need to ensure that their inventory is accessible to Google Ads.

5. The value that publishers place on this collective block of advertising demand provides Google with the ability and incentive to leverage its market power in the Advertiser Ad Network market into other areas of the ad stack such as the Ad Exchange and Publisher Ad Server markets. Google has done this through its tie: (i) providing full access to Google Ads' demand only to its ad exchange, AdX, and (ii) only permitting its publisher ad server, DFP, the ability to receive real-time bids from AdX. Because of the importance of the revenue realized from real-time bidding from the mass of advertisers that are only available from Google Ads, the tie strongly incentivizes publishers to adopt DFP to access AdX.

6. An ad tech tool's scale is a crucial factor in its ability to compete effectively with rivals. By strongly incentivizing publishers to use DFP and AdX to get

access to Google Ads' advertising demand, Google has deprived ad exchange and publisher ad server rivals of the ability to generate scale and become more effective competitors. In fact, given that publishers typically use only one publisher ad server to manage their inventory, Google's conduct has effectively made DFP the only publisher ad server that Canadian publishers use.

7. By leveraging its market power from the Advertiser Ad Network market into the markets for Ad Exchanges and Publisher Ad Servers, Google has increased barriers for firms wanting to enter or expand by providing programmatic web advertising services in these markets. To effectively compete, a firm would need to provide publishers access to a collective block of advertising demand that is comparable to that of Google Ads to induce them to adopt its ad exchange or publisher ad server. Establishing such a collective block of advertising presents a sizable barrier to entry.

8. Google's tie involving Google Ads, AdX and DFP, has allowed it to dominate the Publisher Ad Server market. The publisher ad server acts as the key piece of software that determines the winning advertiser for a particular publisher's impression. It therefore serves a critical decision-making role in the sale of a publisher's inventory. Google has used its dominance in the Publisher Ad Server market to favour AdX over rival ad exchanges. In particular, Google provided AdX with the opportunity of a "first-look" at a publisher's inventory when publishers were using a "waterfall" system to access exchanges. With a "first-look" at a publisher's inventory, combined with knowledge of the average value of bids that a publisher used to rank exchanges in its waterfall, Google was able to ensure that AdX won valuable impressions for prices no higher than needed to beat bid rival exchanges.

9. When publishers began transitioning from the "waterfall" system to "header bidding", Google used DFP to provide AdX a "last look" advantage over other ad exchanges. Header bidding provided a publisher the ability to receive real-time bids from competition among ad exchanges other than AdX. Google did

not participate in header bidding but instead used DFP to call AdX to fill a publisher's impression after it had sought real-time bids from rival exchanges through the header bidding process. AdX, aware of the highest bid from rival exchanges, was then able to win the impression with a slightly higher bid. Again, Google's use of DFP provided AdX with a clear advantage over rival exchanges in the ability to compete in buying publisher ad inventory.

10. Google also abused its market power in the Publisher Ad Server market by making technological changes to DFP so it no longer offered publishers the ability to set separate price floors for different ad exchanges. Publishers value the ability to set different price floors because this allows them the ability to shift sales to exchanges that provided volume rebates or provided other advantages such as superior ad quality. Because AdX is the largest ad exchange, it offers the "thickest" market for ad inventory as the number of ad buyers on AdX typically exceeds those on any other ad exchange for any given impression. This means that AdX typically offers higher prices for publisher impressions. By eliminating differential price floors (instituting what was known as Unified Pricing Rules), Google no longer allowed publishers to trade-off the ability to forego an immediate high price for selling inventory on AdX versus the benefits of shifting sales to other exchanges to promote longer term competition among ad exchanges. This clearly is to the advantage of Google, as it allows it to benefit from its scale advantage that it currently enjoys and prevents the ability of rival exchanges to gain scale through the actions of publishers.

11. In addition to its abuse of its dominance using DFP, Google also artificially inflates Google Ads' rate of successfully winning auctions on AdX by paying publishers more for their inventory than the maximum amount that Google Ads' advertisers are willing to pay. Google does this for impressions where it expects heavy competition from rival ad-buying tools. By paying publishers amounts exceeding advertisers' maximum willingness to pay, Google creates inefficiency due to impressions being served by advertisers who do not value

the impression the highest – something that auction mechanisms are typically designed to do. Furthermore, by increasing the number of impressions won by Google Ads, Google reduces the win rate, and hence scale, of other ad-buying tools which negatively impacts their ability to compete over time. Enhancing Google Ads' win rate on AdX may also shift sales that would otherwise have occurred on rival exchanges. This too, would serve to reduce the scale of competitor exchanges and negatively impact their ability to compete.

12. In summary, Google's interrelated and interdependent actions have had, are having, and are likely to have the effect of preventing and lessening competition substantially in the Publisher Ad Server, Ad Exchange and Advertiser Ad Network markets in Canada. But for Google's practice of anti-competitive acts, the Publisher Ad Server, Ad Exchange and Advertiser Ad Network markets would be substantially more competitive, including by way of lower prices, enhanced innovation, higher service quality and more efficient allocation of impressions.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

COMMONWEALTH OF VIRGINIA
202 North Ninth Street
Richmond, VA 23219

STATE OF CALIFORNIA
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

STATE OF COLORADO
1300 Broadway, 7th Floor
Denver, CO 80203

STATE OF CONNECTICUT
165 Capitol Avenue
Hartford, CT 06106

STATE OF NEW JERSEY
124 Halsey Street, 5th Floor
Newark, NJ 07102

STATE OF NEW YORK
28 Liberty Street, 20th Floor
New York, NY 10005

**JURY TRIAL DEMANDED**

STATE OF RHODE ISLAND
150 South Main Street
Providence, RI 02903

and

STATE OF TENNESSEE
P.O. Box 20207
Nashville, TN 37202

*Plaintiffs*,

v.

GOOGLE LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

*Defendant*.

**COMPLAINT**

# Table of Contents


I. Introduction ..... 1

II. Nature of this Action ..... 4

III. Display Advertising Transactions ..... 16

- A. How Ad Tech Tools Work ..... 16
- B. How Ad Tech Intermediaries Get Paid ..... 22
- C. How Publishers and Advertisers Select Ad Tech Tools ..... 24
- D. Why Scale and the Resulting Network Effects are Necessary to Compete in Ad Tech ..... 26
- E. How Multi-Homing Enables Competition in the Ad Tech Stack ..... 28

IV. Google's Scheme to Dominate the Ad Tech Stack ..... 30

- A. Google Buys Control of the Key Tools that Link Publishers and Advertisers ..... 31
- B. Google Uses Its Acquisitions and Position Across the Ad Tech Stack to Lock Out Rivals and Control Each Key Ad Tech Tool ..... 35
  - 1. Google Thwarts Fair Competition by Making Its Google Ads' Advertiser Demand Exclusive to Its Own Ad Exchange, AdX ..... 37
  - 2. In Turn, Google Makes Its Ad Exchange's Real-Time Bids Exclusive to Its Publisher Ad Server ..... 43
  - 3. Finally, Google Uses Its Control of Publisher Inventory to Force More Valuable Transactions Through Its Ad Exchange ..... 46
  - 4. Google's Dominance Across the Ad Tech Stack Gives It the Unique Ability to Manipulate Auctions to Protect Its Position, Hinder Rivals, and Work Against Its Own Customers' Interests ..... 55
    - a) Google Works Against the Interests of Its Google Ads' Customers By Submitting Two Bids Into AdX Auctions ..... 57
    - b) Google Manipulates Its Fees to Keep More High-Value Impressions Out of the Hands of Rivals ..... 60
- C. Google Buys and Kills a Burgeoning Competitor and Then Tightens the Screws ..... 65
  - 1. Google Extinguishes AdMeld's Potential Threat ..... 65
  - 2. Google Doubles Down on Preventing Rival Publisher Ad Servers from Accessing AdX and Google Ads' Demand ..... 68
  - 3. Google Manipulates Google Ads' Bidding Strategy to Block Publisher Partnerships with Rivals ..... 71
- D. Google Responds to the Threat of Header Bidding by Further Excluding Rivals and Reinforcing Its Dominance ..... 72

1. The Industry Attempts to Rebel Against Google's Exclusionary Practices ........ 72

2. Google Blunts Header Bidding By "Drying Out" the Competition ........ 78

a) Google Develops So-Called Open Bidding, Its Own Google-Friendly Version of Header Bidding To Preserve Its Control Over the Sale of Publisher Inventory ........ 78

b) Google Further Stunts Header Bidding by Working to Bring Facebook and Amazon into Its Open Bidding Fold ........ 82

c) Google Manipulates Its Publisher Fees Using Dynamic Revenue Sharing in Order to Route More Transactions Through Its Ad Exchange and Deny Scale to Rival Ad Exchanges Using Header Bidding ........ 86

d) Google Launches Project Poirot to Manipulate Its Advertisers' Spend to "Dry Out" and Deny Scale to Rival Ad Exchanges That Use Header Bidding ........ 90

e) Google Imposes So-Called Unified Pricing Rules to Deprive Publishers of Control and Force More Transactions Through Google's Ad Exchange ........ 101

f) Google Outright Blocks the Use of Standard Header Bidding on Accelerated Mobile Pages ........ 110

g) Google Replaces Its Last Look Preference from Dynamic Allocation with an Algorithmic Advantage and Degrades Data Available to Publishers ........ 113

V. Anticompetitive Effects ........ 116

VI. Relevant Markets ........ 123

A. Geographic Markets ........ 124

B. Product Markets ........ 124

1. Publisher Ad Servers ........ 124

2. Ad Exchanges ........ 126

3. Advertiser Ad Networks ........ 129

VII. Jurisdiction, Venue, and Commerce ........ 131

VIII. Violations Alleged ........ 132

IX. Request for Relief ........ 139

X. Demand for a Jury Trial ........ 140

## I. INTRODUCTION

1. An open, vibrant internet is indispensable to American life. But today's internet would not exist without the digital advertising revenue that, as a practical matter, funds its creation and expansion. The internet provides the public with unprecedented access to ideas, artistic expression, news, commerce, and services. Content creators span every conceivable industry; they publish diverse material on countless websites that inform, entertain, and connect society in vital ways. Yet the viability of many of these websites depends on their ability to sell digital advertising space. Just as newspaper, radio, and television organizations historically relied on advertising to fund their operations, today's online publishers likewise rely on advertising revenue to support their activities and reach. But unlike historical media advertising, today's online ads are bought and sold in enormous volumes in mere fractions of a second, using highly sophisticated tools and automated exchanges that more closely resemble a modern stock exchange than an old-fashioned, bilateral contract negotiation for newspaper ad space.

2. Website publishers in the United States sell more than 5 trillion digital display advertisements on the open web each year—or more than 13 billion advertisements *every day*. The sheer volume of these online ads make the offline advertisements of yesteryear pale in comparison. To put these numbers in perspective, the daily volume of digital display advertisements grossly outnumbers (by several multiples) the average number of stocks traded each day on the New York Stock Exchange. The digital display advertising business is also lucrative. Collectively, these advertisements generate more than $20 billion in revenue per year, just for publishers based in the United States.

3. To meet this demand, sophisticated technological tools, informally known as "ad tech," have developed to automate advertising matchmaking between two key groups: website

publishers and advertisers.[1] These tools have evolved such that today, every time an internet user opens a webpage with ad space to sell, ad tech tools almost instantly match that website publisher with an advertiser looking to promote its products or services to the website's individual user. This process typically involves the use of an automated advertising exchange that runs a high-speed auction designed to identify the best match between a publisher selling internet ad space and the advertisers looking to buy it.

4. But competition in the ad tech space is broken, for reasons that were neither accidental nor inevitable. One industry behemoth, Google, has corrupted legitimate competition in the ad tech industry by engaging in a systematic campaign to seize control of the wide swath of high-tech tools used by publishers, advertisers, and brokers, to facilitate digital advertising. Having inserted itself into all aspects of the digital advertising marketplace, Google has used anticompetitive, exclusionary, and unlawful means to eliminate or severely diminish any threat to its dominance over digital advertising technologies.

5. Google's plan has been simple but effective: (1) neutralize or eliminate ad tech competitors, actual or potential, through a series of acquisitions; and (2) wield its dominance across digital advertising markets to force more publishers and advertisers to use its products while disrupting their ability to use competing products effectively. Whenever Google's customers and competitors responded with innovation that threatened Google's stranglehold over any one of these ad tech tools, Google's anticompetitive response has been swift and effective. Each time a threat has emerged, Google has used its market power in one or more of these ad

[1] Internet advertisers include businesses, agencies of federal and state governments, charitable organizations, political candidates, public interest groups, and more. The money these advertisers spend on digital advertising creates an important stream of revenue for websites to use in creating, developing, and publishing website content.

tech tools to quash the threat. The result: Google's plan for durable, industry-wide dominance has succeeded.

6. Google, a single company with pervasive conflicts of interest, now controls: (1) the technology used by nearly every major website publisher to offer advertising space for sale; (2) the leading tools used by advertisers to buy that advertising space; and (3) the largest ad exchange that matches publishers with advertisers each time that ad space is sold. Google's pervasive power over the entire ad tech industry has been questioned by its own digital advertising executives, at least one of whom aptly begged the question: "[I]s there a deeper issue with us owning the platform, the exchange, and a huge network? The analogy would be if Goldman or Citibank owned the NYSE."

7. By deploying opaque rules that benefit itself and harm rivals, Google has wielded its power across the ad tech industry to dictate how digital advertising is sold, and the very terms on which its rivals can compete. Google abuses its monopoly power to disadvantage website publishers and advertisers who dare to use competing ad tech products in a search for higher quality, or lower cost, matches. Google uses its dominion over digital advertising technology to funnel more transactions to its own ad tech products where it extracts inflated fees to line its own pockets at the expense of the advertisers and publishers it purportedly serves.

8. Google's anticompetitive behavior has raised barriers to entry to artificially high levels, forced key competitors to abandon the market for ad tech tools, dissuaded potential competitors from joining the market, and left Google's few remaining competitors marginalized and unfairly disadvantaged. Google has thwarted meaningful competition and deterred innovation in the digital advertising industry, taken supra-competitive profits for itself, and

prevented the free market from functioning fairly to support the interests of the advertisers and publishers who make today's powerful internet possible.

9. The harm is clear: website creators earn less, and advertisers pay more, than they would in a market where unfettered competitive pressure could discipline prices and lead to more innovative ad tech tools that would ultimately result in higher quality and lower cost transactions for market participants. And this conduct hurts all of us because, as publishers make less money from advertisements, fewer publishers are able to offer internet content without subscriptions, paywalls, or alternative forms of monetization. One troubling, but revealing, statistic demonstrates the point: on average, Google keeps at least ***thirty cents***—and sometimes far more—of each advertising dollar flowing from advertisers to website publishers through Google's ad tech tools. Google's own internal documents concede that Google would earn far less in a competitive market.

10. The United States and Plaintiff States bring this action for violations of the Sherman Act to halt Google's anticompetitive scheme, unwind Google's monopolistic grip on the market, and restore competition to digital advertising.

## II. NATURE OF THIS ACTION

11. The seeds for Google's eventual march toward a monopoly in ad tech were sown in the early 2000s, when it capitalized on its well-known search engine to start a profitable search advertising business. In 2000, Google launched **Google Ads** (then called AdWords[2]), a tool that allowed businesses to buy advertisements that could be seen by Google search users right alongside Google's popular search engine results. Businesses quickly learned the power of

[2] Over the period addressed by the Complaint, Google has renamed its ad tech products a number of times and has either shifted certain functions between products or combined its products in ways intended to obscure Google's dominance across the ad tech stack.

this instantaneous, highly-targeted advertising technique, and they flocked to Google Ads as a result.

12. By the early 2000s, Google realized that these same advertisers would buy digital advertisements on third-party websites as well. So Google stepped in to profit (as a middleman) on digital advertising transactions having nothing to do with Google or its search engine by creating an advertiser ad tech tool for Google Ads' customers that wanted to buy ad space on third-party websites.

13. But Google was not satisfied with its dominance on the *advertising* side of the industry alone; Google devised a plan to build a moat around the emerging ad tech industry by developing a tool that would be used by website *publishers* as well.

14. Google sought to develop an ad tech tool called a **publisher ad server** that publishers would use to manage their online advertising sales. Google recognized that because publisher ad servers set the rules for how and to whom publisher advertising opportunities are sold, owning a publisher ad server was key to having visibility into, and control over, the publisher side of digital advertising. By controlling the *publisher* ad server on the other end of the transaction, Google could further entrench its *advertiser* customer base by giving advertisers access to more advertising opportunities and pushing more transactions their way.

15. Of course, by becoming the dominant player on both sides of the digital advertising industry, Google could also play both sides against the middle. It could control both the publishers with digital ad space to sell, as well as the advertisers who want to buy that space. With influence over advertising transactions end-to-end, Google realized it could become "the be-all, and end-all location for all ad serving." The outsized influence it could obtain by having a dominant position on both sides of the industry would give Google the ability to charge supra-

competitive fees and also enjoy an abiding dominance sufficient to exclude rivals from competition. Google would no longer have to compete on the merits; it could simply set the rules of the game to exclude rivals.

16. The only problem with Google's plan was that Google's publisher ad server failed to gain traction in the industry. So, Google pivoted to acquiring the market-leading publisher ad server from an ad tech firm called DoubleClick. In early 2008, Google closed its acquisition of DoubleClick for over $3 billion. Through the transaction, Google acquired a publisher ad server ("**DoubleClick for Publishers**" or "**DFP**"), which had a 60% market share at the time. It also acquired a nascent **ad exchange** ("**AdX**") through which digital advertising space could be auctioned. The DoubleClick acquisition vaulted Google into a commanding position over the tools publishers use to sell advertising opportunities, complementing Google's existing tool for advertisers, Google Ads, and set the stage for Google's later exclusionary conduct across the ad tech industry.

17. After the DoubleClick acquisition, Google enhanced and entrenched DFP's already-dominant market position. Google internally recognized that publisher ad servers are "sticky" products, meaning that publishers rarely switch because of the high costs and risks involved. As DoubleClick's former CEO observed, "Nothing has such high switching costs. . . . Takes an act of God to do it." Thus, in order to lock more publishers into DFP and to reinforce its stickiness, Google forged an exclusive link between Google Ads and DFP through the AdX ad exchange. If publishers wanted access to exclusive Google Ads' advertising demand, they had to use Google's publisher ad server (DFP) and ad exchange (AdX), rather than equivalent tools offered by Google's rivals. In effect, Google positioned itself to function simultaneously as buyer, seller, and auctioneer of digital display advertising.

18. Google's strategy paid off. This arrangement has had a profound effect on the evolution of digital advertising. First, it tilted the industry in Google's favor, driving publishers to adopt and stay on Google's DFP publisher ad server in order to have access to Google Ads' advertiser demand. Second, it cut off the possibility that Google Ads' advertiser spending could sustain, or encourage the entry of, a rival ad exchange or publisher ad server by providing critical advertising demand. For the vast majority of webpage publishers, this arrangement made DFP the only realistic publisher ad server option. Indeed, by 2015, Google estimated that DFP's publisher ad server market share had grown to a remarkable 90%. Google's durable monopoly over the publisher ad server market has allowed it to avoid innovation and competition by controlling the very rules by which the game is played. As a result, other publisher ad servers have left the market altogether, refocused on related markets, or faded into insignificance; no new publisher ad servers have entered the market.

19. Around the same time that Google tied its exclusive Google Ads' advertiser demand to its publisher ad server (DFP) through AdX, Google took two additional steps to make it more difficult for rivals to compete.

20. *First*, Google configured Google Ads to bid on Google's AdX ad exchange in a way that actually *increased* the price of advertising, to the benefit of publishers and the detriment of Google's own advertiser customers. As one Google employee observed, Google Ads was effectively sending a "$3bn yearly check [to publishers] by overcharging our advertisers to ensure we're strong on the pub[lisher] side." In the short-term, this conduct locked publishers into Google's publisher ad server by providing them a steady stream of intentionally-inflated prices for certain inventory, at the cost of Google's own advertiser customers. But in the long run, Google's actions harmed publishers as well by driving out rival publisher ad servers and

limiting competition in the publisher ad server market. In effect, Google was robbing from Peter (the advertisers) to pay Paul (the publishers), all the while collecting a hefty transaction fee for its own privileged position in the middle. This conduct turned the entire purpose of the digital advertising industry on its head. Rather than helping to fund website publishing, Google was siphoning off advertising dollars for itself through the imposition of supra-competitive fees on its platforms. A rival publisher ad server could not compete with Google's inflated ad prices, especially without access to Google's captive advertiser demand from Google Ads.

21. *Second*, Google used its captive advertiser demand to thwart legitimate competition by giving its AdX ad exchange an advantage over other ad exchanges through a mechanism known as dynamic allocation. Dynamic allocation was a means by which Google manipulated its publisher ad server to give the Google-owned AdX (and only AdX) the opportunity to buy publisher inventory before it was offered to any other ad exchange, and often to do so at artificially low prices. Google also programmed DFP, its publisher ad server, to prevent publishers from offering preferential terms to other ad exchanges or allowing those exchanges to operate in the same way with DFP. Google knew that dynamic allocation would inevitably steer advertising transactions away from rivals, denying them critical scale needed to compete, and would advantage AdX, where Google could extract the largest fees. Google's scheme predictably reinforced publishers' dependence on both AdX and DFP. Publishers were effectively precluded from using rival ad servers or ad exchanges that might better suit their needs while Google was given a free pass from having to compete on the merits with those rivals.

22. By at least 2010, other ad tech companies had recognized that Google's platforms were not working in the best interest of publishers, and they attempted to develop innovative

technologies to introduce more competition. Some companies began offering "yield management" functionality that helped publishers identify on a real-time basis better prices for their inventory outside of Google's products. Google recognized that yield managers posed a major threat to the increasingly closed system Google sought to establish, in which only its ad exchange was able to compete based on real-time pricing. So, in response, Google employed a familiar tactic: acquire, then extinguish, any competitive threat.

23. In 2011, Google acquired AdMeld, the leading yield manager, folded its functionality into Google's existing products, and then shut down its operations with non-Google ad exchanges and advertiser tools. Google soon thereafter changed its AdX contract terms to prohibit publishers from using any other platform (such as another yield manager) that would force AdX to compete in real time with other ad exchanges. As a Google product manager wrote: "Our goal should be all or nothing – use AdX as your [exchange] or don't get access to our [advertising] demand." Unsurprisingly, this unabashed, anticompetitive conduct had a profound effect on the market, denying rival ad tech competitors the scale necessary to compete and depriving publishers the benefits of free market competition and real choice.

24. Not long after, in 2013, Google launched **Project Bernanke**, a secret scheme to manipulate the bids that Google Ads submitted into Google's ad exchange, AdX, in order to win more competitive transactions and solidify AdX's dominance in the industry. Project Bernanke allowed Google to suppress competition by preventing rival ad exchanges from achieving the transaction volume and scale necessary to compete. Unless another ad exchange developed both its own unique source of captive advertiser demand—where it could potentially manipulate advertiser bids—and a widely-adopted publisher ad server—where it could see the same advertising inventory and bid data as Google—competition on the same terms as Google was

nearly impossible. Once again, by controlling all sides of the ad tech industry, Google has been able to manipulate the system in ways unique to itself so that, in the end, it did not have to compete on the merits for customers and volume.

25. Publishers and competing ad tech providers, increasingly wary of Google's bullying behavior, have continued to look for new ways to circumvent Google's dominance. Between 2012 and 2013, market participants began using a technique called "**header bidding**" as a partial workaround to Google's self-preferential algorithms and ad tech restrictions. As one Google employee explained, "Publishers felt locked-in by dynamic allocation in [Google's ad server] which only gave [Google's ad exchange] the ability to compete, so HB [header bidding] was born."

26. Publishers used header bidding to take back some degree of power over their own advertising transactions. They inserted header bidding computer code onto their own websites to allow non-Google advertising exchanges an opportunity to bid for advertising inventory before Google's hard-coded preferences for its own ad exchange were triggered. Header bidding allowed publishers to ensure that multiple advertising exchanges—not just Google's AdX—could bid on their inventory, thereby increasing the chances that they could find the best match.

27. Google has refused to tolerate this new form of competition, even though it has acknowledged in internal emails that header bidding had grown naturally out of Google's being "unwilling[] to open our systems to the types of transactions, policies and innovations that buyers and sellers wish to transact." Indeed, Google privately admitted that "header bidding and header wrappers are BETTER than [Google's platforms] for buyers and sellers," and that increased competition between AdX and publishers using header bidding would increase publisher revenues by 30 to 40%, and would provide additional transparency to advertisers. Not

only would header bidding enable rival exchanges to compete more effectively against Google's ad exchange, it might also allow them or others to enter the publisher ad server market if Google no longer had exclusive access to unique advertiser demand.

28. Google executives described header bidding as an "existential threat." They worried that wider adoption of header bidding practices could lead to Google's ad exchange having to compete with other ad exchanges on a level playing field, where Google could no longer set the rules in its own favor. If that were to happen, those rival ad exchanges might actually succeed in eroding, or even breaking up, Google's advertiser juggernaut, and the entire industry could be opened up for competition. Google feared the worst: the entire moat of anticompetitive protections that Google had built around the ad tech industry could be breached.

29. Faced with this "existential" threat, Google sought to stem the rising tide toward header bidding by promoting a Google-friendly analog of header bidding that Google deceptively titled "Open Bidding." Google has promoted Open Bidding as an answer to the industry's call for wider participation by rival ad exchanges and increased competition. In fact, Open Bidding was a Trojan Horse that Google used to further cement its own monopoly power.

30. As a condition to using Google's Open Bidding, Google has required that publishers and participating ad exchanges give Google visibility into each auction (including how rival exchanges bid), allow Google to extract a sizeable fee on every transaction (even where another exchange won), and limit the pool of advertisers allowed to bid in the auctions. In doing so, Google's ad exchange has retained a guaranteed seat in every auction, regardless of whether Google's ad exchange offers the best match between advertisers and publishers.

31. Google also sought to co-opt what it perceived to be its two biggest threats (Facebook and Amazon) into Open Bidding. In internal documents, Google concluded that while

it "[c]annot avoid competing with FAN [Facebook]," it could, through a deal with Facebook, "build a moat around our demand." Internal documents recommending a deal with Facebook revealed Google's primary motive: "[f]or web inventory, we will move [Facebook's] demand off of header bidding set up and further weaken the header bidding narrative in the marketplace." Thus, for these reasons, Google ultimately agreed to provide preferential Open Bidding auction terms to Facebook in exchange for spend and pricing commitments designed to push more of Facebook's captive advertiser spend onto Google's platforms. Google sought to head off Amazon's investment in header bidding technology with a similar offer, albeit without the same success.

32. Google also adjusted its auction mechanisms across its ad tech products to divert more transactions to itself and away from rivals that might deploy header bidding. On the publisher side, Google allowed AdX—and only AdX—to change its auction bid by altering Google's own fee after seeing the price to beat from another exchange.

33. On the advertiser side, Google first considered outright blocking its advertiser buying tool from buying inventory made available via header bidding. The goal: "dry out HB [header bidding]." When Google decided that strategy would be too costly for Google, it pivoted to a different and more insidious strategy with the same effect.

34. Google recognized that "instead of stop[ping] bidding on HB [header bidding] queries, we could bid lower on HB queries," and win the same impressions on Google's ad exchange instead. No rival exchange was in a position to compete with this strategy because no rival had the scale necessary to compete against the industry giant, especially considering the built-in advantages that Google afforded its own ad exchange and publisher ad server. Google, and Google alone, had control over both the leading source of advertiser demand and the

dominant publisher ad server. So, Google programmed its advertiser buying tool to advantage its ad exchange.

35. Google's bidding strategy on header bidding transactions proved remarkably effective in stunting the growth of header bidding, but Google still worried that its moat was not fully secure. Google learned that some publishers were using price controls within Google's own DFP publisher ad server to sell advertising inventory to rival exchanges outside of Google's closed-wall system, even in instances where Google's own AdX exchange had offered to pay more for the inventory. Publishers did so for a variety of reasons, including considerations related to ad quality, volume discounts, diversification of demand sources, data asymmetries, or other factors.

36. When Google identified this threat, it simply removed the feature from DFP and instead imposed competition-stifling Unified Pricing Rules. Under these new rules, publishers could no longer use price floors to choose rival exchanges or other buyers over AdX or Google Ads, no matter the reason. Google effectively took away their own customers' right to choose what buyer or ad exchange best suited their needs. In doing so, Google once again bought itself a free pass on competition.

37. Google's exclusionary, anticompetitive acts have severely weakened, if not destroyed, competition in the ad tech industry. In decision after decision, year after year, Google has repeatedly done what was necessary to vanquish competitive threats, including by enacting policies that took choices away from its own customers. And despite what Google may claim, it did not do so to protect the privacy interests of Google users. Indeed, Google intentionally

exploited its massive trove of user data to further entrench its monopoly across the digital advertising industry.[3]

38. Due to Google's conduct, ad tech tools that should have evolved to better serve website publishers and advertisers in a competitive environment have instead evolved to serve the interests of Google alone, to the detriment of Google's own customers. The results have been catastrophic for competition. Today, major website publishers have a single viable choice for publisher ad servers—Google's DoubleClick for Publishers. Google routes transactions from its publisher ad server to its more expensive ad exchange—AdX—and away from rival platforms, all of which are less than a quarter of AdX's size.

39. Advertisers and publishers, the key players in this market, have had scant visibility into the scope and extent of Google's anticompetitive conduct. As the lone conflicted representative of both buyers and sellers, Google has created a deliberately-deceptive black box where Google sets the auction rules to its own advantage. Diminished competitive pressure has reduced Google's incentive to innovate, and Google's control of these key ad tech tools has inhibited rivals' ability to introduce efficiency-enhancing innovations. Publishers and advertisers suffer from reduced competition for both ad tech products and advertising inventory. Google's conduct undermines the very purpose of digital advertising in the first place: to achieve optimum terms and pricing for digital advertisements so website publishers can continue to serve their

[3] At the time of the DoubleClick acquisition, Google's privacy policies prohibited the company from combining user data obtained from its own properties, e.g., Search, Gmail, and YouTube, with data obtained from non-Google websites. But in 2016, as part of Project Narnia, Google changed that policy, combining all user data into a single user identification that proved invaluable to Google's efforts to build and maintain its monopoly across the ad tech industry. Over time, Google used this unique trove of data to supercharge the ability of Google's buying tools to target advertising to particular users in ways no one else in the industry could absent the acquisition of monopoly—or at least dominant—positions in adjacent markets such as Search.

vital purposes in society. Indeed, Google's own documents show that Google has siphoned off ***thirty-five cents*** of each advertising dollar that flows through Google's ad tech tools:




Fig. 1

40. The cumulative impact of Google's anticompetitive conduct is more than simply the sum of each harm Google has caused. As new threats have arisen, Google has spread its actions across wide-ranging ad tech products knowing the synergistic, multiplier effect that its actions would have across the industry. Because Google has such a powerful hand in each aspect of the ad tech industry, it alone has the power to use and deploy hidden levers to manipulate the overall system to its advantage.

41. It is critical to restore competition in these markets by enjoining Google's anticompetitive practices, unwinding Google's anticompetitive acquisitions, and imposing a remedy sufficient both to deny Google the fruits of its illegal conduct and to prevent further harm to competition in the future. Absent a court order for the necessary and appropriate relief, Google will continue to fortify its monopoly position, execute its anticompetitive strategies, and thwart

the competitive process, thereby raising costs, reducing choice, and stifling innovation in this important industry.

## III. DISPLAY ADVERTISING TRANSACTIONS

42. When an internet user opens a website, a complex series of transactions—nearly instantaneous and invisible to the user—determines which ad to show to that user in each available ad space on the webpage. The set of technological tools that connect website publishers selling advertising opportunities to the advertisers wishing to buy those advertising opportunities ("ad inventory") is referred to as **ad tech**. Below is a schematic depicting some of the important ad tech tools used in online digital advertising:




Fig. 2

### *A. How Ad Tech Tools Work*[4]

43. The content creator or owner of a website is called a **publisher**. Each website can be programmed by its publisher to create slots where ads can be displayed. A graphical ad

[4] The process described herein governs the sale of display ads on the "**open web**," meaning websites whose inventory is sold through ad tech intermediaries that offer inventory from

displayed on a website that is viewed in an internet browser is called a **display ad**. A display ad may contain images, text, or multimedia. A single display ad shown to a single user on a single occasion is called an **impression**.

44. An ad tech transaction begins when a user opens a website. While the website's content loads, the website uses a **publisher ad server** to select which ads will fill each ad slot on the page. The publisher ad server is an ad tech tool that evaluates potential ads from different advertising sources and applies a decision-making logic to determine which ad will be displayed to the user opening the website. Since 2008, Google has owned the industry's leading publisher ad server, **Google Ad Manager**, which is often still referred to by its former name, **DoubleClick for Publishers ("DFP")**.

45. For a typical medium-to-large website, the publisher ad server first determines whether the ad spaces on the webpage opened by the user have already been sold to a specific advertiser directly by the publisher. Such **direct sales** result from one-on-one negotiations between website publishers and advertisers and typically involve premium ad placements (e.g., ads at the top of a webpage) that command the highest prices from advertisers. For any ad space not filled through direct sales, the publisher ad server then tries to sell the ad space through indirect sales channels. **Indirect sales** allow publishers to sell remaining or "remnant" ad space

multiple websites. Some websites, especially social media companies like Facebook and Snapchat, operate under a different "closed web" (or "walled garden") model in which inventory is sold directly to individual advertisers using a proprietary tool employed by that website. Other types of advertising distinct from open web display advertising include search ads (e.g., sponsored results in a search engine), video ads (e.g., commercials that play before, during, or after a streaming video), and mobile app ads (e.g., ads shown within a game or other non-browser app downloaded from an app store to a user's mobile device). The focus of this Complaint is on Google's anticompetitive conduct in the market for open web display advertising transactions.

(i.e., space not sold through direct sales). Many website publishers, especially smaller ones, only sell ad space through such indirect sales.[5]

46. Indirect sales are typically made via a series of interactions between ad tech tools. These technologies allow website publishers and advertisers to transact through lightning-fast automated processes, known as **programmatic** buying. Today, most programmatic transactions take place on an ad exchange. An **ad exchange** (sometimes called a supply-side platform or SSP) is a software platform that receives requests—often from a publisher ad server—to auction ad impressions on a particular webpage. The ad exchange solicits bids on the impression from advertiser buying tools, chooses the winning bid, and transmits information on the winning bid back to the publisher ad server. Google presently owns the industry's leading ad exchange, called **AdX** (now packaged as part of **Google Ad Manager**).

47. When a publisher ad server sends an auction request to an ad exchange, the publisher ad server provides certain information about the impression for sale. This can include information about the website itself, the ad space on the webpage (e.g., where the ad is placed), and the user that will view the impression.[6] After receiving this information from the publisher ad server, the ad exchange may supplement the information with any additional information the ad exchange might independently have about the user viewing the ad, including information about the user's browsing history, location, and age.[7] The ad exchange then transmits the bid

[5] For both direct and indirect sales, ad impressions are generally priced on a **CPM** basis, referring to cost-per-thousand (in Latin, "mille") per impression. For example, an impression with a $1 CPM would cost $0.001, or one-tenth of a cent.

[6] Because the publisher ad server historically transmitted this information to the ad exchange, the publisher ad server controlled what information was sent to prospective advertisers and in what form.

[7] Information concerning the user's location and browsing history can be gleaned through "cookies" set in place by the user's web browser. These cookies allow the web browser to collect

request, along with information gathered about the user and the website, to various advertiser buying tools, described below. The detailed information concerning the user's location and browsing history is highly valuable to advertisers because it helps advertisers assess the value of the particular impression to its overall advertising campaign. For example, if the information tells a particular retail advertiser that the user had previously browsed that retailer's website but did not complete a sale, then that retailer may be willing to pay a premium for the particular impression.

48. Advertisers receive and respond to bid requests using **advertiser buying tools**. These advertiser buying tools assist advertisers with connecting to ad exchanges, selecting impressions to bid on, submitting bids, and tracking the purchased impressions against the advertiser's advertising campaign goals.

49. Large ad buyers, such as major ad agencies or large businesses, frequently use a type of advertiser buying tool called a **demand side platform**. Demand side platforms provide sophisticated and customizable tools that allow the ad agency or business to manage their advertising purchases. Advertisers using demand side platforms have extensive control over where and how they bid for ad inventory. They often use their own data, or data purchased from other entities, to target particular users for their ad campaign. Google owns the United States' leading demand side platform, **Display & Video 360 ("DV360")**.

50. Smaller advertisers often rely on a type of advertiser buying tool with fewer, simpler options that are less customized. These advertiser buying tools are called **advertiser ad**

information about a user's internet location and browsing history which can then be passed along, or sold, to interested parties.

**networks**.[8] Today, most ad networks bid for and buy advertising space on an impression-by-impression basis, submitting bids alongside other ad networks and demand side platforms. Advertiser ad networks offer a self-service, easy-to-use technology solution, which as a practical matter is the only viable option for smaller advertisers, advertisers that prefer a simple "hands-off" approach, or advertisers that need the ad network's targeting data to buy ads effectively. Google offers the industry's leading ad network, **Google Ads**.

51. Most ad networks, including Google Ads, are a "black box" to advertisers. Advertisers have almost no control over the process by which the ad network bids for impressions. Nor do the networks provide advertisers with information about how or why the network bids for particular impressions on particular websites at particular times. Most ad networks charge advertisers primarily on a "cost per click," or "CPC" basis. The advertiser thus has no insight into how much the ad network spent to purchase a particular impression; the advertiser is charged a fee only when an internet user clicks on the ad. Google's ad network, Google Ads, sets this fee based on the actual cost incurred to buy advertising inventory plus a markup. This prevents Google's advertising customers from knowing how much Google is charging them, over and above Google's costs, for the inventory.

52. These ad networks are particularly important to businesses that do not have the expertise, advertising budget, or targeting data required for a demand side platform to be a viable option. Ad networks are also critical to website publishers. These ad networks are the only way for publishers to reach and sell ad space to smaller businesses that rely exclusively or primarily

[8] These advertiser networks are referred to as "networks" because they originally operated on a network model whereby the ad network would agree to buy a portion of a publisher's advertising space in bulk at a pre-set price. The ad network would then distribute the publisher's advertising space among a network of advertisers. The prices charged to those advertisers were not necessarily derived from the bulk price the network paid to acquire the space.

on ad networks to buy ad space. Further, the type of advertising space these ad networks seek to purchase from website publishers is often distinct from the advertising space sought by other advertising tools. That is because the advertisers using these networks often have unique advertising objectives. Further, these ad networks, and in particular Google Ads, have access to unique user data that allow them to target very specific advertising opportunities.

53. The flow of display ad transactions through these platforms—collectively called the **ad tech stack**—is depicted again below.




Fig. 3

54. The publisher ad server is referred to as the "**sell-side**." The advertiser buying tools are referred to as the "**buy-side**." Impressions offered for sale by publishers are referred to as publisher "**inventory**" and advertisers' interest in buying impressions is referred to as advertiser "**demand**."

55. Whether the advertiser uses a demand side platform or an ad network as its advertiser buying tool, the tool evaluates the bid request received from the ad exchange and, if the impression meets the advertiser's criteria (e.g., targeted audience, website category), the tool

determines an amount to bid on the impression. Because each impression is filled within fractions of a second while the website loads for the user, an advertiser could never evaluate each impression individually. Instead, advertisers rely on these automated advertiser buying tools to evaluate impressions and bid on their behalf based on parameters pre-configured by the advertiser ahead of time. The advertiser buying tool then sends its highest bid for the impression—as calculated by the tool—back to the ad exchange for consideration.

56. After receiving bids from multiple advertiser buying tools, the ad exchange holds an auction to determine the winning bidder. Historically, most ad exchanges ran a second-price auction in which the winning bidder paid a price one cent higher than the bid of the second-highest bidder. Today, however, most ad exchanges run first-price auctions where the highest bidder simply pays the price of its winning bid. The ad exchange sends information about its winning bid back to the publisher ad server, which evaluates the ad exchange's bid under a set of rules defined by the publisher ad server. The publisher ad server then makes the final decision regarding which ad to "serve" to the user. The publisher ad server sends a message to the winning advertiser to provide the content of the ad to be displayed.

### *B. How Ad Tech Intermediaries Get Paid*

57. Once the winning bid has been chosen, the advertiser pays the website publisher for the impression, but a portion of the payment is retained by each intermediary along the way as payment for its services. The advertiser buying tool and the ad exchange supplying the winning bid each collect a portion of the purchase price for the impression, which is referred to as a "**revenue share**" or "**take rate**." The publisher ad server generally charges the publisher a fee based on the number of impressions served. Unlike a revenue share, the publisher ad server fee typically does not vary based upon the price paid for each particular impression.

58. The total percentage of advertiser spend extracted by ad tech intermediaries can have a substantial impact on the revenue website publishers earn from advertising and on the return on investment that advertisers receive from their advertising campaigns. But this percentage is typically not fully transparent to advertisers or publishers; some fees are disclosed only to publishers or advertisers while other fees are obscured or not disclosed at all. According to Google's internal documents, when a transaction passes through each of Google's ad tech tools (including Google's campaign manager product, which helps advertisers manage ad content and track campaign spending), Google estimates that it gets to keep about 35% of every dollar spent on digital advertising (as shown in Figure 4 below).




Fig. 4

59. These technology platforms have provided essentially the same services for over a decade. During that time, Google's monopoly positions and the restrictions it has imposed across these technologies have diminished the incentive and ability for Google or others to innovate. This reduced innovation is compounded by high prices: despite publishers' and advertisers'

interests in reducing the amount of advertising spending siphoned off by intermediaries, Google's take rate has remained remarkably stable over time. In particular, Google has consistently charged a roughly 20% fee for impressions bought through its ad exchange, the link in the chain where the highest fees are charged.

### *C. How Publishers and Advertisers Select Ad Tech Tools*

60. Publishers and advertisers try to optimize their use of ad tech to meet their revenue or advertising goals. As a general matter, publishers use only one publisher ad server to manage ad inventory in order to avoid discrepancies in tracking revenue or impressions and to minimize the burden of having employees oversee two largely duplicative systems. Ultimately, there can only be one publisher ad server acting as the final decision-maker as to which advertisement will fill each impression.

61. Sizeable publishers generally prefer to offer their inventory for sale through more than one ad exchange (a practice called "**multi-homing**"). This increases the likelihood that an advertiser on one or more of the ad exchanges will be able to "match" the advertising opportunity offered by the publisher to a user or category of user that an advertiser particularly values and therefore is willing to compete to buy. When publishers are able to offer their inventory for sale through multiple ad exchanges simultaneously, it causes ad exchanges to compete with each other to provide the best "match" or the lowest revenue share. However, there are integration, contracting, and other costs associated with the publisher adding each additional ad exchange.

62. Likewise, advertisers often connect with multiple ad exchanges through their advertiser buying tools, hoping that exposure to as much advertising inventory as possible will increase the likelihood of reaching the advertisers' intended targets for their advertising campaigns at the lowest cost. Using multiple ad exchanges also allows advertisers to compare

performance between ad exchanges. Similarly, when advertisers are able to freely multi-home among ad exchanges, it forces ad exchanges to compete with each other to provide advertisers the best return on their advertising expenditures.

63. Although there are a number of factors that advertisers consider when deciding which ad exchanges and/or ad buying tools to use, one key driver is access to especially valuable advertising inventory. Some ad tech products can be used to buy or sell both open web display advertising—the focus of this Complaint—as well as other types of advertising, such as advertising inventory that is "owned-and-operated" ("O&O") by the company offering the ad tech product.

64. For example, some of Google's ad tech products allow advertisers to buy both open web display advertising on third-party websites as well as advertising on Google's O&O properties. Google's O&O properties include several market-leading sources of non-open web display advertising inventory, such as Google Search, YouTube, Gmail, and Android's Google Play Store, among others. Advertisers and advertising agencies looking to advertise on these O&O properties often must adopt at least one of Google's advertising tools to do so effectively. For example, many larger advertisers and ad agencies seeking to promote their brands through online video advertising on the market-leading YouTube website generally must use Google's advertising tools to do so; so for them, as well, adoption of Google's ad tech tools is considered a must.

65. If an advertiser or advertising agency believes it needs Google's tools for purposes of Google O&O advertising, it is less likely to adopt another buying tool—or tools—to advertise on the open web. Among other considerations, the adoption of multiple ad tech tools typically costs more (in time and money) and limits the ability of the ad tech tools to share

important performance data across these tools. As a result, companies with especially valuable O&O advertising—such as Google—may be able to take advantage of existing, sizeable advertising bases already locked into their advertising tools.

### *D. Why Scale and the Resulting Network Effects are Necessary to Compete in Ad Tech*

66. Scale is a critical factor in the long-term success of each of the key products that comprise the ad tech stack. Scale and related network effects are cumulative; they reinforce market power for incumbents and raise barriers to entry and competition for nascent and smaller rivals. There are at least three important dimensions of scale at play in online digital display advertising.

67. *First*, scale in ad tech means having a significant number and variety of publishers or advertisers using a particular ad tech product. For example, an ad exchange that has significant scale enjoys large numbers and varied types of (i) publisher advertising inventory, on the one hand; and (ii) advertisers that bid through the ad exchange, on the other hand. This scale is key to attracting both publishers and advertisers to the ad exchange because ad exchanges are characterized by strong network effects (meaning that the value of an ad exchange to its users increases as more users adopt the tool). An ad exchange with access to more inventory—especially more sought-after inventory—will be more attractive to advertisers. Likewise, an ad exchange with more advertisers—and more unique advertisers—will be more attractive to publishers. This aspect of scale plays out in similar but less pronounced ways for publisher ad servers. For example, larger and more valuable inventory justify an ad exchange incurring the cost to integrate with a particular ad server. Publisher ad servers are also relatively more expensive to build and relatively less expensive to run, so a larger publisher base allows the publisher ad server to spread the fixed costs over more publishers. With respect to advertising

buying tools, more advertisers and more overall advertising spend will attract publishers to a particular tool. Moreover, to the extent that an advertiser buying tool has access to data from a related sell-side product, the advertiser buying tool can gain unique targeting abilities.

68. *Second*, scale includes the number and quality of impressions that publishers have offered for bidding through the ad tech product, the number of bids advertisers have made, and the number of transactions that have been completed—as well as the associated revenue for those transactions. The more business the ad tech provider has done, the more data that provider has, and the greater the ability the provider has to increase the value of its services. For example, an ad tech provider that is able to see a larger swath of advertising inventory made available for auction will have greater insights into the universe of inventory available, and can adjust—or suggest adjustments to—its customer's bidding behavior accordingly. Additionally, an ad tech provider that is able to see at scale who ultimately buys or bids on inventory and at what prices can create bidding strategies that can be used to predict more accurately future auctions for similar inventory. For example, the ability to observe the depth and distribution of bids for different advertising inventory can provide valuable data on how demand might change based on price and other factors. In addition, data concerning advertisers' buying strategies, and how all of this information changes over time, is incredibly useful. Without access to this type of inventory, bidding, and transaction information at scale, an ad tech provider is less able to offer a competitive ad tech tool to publishers or advertisers.

69. *Third*, scale includes the depth of targeting data that an ad tech product has available and can use to identify the most valuable matches between particular pieces of publisher inventory and advertisers. This aspect of scale in the ad tech ecosystem is influenced both by an ad tech provider's access to relevant targeting data from seeing and winning more

digital advertising transactions (which can provide important information on an internet user's characteristics and behavior) as well as from other parts of its business (e.g., Google's access to website contextual data and detailed user profiles on its customers using Search, Chrome, Android, or Gmail).

70. The ability of an ad tech product to achieve scale along these dimensions is important to its long-term success. For an ad exchange, increasing publisher inventory and advertiser demand, understanding the likely bid landscape based on prior consummated transactions, and having access to detailed user targeting and contextual data all increase the ad exchange's chances of being the supplier of the advertiser bid ultimately selected by the publisher ad server. This is key because ad exchanges only collect a revenue share on *winning* bids—even though the ad exchange incurs costs (for personnel, equipment, and processing power) for every bid request and response, whether won or lost. An ad exchange lacking sufficient access to these various dimensions of scale may not be able to compete effectively, innovate, or even operate.

### *E. How Multi-Homing Enables Competition in the Ad Tech Stack*

71. The purpose of the ad tech stack is to bring together publishers and advertisers. Publishers benefit when there are more advertisers to bid on their inventory, and advertisers benefit when there are more impressions available to buy. As a result, the various markets that make up the ad tech stack exhibit strong "indirect network effects," i.e., the value of the services provided by these ad tech tools increases as the number of participants on both sides of the product increases.

72. Additionally, because each possible advertising opportunity (or impression) is unique based on a variety of factors (e.g., the identity of the user, the substance of the website, the location on the webpage), the value of a particular impression opportunity can vary

significantly across advertisers. For example, a banner ad at the top of an automotive website would be highly valuable to a car dealership located in the same zip code as the user; that same banner ad space would be less valuable to a home improvement store located in another state. Digital advertising technology, when operating in a healthy, competitive environment, attempts to create the most value for its customers by matching publisher advertising opportunities with the advertisers willing to pay the most for them. By multi-homing across ad exchanges, both website publishers and advertisers are able not only to seek the best possible match for a given advertising opportunity, they are also able to contribute to, and benefit from, competition more generally.

73. Ad exchanges compete for publisher inventory and advertiser demand at two distinct but related levels. First, they compete for adoption by publishers and advertisers, i.e., the opportunity to see a publisher's inventory or submit an advertiser's bid. Second, once an exchange has been adopted, it competes with other exchanges to win the ability to process a particular advertising transaction (i.e., to win individual advertising auctions). At both levels of competition, ad exchanges compete not only on price but also on quality and access. Generally, an ad exchange with more advertisers will be more valuable to publishers, and vice versa. When both sides in a market single-home (i.e., only connect with a single ad exchange), sellers (publishers) tend to flock to the ad exchange with the most buyers (advertisers), all else being equal. Advertisers likewise prefer the ad exchange that has the most advertising inventory from publishers. Google's dominance of scale on both sides of the ad tech stack thereby strengthens Google's dominance overall in the industry and weakens its rivals' ability to compete. Conversely, when participants on both sides actively multi-home, there may be multiple exchanges that offer access to the other side of the market, applying competitive pressure to

decrease fees or increase quality in order to win business. Thus, actions that impair the ability of one or both sides to multi-home are invariably corrosive to competition.

## IV. GOOGLE'S SCHEME TO DOMINATE THE AD TECH STACK

74. Over the past fifteen years, Google has acquired and maintained mutually reinforcing monopoly positions in tools across the ad tech stack. Google's scheme has involved a range of conduct, whereby it—often surreptitiously—has wielded its market power in various ad tech tools to undermine attempts by publishers, advertisers, and rivals to introduce more competition for digital advertising transactions. Individually and in the aggregate, Google's anticompetitive acts have deprived rivals of critical scale and contributed to Google's dominance by erecting substantial barriers to entry and competition.

75. Google also has used its dominant position time and again to prevent publishers—its own customers—from efficiently and effectively multi-homing across ad exchanges, and to prevent rival ad tech providers from deploying technology that would have improved the process by which advertisers and publishers find the best advertising matches in real time for each impression. In the face of potential competitive threats, Google has resisted innovation and chosen not to compete on the merits. Instead, it has used acquisitions and market power across adjacent ad tech markets to quash the rise of rivals, tighten its control over the manner and means through which digital advertising transactions occur, and prevent publishers and advertisers from

working effectively with Google's rivals. As the figure below demonstrates, Google's dominance across the ad tech industry is unparalleled.




Fig. 5

### *A. Google Buys Control of the Key Tools that Link Publishers and Advertisers*

76. Google entered display advertising on the back of its early strength in search and search advertising. In 2000, Google launched **Google Ads** (then called "AdWords"), a self-service buying tool for advertisers. At the time, advertisers could use Google Ads to purchase advertising on the webpage displaying Google search results.

77. As Google's search engine dominance grew, it attracted large numbers of small and large businesses that considered advertising on Google's search results page to be critical to reaching customers searching for their products or services. After amassing this pool of advertisers, Google realized it could not only sell them advertising space on Google's search results page, but also step in as an intermediary to sell them advertising space on non-Google websites as well. Thus in 2003, Google changed the default setting on Google Ads so that businesses were automatically opted into using Google Ads to advertise on third-party websites

through what became known as **Google Display Network**, or "**GDN**." Today, Google Ads has grown to represent over two million advertisers, spending about $11 billion worldwide on open web display inventory per year. Google Ads is a substantial, unique source of advertising demand and revenue for publishers.

78. In 2006, Google found itself without sufficient access to non-Google premium advertising inventory to meet its advertisers' demand. Effectively integrating Google Ads with existing publisher-facing platforms would have benefited both Google Ads advertisers—by increasing their access to inventory—and Google—by increasing advertising sales, and in turn Google's total revenues as a percentage of those sales. Instead, Google sought to maintain more control over advertising purchases made by its Google Ads' advertisers. In particular, it limited the ability of its Google Ads' advertisers to buy inventory from Google's rivals. Google recognized that if it could secure access to its own pool of publisher inventory, it could control the entire transaction, end-to-end, and become the "the be-all, and end-all location for all ad serving." To that end, Google built and launched its own publisher ad server, but the product failed to gain traction.

79. Rather than innovate and compete, Google found a shortcut. In 2007, Google announced that it would buy DoubleClick for $3.1 billion. DoubleClick offered the industry-leading publisher ad server, called DoubleClick for Publishers or "DFP", which at the time had an estimated 60% market share. DoubleClick also was developing a nascent ad exchange, called AdX.

80. The DoubleClick acquisition was a pivotal moment for Google's display advertising technology business and its strategy to dominate the ad tech stack. The deal provided Google with direct access to website publishers (and their inventory) on DoubleClick's publisher

ad server and, for the first time, a significant presence on both the advertiser and publisher sides of the ad tech stack. Google feared that if a rival acquired DoubleClick, Google would not control all the tools that link Google's advertisers with publisher inventory; in short, a rival could "disintermediate" Google. Disintermediation risked allowing another company to control how and where publishers sell impressions to advertisers, something Google would not tolerate because it would limit Google's ability to generate monopoly profits. Setting the stage for what was to come, the DoubleClick acquisition provided Google the unilateral power to implement a series of anticompetitive restraints, using its dominance on both the publisher and advertiser sides of the market to inhibit competition across the entire ad tech stack.

81. The Federal Trade Commission ("FTC") investigated Google's proposed acquisition of DoubleClick. The FTC considered "the possibility that Google could leverage DoubleClick's leading position in third party ad serving to its advantage in the ad intermediation market" and whether Google could "exclusively bundle AdWords [advertiser demand] with [its publisher-side platforms] AdSense and DFP."

82. The FTC ultimately declined to challenge Google's acquisition of DoubleClick for the reasons set out in its public closing statement. The FTC concluded that "DoubleClick does not have market power despite its high market share"—over 60% at the time—and that "firms can and do switch ad serving firms when it is in their self-interest to do so." Based on these assumptions, the FTC believed any anticompetitive conduct by Google "would likely be defeated by customers switching to one of the other third-party ad serving products."

83. Google's contemporaneous business documents paint a very different picture, however. Six months after the FTC closed its investigation without taking action, one senior Google executive wrote about the importance of controlling access to publisher inventory

through the DFP publisher ad server, stating "the thing we want 'secured' is the DFP platform adoption" because "if we have this" then Google would "have a +20% monetization advantage." In other words, Google believed it could sustainably charge a higher price on advertising transactions than its competitors because it controlled the process and rules by which publisher inventory could be sold.

84. Google knew the emerging ad tech market better, and acknowledged in internal documents that "due to [the publisher ad server's] position as the operating system for ad sales, switching costs are very high." Because of this "stickiness" of publisher ad servers, Google knew it could manipulate the system in its favor—and to the detriment of competition—without fear that publishers would switch to other publisher ad servers. After the acquisition was completed, the former DoubleClick CEO explained at an internal Google strategy meeting, "My view is nothing really matters but the platform [publisher ad server]. Nothing has such high switching costs. If there's a better network or exchange, you can just switch to it. Switching platforms is a nightmare. Takes an act of God to do it."

85. Following the DoubleClick purchase, Google cemented its position as the dominant intermediary between advertisers and publishers through a series of additional acquisitions that eliminated potential competitors and further bolstered Google's position in open digital advertising. For example, in 2009, Google paid $750 million to purchase AdMob, a technology system that allowed publishers of mobile apps to sell ads as well. While Google's conduct in the distinct market for mobile app advertising is outside the scope of this Complaint, Google's anticompetitive conduct in the mobile apps market is consistent with the conduct alleged in the market for display advertising.

86. In 2010, Google acquired Invite Media for approximately $81 million. Invite Media offered a demand side platform. Google subsumed Invite Media into a demand side platform it was developing, Display & Video 360 (at the time, known as "DoubleClick Bid Manager"). By capturing an increasingly large share of bigger, more sophisticated advertisers and advertising agencies, Display & Video 360 complemented Google Ads and expanded Google's control over advertiser demand.

87. In 2011, Google bought AdMeld for approximately $400 million. As discussed further below, AdMeld had developed technology to provide "yield management" functionality to publishers. Yield managers like AdMeld helped publishers manage inventory and optimize revenue by comparing offers from multiple advertiser demand sources at the same time. This comparison feature made it easier for new ad exchanges and advertiser demand sources to enter the ad tech industry because it gave publishers the incentive and ability to switch between ad exchanges and advertiser demand sources in response to better prices and service.

88. The DoubleClick, Invite Media, and AdMeld acquisitions helped Google achieve dominant positions at each level of the open web ad tech stack and set the stage for Google to control and manipulate the process by which publishers sell and advertisers buy open web display inventory.

### *B. Google Uses Its Acquisitions and Position Across the Ad Tech Stack to Lock Out Rivals and Control Each Key Ad Tech Tool*

89. After amassing a position as the dominant intermediary for display advertising, Google used its monopoly power over each level of the ad tech stack to reinforce its dominant positions and limit where and how other ad tech providers could compete. Most notably, Google made its Google Ads' demand available only through its AdX ad exchange. In turn, Google effectively made its ad exchange available only to publishers using its publisher ad server (DFP).

This benefited Google's long-run aspirations of dominating the publisher ad server market, at the expense of Google Ads' advertisers seeking access to the widest variety of publisher inventory at the lowest price. By allowing only its own publisher ad server effective access to important, unique Google Ads' demand, Google could force publishers to adopt and remain on its publisher ad server; other ad servers could not compete to offer a similar product. But this restriction meant Google Ads' advertisers could not buy inventory available only on other ad exchanges or via non-Google publisher ad servers, and they could not take advantage of fee competition that might make that advertising inventory less expensive. The restriction also was contrary to Google's short-term financial interests, which turned on buying more and more-valuable advertisements from as many publishers as possible.

90. Google introduced several policies and auction changes to force more transactions to flow through its platforms and make it more difficult for publishers to switch ad servers. These restrictions collectively stifled competition by artificially preventing rivals from competing on the same terms as Google's products, thereby impeding publishers' and advertisers' ability to work effectively with rivals and allowing those rivals to obtain scale. Google implemented these restrictions even though it knew that it would have been better for Google Ads' advertisers (and far more profitable for Google Ads in the short run) to multi-home across ad exchanges. And, likewise, publishers would have benefited from being able to effectively access advertiser demand through multiple ad exchange intermediaries. These restrictions had the effect of taking Google's publisher ad server from a market leader to a monopoly—currently with no credible competition—and catapulting its nascent ad exchange into a monopoly position that dwarfs all other ad exchanges.

### *1. Google Thwarts Fair Competition by Making Its Google Ads' Advertiser Demand Exclusive to Its Own Ad Exchange, AdX*

91. The DoubleClick acquisition was a first step in Google's march to monopoly. After purchasing DoubleClick, Google restricted Google Ads' purchasing of display inventory to sources controlled by Google (inventory owned by Google or by publishers using Google's monetization products, including its newly acquired publisher ad server). The goal was ultimately to lock publishers into its ad exchange and publisher ad server, and block competing ad exchanges and publisher ad servers from accessing Google's valuable pool of advertiser demand. Google implemented this restriction when it launched "AdX 2.0" on September 17, 2009. At the time, Google identified one of AdX's two differentiators from other ad exchanges as unique "access to AdWords advertisers."

92. Google has continued to sacrifice profits and act against the interests of its own advertisers by blocking its Google Ads' customers from buying almost any inventory through non-Google platforms, such as rival ad exchanges and networks, even if those competitors offered more valuable inventory or the same inventory at lower prices. Google estimated that by 2017, Google Ads was forgoing $863 million per year in revenue by not purchasing inventory from rival ad exchanges and networks. But Google believed this forgone revenue was worth it in the name of advancing its growing moat and protecting its monopoly positions across the ad tech stack. Exclusive access to Google Ads' demand compelled most publishers to adopt whichever ad tech tools Google required to effectively access that demand.




Fig. 6[9]

93. Google Ads' unique and sizeable advertiser demand is what makes Google's ad exchange unavoidable for most website publishers. Google Ads' demand is unique both in its volume and diversity of advertisers (now with more than two million) and in its ability to attract advertisers at scale who cannot effectively use any other digital display advertising tool to purchase ads on the open web. Even for Google Ads' advertisers who can use alternative buying tools, many of them are pushed into Google Ads in order to buy other forms of critical advertising inventory that Google makes available effectively only through its buying tools, such as portions of YouTube, Gmail, and Search ad inventory. Together, these characteristics mean that Google Ads has a significant scale advantage by controlling a unique demand group (that spends about $11.5 billion on display inventory each year).

94. Google Ads is also differentiated from other sources of advertising demand because Google's data-targeting advantages allow it to identify inventory that is uniquely

[9] Diagrams are provided throughout to highlight the location within the ad tech stack where the conduct predominantly occurred. They are not intended to identify all areas where the identified conduct impacted the competitive process or other market participants.

valuable to Google Ads' advertisers. Google Ads' targeting data is derived from a wide array of user data that Google compiles across its many market-leading or monopoly products (e.g., Chrome, Gmail, Google Search) as well as data that Google requires its publishers to share with it through a data pool called the "ICM Coop."[10] Google Ads combines this targeting data with contextual data Google extracts while crawling publisher websites. These sources of data fuel the immense network effects that raise barriers to entry and insulate Google from competitive pressure.

95. The advertiser make-up and data advantages of Google Ads lead it to buy large swaths of inventory that otherwise would go unsold. Certain inventory is valuable only to advertisers that use Google Ads exclusively; other inventory is undervalued without the user targeting and contextual data that Google makes available only to Google Ads. Google does not simply limit access to this data to its own advertiser buying tools. It also has exercised its market power to undercut rivals' ability to compete using the same or similar data. For example, after the DoubleClick acquisition, Google "hashed" (i.e., masked) the user identifiers that publishers previously were able to share with other ad technology providers to improve internet user identification and tracking, impeding their ability to identify the best matches between advertisers and publisher inventory in the same way that Google Ads can. Of course, any purported concern about user privacy was purely pretextual; Google was more than happy to exploit its users' privacy when it furthered its own economic interests.[11]

[10] The ICM Coop is not a real cooperative among website publishers. Rather, it is a data pool over which Google has sole control that publishers must participate in in order to receive competitive bids from Google Ads. Google estimated the value of this data to Google Ads was $4 billion in 2015.

[11] *See supra*, n. 3.

96. Google recognized the power it wielded in Google Ads and used it to prop up and insulate its other ad tech products from competition. According to a 2011 internal analysis, Google found that allowing Google Ads to buy inventory on rival ad exchanges would cause serious losses to its publisher platforms (DFP and AdX) because many publishers and advertisers would prefer to transact through rival platforms. Google estimated that in such a scenario its ad exchange would lose 20 to 30% of its impressions, and its publisher ad server would lose 20% of its publishers. Later internal studies confirmed Google Ads' stranglehold. A 2014 Google experiment found that more than half of the impressions that publishers offered on its ad exchange would go unsold without the critical Google Ads' demand. If the Google Ads' demand was removed from the ad exchange, Google's publishers would experience a 65% drop in revenue because no advertisers outside of Google Ads were interested in buying the unique impressions available or able to do so in light of the auction restrictions described below. Google congratulated itself on having effectively locked out meaningful competition. At one Google strategy meeting, Google executives applauded the fact the "unique Google Display Ad demand" allowed it to justify "why we can charge 20%" fees for open auction transactions won on AdX, even on transactions that did not use Google Ads' buying tools.

97. By preventing publishers from accessing this incredibly valuable demand through rival ad exchanges that publishers otherwise would prefer, Google distorted the way in which website publishers partner with Google's competitors. As Google's former head of global strategy and commercialization explained: "When [advertiser] demand can only be found through certain sources, it compels publishers to work with that product." Because Google owns both DFP and Google Ads, and publishers needed to use DFP to access Google Ads' demand

effectively, Google had no incentive to operate DFP for its own publisher customers' benefit in the way that DoubleClick did.

98. For Google Ads' single-homing advertisers, Google has made it impossible for any rival ad exchanges to compete for the opportunity to link them with publisher inventory. As a result of this restraint, single-homing advertisers have more limited access to advertising inventory (less "reach"). Google recognizes that while this exclusivity locks in publishers, it harms Google Ads' advertisers, which have no reasonable alternatives to which they can turn. As explained in one 2012 internal document, the policy amounts to a "buyside-subsidizes-sellside model" that "artificially handicap[s] our buyside (GDN [Google Ads]) to boost the attractiveness of our sellside (AdX [ad exchange])." Later, in 2014, one Google employee complained about Google Ads' sending Google's publisher platforms a "$3bn yearly check by overcharging our advertisers to ensure we're strong on the pub[lisher] side." These complaints by Google's own employees working on Google's advertiser tools reflect the artificiality of the restrictions imposed on Google Ads, and make clear that the restrictions are what they seem: blatant exclusionary conduct designed to obtain and maintain monopoly power rather than efforts to build a viable, vibrant ad exchange. Deliberately overcharging its own advertisers is also clear evidence of monopoly power over the advertising side of the ad tech industry. No other competitor could engage in such conduct and expect to stay in business.

99. In response to pressure from within Google's own ranks, including by employees managing Google Ads, and only after it shored up its market position across the ad tech stack, beginning in 2015, Google allowed limited categories of advertising demand to bid for some inventory on rival ad exchanges. This was something that Google's engineering team had previously considered and viewed as technically possible, but which its product leadership had

refused to allow. Google's buy-side employees championed this new feature as in the interest of Google Ads' advertisers and Google Ads itself, as a standalone product.

100. Even for the limited subset of demand that Google finally allowed Google Ads to bid on rival ad exchanges, Google disadvantaged those bids. Specifically, Google refused to allow Google Ads' advertisers to submit bids to rival exchanges using the same bid modelling and targeting data that Google Ads used to generate bids for Google's own ad exchange. Likewise, when submitting Google Ads' advertisers' bids to rival exchanges, Google submitted only the single highest bid, whereas when Google submitted the same advertisers' bids to Google's own ad exchange, AdX, Google submitted its two highest bids to improve the revenue payout to publishers.

101. In effect, Google systematically decreased the payout that Google Ads provided to publishers by extracting higher fees on the transactions (now ranging from 32% to 50%). In aggregate, Google understood "32% margin and no 2nd price makes [Google Ads demand] less desirable to access via a middle-man." Once again, Google acted to preserve its own monopoly power rather than its customers' best interests.

102. Google implemented these changes not because it was interested in helping its advertisers achieve the best return on their advertising investment; rather, by submitting two bids, Google was able to redirect sales back to AdX, ensuring AdX's "must have" status in the industry and making it difficult for rivals to have the scale necessary to compete. In fact, Google has gone so far as to enter into non-disclosure agreements with these rival ad exchanges to prohibit them from telling publishers that even this limited form of Google Ads' demand could be found outside of Google's ad exchange. Google imposed these restrictions because it understood that "when our competition is able to say that they have access to [Google Ads],

whether it is equal or not, our sales and marketing teams will have to be prepared for significant competitive pressure." Rather than face that competitive pressure, Google simply restricted rival exchanges' ability to market their capabilities to their publisher customers.

103. Google's coupling of Google Ads' demand to its budding ad exchange was significant in Google's plan to dominate the market and exclude competition. Google took its existing scale advantages in Google Ads and extended those to Google's other ad tech products, by driving more opportunities and transactions through them and away from rival marketplaces. As predicted, Google's nascent ad exchange grew exponentially after its relaunch in 2009. In the wake of the DoubleClick acquisition and the implementation of these restrictive policies, Google's ad exchange display revenue grew 283% in 2009 and an astounding 844% in 2010. By June 2011, Google executives boasted about becoming the "#1 player" in U.S. display advertising, a substantial jump for a company that had failed to gain traction with its own publisher ad server just five years earlier. Today, because of this exclusionary conduct, 95% of Google Ads' spend flows through Google's own AdX ad exchange, while less than 5% flows through rival ad exchanges. The combination of Google's acquisitions with its anticompetitive business practices has suppressed, or altogether eliminated, the necessary growth for rivals to compete.

### 2. *In Turn, Google Makes Its Ad Exchange's Real-Time Bids Exclusive to Its Publisher Ad Server*

104. At the same time, Google used what most publishers saw as AdX's must-have status to reinforce and grow its already dominant publisher ad server, DFP, ultimately pushing remaining publishers to adopt Google's ad server and forcing rivals to exit the market. With its relaunch of the ad exchange after the DoubleClick acquisition, Google required publishers to use its ad server to obtain real-time bids from its ad exchange. If a publisher chose not to use DFP, it

was relegated to selling impressions to AdX at a floor price based on historical average prices, which were often much less than the real-time, impression-specific bids AdX made through DFP. As a 2018 Google presentation bluntly noted, "[DFP] is the only way to access [AdX] as a publisher."




Fig. 7

105. Google did not need to make AdX exclusive to DFP in this way, but nevertheless decided to pursue the most restrictive alternative. In 2011 and 2012, Google developed a feature that would enable AdX to compete for inventory in the same way on other publisher ad servers. The feature was available in beta to some partners and required only "minimal effort" to roll out commercially. But Google saw that this feature risked taking away a "key differentiator for DFP": access to real-time AdX demand. As one Google employee explained in September 2012, "it is too early to give AdX to non-XFP [DFP] partners. . . . This is an amazing time to 'lock in' impressions by offering XFP [DFP] to publishers . . . . AdX can serve as a tool to pull publishers onto XFP [DFP]. . . . Ad Servers are sticky, and hard to replace. The next 12 months are a very good time to switch publishers over." By 2013, Google decided to end this experiment in

openness, with Google's lead product manager for AdX declaring: "[O]ur goal should be all or nothing – use AdX as your SSP or don't get access to our demand."

106. By limiting Google Ads' demand to the AdX ad exchange, and limiting real-time access to the ad exchange to publishers using Google's publisher ad server, Google compelled publishers to adopt its ad server for effective access to Google Ads' demand. Recognizing the importance of real-time competition for ad inventory—which priced an advertisement based on the particular characteristics of a webpage user at that specific point in time—Google blocked publishers using rival ad servers from connecting to Google's ad exchange in the same way. Google knew that its Google Ads' advertisers provided a unique, rich source of advertiser demand, and that no other publisher ad server (or ad exchange) could offer similar access to such a lucrative pool of advertiser demand. Many publishers could not afford to use a rival publisher ad server because they could not afford to lose the revenue that Google's exclusively-linked platforms could provide. In essence, Google dictated publishers' choice of each key ad tech tool used to sell their inventory: publishers must make their inventory available through Google's publisher ad server and ad exchange to get the opportunity to sell a portion of it to Google's extremely valuable Google Ads' advertisers.

107. By 2015, these restrictions had virtually eliminated competition between publisher ad servers, driving rivals to abandon the market completely. Google's market share for publisher ad servers soared from 60% in 2008 to 90% by 2015. In a 2016 customer presentation, Google described DFP as the "defacto [sic]" publisher ad server with a "90% market share." At the same time, it guaranteed to Google Ads—via Google's ad exchange—preferential access to an unrivaled swath of publisher inventory, as well as the associated contextual and user targeting data, which supported Google Ads' remaining a dominant, scaled ad network.

108. To this day, Google's restrictions and conduct essentially foreclose the possibility of entry into the publisher ad server market. To enter the publisher ad server market, a competitor not only would need to offer a full-featured ad server, but also would need to be able to link it to an ad exchange and advertiser demand source of the same size and scale as Google's ad exchange and Google Ads' advertiser demand. Without such a full-stack offering, a competitor would need to convince publishers to sacrifice effective access both to Google's ad exchange as well as access to Google Ads' unique advertiser demand, an ask that is simply not economically feasible given Google's successful exclusionary conduct to date.

### *3. Finally, Google Uses Its Control of Publisher Inventory to Force More Valuable Transactions Through Its Ad Exchange*

109. Google's ownership of the leading publisher ad server, DFP, allowed it to set the rules that governed how most publisher inventory in the market is sold. Google internally referred to publisher ad servers as the "ad revenue operating system for publishers" because they decide who is offered a chance to buy publisher inventory and on what terms. Not content to operate in a free and competitive market, Google altered its publisher ad server rules to force more transactions—and more high-value transactions—through its ad exchange and advertiser platforms. The changes did not allow Google's ad exchange rivals to compete in the same way or

on the same terms, largely leaving them with the leftover scraps of inventory that Google's advertisers did not want, even at artificially discounted prices.




Fig. 8

110. Until at least the advent of header bidding between 2012 and 2013 (and for many publishers not until at least 2018), publishers that wanted to offer inventory to multiple ad exchanges via Google's publisher ad server had to use a system known as the "waterfall." Even though this system plays a smaller role now than it once did,[12] it played a pivotal role in establishing Google's dominance in the ad exchange market, was a critical predicate to certain other Google conduct, and helped to create the market monopoly that Google enjoys today.

111. Under the waterfall process, the publisher ad server would send offers to sell advertising inventory to ad exchanges and advertiser ad networks one at a time in sequence until it found an eligible buyer. To set up the waterfall, publishers had to manually enter into the publisher ad server the average price they expected to be paid by each ad exchange based on

[12] Because of the difficulties and costs of utilizing newer alternative systems in Google's ad server, many publishers are still forced to use the waterfall system today.

historical averages. Because these were average prices, they did not necessarily reflect what an ad exchange would pay for any individual impression at any particular time. The publisher ad server then ranked each ad exchange from highest to lowest based on average historical price. Then when a user opened a publisher's webpage and an ad impression became available for sale, the ad server offered the impression to the ad exchange ranked highest in the waterfall. If that ad exchange had an advertiser willing to pay more for the impression than the minimum price set by the publisher (the "price floor")—which could differ from the average prices of that ad exchange—the ad exchange won the impression, and its advertiser was able to display the ad. The ad was not submitted to any of the other ad exchanges in the waterfall, even if one of them might have been willing to pay more for the impression. Alternatively, if the first ad exchange did not have an advertiser willing to pay at least the publisher's price floor, the ad server called the next ad exchange in the list. This process continued until someone purchased the impression or the last ad exchange in the waterfall was called.




Fig. 9

112. The inefficiencies associated with the waterfall system are obvious: ad exchanges at the bottom of the waterfall might never get a chance to bid, even if they could supply a lucrative bid. In those instances, publishers received less revenue than they could have. But while this inefficiency plagued how inventory was sold to rival ad exchanges, Google used its control over the process to allow its ad exchange—and only its ad exchange—to compete outside of the waterfall process.

113. As part of its post-acquisition relaunch of AdX, on a “system written from scratch” on Google’s platform, Google redeployed “dynamic allocation.” Dynamic allocation provided AdX a prized position over all other indirect sources of advertising demand, which allowed AdX to both “see more” and “win more” valuable publisher inventory.

114. *First*, Google configured its publisher ad server to afford Google’s ad exchange a “first look” at all inventory the ad exchange was eligible to buy. Google’s publisher ad server

always called Google's ad exchange for a real-time bid before offering inventory to rival ad exchanges. This placed Google's ad exchange at the top of every waterfall, regardless of where it would otherwise be ranked based on its average historical prices. In practice, it meant that Google's ad exchange saw more publisher inventory than any other ad exchange and could offer advertisers the ability to obtain the most valuable impressions by simply paying slightly more than a static historical *average* price paid by rival ad exchanges.

115. *Second,* before Google's ad exchange competed for an impression, Google's publisher ad server shared with its ad exchange the highest competing price from the waterfall, i.e., the highest *average* price of a rival ad exchange. This set the auction floor price within Google's ad exchange and provided bidders on Google's ad exchange with two key advantages: (1) buyers on Google's ad exchange could see the floor price (i.e., the minimum price to win) and adjust their bids accordingly; and (2) buyers on Google's ad exchange often had to pay only that *average* price of the rival ad exchange. The latter of these advantages was a function of Google conducting a second-price auction on its ad exchange. Under this auction format, if only one bid on Google's ad exchange was higher than the price floor, that bid won the inventory at the floor price that had been set by the rival ad exchange's average price. In this way, Google's ad exchange was able to win high-value impressions without paying the price advertisers on other ad exchanges were actually willing to pay.

116. *Third*, Google configured the ad server to allow its ad exchange to compete on the basis of real-time pricing derived from its internal auction for a particular impression shown to a particular internet user. Unlike rival ad exchanges, Google's ad exchange was not relegated to competing on the basis of historical average prices. Combined with Google's treasure trove of user targeting and webpage contextual data, Google's control over the ad server allowed it to

tailor its bids more carefully; that is, it could bid high for a more valuable impression and low for a less valuable impression. For example, it could offer a publisher $10 CPM to show a car dealer's advertisement to a user who recently clicked through several car manufacturer websites while offering the same publisher only $1 CPM to show the same ad to a 14-year-old user who resides in a state where the dealer does not operate. Google's publisher ad server would not permit other ad exchanges to compete in this way. Instead, all other ad exchanges were forced to compete on the basis of the "waterfall" method using historical, average prices, even though the industry quickly developed a technology standard to bid in real time in this way.

117. This two-tiered arrangement denied rival ad exchanges the opportunity to gain the scale needed to compete effectively with Google by diverting bidding opportunities and transactions to Google's ad exchange and away from rivals who did not have a chance to compete at all or to compete on the same terms. It also harmed publishers in the form of lower revenues, limited the ability of advertisers to identify publisher inventory they valued most at the best prices, and decreased the overall quality of matches between publishers and advertisers.

118. Under the waterfall setup, rival ad exchanges never had the opportunity to bid on most impressions. If an ad exchange earlier in the waterfall sequence submitted a bid above the publisher's price floor, the ad server never offered the inventory to ad exchanges lower in the waterfall. The rules that Google's publisher ad server applied to Google's ad exchange, however, provided Google's ad exchange the opportunity to bid on every eligible impression, armed with substantial data on the publisher's inventory and the competitive landscape. Because rival ad exchanges were relegated to the waterfall process, unlike Google's ad exchange, they had limited windows into the universe of publisher inventory available and lacked the valuable data on available inventory and competition that Google harvested. By preventing publishers from freely

multi-homing and seeing real-time bids from multiple ad exchanges, Google deprived publishers of the benefits of full competition between ad exchanges. Likewise, by providing Google's ad exchange with a preferential—and for many impressions, sole—opportunity to buy publisher inventory, Google discouraged advertisers from multi-homing among ad exchanges and provided a substantial competitive advantage to buyers on Google's ad exchange, the largest buyer being Google Ads.

119. In addition, through dynamic allocation, Google's ad exchange had the opportunity to win impressions whenever it matched a rival's average price. This permitted Google's ad exchange (and its largest buyer, Google Ads) to win more impressions than its rivals, especially higher-value impressions. But for dynamic allocation, a rival ad exchange might have won the impression because it could offer a higher price or better match. Over time, this distortion of the auction process meant that advertisers were more likely to win the impressions they most wanted through Google's ad exchange as compared to a rival ad exchange. As a result, rival exchanges struggled to attract advertiser ad campaigns, which in turn made it difficult for them to amass publishers willing to offer their inventory through the ad exchange. Of course, dynamic allocation also hurt Google's own publishers, by sacrificing the fees they paid Google to maximize the value of their advertising inventory.

120. In 2014, Google expanded and further entrenched its artificial advantages by introducing "enhanced" dynamic allocation, which remains in place today. This update allowed Google's ad exchange to obtain the benefits of dynamic allocation over inventory potentially covered by direct contracts between publishers and advertisers. Historically, this inventory was not offered to ad exchanges at all because qualifying inventory was set aside to fill the direct contract; only after the direct contract was filled did otherwise qualifying inventory become

available for auction. Enhanced dynamic allocation afforded Google's ad exchange a right of first refusal over this inventory regardless of whether the publisher had yet fulfilled the terms of the direct contract. Enhanced dynamic allocation allowed Google's ad exchange to win the impression as long as it was willing to pay more than Google's own estimate of the "value" of fulfilling the terms of the direct contract at that moment, which Google calculated through an opaque process that predicted the likelihood the publisher would still be able to satisfy the terms of the direct contract through future impressions even if Google's exchange filled the one currently available. At the same time, Google ensured that "[i]t [was] not possible for publishers . . . to deactivate Enhanced Dynamic Allocation" within the publisher ad server.

121. Combined, dynamic allocation and enhanced dynamic allocation push more transactions through Google's ad exchange by unfairly tilting the playing field in Google's favor, driving additional scale benefits available only to Google. Because of the exclusive link between Google's ad exchange and its market-leading publisher ad server, no rival can offer publishers or advertisers the same terms as Google. The benefits to Google, and only Google, are plain.

122. *First*, Google has been able to apply its substantial 20% revenue share fee at the ad exchange level over more transactions, boosting Google's revenues and profits. This fee has been earned not only on transactions where Google Ads won, but also on transactions where other Google and non-Google advertiser buying tools won. Because Google could capture these higher revenues at the ad exchange level, Google was able to forgo or heavily discount the fees it otherwise might charge for publisher ad server services—historically much smaller than ad exchange fees. Indeed, for many customers, Google completely waived publisher ad server fees on a given transaction if it was able to charge its 20% ad exchange fee. By extracting higher fees at the ad exchange level than at the publisher ad server level—which Google needed to control to

force more transactions to its ad exchange—Google has also able to maintain low ad serving fees while still achieving its margin goals across the ad tech stack. This fee structure discourages entry by potential ad server competitors, because entry could only be economically feasible by replicating Google's overall strategy: building dominant positions at each level of the ad tech stack and forcing more transactions to flow through those tools.

123. *Second*, by forcing more transactions through Google's ad exchange and away from rivals, Google has distorted the pathways through which publishers and advertisers transact and impeded the ability of competitors to gain the scale necessary to compete effectively in the ad exchange market. Google's dynamic allocation and enhanced dynamic allocation programs have decreased the likelihood that a rival ad exchange could win a transaction, even if it had an advertiser willing to pay the most for an impression. In turn, this has diminished the ability of ad exchanges to attract additional publishers and advertisers to their platforms and has deprived them of valuable transaction data that could improve their competitiveness.

124. *Third*, by giving Google's ad exchange (and only Google's ad exchange) a "first look" option of purchasing publisher impressions offered for sale through DFP, Google has limited the ability of publishers to freely and effectively offer their impressions for sale on multiple ad exchanges. Dynamic allocation and enhanced dynamic allocation has resulted in a two-tiered system—a special auction where Google's AdX competed and a secondary, inferior auction potentially available to rival exchanges. Publishers are unable to partner with Google's rival ad exchanges on the same terms as Google's AdX. Those rivals cannot integrate with DFP via a mechanism equivalent to dynamic allocation, even if they had the technological capability to do so.

125. Even though Google modified the way dynamic allocation operated in late 2019, the effects of the decade-long program persist. Over that period, Google has amassed substantial scale within its ad exchange while undercutting rivals' ability to do the same. The flywheel network effects of that scale continue to advantage Google's ad exchange, especially when combined with the new algorithmic bidding programs described below that largely replicated the effect of dynamic allocation. Even today, Google continues to use enhanced dynamic allocation to favor buyers transacting through Google's platforms. Only those buyers can bid with knowledge of the Google-determined price floor that Google sets through enhanced dynamic allocation.

#### *4. Google's Dominance Across the Ad Tech Stack Gives It the Unique Ability to Manipulate Auctions to Protect Its Position, Hinder Rivals, and Work Against Its Own Customers' Interests*

126. In addition to restricting vital Google Ads' demand to website publishers using Google's publisher ad server and ad exchange, Google realized it also could manipulate Google Ads' bidding strategy to further entrench its publisher ad server and make entry by competing ad servers unworkable. Google Ads ostensibly bought inventory on behalf of its advertisers using price and budget limitations decided by each advertiser. But Google chose to do so in ways that served Google's long-term goal of dominating publisher platforms.




Fig. 10

127. Google Ads' advertisers set maximum prices,[13] budgets, and other parameters for their campaigns, but Google Ads is otherwise a "black box" to advertisers. Google has nearly full control over when, where, and how Google Ads bids for its advertiser customers. Using that control, Google designed a system intended to force Google Ads' two million advertisers to pay higher advertising prices. The goal and effect are clear: increase payouts to publishers using Google's platforms—the only place Google Ads' demand was available—to make Google Ads' advertising demand and Google's publisher ad server and ad exchange even more indispensable to publishers (while also allowing Google to maintain its supra-competitive take rates). In doing so, Google foreclosed the ability of rivals to compete effectively against its publisher ad server business and further propelled Google's DFP ad server from a dominant platform to a monopoly.

128. Over time, as Google's monopoly over the publisher ad server was secured, Google surreptitiously manipulated its Google Ads' bids to ensure it won more high-value ad

[13] Although advertisers set a maximum price for advertising (generally on a per click basis), Google actually charges advertisers the lower of 1) their maximum price or 2) Google's cost plus a set margin.

inventory on Google's ad exchange while maintaining its own profit margins by charging much higher fees on inventory that it expected to be less competitive. In doing so, Google was able to keep both categories of inventory out of the hands of rivals by competing in ways that rivals without similar dominant positions could not. In doing so, Google preserved its own profits across the ad tech stack, to the detriment of publishers. Once again, Google engaged in overt monopoly behavior by grabbing publisher revenue and keeping it for itself. Google called this plan "Project Bernanke."

***a) Google Works Against the Interests of Its Google Ads' Customers By Submitting Two Bids Into AdX Auctions***

129. Google Ads determines how to bid on behalf of its advertisers using price and budget maximums decided by the advertiser. For each piece of available inventory, Google Ads runs an internal auction of Google Ads' advertisers, based on an algorithm that considers eligible advertisers' specified maximum cost-per-click prices, Google's predictions of the likelihood of a user clicking an ad, and a number of other factors. These bids are then converted into a cost-per-impression ("CPM") bid, which, until 2013, Google then adjusted downward to ensure Google Ads would charge an expected 14% take rate on each impression—in addition to the 20% take rate charged by Google's ad exchange. If Google Ads then won the impression—and the user ultimately clicked on the ad—the Google Ads' advertiser would pay the amount paid for the impression plus Google's fee.

130. Until late 2019, AdX operated what was known as a second-price auction. In a second-price auction, the advertiser with the highest bid wins the right to display its ad on the publisher website. The winning advertiser, however, only pays one cent more than the price of the second-highest bid, and gets to keep the difference between the two as an "auction discount."

If the advertiser is the only bidder, then it must pay only the minimum price the publisher agreed to accept, known as the price floor.

131. Because of this auction dynamic, advertiser buying tools have an incentive to submit only one bid into an ad exchange's auction. If an advertiser buying tool submits two bids into a second-price auction, the higher bid might win the auction while the lower bid sets the price; without the second bid, the inventory might have been sold to the winning advertiser at a lower cost (possibly even at the floor price set by the publisher). In essence, the second bid into the auction only serves to drive the final auction price upwards, while conveying no real increased chance of winning.

132. To avoid driving up the cost of advertising, non-Google advertiser buying tools only submitted a single bid into AdX auctions. But Google took a different approach for Google Ads and, unknown to advertisers, submitted *two* bids from Google Ads' advertisers into the AdX auction. This was contrary to the interests of Google Ads' advertisers—who benefited when Google Ads paid less for impressions resulting in clicks—but furthered Google's goal of locking publishers into its ad exchange and publisher ad server. These higher payouts for publishers on Google's platforms were a key part of Google's overall strategy to prevent new publisher ad servers from entering the market and to increase the stickiness of Google's own publisher ad server by raising publishers' switching costs. The strategy allowed Google to extract additional margins across the ad tech stack through the two-tiered auction structure described above. A publisher that left Google's platform not only lost access to all of the unique advertiser demand available only on Google Ads, but also lost access to an advertising buying tool willing to overcharge its advertisers to benefit its publishers.

133. Google generally did not disclose to Google Ads' advertisers the fees that Google extracted from their ad purchases. Even when it did publicly disclose average fees from the perspective of the revenue received by publishers, it did not disclose that those fees came on top of advertising prices that were inflated by virtue of Google Ads' bidding practices. This obscured the total "take rate" Google was keeping for itself, making it difficult for advertisers to compare Google Ads to any potential competitor.

134. Google's internal analyses confirm the purpose and effect of Google Ads' double-bid policy. A 2013 study found that Google Ads submitted the top two bids in ***85%*** of the auctions it won, meaning its bids set the price in the vast majority of auctions it won. Because Google Ads did not face meaningful competition for its advertising customers, however, this statistic did not lead Google to reduce its advertisers' bids or otherwise adjust its bidding strategy. Rather, the study confirmed Google's understanding that it had full control and pricing power over a unique pool of advertiser demand that was often interested in inventory other advertisers did not or could not value in the same way. As Google itself acknowledged, Google Ads had "no margin or inventory sourcing constraints" so it was able to "establish[] processes to tune margins in the backend," outside auctions. As usual, what mattered most was Google's own dominance, not its customers' best interests.

135. Years later, little had changed when Google revisited the question of what would happen if Google Ads submitted only one bid into the AdX auction.[14] The answer: the 30 to 40% boost in publisher revenue from Google's two-bid strategy would disappear. Strikingly, the same analysis showed that if Google Ads submitted only one bid on AdX—and thereby was able to

[14] On the limited occasions where Google Ads bids on inventory on third-party exchanges, it submits only one bid.

buy inventory at lower prices—its profits on Google Ads would increase by an astonishing 50% in the short run.




Fig. 11

136. But Google simply could not risk a change that weakened its ability to keep publishers locked into its publisher ad server and ad exchange. The loss of inflated publisher revenues on Google's platform might finally make a rival publisher ad server an attractive alternative and threaten Google's monopoly. If publishers switched, Google would lose control over the ad selection process and be forced to interoperate with those rival products for inventory.

### *b) Google Manipulates Its Fees to Keep More High-Value Impressions Out of the Hands of Rivals*

137. As Google's publisher ad server monopoly was being cemented, Google's focus shifted to ensuring its ad exchange rebuffed growing challenges from rival ad exchanges. Recognizing that Google Ads still faced little competition for most impressions it won on AdX, over time Google adjusted its fees—and in turn its bids—to ensure it could win more high-value

transactions while paying less for lower-value transactions. By owning both the dominant publisher ad server and the dominant ad exchange, Google had unique access to the price data it needed to make these adjustments in a way that ensured more transactions, revenue, and profits flowed to Google—and in particular its Google Ads' ad network and ad exchange—with minimal risk to Google.

138. First, in January 2013, through a program called Dynamic Revenue Share, Google adjusted the way Google Ads took its revenue share fee from a fixed 14% take rate on each impression sold to a changing, or dynamic, fee that averaged 14% per publisher over time. This allowed Google Ads to effectively increase its bids in competitive auctions (by taking a lower expected fee) and make up the losses by setting a higher expected fee on non-competitive auctions. This change reinforced Google's ability to win more transactions on its ad exchange than could rival ad networks or demand-side platforms, augmenting the advantages Google already afforded its ad exchange through dynamic allocation, without the need to compete by reducing its fees.

139. Second, later in 2013, Google implemented Project Bernanke,[15] which doubled-down on Dynamic Revenue Share by subsidizing bids (i.e., bidding above the advertiser's willingness to pay) on competitive impressions, thereby sacrificing any profit on the transaction. Of course, Google ensured that its own margins would be maintained. Google offset any loss on a given transaction by charging much higher fees (i.e., 50% or more) on impressions where Google Ads faced no competition—the majority of impressions Google Ads had already been winning. In doing so, Google Ads and AdX were able to win more impressions over their

[15] Project Bernanke was named after former Federal Reserve Chairman Ben Bernanke because it resembled "quantitative easing on the Ad Exchange."

respective rivals, increasing Google Ads' spend by 20% and profits by 30%, and increasing overall ad exchange revenue by 8%. A Google simulation of the program confirmed that advertisers using non-Google buying tools won fewer of the coveted high-value impressions, decreasing their relatively smaller spend on AdX by 14%.

140. Finally, in 2014, Google implemented Project "Global Bernanke" which changed the method by which Google calculated the Google Ads' take rate (sometimes referred to as "margin"). Instead of applying the same take rate to each publisher's ad inventory, Google took an average take rate at the ad exchange level. Google took a higher cut of advertiser spend for some publishers while taking less for others. The effect was to further shift the publisher benefits of Google Ads' two-bid system to the most important publishers and away from "non-competitive" publishers (i.e., publishers whom Google believed were unlikely to risk switching to a rival ad server). Google candidly acknowledged that by 2014 it was not worried it might lose "non-competitive publishers." As one document explained, it is "unlikely they can do better on another network (which doesn't have any [Google Ads] demand)."

141. The Google-generated graphic below shows Dynamic Revenue Share and Project Bernanke in practice. After running its internal auction (as described above), Google Ads calculates its two highest bids on a CPM basis as $1.00 and $0.96 (the gray bars). These bids might be similar because they are based on the same Google targeting data. Applying a uniform 14% take rate (or "margin") would result in bids equal to $0.86 CPM and $0.83 CPM. With dynamic revenue share, Google adjusted the bids to $0.95 CPM and $0.83 CPM (the red bars in the Figure). For Bernanke, Google raised the first bid even further (sometimes substantially), as the first bid determines the winner of the auction. By raising the first bid (here from $0.95 CPM

to $1.20 CPM, the green bars), Google Ads won more auctions, either clearing publishers' reserve price more often or winning against a rival's bid for competitive impressions.




Fig. 12

142. By manipulating the auctions in this fashion, Google was able to subsidize the inflated advertiser bids by dropping the price of the runner-up's bid (here from $0.83 CPM to $0.48 CPM). Where an auction was not competitive—the majority of auctions that Google Ads won—the lower price was the one Google Ads paid for the impression. Google then kept the margin (an estimated 50% in the example) to subsidize competitive queries. In this example, instead of the website publisher receiving $0.83 CPM for the advertisement, it received only $0.48 CPM for the impression under Bernanke, assuming only Google Ads' advertisers submitted bids. A similar drop in price would occur for other "non-competitive" impressions. At the advertiser level, Google aimed for the same average take rate for each Google Ads' advertiser: a 32% difference between what the advertiser paid to Google and what Google ended

up paying to publishers for all of the impressions that the advertiser purchased.[16] Bernanke increased the number of transactions that Google won through its platforms, and in turn increased Google's overall revenues and profits while denying scale to competing ad exchanges.

143. Project Bernanke allowed Google Ads to continue to pass along additional revenue to publishers on Google's platforms (the only place it ran) but did so disproportionately relative to the competitiveness of the publisher. In doing so, it won more high-value impressions on Google's ad exchange and reinforced the stickiness of Google's ad server for key publishers. Other ad exchanges and ad servers that lacked a captive source of advertiser demand whose bids they could manipulate were unable to subsidize important publishers in the same way, presenting another roadblock to entry or expansion in the publisher ad server and ad exchange markets. For their part, while Google Ads' advertisers won some additional competitive impressions, they did not receive the full benefit of the lower prices Google Ads paid for non-competitive inventory. Moreover, Google did not disclose to advertisers that it was shifting savings away from them to increase its own margins. In effect, Google fended off competition that could have challenged its monopoly power to force advertising transactions through its own ad tech products and limited publishers' and advertisers' ability to multi-home with rival products while still being able to maintain its high overall margins. In essence, a win-win, but only for Google.

144. In terms of its impact on competition, Google's dynamic allocation and dynamic revenue sharing programs functionally made price competition among rival ad exchanges obsolete because no rival had sufficient scale across the ad tech stack to compete against Google.

[16] Google Ads' advertisers specify a maximum cost-per-click they are willing to pay. Google charges advertisers a fee on top of the price that Google pays for publisher inventory. The result is often less, and "sometimes much less," than the advertiser's specified maximum.

Google could effectively afford to charge nothing where it wanted to obtain high-value inventory because it had the ability to make up the difference on the back end with less valuable inventory.

### *C. Google Buys and Kills a Burgeoning Competitor and Then Tightens the Screws*

145. By 2010, Google's rivals had begun to design and market technology in an attempt to circumvent the limitations on competition that Google imposed through its publisher ad server. Google's response was forceful, extinguishing the leading innovator via acquisition and tightening its restrictions to head off similar potential threats. Google continued to impede its rivals' ability to offer real-time competition for publisher inventory on the same playing field as Google's ad exchange. Google used anticompetitive means to keep customers on both sides of the stack (i.e., publishers and advertisers) locked in to its ad tech tools, while ensuring that competitors for those valuable customers were locked out.

#### *1. Google Extinguishes AdMeld's Potential Threat*

146. In 2011, Google acquired a competitor, AdMeld. In doing so, Google removed from the market what it viewed as a "critical threat" to its ad exchange and publisher ad server businesses. AdMeld's yield management technology could receive bids in real time from multiple ad exchanges and other demand sources. This could allow other ad exchanges to compete in the same way Google's publisher ad server allowed Google's ad exchange to compete through dynamic allocation, utilizing in part a real-time bidding standard. Publishers quickly moved to adopt the yield management technology because it allowed them to multi-home more effectively among ad exchanges and ad networks. It also gave publishers the ability to connect with the advertisers who especially valued their inventory. In contrast, Google's publisher ad server did not permit connections to any advertising demand source other than the buyers on the AdX ad exchange, which of course included Google Ads' advertiser base. Quite simply, AdMeld threatened to destroy the advantage Google had created for itself in its

exclusionary publisher ad server by allowing website creators to offer their digital advertising inventory to multiple ad exchanges in order to find the best available match.

147. Externally, AdMeld described itself as "the largest, independent practitioner of RTB [Real Time Bidding] behind Google," "connect[ing] to more than 200 ad networks, & 35 Demands Side Platforms (DSP) and process[ing] more than 11 billion bids daily" with links to 20 leading data providers. Relying on its "core functionality" of real-time bidding, AdMeld proposed becoming its customers' "central ad decision hub," the key role Google reserved for its own publisher ad server product.

148. In a 2010 strategy discussion, Google executives noted that "Yield Managers are a threat we need to take *very* seriously" with "AdMeld [being] the largest concern" and one of three "Key competitors." Specifically, if AdMeld continued to attract publishers to its technology, Google worried about the possibility of having to "pass real-time AdX pricing into a non-DFP ad server." If Google were forced to do so, it would eliminate DFP's exclusive access to AdX, which Google believed would be—and which ultimately was—the key to DFP's growth and enduring dominance.

149. AdMeld typically charged only a 7% revenue share compared to Google's 20% revenue share on AdX. So rather than compete with AdMeld, what did Google do? It bought and buried it. In a presentation outlining the "Strategic Rationale" for the deal, Google executives explained that the acquisition would "reduce [the] risk of disintermediation," i.e., the possibility publishers and advertisers would transact through rivals. Disintermediation at any level of the ad tech stack was a serious threat to Google's entire strategy of being the sole entity with end-to-end control over digital advertising transactions.

150. In other documents evaluating whether to buy a yield manager like AdMeld, Google candidly acknowledged that the underlying "technology is irrelevant to us." Google already had in place the only yield management tool it wanted publishers to use: dynamic allocation's real-time bidding integration with Google's ad exchange. Google also recognized that its customer base already largely overlapped, "so we aren't buying customers." Only one real question remained open for Google: "How does the competitive landscape change if we buy one?"

151. The Antitrust Division investigated the AdMeld deal before it closed. Like the FTC considering the DoubleClick acquisition, the Antitrust Division declined to challenge the deal based on assumptions about the ad tech market that, with the benefit of hindsight, were incorrect—in no small part due to Google's subsequent anticompetitive conduct. At the time, the Antitrust Division cited multi-homing among display advertising platforms as a factor that "lessens the risk that the market will tip to a single dominant platform." But Google's increasing scale and dominance across the ad tech stack, coupled with its subsequent exclusionary conduct, destroyed the ability of advertisers and publishers to effectively multi-home among alternative ad exchanges. As a result, the market tipped and AdX became the dominant ad exchange.

152. Shortly after the AdMeld deal closed, Google combined the yield management functionality of AdMeld into DFP and migrated all AdMeld customers to AdX. Critically, it then shut down AdMeld's nascent real-time bidding technology, quashing a competitive threat that otherwise might have challenged Google's market position and forced Google to move toward a more open system that allowed publishers to utilize AdMeld's innovative technology to facilitate real-time competition among non-Google ad exchanges and advertisers.

153. By acquiring AdMeld, Google eliminated the existing competition between AdMeld and Google's sell-side products, foreclosed any potential competition, and helped eliminate the leading yield management technology that Google knew might displace its dominant market positions.

***2. Google Doubles Down on Preventing Rival Publisher Ad Servers from Accessing AdX and Google Ads' Demand***

154. After acquiring and killing AdMeld's innovative technology in order to prevent publishers from having the opportunity to experience real-time competition between Google and rival ad exchanges and publisher ad servers, Google clamped down on similar attempts by publishers to allow Google's ad exchange to integrate with rival publisher ad servers.

155. By 2015, Google's publisher ad server, DFP, had reached a 90% market share and had snuffed out most meaningful competition. In part because of the scale that Google's publisher ad server had achieved by excluding competitors, Google's ad exchange was large and growing quickly; Google Ads likewise remained the dominant advertiser ad network and an especially valuable source of advertising demand for many publishers. Emboldened by its success, in 2014 Google changed the AdX terms of service to further entrench its market power. Those changes prohibited publishers from using non-Google ad servers, or the remaining yield management solutions, to compare bids from Google's ad exchange with bids from other ad exchanges in real time, notwithstanding the increased access to inventory such an integration could provide to advertisers buying on AdX. In effect, Google decreed that any publisher that wanted real-time competition involving AdX would have to use Google's publisher ad server,

DFP, formally cementing in policy what Google had intended from the outset of its relaunch of AdX in 2009.




Fig. 13

156. Google's decision was bad for publishers, locking them into a less innovative publisher ad server with artificial limitations on real-time price competition for advertising inventory. It was also bad for any would-be publisher ad server rivals—effectively sounding the death knell for future publisher ad server competition. Google's exclusionary policy effectively prohibited a competing publisher ad server from offering any form of real-time competition that included Google's ad exchange and the unique advertiser demand that came with it. Forgoing such competition was a non-starter for nearly all publishers. This restriction is still in place today, an insurmountable obstacle for any nascent publisher ad server competitor.

157. Google built a wall around its exclusive link between its publisher ad server and ad exchange because it feared competition. In particular, Google feared a rival could offer a more attractive publisher ad server by simply allowing all advertiser demand to compete in real time on a level playing field for publisher inventory. More demand competing in real time for

publisher inventory generally increases the likelihood that the advertiser that is willing to pay the most for an impression will have a chance to buy it. Rivals that offered technology upending this policy would be seen as offering a better publisher ad server. As one Google employee wrote, if another publisher ad server could place Google's ad exchange in real-time competition with other ad exchanges, that ad server could offer publishers a "super set of demand" and "[n]o one would sign up for AdX directly" through Google's publisher ad server.

158. Even though both publishers and advertisers benefit from real-time competition between AdX and other ad exchanges, by policy, Google limited real-time competition from rival ad exchanges to maintain its dominant positions at both ends of the ad tech stack and to further insulate its growing position in the ad exchange market. Google's decision was based on business, not technology. As the lead architect of AdX explained in an internal email about the policy, "Our goal should be all or nothing – use AdX as your SSP [ad exchange] or don't get access to our demand." Indeed, Google had already worked quietly to develop the technology that might allow AdX to integrate in real time with non-Google publisher ad servers. But Google made a "strategic decision" to prohibit such integrations via contract; it terminated its internal projects and blocked efforts by rivals and publisher customers to implement such integrations. That prohibition endures today, and both publishers and advertisers are paying the price for Google's anticompetitive refusal to innovate or integrate.

159. Now, the only way a publisher can access Google's ad exchange outside Google's publisher ad server is by placing an "AdX Direct" tag on the publisher's website. Even though these tags could benefit buyers on Google's ad exchange by providing access to additional publisher inventory, Google designed the tags to discourage publishers from using them. They offer only the most rudimentary functionality: publishers can send a request to Google's ad

exchange with a price floor, and if there is an advertiser on AdX willing to pay that price or higher, Google's ad exchange wins the inventory. No other competing bids are considered, and Google's bid cannot be compared to other ad exchanges' bids.

160. Recognizing that AdX Direct is an antiquated relic in comparison to real-time bidding, Google even planned to eliminate the tag entirely in 2019. Google later paused that project as antitrust enforcers focused their gaze on the company's digital advertising business. But Google has not retained AdX Direct because it is a competitive product offering valued by publishers. Rather, in the words of a Google employee, it merely serves as "a concept for antitrust"—something Google's antitrust lawyers could claim offers rival ad servers some remote chance of competing on the merits with Google's ad server. Google's internal analyses of AdX Direct, however, reflect publishers' reality: Google's restrictions make impossible any reasonable substitute for the real-time integration with Google's ad exchange available exclusively through Google's ad server.

### *3. Google Manipulates Google Ads' Bidding Strategy to Block Publisher Partnerships with Rivals*

161. Google also took the opportunity to tweak its Project Bernanke algorithm to further lock in publishers who considered using innovative bidding technology offered by Google's rivals. Some publishers attempted to partner with rival ad exchanges to offer them "first look" access to inventory—an opportunity to bid in real time for inventory before it was offered to Google's AdX. "First look" could potentially prop up rival ad exchanges by giving them effective access to some of the most valuable inventory.[17]

[17] Previously, Google used dynamic allocation in its publisher ad server to exclude rival exchanges from meaningful competition. By only permitting Google's own ad exchange to bid in real time—ahead of any other exchange—for impressions, Google was unfairly advantaged and competitors were effectively stymied from competing.

162. Beginning in 2014, Google recalibrated the earlier Project Bernanke to decrease Google Ads' bids on AdX for publishers that allowed rivals an opportunity to buy inventory ahead of AdX. Google called this "Project Bell." Where publishers tried to partner with rival sources of advertising demand for "first look" access to inventory, Google reduced bids—without any input from or awareness of the underlying advertiser—by about 20%. According to Google's documents, it explicitly warned publishers that utilizing innovative "first-call" technology from rivals would cause publisher yield to drop 20 to 30%. Of course, only a company like Google with substantial market power across the entire ad tech stack would have the incentive or ability to implement such a program. Project Bell both insulated Google's ad exchange from this new form of competition and preserved preferential access for buyers on Google's ad exchange, including Google Ads.

### *D. Google Responds to the Threat of Header Bidding by Further Excluding Rivals and Reinforcing Its Dominance*

#### *1. The Industry Attempts to Rebel Against Google's Exclusionary Practices*

163. By 2015, Google's publisher customers and ad exchange competitors had grown so frustrated with Google that they attempted to implement a form of open, real-time competition with Google's ad exchange that evaded Google's exclusionary restrictions. This innovative technology was called header bidding.

164. Header bidding worked as follows: publishers inserted certain computer code into the "header" section of the HTML code of a web page. This code triggered a real-time auction among ad exchanges *before* the publisher's web page called the publisher ad server.[18] The highest bid from the header bidding auction was then sent to the publisher's ad server. Because

[18] Because early versions of the header code were run on the device of the user, or client, they were referred to as "client-side" header bidding.

of the way Google configured DFP, the winning bid from the header bidding auction was then sent to Google's ad exchange to see if it could beat that price. Critically, through dynamic allocation, Google's ad exchange always received this "last look" advantage, essentially a right to buy any impression as long as it had at least one advertiser willing to match the competing bid price from the header bidding auction.

165. As originally designed, header bidding had limitations that stemmed from Google's restrictions on how publishers could sell their inventory through Google's publisher ad server. For example, publishers had to configure thousands of entries into the publisher ad server and recode their pages to implement a workaround to enable header bidding. Web pages also ran somewhat more slowly because publishers had to run multiple auctions sequentially: the header bidder auctions first, and then Google's ad exchange auction, which always ran last. Despite these limitations, for the first time, Google's ad exchange was forced to compete, at least in some fashion, against real-time bids from rival ad exchanges rather than against static, historical average prices from those ad exchanges. In assessing the impact of header bidding, a 2016 Google internal presentation noted "header bidding and header wrappers are BETTER than [Google's platforms] for buyers and sellers." Google explained that competition between AdX and buyers using header bidding increased publisher revenues by 30 to 40%, and provided additional transparency to advertisers. In essence, header bidding allowed publishers, advertisers, and Google's rivals an opportunity to at least partially circumvent Google's restrictions against real-time competition. Market participants had demonstrated their preference for improved choice, flexibility, and competition, even if it came at the cost of burdensome computer workarounds and slower load times for end users.




Fig. 14[19]

166. In practice, header bidding dramatically improved the competitiveness of rival ad exchanges. Header bidding provided a real opportunity for rival ad exchanges to see and compete for more publisher inventory, and potentially gain scale to compete effectively with Google. By allowing a publisher to call multiple ad exchanges in real time—effectively multi-homing at the ad exchange level—header bidding vastly increased the amount of inventory rival ad exchanges could offer their advertisers. In turn, advertisers had the opportunity to see and bid on more inventory—potentially through lower-cost channels than Google's ad tech tools—increasing their chances of winning inventory. By improving the ability of advertisers and publishers to connect, these rival ad exchanges were able to clear more transactions, increase

[19] "SSPs" refers to non-Google ad exchanges.

revenues for publishers, and improve the quality of matches. In turn, header bidding had the potential to attract more advertisers and publishers to these rival ad exchanges by increasing the incremental value they could offer.

167. Due to this increased competitiveness, non-Google affiliated buyers began to buy more advertising inventory through third-party ad exchanges using header bidding. Google's internal analysis showed a deceleration in spend by non-Google advertiser buying tools on AdX as "header bidding removed AdX inventory exclusivity . . . [and] buyers shift[ed] spend as other inventory sources delivered equal/better value." A large buyer explicitly indicated to Google that they were "shifting spend over to HB partners" because they were "seeing better performance."

168. More transactions flowing through rival ad exchanges made it easier for those ad exchanges to offset the massive cost of processing billions of ad requests each day; ad exchanges are only compensated for requests that result in a won transaction. These new transactions also provided ad exchanges with additional data on the universe of publisher inventory, user targeting data, and the competitive landscape.

169. Building on the success of early client-side header bidding, several companies invested to develop new innovative free or low-cost tools (called "wrappers") that enabled "server-side" header bidding. This new form of header bidding allowed the header of a web page to call a single server, which then sent calls to multiple ad exchanges, each of which returned a bid to the server, which in turn passed on the winning bid to the web page. Server-side header bidding turbocharged the scale benefits of header bidding by decreasing integration costs and improved the internet user experience by reducing latency introduced by header bidding.

170. Internally, Google recognized that header bidding substantially benefited every market participant except one: Google. For that reason, Google refused to participate and instead

chose to stifle any competitor that dared employ header bidding. As one Google employee explained, "[Header bidding] gives many publishers better yield, so it's a no-brainer for a publisher to adopt it." A late 2015 internal discussion somberly noted that Google "[did] not have incredibly robust arguments to discourage header bidding" and conceded that header bidding offered the competition Google had publicly preached but privately precluded:

> With AdX we've always advocated the more competition a pub has being considered with real time price competition the better the yield. Our competition is using this same argument for why header bidding makes sense. If they can submit a near real time price into DFP the[] competition with AdX is improved.

As another Google employee observed, "[Google's ad server] has historically made it difficult for [ad exchanges] to compete on a level playing field with AdX."

171. Google viewed header bidding—and particularly server-side header bidding—as a direct and, in the words of a 2016 internal strategy paper, "existential threat" to the market power Google had amassed. Internal Google documents confirm that Google understood header bidding to be a direct response by its customers and competitors to counteract Google's increasing dominance and its "unwillingness to open our systems to the types of transactions, policies and innovations that buyers and sellers wish to transact." Header bidding was an attempt to "circumvent dynamic allocation," one Google employee noted in late 2015. Another employee recognized that "[p]ublishers felt locked-in by dynamic allocation in [Google's ad server] which only gave [Google's ad exchange the] ability to compete, so HB was born." Another described header bidding as a "world of true, multi-sourced [real-time bidding]" without Google as the "authoritarian intermediary."

172. Beyond breaking the restrictions Google had put in place, header bidding also represented a pervasive threat to Google's market power stemming from its unique and

substantial advertiser demand. If header bidding could bring together a critical mass of non-Google advertising demand into a single real-time auction (e.g., a server-side header bidding auction), it might be able to undermine the power Google wielded through its Google Ads' advertising demand, thereby weakening the need for publishers to use Google's publisher ad server and ad exchange in the first place.




Fig. 15

173. While header bidding was an important step toward more competition among ad exchanges, it could not displace Google's dominance overnight. Google had hard-coded into the ad selection rules of its publisher ad server several advantages for its own ad exchange that would prevent rival ad exchanges from competing. Absent toppling Google's monopoly position in the publisher ad server market, header bidding could offer publishers and advertisers only incremental gains. Thus, in the wake of header bidding, Google implemented still further measures to limit the growth of both header bidding and the rival ad exchanges deploying this technology.

### *2. Google Blunts Header Bidding By "Drying Out" the Competition*

174. Google moved swiftly to respond to the perceived threat header bidding posed to its ad exchange dominance and publisher ad server monopoly. Instead of leaning into the increased real-time competition between ad exchanges spurred by header bidding—which would have led to higher revenue for publishers, lower ad tech fees, and better return-on-investment for advertisers—Google adopted a multi-prong strategy to forestall the adoption of header bidding by publishers and, as a Google partnership strategist phrased it in an internal email, "dry out" rival ad exchanges that adopted header bidding.

175. In doing so, Google aimed to return to a more outdated, closed, two-tiered system of competition for advertising transactions. Header bidding represented a real opportunity for the market to move to a more open system where publishers could effectively multi-home their inventory across competing ad exchanges and varied sources of advertising demand. Although Google realized that its original vision of all display advertising transactions flowing through Google's ad exchange was no longer realistic, Google also recognized it could take advantage of its dominance at each layer of the ad tech stack to impede publishers, advertisers, and rival ad tech providers from further opening up the ad tech ecosystem and loosening Google's control over where transactions flowed.

#### *a) Google Develops So-Called Open Bidding, Its Own Google-Friendly Version of Header Bidding To Preserve Its Control Over the Sale of Publisher Inventory*

176. Employees working on Google's publisher-facing platforms responded to the threat of header bidding by developing a limited way for rival ad exchanges to finally compete in real time within Google's platforms, but on terms dictated by Google. Although Google could not return to a fully closed system of real-time bidding—one Google previously reserved for its own ad exchange via dynamic allocation—it could create a system over which it retained control

to dictate the terms on which competition occurred. The mechanism, internally referred to as "Jedi," came with a number of limitations designed to dampen competition and insulate Google's ad exchange from vigorous competition. To that end, as explained by Google's lead product manager for DFP and AdX, Google intentionally designed this new form of integration to be just "slightly better" than early versions of header bidding.

177. Google called this mechanism "Exchange Bidding," later renamed "**Open Bidding**" (for simplicity, referred to herein as "Open Bidding"). Google started testing Open Bidding in 2016 and formally launched the program in April 2018. Externally, Google portrayed Open Bidding as an improvement to header bidding that created a real-time bidding auction with multiple ad exchanges, similar to header bidding, but on Google's servers to reduce latency. It represented the first time that Google's ad exchange competed in real time against other ad exchanges, as Google had previously refused to participate in any header bidding auctions.

178. Internally, however, Google understood that the purpose of Open Bidding was to "stem[] the bleeding" and "combat the risk of header bidding." Google understood that if it could blunt header bidding's momentum, it could maintain its "control point and advantage" gained through its publisher ad server monopoly and ultimately "[g]et pub[lishers] to move away from header bidding back into our platform."

179. Google outwardly portrayed Open Bidding as a more publisher-friendly way for participating ad exchanges to bid in real time on publisher inventory, as Open Bidding substantially reduced a publisher's cost to integrate an ad exchange other than Google's AdX within DFP. By contrast, to utilize header bidding, publishers had to configure thousands of lines of pricing rules in the publisher ad server and update each webpage with new code. Google also

offered to share with participating Open Bidding ad exchanges its "last look" advantage over header bidding that dynamic allocation previously had provided only to Google's ad exchange.

180. But Open Bidding also came with major drawbacks for both publishers and participating ad exchanges. Google handicapped rival ad exchanges to impair their chances of winning impressions through Open Bidding, which otherwise might increase their overall attractiveness to publishers. Google did so in four pivotal, mutually reinforcing ways.

181. *First*, Google extracted for itself an additional fee on every transaction won by a rival exchange, reducing the net payout publishers received from integrating with other ad exchanges. Google imposed a 5% fee on rival ad exchanges' transactions through Open Bidding, effectively lowering the net bid of Open Bidding ad exchange participants by 5% relative to AdX's bid. This additional 5% charge effectively amounted to a 25% or more increase in the average ad exchange fee, making bids from rival ad exchanges much less attractive to publishers.

182. *Second*, even if a rival ad exchange won an auction, the rival ad exchange paid Google, and Google paid the publisher. Publishers received payments and reporting related to Open Bidding-won advertisements from Google, not rival ad exchanges, decreasing the number of touchpoints between rival ad exchanges and publishers. By taking control over the payment and reporting functions, Google effectively disintermediated rival ad exchanges from their own publisher customers and, in the long-run, made it less likely publishers would view those rival ad exchanges as valuable partners and continue to use them.

183. *Third*, if a rival ad exchange also owned an advertiser buying tool (as Google did), that exchange could not allow its own advertiser buying tool to participate in Open Bidding auctions. This decreased the competitiveness of those ad exchanges from the perspective of publishers.

184. *Fourth*, through Open Bidding, Google was able to increase its data advantage by obtaining access to the bids of its rivals for each impression, which it could not see in header bidding auctions. Thus, even when other ad exchanges opted to participate in Open Bidding, they initially did not have access to the same data: they were forced to share their bids with Google without any reciprocity.[20] Although Open Bidding provided an additional avenue for rival ad exchanges to participate and potentially to win inventory, those ad exchanges were forced to cede control over the transaction to Google and take steps that diminished their overall competitiveness. By contrast, alternative forms of server-side header bidding offered by market participants without Google's market power have much lower—or no—fees and do not include the restrictions and limitations that Google incorporated into Open Bidding. Notwithstanding these benefits, Google's conduct has stunted adoption and growth. Thus, in the end, Open Bidding fulfilled Google's intent to counter header bidding in a manner that ultimately protected Google's publisher ad server monopoly, and in turn, Google's ad exchange, AdX.

185. Despite Google's success in using Open Bidding to blunt the impact of header bidding, Google came to fear that a header bidding wrapper (code designed to run a multi-exchange header bidding auction), such as Prebid or Amazon's Transparent Ad Marketplace ("TAM"), could one day supplant the publisher ad server as the ultimate decision-maker of which ad to serve. Doing so would threaten the means by which Google had given its ad exchange an unfair advantage over rival ad exchanges. If header bidding were able to aggregate enough advertiser demand, Google believed publishers might be willing to risk adoption of a

[20] Only recently has Google begun to share some bidding information with Open Bidding participants—but not header bidding ad exchanges—in a form that has largely proven unworkable.

header-bidding-focused ad server, because of the diminished importance of advertiser demand exclusively available through Google Ads.

186. In light of this fear, Google set out to lobby other unique sources of advertising demand (such as Facebook) or potential aggregators of advertising demand (such as Amazon) to adopt Google's Open Bidding rather than invest in header bidding infrastructure.

#### *b) Google Further Stunts Header Bidding by Working to Bring Facebook and Amazon into Its Open Bidding Fold*

187. Even before the rise of header bidding, Google had identified Facebook as a potential competitive threat. Facebook had at one point shown ambitions to challenge Google as a full-stack ad tech competitor, acquiring a publisher ad server in 2013 and a video advertising SSP in 2014, though both products were later shuttered. Years later, Facebook recognized that any full-stack ad tech strategy "is subject to one bottleneck and intermediary—Google. They 'own' the Ad Server, and hence the last mile relationship with publishers." Facebook further observed that "[o]ther players in the market, such as Amazon, recognize that unseating Google, and its relationships with publishers is hard, and are also choosing to build on top of Google's rails."

188. Though it had abandoned its efforts to be a full-stack competitor, Facebook still aimed to grow its advertising business beyond its owned and operated ("O&O") digital properties (e.g., Facebook Blue and Instagram apps), which were increasingly supply-constrained. As the number of advertisers on these properties grew, demand threatened to outpace available inventory; Facebook sought publisher inventory outside Facebook to satisfy this unmet advertising demand. In 2014, it launched Facebook Audience Network ("FAN"), which Facebook described as the "power of Facebook ads, off-Facebook." FAN allowed

Facebook advertisers to extend their campaigns outside of Facebook O&O properties with a one-click, opt-in button.

189. At launch, FAN primarily worked with mobile app advertisers to place ads in other mobile apps in order to drive app installs and engagement. It later expanded to open web on mobile devices. By 2016, FAN was participating in the growing header bidding movement, partnering with header bidding wrappers to submit real-time, simultaneous bids, and eventually launching full-scale header bidding in 2017.

190. As a large ad network connected to millions of Facebook advertisers, FAN also competed with Google to lock up available publisher inventory for its advertisers. Prior to joining Open Bidding, Facebook executives foresaw a status quo of "hand-to-hand combat" between the companies to secure access to sufficient inventory from publishers. Google feared such competition with Facebook would end up "eat[ing] margin," and that Google might "respond identically" through deals with top publishers, thus "driving a price war." Facebook was equally leery of such a future, with one executive fretting that the "significant investment required to lock up inventory through direct deals" with publishers would "[l]ikely start a race to the bottom on margin."

191. Google took note of FAN's launch and kept a wary eye on FAN as it grew, describing Facebook as "a unique competitive challenge for us, both short- and long-term" because of its "strength in ad formats and targeting." Google understood Facebook's reach with over a billion users, and it understood that just as Google had valuable targeting and demographic data from its O&O properties—including Search, Gmail, YouTube, Android, and Play Store—Facebook, too, had a massive amount of valuable data from its O&O properties. Even though Facebook had largely given up on building a direct competitor to Google's

publisher ad tech stack, Google saw looming "[d]isintermediation [t]hreats" to DFP from "[l]arge [n]etworks with unique data and advertiser scale seek[ing] direct inventory access[,] [g]oing direct to pubs or using existing [third-party] channels like Header Bidding." By contrast, Google characterized full-stack competitors as "historical competition" of little concern: "This is a short-term threat and we are well positioned here."

192. As FAN began to test and use header bidding, Google grew increasingly alarmed at "the existential threat posed by Header Bidding and FAN." Google strategized over how to respond to FAN's entry into header bidding, and in September 2016, Google laid out a plan to bring FAN into Google's Open Bidding program. Significantly, Google concluded that bringing FAN demand into Open Bidding was a better alternative to slow publisher adoption of header bidding than "[a]ggressively mak[ing] [Open Bidding] much better than [header bidding]."

193. Rather than making a better product and competing on the merits, Google sought a deal with Facebook to bring FAN into Google's Open Bidding—away from rival exchanges' header bidding auctions—to "dry out" the nascent threat posed by header bidding. If competition with Facebook was inevitable, it would be better for Google to compete on a field it still controlled, with the many advantages it had constructed for itself, thus protecting DFP's market dominance. Indeed, Google concluded that while it "[c]annot avoid competing with FAN," it could, through a deal with Facebook, "build a moat around our demand." And as Google's product leadership would ultimately recommend to CEO Sundar Pichai, with a Google-Facebook deal, "[f]or web inventory, we will move [FAN's] demand off of header bidding set up and further weaken the header bidding narrative in the marketplace." Facebook, meanwhile, was frank in its assessment of Google's motivation for the deal: "What Google wants: To kill header bidding (us baptizing [Open Bidding] will help significantly)."

194. Ultimately, in September 2018, after a long negotiation and approvals by each company's top brass—including Pichai, Mark Zuckerberg, and Sheryl Sandberg—Google and Facebook entered into a "Network Bidding Agreement" ("NBA"). The deal provided Facebook with unique terms, including a contractual promise of no last look and direct remittance to publishers, ensuring that Facebook would continue to maintain its publisher-facing relationships. In exchange, Facebook committed to a minimum annual spend on Open Bidding and was incentivized, through an all-units, tiered volume discount, to shift spend to Open Bidding and away from possible alternative header bidding avenues.

195. Having tried and failed to challenge Google as full-stack competitor—in part because of Google's anticompetitive conduct described above—Facebook ultimately resigned itself to operating on top of Google's rails. While the NBA satisfied Facebook's need for increased access to publisher inventory, Facebook recognized that it would also "reduce our future optionality to build our own ad tech and the likelihood of a newbie like Amazon[, which had introduced a header bidding wrapper,] succeeding." Facebook believed that, while perhaps "inevitable," the deal would nevertheless "accelerate Google's stranglehold on ad tech." Facebook's then-VP of Partnerships opined that "by doing this deal, we will cement [Google's] position of power."

196. Amazon's TAM posed a different competitive threat to Google's dominance. It allowed publishers to solicit bids from multiple ad exchanges via a single call from a webpage to Amazon's extensive network of servers. And Amazon took only a small one cent CPM fee—much lower than Open Bidding's 5% fee—for every transaction that flowed through TAM. Google initially feared TAM could aggregate advertising demand in a way that challenged Google's ad exchange and publisher ad server, leading Google to ask Amazon what it would take

for Amazon to stop investing in its header bidding product. However, Amazon rebuffed such requests and continued to develop and deploy TAM. But as with other header bidding solutions, TAM could not fully circumvent all of the restrictions and preferences baked into Google's ad tech products, which website publishers still relied upon. For example, TAM remained subject to a "last look" by Google's ad exchange, allowing Google's ad exchange to win any impression that would otherwise flow through TAM by matching the competing price from TAM.

197. Google's Open Bidding—and Google's efforts to shift the focus of other major ad tech companies like Facebook from header bidding toward Open Bidding—stunted header bidding's adoption, leaving header bidding unable to pose a true threat to Google's monopoly power. In doing so, Open Bidding achieved its goal of blunting the growth of header bidding and protecting Google's publisher ad server. Today, Google still has its publisher ad server monopoly. Header bidding persisted, but its adoption stagnated. And Google turned to other, more surreptitious methods to restrain competition and "dry out" ad exchanges using header bidding.

#### *c) Google Manipulates Its Publisher Fees Using Dynamic Revenue Sharing in Order to Route More Transactions Through Its Ad Exchange and Deny Scale to Rival Ad Exchanges Using Header Bidding*

198. Emboldened by its success in manipulating advertiser fees under Project Bernanke, Google implemented a similar program for the ad exchange fees it charged publishers. The goal was the same: push more high-value transactions through the Google ad exchange and away from rival ad exchanges, including those engaged in header bidding. Google did not simply lower its publisher fees across the board to compete aggressively on the merits. Rather, Google again used the competitive data it alone obtained through its publisher ad server monopoly to adjust its fees—and in turn its ad exchange's bids—in a manner calculated to increase the

number of competitive transactions won by Google's ad exchange, while preserving Google's margins and increasing Google's revenues and profits. In doing so, Google again was able to cherry-pick the most valuable transactions out of the hands of rival ad exchanges, further sabotaging their ability to build scale and compete effectively, all without compromising Google's rich bottom line because Google deftly made up the difference in its take rate on other, less valuable, transactions.




Fig. 16

199. Google called this program sell-side dynamic revenue share. It altered the standard 20% ad exchange fee (revenue share) charged to publishers (sell-side) on an impression-by-impression basis (dynamic). At a high-level, the program doubled down on the benefits Google afforded its ad exchange through dynamic allocation. With dynamic allocation, Google's ad exchange already had the ability to see and use the competing price of its competitors before bidding, while rivals were forced to compete in the equivalent of a blind, sealed-bid auction. Advertisers on Google's ad exchange were able to observe the rival ad exchange's offer price and bid accordingly. Google's ad exchange also used the rival ad

exchange's price as a floor, only charging the winning advertiser on Google's ad exchange more when other advertisers on the exchange also had higher bids.

200. Dynamic revenue share created an additional advantage for Google's ad exchange: after Google's ad exchange ran its auction, Google could adjust the winning bid up or down—by as much as 20%—to beat the price offered by a rival ad exchange. This ensured Google's ad exchange won even more transactions at a cost equal to or only slightly above the highest bid of Google's ad exchange rivals, recouping any discount of ad exchange fees by raising the fees it charged on other less competitive transactions. Only by virtue of Google's control of the dominant publisher ad server and the advantages that ad server afforded Google's ad exchange, such as last look, could Google implement such an anticompetitive program.

201. Since its launch in 2009, Google's AdX ad exchange has consistently charged nearly all publishers a 20% revenue share fee for all "open auction" transactions—auctions not limited to a small set of buyers—on its ad exchange. This means that for transactions on Google's ad exchange, Google could withhold 20% of what the advertiser buying tool paid before passing the balance to the publisher (on top of any fee Google charges advertisers using its advertiser buying tools). Beginning in 2014, Google changed the way it applied AdX's fee. Instead of taking a 20% cut on every individual transaction, Google allowed its take rate to fluctuate across transactions with the goal of averaging a 20% fee for each publisher over the course of the month, which continues today.

202. Google implemented the sell-side dynamic revenue share program with the competitive data it was able to obtain through its publisher ad server monopoly. Through dynamic allocation, buyers on Google's ad exchange, including Google Ads, were able to see the highest rival bid before competing. After running its own internal auction, Google's ad exchange

compared its highest bid to the highest rival bid, which set the price floor of the Google ad exchange auction. When comparing bids, Google considered the "net bid" to the publisher, i.e., the amount the publisher would receive after all ad exchange fees were deducted. If Google's ad exchange would have lost a transaction because Google's ad exchange fee brought its net bid below the rival bid, Google could adjust its fee for that impression to win the transaction. Depending on the rival bid and the publisher at issue, Google could reduce its ad exchange fee to 0%, essentially boosting its ad exchange's bid by 20%. If no rival ad exchange's bid was competitive, Google's ad exchange charged the full 20% fee, *or more*.

203. Because Google's publisher ad server provided its ad exchange—and only its ad exchange—the ability to effectively open the sealed bids of its rivals before bidding and adjust its bid accordingly, only Google's ad exchange could win more transactions this way without substantial decreases in margins. All other ad exchanges had to compete based either on static average prices in the waterfall or bid for impressions via header bidding without any information on competitors' bids. Because of the way dynamic allocation operated, rival ad exchanges were disincentivized from lowering their own ad exchange fees to boost their bids. If they did so, they were not particularly more likely to win additional transactions. Instead, Google's ad exchange could still swoop in afterwards and win the transaction by matching the rival ad exchange's bid. By contrast, Google could adjust its ad exchange fee (1) only when necessary and (2) by the exact amount needed, given its privileged position in the publisher ad server space.

204. Google later went a step further, allowing its revenue share fee to go negative for some transactions (i.e., subsidizing its advertisers' bids), as it had with Project Bernanke. Google offset these subsidized transactions by charging more than a 20% ad exchange fee on transactions where there were no competitive bids from rivals.

205. The program, which continues today, substantially improved Google's position while further depriving other ad exchanges of scale. With the launch of the initial version of the program, Google saw an increase of more than 11% in the number of transactions flowing through its ad exchange, providing an additional $105 million in annual revenue to Google, almost entirely at the expense of rival ad exchanges. The more aggressive version of the program launched in 2016 resulted in an estimated increase of almost 5% in Google's ad exchange profits while reducing the amount of advertiser dollars that were ultimately paid to publishers.

206. Google did not allow publishers to make an informed choice about whether to provide Google's ad exchange with these advantages. Rather, Google pushed through sell-side dynamic revenue share in the same way as many of its other programs: it imposed the changes on publishers by default with virtually no transparency for publishers or advertisers into what Google was doing. Even when one large publisher asked for an explanation, its Google client representative declined to provide any details, indicating the change likely would have little to no impact on the publisher.

207. Of course, Google did not disclose that the program further stacked the deck in favor of Google's ad exchange or that it was designed to further concentrate high-value transactions on Google's platforms at the expense of competition by rival ad exchanges.

#### *d) Google Launches Project Poirot to Manipulate Its Advertisers' Spend to "Dry Out" and Deny Scale to Rival Ad Exchanges That Use Header Bidding*

208. By the fall of 2016, Google worried that it needed to take additional steps to stem the competitive threat from header bidding. As such, Google considered options "for mitigating [the] growth of header bidding infrastructure."

209. The first place Google turned was the substantial volume of advertiser spend that flowed through its large advertiser demand side platform, Display and Video 360 ("DV360"). By

2016-17, Google's DV360 was already one of the largest demand side platforms in the market with a nearly 30% share of gross digital advertising revenue flowing through demand side platforms. Google was familiar with wielding the power stemming from the advertiser spend locked into Google Ads, but it had previously allowed the larger, more sophisticated advertisers and ad agencies on DV360 greater control over where and how they bought advertising inventory. As a result, these advertisers frequently transacted on rival ad exchanges that provided lower-cost or more valuable inventory. As of early 2017, more than half of total advertising spend by DV360 advertisers flowed through rival ad exchanges.

210. Google became increasingly concerned that spend from DV360 advertisers was driving header bidding's growth and helping rival ad exchanges compete. As one of Google's product management leaders for publisher ad products reported to his colleagues, "I think you know this, but I am told regularly that [DV360] is the top buyer on every other ad exchange, so a huge chunk of publisher HB [header bidding] revenue is Google demand going outside our ecosystem and then coming back via 3PE/HB [third-party ad exchanges/header bidding]." DV360 advertisers often represented the largest buyers on rival ad exchanges engaged in header bidding.

211. If header bidding was left unchecked, Google feared its own advertisers' spend would continue to shift to rival ad exchanges and thereby allow those rival ad exchanges to gain the scale and network effects needed to become serious competitors. Google could not allow that to happen.

212. In October 2016, Google employees responsible for DV360 reached an "overall consensus" that Google did not "want to compete on [header bidding] queries." To that end, Google engaged in a series of projects designed to reduce the flow of DV360 advertiser spend to

rival ad exchanges engaged in header bidding and redirect that spend back to Google's ad exchange, regardless of the cost to publishers and advertisers. Hence, even though DV360 was supposed to be a tool that enabled advertisers to bid most effectively for the inventory they wanted, in Google's hands, DV360 was weaponized to stifle competition. Not only was this conduct against the best interests of Google's own advertisers, it was against the best interests of DV360 itself because it harmed the very quality and profitability of the tool Google had created and promoted to customers.

213. As Google's Managing Director for Global Publisher Solutions and Innovation explained in response to news that a competing ad exchange had lowered its fees, the overarching goal for Google was not for DV360 advertisers to benefit from reduced fees on other exchanges but for advertiser spend flowing through Google's tools to "only buy on AdX impressions that are [available both] through AdX and multiple" ad exchanges in order to "dry out HB [header bidding]" ad exchanges.




Fig. 17

214. Google's initial proposed strategy was to go all in—simply block DV360 advertisers from buying on rival ad exchanges any inventory offered by publishers Google believed used header bidding. In late 2016, Google experimented with creating a "white list" of publishers that did not use header bidding, retaliating against publishers that dared embrace innovative technology that could improve publisher revenue. Google's DV360 advertiser tool would permit advertisers to submit bids on rival ad exchanges only for inventory from such white-listed publishers; it refused to allow its advertisers to submit bids on rival ad exchanges if Google suspected the relevant publisher used header bidding. The intended effect was obvious: "move a lot of rev[enue] to AdX and put pressure on HB [header bidding] infra[structure]." Unfortunately for Google, experiments testing such an extreme strategy showed that the approach would not only harm advertisers and publishers but also Google. The experiments predicted Google's DV360 buying tool would lose approximately 30% of both impressions and revenue.

215. At a meeting discussing the experiments' results, however, a Google Product Manager suggested an alternative solution to surgically target the threat of header bidding on rival ad exchanges while minimizing losses to Google: "instead of stop bidding on HB [header bidding] queries, we could *bid lower* on HB queries." When combined with the various advantages Google had afforded its ad exchange within Google's publisher ad server, this approach potentially could achieve all of Google's goals: inhibit advertisers from transacting through rival ad exchanges engaged in header bidding while allowing Google to redirect revenue and transactions back to Google's ad exchange, where it could charge supra-competitive fees.

216. Google's product and engineering teams quickly turned to implementing this plan of attack under the code name **Project Poirot**.[21] The purpose of the project was straightforward: Google would shift transactions away from ad exchanges using header bidding and to Google's AdX by artificially manipulating the bids sent to rival ad exchanges so that Google's AdX could win those transactions more often (even if that meant harming Google's own advertisers). Or, as Google put it: "for HB [header bidding] we should win back more on AdX." By July 2017, Google changed the settings of DV360 so that by default all advertising campaigns were opted into Project Poirot; only 1% opted out.

217. Project Poirot worked by systematically lowering all DV360 bids to rival ad exchanges that no longer employed second-price auctions—a proxy for identifying ad exchanges using header bidding. For each ad exchange, Google set a percentage by which it reduced all DV360 bids to that ad exchange. Initially, Google reduced advertiser bids by 10% to 40%; later Google reduced bids for some ad exchanges by as much as 90%. Because Google's AdX did not participate in header bidding, none of DV360's bids on Google's ad exchange were decreased, even where DV360 bid on the same impression on both a rival ad exchange and Google's ad exchange. This manipulation of advertiser bids virtually ensured that Google's ad exchange would win the relevant auction by virtue of the deliberately decreased bids supplied to rival ad exchanges for the same impression.

218. In important ways, the Project Poirot advertiser bid manipulation scheme was both more insidious and more profitable for Google than Google's initial proposal of not bidding at all into rival ad exchanges using header bidding. *First*, by allowing its DV360 advertisers to

[21] Project Poirot was named after Agatha Christie's iconic master detective character, Hercule Poirot. Project Poirot was designed to identify and respond effectively to ad exchanges that had adopted header bidding technology.

bid on all inventory on rival exchanges, albeit at substantially lower levels that won fewer transactions, advertisers could still buy the limited set of inventory that publishers chose not to make available at all to Google's ad exchange, as well as inventory that only appeared particularly valuable in light of targeting data available through a rival ad exchange. However, reduced bids designed to win fewer transactions went against the interests of DV360 advertisers and DV360 itself as a platform. Both would have benefited from winning more inventory on rival ad exchanges at prices advertisers were willing to pay, but for Google surreptitiously lowering their bids.

219. *Second*, for inventory available to DV360 on both a rival ad exchange and Google's ad exchange, Poirot and dynamic allocation worked together to ensure that Google's ad exchange often won the transaction. To do this, Google used its control over the bids of advertisers using its DV360 product. While these large, sophisticated advertisers set general parameters for bidding, especially after the launch of Poirot, Google alone determined the particular bid made on behalf of the advertiser on each of the millions or billions of pieces of inventory an advertiser bid on within each ad exchange; Google opted advertisers into the program while affording them no meaningful visibility into this level of bidding. Through Project Poirot, Google used this power to lower DV360 advertisers' bids on rival ad exchanges, and in turn, that ad exchange's winning bid. Through dynamic allocation, the winning bid on the rival ad exchange—now lowered by Poirot—served as the price floor for Google's ad exchange auction. DV360 could then win the same impression on Google's ad exchange by matching that price. Working together, Poirot and dynamic allocation has led to reduced price competition for Google's ad exchange and has ensured that more transactions flow to Google's ad exchange, even if Google charges higher ad exchange fees. Google has only been able to implement this

scheme by virtue of its control throughout the ad tech stack: advertisers and ad agencies using DV360, the AdX ad exchange, and the publisher ad server.

220. A hypothetical illustrates Project Poirot in action. An advertiser using DV360 might configure an ad campaign to pay a maximum price (for example, $1 CPM) for a particular type of advertising impression. Under Poirot, Google would lower that maximum bid when bidding on rival ad exchanges that used header bidding by applying an ad exchange-level multiplier, for example, bidding $0.38, $0.42, and $0.40 on three rival ad exchanges. In this example, the $0.42 bid is the highest and wins the header bidding auction; that bid is then passed to the publisher's ad server after the ad exchange deducts its revenue share fee (assumed here to be 15%, reducing the net bid to $0.36). Next, the ad server sends that price along with a request for a bid to Google's ad exchange via dynamic allocation. The $0.36 serves as a price floor and is shared with bidders on the ad exchange. On behalf of the *same advertiser* as before, DV360 now bids the advertiser's maximum bid ($1) and wins the impression. Because Google's ad exchange ran a second-price auction, however, the publisher receives only the floor price, $0.36. Google charges the advertiser this price plus the applicable ad exchange revenue share (20%), which translates to $0.45.[22] Ultimately, this means the advertiser pays more for the impression than it would have paid bidding via a rival ad exchange, Google is able to profit by extracting its revenue share fee at the ad exchange level, and the rival ad exchange that otherwise would have won (because it would have charged a smaller revenue share fee than Google's ad exchange from the same DV360 bid) is denied the transaction.

[22] Google also charges an additional fee for use of its DV360 service (on average 9%), which is the same regardless of the ad exchange where the inventory is purchased.

221. Google's prelaunch experiments found that Project Poirot would reduce publisher display revenue from DV360 by over 10%. By contrast, the predicted "surplus"—additional revenue shared between Google and advertisers—was only about 1%. The total number of impressions DV360 purchased would drop by almost 5%. In particular, Google recognized that some advertisers would no longer be able to buy certain impressions only offered on rival ad exchanges, because even if those advertisers were willing to pay the minimum price set by the publisher, Poirot reduced their bids below the minimum. Poirot prevented these advertisers from spending their full advertising budgets and resulted in some ad inventory going unfilled—a loss for the display advertising market as a whole.

222. Project Poirot formally launched in July 2017 under the name "Optimized Fixed CPM Bidding." Google did not afford its advertisers a meaningful opportunity to choose whether Google could systematically lower their bids on rival ad exchanges. Instead, Google imposed these changes while providing virtually no information to its advertisers on the nature or extent of the program. Over 99% of advertising campaigns were subject to Poirot: all "automated bidding" campaigns on DV360 incorporated Poirot automatically, and Google opted in by default all "fixed CPM bidding" campaigns.

223. Internally, Google sometimes justified Poirot as benefiting advertisers, but such justifications were pretextual. Google designed Poirot to lower DV360's bids into third-party ad exchanges ostensibly to account for "non-second-price auctions," such as where a publisher uses soft floors that are set above the second-highest bid or uses floors that change based on bidding history. But Poirot did not apply the same rules to Google's ad exchange that it applied to its competitors. Poirot did not adjust DV360's bids into AdX even though AdX was not a true second-price auction: AdX itself used features such as Reserve Price Optimization ("RPO")

that—like those used in purported non-second-price auctions—similarly adjusted floors based on what bids Google expected to receive. As one document explained, RPO went live in 2015 (before Poirot) and "move[d] Google away from a 2nd price auction." Google employees discussed the interaction between RPO and Poirot and noted that RPO was designed to go undetected by Poirot, and they concluded that if AdX continued to develop more aggressive versions of RPO then DV360 would adjust Poirot to avoid detecting this auction dynamic within AdX. Poirot intentionally did not target all non-second-price auctions; it gave the auctions Google conducted a pass.

224. As Google's Director of Product Management for Display and Video Ads noted, Poirot's initial implementation in 2017 was "quite effective, resulting in [DV360] spending 7% more on AdX and reducing spend on most other ad exchanges." One employee on Google's team explained that with Poirot, "spend on 3PEs [third-party ad exchanges] dropped by a whopping 32%." Poirot shifted approximately $200 million of DV360 advertiser spend away from rival ad exchanges and toward Google's. This spend was subjected to Google's 20% ad exchange revenue share fee—one of the highest in the industry—resulting in an additional $40 million in profit for Google.

225. This substantial shift in advertising spend by the largest demand side platform in the market, combined with the systematic drop in bid price, had real consequences for competition between ad exchanges. DV360's lowered bids reduced the competitiveness of header bidding auctions, which in turn lowered the win rates of ad exchanges relying on header bidding. The win rate on Google's ad exchange increased even though Google had made no improvements to its ad exchange, offered no additional benefits to publishers, and reduced advertisers' reach (without their knowledge). Because publishers consider win rates before

investing the time and resources necessary to integrate with ad exchanges, Poirot's hit to rival ad exchanges made it even less likely publishers would continue to offer inventory to these ad exchanges and less likely that new publishers would integrate with these ad exchanges through header bidding.

226. Google's success with Poirot was possible because of Google's ability to control the auction process run by its monopoly publisher ad server and Google's last-look advantage stemming from its ad server's dynamic allocation function. Google was able to lower DV360's bids into rival ad exchanges without fear of losing impressions—even if DV360's reduced bid lost in the rival ad exchange's auction—because for the majority of impressions, it would get another bite at the apple when Google's ad exchange was later called for a bid. And because Poirot generally reduced the clearing price of header bidding auctions, Google's ad exchange could win the impression at a lower price, thereby decreasing the revenues ultimately paid to publishers. Without the systemic advantages that Google's publisher ad server forced publishers to afford to Google's ad exchange, and without Google's dominant position among advertiser buying tools, Poirot could not have been nearly as successful in halting the potential rise of rival ad exchanges.

227. Seeing Poirot's initial success, Google doubled down on the strategy. Google was unconcerned about any potential blowback from publishers (who had no meaningful alternative to DFP) or advertisers (who had no insight into the changes). In September 2018, Google launched "Poirot 2.0." Under this new version of the program, Google reduced DV360 advertiser bids further, by as much as 90% to some ad exchanges.

228. Google's prelaunch experiments indicated that Poirot 2.0 would significantly affect rival ad exchanges, even more than the initial iteration. Google anticipated Poirot 2.0

would further decrease DV360 advertiser spend on rival ad exchanges by another 20%, lower publisher payouts from auctions DV360 won by 20%, and lower rival ad exchanges' win rates by 10%. The estimated impact of Poirot 2.0 on the most vocal proponents of header bidding technology was even more pronounced: AppNexus/Xandr would lose 31% of DV360 advertiser spend, Rubicon would lose 22%, OpenX would lose 42%, and Pubmatic would lose 26%. For Google's ad exchange, on the other hand, Poirot increased revenue, publisher payouts, and win rates, through a sleight of hand forcing a shift in advertiser spend. As Google's Director of Engineering—and chief architect of Poirot—explained to colleagues, Poirot had largely achieved in practice Google's earlier plan to boycott header bidding auctions: "lowering bids may have a similar effect" to stopping all bidding on rival ad exchanges. Poirot 2.0 also accomplished Google's strategic goal to "dry out" header bidding without the need for Google to take the significant hit to its revenues and profits that initial experiments suggested might be necessary.

229. Rival ad exchanges lost significant transaction volume from Poirot, undercutting efforts to gain scale. Immediately after the launch, OpenX experienced a 30% year-over-year decline in DV360 advertiser spend, and Google internally identified Poirot as the "biggest culprit." As a result of the loss, OpenX was forced to lay off approximately 100 employees. Other ad exchanges also felt significant drops in DV360 spend and complained to Google. Google's internal discussions confirmed that Poirot 2.0 was the cause.

230. Poirot's success enabled Google to maintain the 20% revenue share fee it has charged on its ad exchange since 2009. Before Poirot, Google employees believed such a high fee was no longer sustainable, as header bidding risked commoditizing ad exchange services; if header bidding continued, Google's employees expected the fee to drop to 5%. By 2019, after Poirot 2.0 was fully implemented, Google's Americas Partnership Finance Lead noted that on

Google's ad exchange fee, "we should continue to hold the line, esp. given currently healthy growth levels, since project Poirot." Poirot, which continues in some form today, shifted spend to Google's ad exchange with its higher revenue share fee; deprived competing ad exchanges of scale, auction pressure, and higher win rates; lowered publisher payouts; and limited advertisers' ability to fully and effectively spend their budgets—all without any improvements to Google's own ad exchange.

#### *e) Google Imposes So-Called Unified Pricing Rules to Deprive Publishers of Control and Force More Transactions Through Google's Ad Exchange*

231. Poirot was incredibly effective at redirecting DV360 advertiser spend away from rival ad exchanges, and putting Google's ad exchange back on the road to acquiring monopoly power, notwithstanding the opening that header bidding had briefly created for competition between ad exchanges. The fraction of DV360 spend on AdX increased from approximately 40% to 70% due to Project Poirot. An internal Google document fretted that "Adx is now dominant to the point where we need to communicate to advertisers (and sometimes even to ad exchanges) why over 70% of [DV360] spend happens on Adx."

232. But Google was not satisfied. Despite the dramatic shift of DV360 spend to AdX and away from rival ad exchanges, Poirot was not quite as effective as they thought it should be, given how much Google had stacked the deck in favor of its ad exchange. One Google Engineering Director noted that while Poirot had made progress on shifting spend to Google's ad exchange and away from rival ad exchanges, "we need to do more." A review of publisher data from Google's ad server and Open Bidding—information effectively covering the sale of nearly all open web ad inventory—quickly identified the problem: Google's publisher customers. Google employees realized that publishers were using pricing controls built into the publisher ad server to set the terms on which their inventory was sold to advertisers, including by setting

different minimum price floors for different buyers. Google perceived publishers' ability to steer ad sales to rival ad exchanges, and to control who bought their ads and at what price, as a threat to Google's ability to control the flow of transactions.

233. Within Google's publisher ad server, publishers were able to set different price floors for specific exchanges or advertiser buying tools. For example, a publisher could set a price floor of $2 for Google's ad exchange and $1.80 for the competing ad exchange, OpenX. If OpenX submitted a winning bid of $1.85, and Google's ad exchange had a buyer willing to pay $1.90, the inventory would still be sold to the OpenX advertiser because Google's AdX ad exchange failed to clear the minimum price set by the publisher for AdX.

234. There are many reasons why publishers might want to set non-uniform price floors for different exchanges or advertiser buying tools. Publishers have relationships and deals with advertisers, agencies, and ad exchanges that have implications beyond the sale of a single impression. For example, a publisher might want to boost an ad exchange's chances of winning a particular impression in order to reach previously negotiated volume discount thresholds. Additionally, some publishers might set a higher price floor for Google's ad exchange than for a rival ad exchange to account for publisher-specific preferences for a particular ad exchange, the quality of advertiser demand, better advertisement load rates, and data advantages. Some publishers also wanted to mitigate risk from overexposure to a single exchange (such as Google's ad exchange) or to avoid conflict with direct sales channels. For all of these reasons and others, the ability to set different floors for different ad exchanges or advertiser buying tools was an important tool that publishers used to manage these partner relationships and direct the sale of their own inventory to maximize their overall business objectives.

235. Google recognized that the ability to choose different floors for different ad exchanges or buying tools was a DFP feature that publishers valued. One Google Senior Product Manager explained to his colleagues: “The general idea is that the pub[lisher] doesn’t care about maximizing revenue on every individual query – they want to maximize revenue for their overall business, and that might mean sacrificing a few pennies of lost indirect revenue” on a single transaction. Similarly, Google’s Director of Global Partnership and Publisher Solutions explained: “Pub[lishers] are also rational[] when they decide to diversify their source of revenues” using floors given that “[i]t help[s] them to keep Google at bay and put pressure on us (similar to any industry).” By using different price floors, publishers expressed a willingness to occasionally accept a slightly lower price from a rival ad exchange than from Google’s ad exchange for the same inventory. But publisher controls and goals mattered little when they conflicted with Google’s desire for increased market share and profits. Google refused to tolerate a system in which publishers exercised control over their own inventory.

236. Even before Poirot, Google had noticed that some publishers used price floors to direct the flow of certain transactions to rivals. In response, Google had insisted on “equal footing” clauses in certain publisher contracts, which ostensibly prevented publishers from offering inventory to competitors on more favorable terms or at lower prices than those offered to AdX. However, these contractual provisions were difficult to monitor and enforce even for the small number of publishers for which they applied. Confronted with a broader concern about the operation of price floors in the wake of Poirot, Google developed an alternative approach that was blunt but effective: Google simply removed the existing feature in its publisher ad server that allowed publishers to set different floor prices and preference rival ad exchanges or buying

tools. Going forward, only Google, not its customers, would be permitted to dictate preferences, and only those preferences that advanced Google's strategic ambitions would be tolerated.




Fig. 18

237. Recognition of the flooring "problem" was widespread within Google's display advertising leadership. When one Google employee asked why DV360 was still winning inventory through rival ad exchanges, Google's Project Poirot architect explained that "the best guess is that the AdX [price] floors are higher." He went on to note that "[t]his is one big problem for the Adx team to try fixing so that more of the [DV360] buying will switch to Adx." He suggested that "if we figure out how to equalize floors (i.e., get the Adx floors down), as a buyer, we will start seeing benefits in terms of buying more through Adx and decreasing incrementality on 3PE" (third-party ad exchanges). As usual, Google did not care what was best for its customers; Google insisted on doing whatever was necessary to decrease spend on AdX's competitors, thereby denying them the scale and competitive position to threaten Google's AdX monopoly.

238. Google's internal analyses of the pricing floor practice demonstrated the extent of the "problem." Google believed its AdX ad exchange was already winning 66% of auctions where an ad exchange used header bidding, but for a little less than half of the inventory it did not win, Google's AdX had a higher bid than the rival ad exchange that did win. The AdX ad exchange was losing these auctions because publishers had configured price floors that awarded the inventory to a rival ad exchange or rival demand source at lower per-impression prices than AdX and/or Google Ads offered in certain auctions. In response, Google went to work to block publishers from setting price floors that disadvantaged its AdX business.




Fig. 19

239. In March 2019, Google announced a number of changes to its publisher ad server and ad exchange. Among the notable changes were the removal of granular publisher price controls from the ad server. In their place, Google required publishers to set a single floor price for inventory that applied to all ad exchanges and advertiser buying tools. Google called these

degraded pricing controls Unified Pricing Rules, or UPR. Unified Pricing Rules were the culmination of Google's work to stop publishers from using ad exchange-specific or buyer-specific price floors to steer transactions to rival ad exchanges and away from Google's ad exchange and buying tools. Under Unified Pricing Rules, publishers were no longer allowed to set different price floors for Google's ad exchange or advertiser buying tools versus other ad exchanges or advertiser buying tools.

240. Google recognized this product change came with a number of "major risks," including "(1) revenue drop for some pub[lishers][23] (2) negative pub[lisher] reaction (loss in ability to set per-buyer floors) (3) negative adv[ertiser] reaction (potential for DV3[60] spend share ↑ on AdX)." Internal experiments found that UPR increased DV360 and Google Ads' spend on AdX and decreased spend on rival ad exchanges. One analysis found that UPR caused DV360 to win approximately 32% more impressions on AdX and led to a 6% increase in AdX revenue.

241. Google bundled its imposition of Unified Pricing Rules with other changes to provide cover. As one employee explained, Google "bundled . . . a bunch of contentious changes," such as the "overhauled pricing rules," with less objectionable changes "to make the contentious ones more stomachable." For example, Google changed its ad exchange from a second-price auction to a first-price auction, which altered some of the ways price floors impacted auctions. Google used the auction format change to contend that the only legitimate reason for differential price floors in its view—to increase the clearing price of a second-price auction—had been eliminated. Google also claimed that the granular price control feature of its

[23] Some publishers were able to achieve greater total revenue by flooring different ad exchanges and demand sources at different prices.

ad server only confused its publisher base—even the sophisticated publishers most likely to use price floors. Google asserted that it was doing those customers a favor by eliminating the function.

242. In reality, Google's internal documents demonstrate that these were pretextual justifications for the true driver of Unified Pricing Rules: preventing publishers from preferencing rival ad exchanges. Google employees candidly acknowledged that the change in auction format alone "would have achieved most of what we desperately need to fix our ecosystem," irrespective of changes to price floors. But the Google ad exchange "team wanted to use this migration [to a first-price auction] as an opportunity to significantly limit the ability of publishers to set floor-prices per buyers (which is a good goal to have)." Externally, Google told publishers and others that the combined changes would "simplify programmatic buying," "reduce complexity and create a fair and transparent market for everyone." Internally, Google acknowledged that getting rid of higher price floors for Google's ad exchange was the "primary internal objective for the entire launch" of bundled changes and its "key driver." Internal Google documents explained that the changes "will be a shift in DV360 spend patterns away from [third-party ad exchanges]." Not surprisingly, internal Google documents identified the "winner" of the new rules to be AdX, its own ad exchange, and accurately listed rival ad exchanges to be the "losers" under the new rules.

243. Publishers were livid when Google announced the change. At an April 18, 2019 meeting with Google, publisher customers lashed out. Google's meeting notes reflect that publishers reiterated what Google already knew: "optimizing yield is important but CONTROL is also important." Publishers "laugh[ed]" when Google employees tried to push the farce that "we [Google] don't want to take control away" from publishers. Publishers informed Google that

"we can give you 1,000 reasons why we want buyer rules" and pointed out that "maybe flooring doesn't have to do with 'pure yield' but might be needed for 'business reasons.'" Notwithstanding the clear value the pricing rules provided publishers, Google's own desire to prevent publishers and rival ad exchanges from circumventing the effects of Poirot won the day. Google refused to make any changes to the proposed Unified Pricing Rules. Because it had a publisher ad server monopoly, Google did not need to be responsive to its publisher customers' needs; Google was confident that there was nowhere else for them to turn.

244. By 2019, effectively all viable publisher ad server competitors had exited or were in the process of exiting the market. Even if an alternative publisher ad server had remained, it could not have provided publishers access to the substantial and unique Google Ads' advertiser demand that remained available almost exclusively through Google's ad exchange.

245. With Unified Pricing Rules, Google exercised its market power to intentionally degrade the quality of its publisher ad server at the expense of publisher customers. It did so to prevent publishers from choosing to transact more through rival ad exchanges, further inhibiting the ability of these smaller ad exchanges to gain needed scale and compete effectively. Google reduced the share of other ad exchanges not by making its own ad exchange more attractive to publishers but, rather, by preventing publishers from preferencing other ad exchanges and by refusing to allow rival ad exchanges to compete for transactions on any dimension other than per-impression price. At the same time, Google shifted those transactions to its own ad exchange, further boosting Google's profits derived from its supra-competitive revenue share fees, at the expense of both advertisers and publishers. Likewise, publishers could no longer set lower price floors for particular demand source partners, such as non-Google advertiser ad networks, which reduced the possibility that publishers could partner with a rival to challenge

Google Ads' dominance. Publishers were—and today still are—powerless to respond given the lack of viable substitutes to Google's publisher ad server monopoly. They are locked into Google's publisher ad server and subject to Google's dictates about how they should monetize their own inventory.

246. Google fully launched Unified Pricing Rules in September 2019. As expected, UPR succeeded in shifting transactions away from rivals and to Google's ad exchange. The market share of Google's ad exchange increased by approximately 6% in 2019 following the announcement and ramp-up period. Google's advertiser business also benefited: the average floor price faced by Google Ads' advertisers on Google's ad exchange dropped from a little over $3 to about $1. Of course, had Google Ads bid for inventory through ad exchanges other than AdX, Google Ads' advertisers might never have faced the higher floors applicable to Google's ad exchange in the first place. They would have faced the floors that publishers chose to apply to rival ad exchanges. Google's internal modeling found that the Unified Pricing Rules created the "primary benefit" of Google's bundled auction changes, and the "best guess" of the impact was an annual increase of $430 million in Google's gross revenues and $118 million in Google's net revenues.

247. Most importantly for Google's overall strategy, Unified Pricing Rules had a "negative effect on 3P SSP [ad exchange] spend." For example, one ad exchange competitor complained to Google that its win rate had decreased 6% during the launch of Unified Pricing Rules. Internally, Google employees attributed the decrease to Unified Pricing Rules and warned others not to share this "extremely sensitive" information externally. By the end of 2019, Google's ad exchange was "still retaining [the] largest and growing share of spend" for inventory sold via open auction.

### *f) Google Outright Blocks the Use of Standard Header Bidding on Accelerated Mobile Pages*

248. Project Poirot and the imposition of Unified Pricing Rules are both examples of Google wielding its power on both sides of the ad tech stack to stymie competition in the middle for ad exchanges. Google could not directly block publishers from adding header bidding code to their own webpages, so it had to resort to these indirect methods of limiting the growth of header bidding. But when given the opportunity to do just that—outright block adoption of client-side header bidding—in one corner of the internet, Google leaped at the opportunity, consistent with its broader strategy to stop header bidding in its tracks and thereby stifle competition from rival ad exchanges.

249. Beginning in 2017, Google recognized it could use its monopoly power in the general search market—specifically its ability to rank websites that appear in search results—to force at least certain publishers to forgo traditional, client-side header bidding and instead adopt Google's more limited and self-serving version it named Real Time Config ("RTC"). To do so, Google launched a project known as Accelerated Mobile Pages ("AMP") in an effort to push parts of the open web into a Google-controlled walled garden, one where Google could dictate more directly how digital advertising space could be sold.

250. A year earlier, in 2016, Google began to prioritize within its Google Search results websites that implemented an alternative webpage format known as AMP, which purported to allow faster loading times and a better mobile web experience. It also conditioned access to the News Carousel—the ribbon at the top of certain Google Search pages that highlights relevant news stories—on the adoption of AMP. Technically, AMP was an open-source project; in reality, Google and its engineers tightly controlled the AMP project through at least late 2020; its engineers still have an outsized influence in the project today.

251. Although AMP's faster loading and improved user experience goals appeared altruistic, Google also recognized that its control over AMP opened the door to advancing Google's financial interests, including its desire to quell the rising tide of header bidding. Google's Vice President of Product for Mobile App Advertising drafted a proposal for "wall[ing] off AMP" with "All-in-one Monetization, fully Google controlled and branded: All 'monetization' of content build on these technologies goes through Google." The proposal explained: "Given AMP is open-source, we propose the walled garden to include pages cached and served by Google" and to "[u]se the power of Google Search to prioritize traffic built on these technologies. 'Point our biggest most important pipe there.'"

252. For the first 18 months of AMP's existence, the AMP standard fully supported header bidding, luring in publishers vying to appear at the top of Google's Search listings or in the News Carousel. Early on, Google's AMP Ads Steering Committee formally considered and decided not to deprecate the mechanism for traditional header bidding in AMP because doing so would hurt publishers' ability to sell their advertisements. Instead, the committee agreed in March 2017 that "[i]f a [publisher] implemented such a thing [header bidding], AMP has very little influence from a policy perspective and business perspective - even if we, as Google, don't like it from a business perspective. AMP will look at it from an engineering standpoint and if it meets the standards, accept it."

253. However, just a few months later, Google abruptly changed course, overriding the view of the committee and shifting the open AMP framework into a Google-controlled closed environment where Google decided how digital advertising could be sold. Only a Google-dictated and Google-driven version of "header bidding" would be allowed: one that provided Google's ad exchange a preferred position and restricted publishers' ability to connect with their

preferred ad exchange partners. Publishers could not use traditional header bidding (i.e., client-side header bidding) that could provide higher quality advertising matches and additional revenue, and could only call directly a limited number of ad exchanges and data providers. Google formally launched its version of header bidding for AMP pages, RTC, in August 2017.

254. While Google told the world that its removal of traditional header bidding was based on page latency and a desire to improve user experience, its internal documents painted a different picture. Several Google employees shared their views that any concerns about user experience or latency were a smokescreen to mask Google's real motivation: further propping up its ad tech monopoly and profits. As a key software engineer explained, "If DFP wants to say 'We refuse to serve an ad onto your AMP page if we've been intermediated [by header bidding]', then we can certainly choose to do so. But that's a DFP business decision, not an AMP platform one." He added, "You product folks are welcome to make whatever decision you want about header bidding. But on the justification front, . . . your 500ms-delay-is-bad explanation really doesn't hold water." He went on to say: "If publishers can make more money on AMP pages via something that causes ads to load a little later, but that doesn't harm the [user experience] of the non-ad portion of the page, I think the AMP ecosystem should absolutely support it. I acknowledge that incentives here might not align, and I am indeed saying that AMP should embrace proposals that give more money to publishers even if it results in less money for DRX [DFP and AdX]." Similarly, Google's Vice President for News wrote, "AMP is under pressure to increase revenue and, specifically, to effectively support dynamic bidding. We need a solution. Also, please be cognizant of criticism that our reluctance on header bidding is driven by business self interest, not principle."

255. AMP adoption ultimately proved to be relatively limited, especially outside of news websites. As part of Google's grand strategy to combat the growth of header bidding, however, it served as yet another mechanism to deter publishers from adopting the technology. It was a new tool in Google's toolbox to use its monopoly power in adjacent markets to prop up and protect its growing ad tech monopolies. It also demonstrated that Google was more than willing to make misleading claims about performance as a pretext for stifling competition.

#### *g) Google Replaces Its Last Look Preference from Dynamic Allocation with an Algorithmic Advantage and Degrades Data Available to Publishers*

256. The shift of transactions from rival ad exchanges to Google's ad exchange as part of Unified Pricing Rules came at the same time that Google relinquished one of the substantial preferences it had previously given its ad exchange: the "last look" advantage of dynamic allocation. Its reason for doing so was not altruistic. Maintaining last look would have given publishers a path to effectively floor AdX higher than other ad exchanges notwithstanding Unified Pricing Rules. And as with the shift to a first-price auction, Google believed that removing last look "allows bundling of other valuable changes, that can be positioned as pro-competitive." Google Engineering Director explained that Google "paired this change [dropping last look] with other benefits to Google (fair access and uniform reserve prices), rather than being forced by regulators to remove last look under disadvantageous terms."

257. But even this concession was a mirage. Although eliminating "last look" might have resulted in a small decline in transactions on Google's ad exchange—partially offset by the benefits of Unified Pricing Rules—Google deployed a replacement that was effective in replicating the prior advantage. Relying on its massive trove of data from its monopoly publisher ad server and dominant ad exchange, Google developed an algorithmic model to predict the bids of rivals for each impression. In this way, Google could still predictively "peek" at its rivals' bids

before submitting its own. Specifically, Google's unique access via dynamic allocation to years of data on multiple bids per auction for trillions of auctions allowed Google to estimate the *distribution* of predicted prices necessary to replicate "last look." Google's technical documents explain that for accurate predictions "[w]e need to predict the full distribution of competition, not just the point estimate." Only Google had the data to do so by virtue of its dominant position across the ad tech stack. Moreover, the effects of years of a last look advantage did not disappear overnight. Google had already obtained the benefits of preferential access and continued to realize the enduring flywheel effects of scaling its ad exchange while eclipsing rivals.




Fig. 20

258. Google delayed giving up last look for months while it fine-tuned the "Smart Bidding" algorithm that would replace it. When Smart Bidding launched, it fully offset the 30% drop in Google Ads' revenue that Google expected from the loss of last look (without Smart Bidding) and turned an expected 10% drop in DV360 revenue into a revenue increase of 3%.

259. Beginning in late 2019, Google made some of the data used in Smart Bidding available to rival ad exchanges, but important limitations applied. Google only shares data with

rival ad exchanges that bid on the impression via Open Bidding (not header bidding); data is limited to the winning price for an auction (where the rival ad exchange lost) or the second-highest bid (where the rival ad exchange won); and data is shared in a format that many ad exchanges could not use. This is insufficient for rival ad exchanges to replicate the broader data trove to which Google has access and against which it was able to train its bidding algorithms for years. For their part, publishers have no ability to block Google from continuing to have access to this pricing data or to allow rival ad exchanges access to similar data outside the parameters dictated by Google.

260. At the same time that it rolled out Smart Bidding, Google degraded the data it made available to publishers that previously allowed them to monitor how Google's ad exchange was competing against rival ad exchanges. Prior to late 2019, Google made available to publishers a "data transfer file" that allowed eligible publishers to see on an impression-by-impression basis the individual bids from competition among ad exchanges and certain advertising demand sources for the publishers' inventory. Publishers could then respond to changes in the nature of competition by tweaking the way in which they made their inventory available to their ad tech partners. Commenting on the earlier version of the data transfer files, Google acknowledged their value was to create a "more transparent auction marketplace" and "enabl[e] publishers to find opportunities for incremental revenue."

261. Following the shift to Unified Pricing Rules and the introduction of Smart Bidding, Google altered the files to prevent publishers from linking the bids from Google's advertising products to those from rivals using header bidding for the same impression. This has made it more difficult for publishers to make informed choices about how and where to make

inventory available and to monitor Google's bidding behavior for potential anticompetitive conduct.

## V. ANTICOMPETITIVE EFFECTS

262. Google's course of conduct has corrupted the competitive process by which publishers and advertisers select, and then use, pivotal ad tech tools. In doing so, Google has undermined publishers' and advertisers' ability to make optimal matches for advertising inventory on mutually agreeable terms. Google also has interfered in rivals' attempts to partner successfully with Google's publisher and advertiser customers, thereby limiting the competitive benefits that would otherwise flow from customers' ability to effectively multi-home across competing ad tech products. Instead of fostering a competitive and innovative market, Google has wielded its market power to dictate the terms on which publishers and advertisers do business, ensuring those terms advance Google's anticompetitive ends and bottom line rather than its customers' best interests.

263. Google's conduct, described above, consists of a series of interrelated and interdependent actions, which have had cumulative and synergistic anticompetitive effects, the full scope and effect of which could not be fully recognized in real time by anyone outside of Google. Google's anticompetitive conduct includes, but is not limited to:

(1) Google's acquisition of DoubleClick to obtain not only a dominant publisher ad server, DFP, but also a nascent ad exchange, AdX, in order to pursue its goal of dominance across the entire ad tech stack;

(2) Google's restriction of Google Ads' advertiser demand exclusively to AdX;

(3) Google's restriction of effective real-time access to AdX exclusively to DFP;

(4) Google's limitation of dynamic allocation bidding techniques exclusively to AdX;

(5) Google's providing AdX with a "last look" auction advantage over rival exchanges;

(6) Google's acquisition of AdMeld to stop its yield management technology from promoting multi-homing across ad exchanges;

(7) Google's use of Project Bell, which lowered, without advertisers' permission or knowledge, bids to publishers who dared partner with Google's competitors;

(8) Google's deployment of sell-side Dynamic Revenue Share to manipulate auction bids—without publishers' knowledge—to advantage AdX;

(9) Google's use of Project Poirot to thwart the competitive threat of header bidding by secretly and artificially manipulating DV360's advertiser bids on rival ad exchanges using header bidding in order to ensure transactions were won by Google's AdX; and

(10) Google's veiled introduction of so-called Unified Pricing Rules that took away publishers' power to transact with rival ad exchanges at preferred prices.

264. Google's anticompetitive scheme spans nearly two decades and continues to the present. Moreover, the flywheel effects of even the earliest conduct are lasting, enabling and amplifying the impact of subsequent conduct, and setting in motion Google's march to an ever-increasingly dominant position across the ad tech industry that persists today. Google has distorted the competitive market forces that would otherwise determine prices and output and would incentivize innovation, efficiency, customer choice, and control. Google's conduct has preserved Google's dominant market positions at all levels of the ad tech stack and allowed

Google to siphon away a supra-competitive portion of advertiser dollars before they can reach website publishers.

265. Collectively, by hamstringing rivals' abilities to compete on the merits, Google's conduct has stifled innovation and limited publisher and advertiser choice. Google's conduct has harmed internet users as well. Fewer advertising dollars reach website publishers—because of higher ad tech fees and less efficient advertising matches—meaning those publishers have fewer resources to create content for internet users. These harmful effects are not just historical; rather, Google's anticompetitive conduct continues to affect the marketplace on an ongoing basis.

266. ***Higher Prices and Higher Margins for Google.*** The overarching goal of much of Google's conduct has been to force as many transactions as possible (especially high-value transactions) to flow through its own ad tech products, with Google taking a cut of the advertising spend at each step of the way. The focal point of Google's monetization strategy has been its ad exchange, where it charges its highest revenue share fees: consistently around 20% for open auction transactions since 2009, while its rivals charged only a fraction of that amount. Google's documents admit that ad exchange technology largely became commoditized years ago, and but for Google's ability to build and defend a moat around its ad tech products, competition would have driven prices down for most transactions by as much as 75%, especially where that same advertising demand is otherwise available on rival ad exchanges. Instead, Google has succeeded in defending its supra-competitive prices for all transactions flowing through its ad exchange without ceding—and indeed growing—its market share even today.

267. The revenue share fees Google charges come directly out of advertisers' advertising budgets and ultimately out of website publishers' bottom-line revenues. This means that advertisers are able to buy fewer ad impressions at the prices at which publishers are willing

to sell, less advertiser spend makes it to the publishers that internet users rely upon to generate and disseminate important content, and ultimately fewer publishers are able to offer internet users content for free (without subscriptions, paywalls, or alternative forms of monetization).

268. ***Scale, Flywheel Effects, and Diminished Multi-Homing.*** Google's strategy to shift additional transactions to its ad exchange and inhibit the ability of publishers and advertisers to transact effectively through rivals was not merely to charge supra-competitive fees. Google was also concerned that too many transactions flowing through alternative pipes—other ad technology platforms—could allow rivals to gain scale and challenge Google's competitive moat. The growth of alternative ad tech tools posed a risk of increased competition via more effective multi-homing, leading to pressure to reduce prices and increase choice and quality for publishers and advertisers.

269. Scale plays a critical role in a company's ability to offer a competitive ad tech platform at a low price and high quality. Scale would bestow many advantages on Google's potential competitors. These include indirect network and feedback effects to attract more advertisers and publishers, more data to improve the efficiency of their transactions, and the opportunity to spread their fixed costs over a larger number of transactions. Google's conduct had the purpose and effect of depriving rivals of sufficient scale to meaningfully compete in the ad exchange, publisher ad server, and advertiser ad network demand markets. Even for conduct Google ostensibly has discontinued, the effects are persistent and ongoing. Scale builds on itself and is self-reinforcing. Google's conduct denying scale to rivals has had a lasting impact that continues to affect today's marketplace.

270. Google has accomplished this objective in a number of ways. Collectively, Google's conduct has allowed its ad exchange to win more impressions by providing it with

more opportunities to win transactions on preferential terms, initially through programs like dynamic allocation and later through the implementation of Project Poirot and Google's so-called Unified Pricing Rules. By using Google's control of the publisher ad server to give its ad exchange preferential access to publisher inventory, Google has been, and continues to be, able to drive up rival ad exchanges' and advertiser ad networks' costs; impede publishers' attempts to identify high-quality, real-time matches through those ad exchanges and networks; limit the ability of ad exchanges to win transactions at sufficient scale; and diminish rival ad exchanges' ability to attract publishers and advertisers to their platforms.

271. Rival ad exchanges have incurred costs to process and respond to each bid request from a publisher, but have been unable to effectively compete on the same terms as Google's ad exchange to win the impression. Because ad exchanges are compensated only on transactions they win, an ad exchange's win rate is critical to the long-term financial viability of the ad exchange and its ability to innovate.

272. Moreover, strong network effects operate in the publisher ad server, ad exchange, and advertiser ad network demand markets, which are driven largely by scale. Due to indirect network effects, both advertisers and publishers are attracted to ad exchanges with more parties on the other side. A rival ad exchange that has less scale due to Google's anticompetitive conduct is less able to attract and maintain additional publishers and advertisers; it swims against the strong current of indirect market effects that benefit Google's larger ad exchange. Similarly, for an advertiser ad network to rival Google Ads' dominance, it must be able to benefit from network effects and have sufficient access to publisher inventory at scale. A competing advertiser ad network would additionally benefit from the associated contextual and user targeting data that provide a competitive advantage. Google's actions inhibiting rival ad

networks from accessing inventory on the terms that publishers prefer has the effect of impeding competition. The result in both cases is a feedback loop that continues to inhibit the growth of rivals while preserving Google's dominant positions.

273. Additionally, Google's conduct has succeeded in locking publishers into Google's publisher ad server. Google's restrictions have rendered its publisher ad server the only viable means to obtain meaningful access to the unique, sizeable Google Ads' advertising demand available almost exclusively on Google's ad exchange, as well as the other advertising demand Google made preferentially available there. Because publishers must as a practical matter single-home with one publisher ad server, this exclusivity essentially compelled publishers to use Google's publisher ad server and inhibited rivals from entering or remaining in the market. As a result, a potential competitor to Google's publisher ad server would need to enter both the publisher ad server and the ad exchange market, both at scale, in order to compete. Only a rival ad exchange operating at scale together with a publisher ad server would likely attract publishers to switch away from Google's highly restrictive publisher ad server. Google perceived that header bidding posed an existential threat to its publisher ad server monopoly because header bidding could allow a potential rival to generate sufficient scale in the ad exchange market and, subsequently, enter the publisher ad server market (or facilitate the entry of a new publisher ad server). Google quashed that threat and deprived its rivals of the ability to gain such scale via header bidding or other innovations.

274. ***Lack of Choice and Control for Publishers and Advertisers Alike.*** Google's anticompetitive conduct has narrowed publishers' and advertisers' choices about how to do business with one another in several ways. Dynamic allocation prevented publishers from effectively offering their inventory on the same terms—or any terms of their choosing—through

multiple ad exchanges. Through the Unified Pricing Rules, Google disabled the function in its publisher ad server that previously allowed publishers to specify the terms on which they wished to transact with ad exchanges and other sources of advertising demand. And unbeknownst to advertisers, Project Poirot surreptitiously discounted their advertising spend on the ad exchanges they selected and directed that spend toward Google's ad exchange instead.

275. More broadly, Google's march to monopoly in the publisher ad server market has left publishers today with basically no choice when selecting a publisher ad server. And because the publisher ad server determines how publisher ad inventory is awarded to an advertiser, publishers have no choice but to acquiesce to Google's will as to how that process should work. Competition no longer constrains Google's ability to write the rules in its favor.

276. ***Information Asymmetries.*** Because Google's ad tech products face little or no meaningful competition, Google has been able to operate its products within a black box, affording publishers and advertisers limited visibility into how, why, and even at what price, website advertising inventory is sold. One industry report suggests that approximately 15% of all digital advertising spend is simply unaccounted for, with publishers and advertisers unable to determine which intermediary may have siphoned this spend off for its own gain. Reduced transparency diminishes the ability of publishers and advertisers to make informed choices in selecting their ad tech products and hampers their ability (and rivals' as well) to serve as a competitive constraint.

277. ***Less Innovation.*** Competitive pressure drives innovation, as competitors are incentivized to develop new ways to outperform one another to attract customers. The lack of any meaningful competition for publisher ad servers has severely dampened innovation in that market. Reflecting on Google's dominant sell-side market position, Google executives noted the

weakness that Google "often play[s] fast follow vs first movers." A more competitive market would have fostered greater innovation. For instance, if not for Google's acquisition of AdMeld and subsequent deprecation of its yield optimization technology, real-time bidding among ad exchanges may have become available to publishers several years before the advent of header bidding, and well before Open Bidding. Similarly, had Google not had a monopoly of the publisher ad server market, a rival publisher ad server may have introduced a tool for server-side real-time bidding among ad exchanges similar to Open Bidding. Instead, the industry was forced to rely on header bidding, which, although useful, is limited because it serves as a partial workaround that was not integrated into a publisher ad server. Moreover, rival ad exchanges have been limited in their ability to introduce any innovation that requires the cooperation of a publisher ad server, even where such cooperation would improve both products. In the absence of serious competitive pressure, Google has a diminished incentive to improve its publisher ad server or ad exchange products.

278. The United States is among the advertisers harmed by Google's anticompetitive conduct. United States departments and agencies, including ones in this district such as the Army, purchase open web display advertising using Google and non-Google ad tech tools. Since 2019, the United States has purchased in excess of $100 million in open web display advertising. The United States has incurred monetary damages as a result of Google's anticompetitive conduct by virtue of the supra-competitive fees, manipulated advertising prices, and lower quality advertising matches described above.

## VI. RELEVANT MARKETS

279. Google's conduct at issue in this Complaint implicates three relevant antitrust markets in the United States: publisher ad servers, ad exchanges, and advertiser ad networks.

### *A. Geographic Markets*

280. The United States is a relevant geographic market for publisher ad servers, ad exchanges, and advertiser ad networks. Market participants recognize this in the ordinary course of business. While Google and certain other market participants offer publisher ad servers, ad exchanges, and advertiser ad networks internationally, there are differences in publisher and advertiser preferences, language, and regulatory frameworks depending on the country to which the publication and/or advertising is intended to be viewed.

281. In the alternative, a relevant geographic market for publisher ad servers, ad exchanges, and advertiser ad networks is worldwide (excluding countries such as the People's Republic of China that substantially restrict international internet access).

### *B. Product Markets*

#### *1. Publisher Ad Servers*

282. Publisher ad servers for open web display advertising is a relevant antitrust product market. For simplicity, this Complaint refers to these products as "publisher ad servers" or "ad servers." Google offers DoubleClick for Publishers, now part of the Google Ad Manager suite, as a product in this relevant market.

283. A publisher uses a publisher ad server to manage the sale of display ads on its webpages. Publisher ad servers provide functionality such as ad delivery, reporting, and forecasting of availability across direct deals and indirect advertising sales. Publisher ad servers evaluate potential sources of advertising demand and are the final arbiters of which ad is selected to fill designated inventory slots on a publisher's webpage.

284. Other ad tech products are not reasonable substitutes for publisher ad servers. As compared to publisher ad servers, alternative products—such as publisher ad networks (including Google's AdSense product), ad exchanges, closed web platforms, or mobile app ad mediation

platforms—offer different functionality, serve distinct needs for publishers, use different pricing structures, and/or monetize different types of digital ad inventory. Thus, there are no reasonable substitutes for publisher ad servers, and a publisher ad server monopolist would be able to maintain prices above the level that would prevail in a competitive market and/or maintain quality below the level that would prevail in a competitive market.

285. Google has maintained a monopoly in publisher ad servers in the United States since at least 2015. As confirmed by Google's internal assessments, Google's share of the publisher ad server market in the United States, measured by either revenue or impressions, has remained above 90% for many years. Its worldwide market share is similar.

286. Importantly, Google's dominance of open web inventory sold via open auction also gives Google a dominant position with respect to the sale of other types of valuable inventory transacted through its publisher ad server. These include directly sold advertisements and advertisements sold outside of open auctions via programmatic advertising tools, e.g., programmatic guaranteed and programmatic direct. Although these transactions are not substitutes for open auction transactions, they give Google substantial sources of additional revenue and data concerning some of the most sought-after publisher inventory. For example, in 2021, direct advertisement sales through DFP represented over $11 billion in gross revenues to publishers, with programmatic guaranteed and programmatic direct representing approximately $1 billion in gross revenue.

287. Google has exploited its monopoly power over DFP. In 2015, Google developed technology within the publisher ad server that was able to support large volumes of programmatic direct transactions. Google initially planned to enable third parties to implement the technology via API protocols. By early 2016, Google recognized that some third-party

exchanges were ahead of AdX in developing programmatic direct technologies. To forestall the development of these competing products, Google developed guidelines which prohibited DV360 from engaging in any engineering work to support competing products before a similar integration was already developed between DV360 and AdX. As a result, competitive product development and innovation was impeded until Google's programmatic direct technologies became the *de facto* market standard.

288. Google's durable monopoly power in publisher ad servers is protected by significant barriers to entry. The cost to build a publisher ad server and achieve the scale necessary to compete effectively are significant. Publishers typically can only use one publisher ad server at a time and rarely incur the costs to switch from one to another due to engineering integration costs and significant disruptions caused by switching. The cost to build a publisher ad server is significant, and barriers to entry are reinforced by Google's anticompetitive conduct in the market.

289. Google's monopoly power in publisher ad servers is further evidenced by Google's ability to engage in conduct that benefits itself at the expense of publishers without inducing them to switch to an alternative publisher ad server. Moreover, Google's monopoly power in publisher ad servers is protected by Google's anticompetitive conduct described herein.

***2. Ad Exchanges***

290. The market for ad exchanges for indirect open web display advertising is a relevant antitrust product market. For simplicity, this Complaint refers to these products as "ad exchanges." Google offers AdX, now part of the Google Ad Manager suite, as a product in this relevant market.

291. Publishers use ad exchanges to auction display ad inventory, and advertisers (through advertiser buying tools) use ad exchanges to purchase that inventory. Alternative

methods and products for transacting ad inventory are not reasonable substitutes for advertisers and publishers. As compared to ad exchanges, alternative methods and products for selling ad inventory—such as direct deals, programmatic guaranteed, traditional ad networks (those not relying on real-time bidding), closed web platforms, or other ad tech tools for other types of digital advertising—are distinct in terms of inventory type, use cases, functionality, inventory constraints, and/or monetization. Thus, there are no reasonable substitutes for ad exchanges, and an ad exchange monopolist would be able to maintain prices above the level that would prevail in a competitive market and/or maintain quality below the level that would prevail in a competitive market.

292. Google enjoys substantial and growing market share with respect to ad exchanges in the United States. Google's AdX is the largest ad exchange in the market; it is approximately four times larger than the next largest ad exchange, whether measured by impressions won or by revenue, and has been for at least several years. For open web advertisements sold via open auctions, Google's ad exchange is the direct winner of more than 50% of all ad impressions and revenue. Its worldwide market share is higher.

293. In addition, Google also controls the Open Bidding system through which other ad exchanges may purchase publisher ad inventory, but only by paying Google a 5% revenue share fee, sharing important bid data with Google, and restricting the demand used to compete in the auction. Open Bidding presently represents another approximately 7% of all U.S. advertising impressions won via open auction. As a result, Google has either full (AdX-won impressions) or partial (Open Bidding-won transactions) control over, and visibility into, most open auction transactions.

294. Through the conduct described above, including enhanced dynamic allocation and the integration of AdX into Google Ad Manager, Google has ensured that AdX is used as an ad exchange by publishers representing more than 90% of all open web display advertisements available for auction. Google estimates that AdX is able to see and bid on 77% of open web impressions and that it could profitably force publishers to use AdX by default. By contrast, all other ad exchanges must compete to be adopted by publishers as a secondary ad exchange before they are able to see inventory on which to bid.

295. Google's share in the ad exchange market, if anything, understates AdX's competitive significance. Many ad exchanges still compete for publisher ad inventory via the "waterfall" method, which does not allow for real-time competition among exchanges and is not a close substitute. Excluding transactions that occur via the waterfall method would significantly increase Google's share of the ad exchange market. Additionally, because AdX has superior access to unique sources of demand from Google Ads, it is a must-have ad exchange for nearly all website publishers; other ad exchanges do not have access to similar sources of unique demand. And AdX is also one of the only exchanges connected to both a publisher ad server and advertising buying tool owned by the same company.

296. Google's monopoly power in ad exchanges is further evidenced by Google's ability to engage in conduct that benefits itself at the expense of publishers and advertisers without inducing them to switch away from AdX and relying exclusively on alternative ad exchanges. This conduct has denied scale to rivals and has allowed Google to maintain a supra-competitive revenue share for its ad exchange for over a decade, despite internal documents suggesting a competitive price would be much lower. In addition, Google's monopoly power in ad exchanges is protected by its anticompetitive conduct described herein.

### 3. *Advertiser Ad Networks*

297. Advertiser ad networks for open web display advertising is a relevant antitrust market. An advertiser ad network provides easy-to-use, self-service bidding tools that facilitate ad placement on open web display ad inventory. Advertiser ad networks are accessible to less sophisticated advertisers, although sophisticated advertisers may also use them. Advertiser ad networks typically configure their simple bidding tool with proprietary targeting data that uniquely values website publisher inventory based on a combination of data sources, including information about the website, where the ad will be displayed, and the particular user visiting the website. Advertiser ad networks typically charge advertisers on a cost-per-click basis rather than a cost-per-impression basis. Because advertiser ad networks generally purchase advertising inventory on a cost-per-impression basis, they must have substantial data and scale to successfully predict the likelihood the user will click on the advertisement and thereby effectively arbitrage the difference between their cost to acquire inventory and the cost-per-click price charged to advertisers.

298. Google's advertiser ad network for open web display ads has been called the Google Display Network ("GDN"), and is a portion of Google's Google Ads product (formerly known as AdWords).

299. Many advertisers that use advertiser ad networks continue to be significantly limited in their abilities to substitute all or most of their advertising spend to demand side platforms (or "DSPs"), the other major advertiser buying tool for accessing open-web inventory. DSPs require the buyer to directly manage their advertising campaigns, are not reasonably accessible to less sophisticated advertisers, and often require buyers to utilize their own proprietary data to effectively bid on advertising inventory. Google has described the distinction

between advertiser ad networks like Google Ads and demand side platforms like Google's Display & Video 360 (DV360) as follows:

**Why do Google Ads and Display & Video 360 charge different amounts?**

- Google Ads is a broad offering used by a range of advertisers across a diverse base from small businesses to larger brands. DV360 is specifically used by large global advertisers and their agencies to execute complex marketing campaigns, and as such is priced as an enterprise-level solution.

Fig. 21

300. Advertising networks that facilitate the sale of digital advertising on search, social media, or app platforms do not purchase inventory from such open web website publishers and have distinct, more limited reach.

301. Google has monopoly power in the relevant market for advertiser ad networks. Google built the open web display advertising component of Google Ads by providing easily accessible bidding tools for advertisers, including less sophisticated advertisers. Google documents state that Google Ads provides access to over 2 million websites and reaches over 90% of internet users. Google Ads' United States and worldwide shares of the market for advertiser ad networks for open web display advertising has not dropped below 70% (measured by impressions) since 2015; it currently stands at around 80%. Google experimented with increasing the revenue share charged on advertising demand available through Google Ads, and found that it could profitably impose an increase in excess of 5%. This demonstrates that advertisers would not substitute away from Google Ads to any alternative ad buying tool in sufficient volume to defeat such a price increase.

302. Google's market power in advertiser ad networks for open web display ads is protected by significant barriers to entry. Google was able to build Google Ads' large pool of unique, often small, advertisers through its search product, as it was able to opt search advertisers

into extending their campaigns into open web display. Few companies have such a product available, nor could one be readily built for this purpose.

303. Any advertiser ad network seeking to compete meaningfully with Google Ads would need to build a large enough pool of advertiser demand to be attractive to ad exchanges and publishers. Building such a pool is difficult, even for well-funded market participants.

## VII. JURISDICTION, VENUE, AND COMMERCE

304. The United States brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Google's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

305. Plaintiffs California, Colorado, Connecticut, New Jersey, New York, Rhode Island, Tennessee, and Virginia by and through their respective Attorneys General, bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Google's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

306. This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

307. The Court has personal jurisdiction over Google; venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because Google transacts business and is found within this District.

308. Google is a limited liability company organized and existing under the laws of the State of Delaware and is headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google's display advertising business is part of its "Ads" unit, which consists of Google's YouTube, search, shopping, and

non-search display advertising businesses. In 2021, Alphabet recorded nearly $260 billion in revenue, a 41% increase over 2020. Alphabet's "Google Network" revenue, which represents non-search display advertising revenue from Google's AdMob, Ad Manager, and AdSense products, among others, generated $31.7 billion in 2021, a 37% increase over 2020 revenue.

309. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, in the plaintiff States, across state lines, and internationally.

## VIII. <u>VIOLATIONS ALLEGED</u>

***First Claim for Relief: Monopolization of the Publisher Ad Server Market in Violation of Sherman Act § 2***

310. Plaintiffs incorporate the allegations of paragraphs 1 through 309 above.

311. Publisher ad servers for open web display advertising in the United States or, in the alternative, worldwide is a relevant antitrust market, and Google has monopoly power in that market.

312. Google has unlawfully monopolized the publisher ad server market through a course of exclusionary conduct described herein. While each of Google's actions increased, maintained, or protected its publisher ad server monopoly and/or market power in adjacent markets, the following exclusionary conduct—taken together—played a particularly important role in unlawfully establishing or maintaining a publisher ad server monopoly:

(1) Google's acquisition of DoubleClick to obtain not only a dominant publisher ad server, DFP, but also a nascent ad exchange, AdX, in order to pursue its goal of dominance across the entire ad tech stack;

(2) Google's restriction of Google Ads' advertiser demand exclusively to AdX;

(3) Google's restriction of effective real-time access to AdX exclusively to DFP;

(4) Google's limitation of dynamic allocation bidding techniques exclusively to AdX;

(5) Google's providing AdX with a "last look" auction advantage over rival exchanges;

(6) Google's acquisition of AdMeld to stop its yield management technology from promoting multi-homing across ad exchanges;

(7) Google's use of Project Bell, which lowered, without advertisers' permission, bids to publishers who dared partner with Google's competitors;

(8) Google's deployment of sell-side Dynamic Revenue Share to manipulate auction bids—again, without publishers' knowledge—to advantage AdX;

(9) Google's use of Project Poirot to thwart the competitive threat of header bidding by secretly and artificially manipulating DV360's advertiser bids on rival ad exchanges using header bidding in order to ensure transactions were won by Google's AdX; and

(10) Google's veiled introduction of so-called Unified Pricing Rules that took away publishers' power to transact with rival ad exchanges at preferred prices.

313. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

314. Google's exclusionary conduct has foreclosed a substantial share of the publisher ad server market.

315. Google's anticompetitive acts have had harmful effects on competition and consumers.

316. Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

***Second Claim for Relief: Monopolization of the Ad Exchange Market in Violation of Sherman Act § 2***

317. Plaintiffs incorporate the allegations of paragraphs 1 through 309 above.

318. Ad exchanges for open web display advertising in the United States or, in the alternative, worldwide is a relevant antitrust market, and Google has monopoly power in that market.

319. Google has unlawfully monopolized the ad exchange market through an exclusionary course of conduct and the anticompetitive acts described herein. While each of Google's actions collectively increased, maintained, or protected its ad exchange monopoly and/or market power in adjacent markets, the following exclusionary conduct—taken together—played a particularly important role in unlawfully establishing or maintaining an ad exchange monopoly:

(1) Google's acquisition of DoubleClick to obtain not only a dominant publisher ad server, DFP, but also a nascent ad exchange, AdX, in order to pursue its goal of dominance across the entire ad tech stack;

(2) Google's restriction of Google Ads' advertiser demand exclusively to AdX;

(3) Google's restriction of effective real-time access to AdX exclusively to DFP;

(4) Google's limitation of dynamic allocation bidding techniques exclusively to AdX;

(5) Google's providing AdX with a "last look" auction advantage over rival exchanges;

(6) Google's acquisition of AdMeld to stop its yield management technology from promoting multi-homing across ad exchanges;

(7) Google's use of Project Bell, which lowered, without advertisers' permission, bids to publishers who dared partner with Google's competitors;

(8) Google's deployment of sell-side Dynamic Revenue Share to manipulate auction bids—again, without publishers' knowledge—to advantage AdX;

(9) Google's use of Project Poirot to thwart the competitive threat of header bidding by secretly and artificially manipulating DV360's advertiser bids on rival ad exchanges using header bidding in order to ensure transactions were won by Google's AdX; and

(10) Google's veiled introduction of so-called Unified Pricing Rules that took away publishers' power to transact with rival ad exchanges at certain prices.

320. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

321. Google's conduct has drastically altered the supply paths through which available display advertising inventory is sold, reducing payouts to publishers, burdening advertisers and publishers with lower-quality matches of advertisements to inventory, and inhibiting choice and innovation across the ad tech stack.

322. Google's anticompetitive acts have had harmful effects on competition and consumers.

323. Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

***Second Claim for Relief, in the Alternative: Attempted Monopolization of the Ad Exchange Market in Violation of Sherman Act § 2***

324. Plaintiffs incorporate the allegations of paragraphs 1 through 309 above.

325. Ad exchanges for open web display advertising in the United States or, in the alternative, worldwide is a relevant antitrust market, and Google has attempted to monopolize that market.

326. Google has attempted to monopolize the ad exchange market through an exclusionary course of conduct and the anticompetitive acts described herein. While each of Google's actions collectively increased Google's market power in the ad exchange and adjacent markets, the following exclusionary conduct—taken together—played a particularly important role in Google's attempt to attain an ad exchange monopoly:

(1) Google's acquisition of DoubleClick to obtain not only a dominant publisher ad server, DFP, but also a nascent ad exchange, AdX, in order to pursue its goal of dominance across the entire ad tech stack;

(2) Google's restriction of Google Ad's advertiser demand exclusively to AdX;

(3) Google's restriction of effective real-time access to AdX exclusively to DFP;

(4) Google's limitation of dynamic allocation bidding techniques exclusively to AdX;

(5) Google's providing AdX with a "last look" auction advantage over rival exchanges;

(6) Google's acquisition of AdMeld to stop its yield management technology from promoting multi-homing across ad exchanges;

(7) Google's use of Project Bell, which lowered, without advertisers' permission, bids to publishers who dared partner with Google's competitors;

(8) Google's deployment of sell-side Dynamic Revenue Share to manipulate auction bids—again, without publishers' knowledge—to advantage AdX;

(9) Google's use of Project Poirot to thwart the competitive threat of header bidding by secretly and artificially manipulating DV360's advertiser bids on rival ad exchanges using header bidding in order to ensure transactions were won by Google's AdX; and

(10) Google's veiled introduction of so-called Unified Pricing Rules that took away publishers' power to transact with rival ad exchanges at certain prices.

327. Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

328. In undertaking this course of conduct, Google has acted with a specific intent to monopolize, and to destroy effective competition in, the ad exchange market in the United States. There is a dangerous probability that, unless restrained, Google will succeed in monopolizing the ad exchange market, in violation of Section 2 of the Sherman Act.

329. Google's conduct has drastically altered the supply paths through which available display advertising inventory is sold, reducing payouts to publishers, burdening advertisers and publishers with lower-quality matches of advertisements to inventory, and inhibiting choice and innovation across the ad tech stack.

***Third Claim for Relief: Monopolization of the Advertiser Ad Network Market in Violation of Sherman Act § 2***

330. Plaintiffs incorporate the allegations of paragraphs 1 through 309 above.

331. Advertiser ad networks for open web display advertising in the United States or, in the alternative, worldwide is a relevant antitrust market, and Google has monopoly power in that market.

332. Google has unlawfully maintained its monopoly in the advertiser ad network market through an exclusionary course of conduct and the anticompetitive acts described herein. While each of Google's actions collectively increased, maintained, or protected its advertiser ad network monopoly and/or market position in adjacent markets, its veiled introduction of so-called Unified Pricing Rules that took away publishers' power to transact with rival advertiser ad networks at certain prices played a particularly important role in unlawfully establishing or maintaining an advertiser ad network monopoly.

333. Google's conduct has drastically altered the supply paths through which available display advertising inventory is sold, reducing payouts to publishers, burdening advertisers and publishers with lower-quality matches of advertisements to inventory, and inhibiting choice and innovation across the ad tech stack.

334. Google's anticompetitive acts have had harmful effects on competition and consumers.

335. Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

***Fourth Claim for Relief: Unlawful Tying in Violation of Sherman Act §§ 1 and 2***

336. Plaintiffs incorporate the allegations of paragraphs 1 through 309 above.

337. Google's AdX and DFP are separate and distinct products. They are sold in different markets; their functions are different; there is separate demand for them; and they have been treated by Google and by other industry participants as separate products.

338. Google's AdX has sufficient market power in the market for ad exchanges for open web display advertising in the United States to coerce publishers to license DFP, thus restraining competition in the market for publisher ad servers for open web display advertising in the United States. AdX was viewed as a "must-have" product in part because of its exclusive access to Google Ads' demand. Google compels publishers to use DFP to access real-time competition between AdX and other demand sources. The only viable economic option for many publishers is to use DFP because choosing a rival platform would require the publisher to lose access to economically essential, real-time, competitive advertiser demand.

339. Google's tying arrangement affects a substantial volume of commerce in the publisher ad server market and has substantially foreclosed competition in the publisher ad server market. Google's tying arrangement has excluded competition in the publisher ad server

market. Google's tying arrangement has further caused competing ad servers substantial damages as a direct and proximate cause of this unlawful conduct because Google has foreclosed other ad servers from competing for potential publishers and has deprived ad servers of other business for reasons having nothing to do with the merits of DFP.

***Fifth Claim for Relief: Damages Incurred by the United States by Reason of Google's Violations of the Antitrust Laws, 15 U.S.C. § 15a***

340. Plaintiffs incorporate the allegations of paragraphs 1 through 309 above.

341. Google's violations of the Sherman Act have caused the United States to incur monetary damages, as the United States and its various agencies and departments are buyers of open web display advertising.

## IX. REQUEST FOR RELIEF

342. To remedy these illegal acts, Plaintiffs request that the Court:

1. Adjudge and decree that Google has acted unlawfully to monopolize the publisher ad server market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;
2. Adjudge and decree that Google has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the ad exchange market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;
3. Adjudge and decree that Google has acted unlawfully to monopolize the advertiser ad network market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;
4. Adjudge and decree that Google has acted unlawfully by tying AdX and DFP in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

5. Award damages pursuant to 15 U.S.C. § 15a;

6. Order the divestiture of, at minimum, the Google Ad Manager suite, including both Google's publisher ad server, DFP, and Google's ad exchange, AdX, along with any additional structural relief as needed to cure any anticompetitive harm;

7. Enjoin Google from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose and effect as the challenged practices;

8. Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Google's unlawful conduct;

9. Enter any additional relief the Court finds just and proper; and

10. Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

## X. DEMAND FOR A JURY TRIAL

343. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated this 24th day of January, 2023.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA,

/s/ Jonathan S. Kanter
JONATHAN S. KANTER
Assistant Attorney General for Antitrust

/s/ Doha G. Mekki
DOHA G. MEKKI
Principal Deputy Assistant Attorney General for Antitrust

/s/ Hetal J. Doshi
HETAL J. DOSHI
Deputy Assistant Attorney General for Antitrust

/s/ Ryan Danks
RYAN DANKS
Director of Civil Enforcement

/s/ Daniel S. Guarnera
DANIEL S. GUARNERA
Acting Chief
Civil Conduct Task Force

/s/ Timothy S. Longman
TIMOTHY S. LONGMAN
Acting Assistant Chief
Civil Conduct Task Force

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
Jamieson Avenue
Alexandria, VA 22046
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
AARON M. TEITELBAUM
*Senior Litigation Counsel*

NICHOLAS S. CHEOLAS
DAVID A. GEIGER
JACKLIN CHOU LEM
ARSHIA NAJAFI
BRENT K. NAKAMURA
G. CHARLES NIERLICH
CHASE E. PRITCHETT
ANDREW SCHUPANITZ
DAVID M. TESLICKO
MICHAEL E. WOLIN
*Trial Attorneys*

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

Attorneys for the United States

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Division
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for Plaintiff Commonwealth of Virginia

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General of California

/s/ Paula Blizzard
PAULA BLIZZARD
Supervising Deputy Attorney General
BRIAN WANG
Deputy Attorney General
HENRY CORNILLIE
Deputy Attorney General

Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Telephone: (415) 510-3765
Email: Paula.Blizzard@doj.ca.gov

Attorneys for Plaintiff State of California

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Division
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff State of California

**FOR PLAINTIFF STATE OF COLORADO:**

PHILIP J. WEISER
Attorney General of Colorado
STEVEN M. KAUFMANN
Deputy Attorney General

/s/ Bryn Williams
BRYN WILLIAMS
First Assistant Attorney General
JAN M. ZAVISLAN
Senior Counsel

Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov

Attorneys for Plaintiff State of Colorado

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Division
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff State of Colorado

**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG
Attorney General of Connecticut
EILEEN MESKILL
Deputy Attorney General

/s/ Nicole Demers
NICOLE DEMERS
Deputy Associate Attorney General

Connecticut Office
of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808-5202
Email: Nicole.Demers@ct.gov

Attorneys for Plaintiff
State of Connecticut

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Division
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff
State of Connecticut

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/ Yale A. Leber
YALE A. LEBER
Deputy Attorney General

New Jersey Office
of the Attorney General
Consumer Fraud Prosecution Section
124 Halsey Street, Fifth Floor
Newark, NJ 07102
Phone: (973) 648-3798
Email: Yale.Leber@law.njoag.gov

Attorneys for Plaintiff
State of New Jersey

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Division
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff
State of New Jersey

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General of New York

/s/ Elinor Hoffmann
ELINOR R. HOFFMAN
Chief, Antitrust Bureau
CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division
MORGAN J. FEDER
Assistant Attorney General

New York State
Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

Attorneys for Plaintiff State of New York

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Division
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff State of New York

**FOR PLAINTIFF STATE OF RHODE ISLAND:**

PETER NERONHA
Attorney General of Rhode Island

/s/ Lloyd M. Ocean
LLOYD M. OCEAN
Special Assistant Attorney General

Office of the Attorney General
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Email: locean@riag.ri.gov

Attorneys for Plaintiff
State of Rhode Island

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
Civil Litigation
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff
State of Rhode Island

**FOR PLAINTIFF STATE OF TENNESSEE**:

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ J. David McDowell
J. DAVID MCDOWELL
Deputy, Consumer Protection Division
ETHAN BOWERS
Assistant Attorney General
TYLER T. CORCORAN
Assistant Attorney General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Phone: (615) 741-8722
Email: David.McDowell@ag.tn.gov

Attorneys for Plaintiff State of Tennessee

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General, Civil Litigation
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Local Counsel for Plaintiff State of Tennessee

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

PUBLIC

270

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America, et al.

**(b)** County of Residence of First Listed Plaintiff ____________
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Julia Tarver Wood, Esq.
U.S. Department of Justice, Antitrust Division
450 Fifth Street NW, Washington, DC 20530

## DEFENDANTS

Google LLC

County of Residence of First Listed Defendant Santa Clara County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Eric Mahr, Esq. - Freshfields Bruckhaus Deringer LLP
700 13th Street NW, 10th Floor
Washington, DC 20005

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [X] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [X] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
15 U.S.C. §§ 1, 2, 15a

Brief description of cause:
Monopolization, Attempted Monopolization, and Unlawful Tying

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE
Jan 24, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Gerard Mene

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:23-cv-108 (LMB/JFA) |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

The federal government and seventeen states ("Plaintiffs") have brought this antitrust action against Google LLC ("Google" or "Defendant"), in which they claim that Google has monopolized three digital advertising technology markets in violation of Section 2 of the Sherman Act, and has tied its products in these markets together in violation of Sections 1 and 2 of the Sherman Act.

With the benefit of a three-week bench trial and extensive post-trial filings, the Court finds that Plaintiffs have failed to prove that there is a relevant market for open-web display advertiser ad networks, but have proven that Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market, and has unlawfully tied its publisher ad server (DFP) and ad exchange (AdX) in violation of Sections 1 and 2 of the Sherman Act. Having found Google liable, the Court will set a briefing schedule and hearing date to determine the appropriate remedies for these antitrust violations.

## I. Procedural History

On January 24, 2023, the United States and eight states—California, Colorado, Connecticut, New Jersey, New York, Rhode Island, Tennessee, and Virginia—filed a five-count

Complaint against Google under Section 4 of the Sherman Act, 15 U.S.C. § 4, and Section 16 of the Clayton Act, 15 U.S.C. § 26,[1] [Dkt. No. 1] at 135, alleging monopolization of the publisher ad server market (Count I), monopolization or attempted monopolization of the ad exchange market (Count II), and monopolization of the advertiser ad network market (Count III), all in violation of Section 2 of the Sherman Act. Id. at 136–42. They also alleged unlawful tying in violation of Sections 1 and 2 of the Sherman Act (Count IV), and claimed that the United States had suffered monetary damages from Google's violations of antitrust law under 15 U.S.C. § 15a (Count V). Id. at 142–43. Based on this claim for damages, the Complaint sought a jury trial. Id. at 144. For remedies, in addition to seeking monetary damages, the Complaint sought an order requiring the divesture of Google's publisher ad server and ad exchange products, enjoining Google from engaging in anticompetitive practices, providing such relief as necessary to restore competitive conditions in the markets affected by Google's conduct, and awarding costs and reasonable attorneys' fees. Id. at 143–44.

On February 17, 2023, Google moved to transfer the case to the Southern District of New York under 28 U.S.C. § 1404(a), [Dkt. No. 44] at 1, alleging that transfer was in the interest of justice because nineteen civil antitrust actions brought against Google for its advertising technology practices had been transferred to that district and consolidated under a single district judge by the Judicial Panel on Multidistrict Litigation in August 2021. [Dkt. No. 44-2] at 7. The Court denied the Motion to Transfer because 28 U.S.C. § 1407(g) exempts antitrust suits brought by the United States and state governments from multidistrict litigation. [Dkt. No. 60] at 12–13,

[1] 15 U.S.C. § 4 authorizes the U.S. Department of Justice to institute proceedings in equity to prevent and restrain violations of the Sherman Act. 15 U.S.C. § 26 allows any person, firm, corporation, or association to obtain injunctive relief against threatened loss or damage from a violation of federal antitrust law. States may bring civil actions under 15 U.S.C. § 26 on behalf of their citizens. See California v. Am. Stores Co., 495 U.S. 271, 282–83 (1990).

18–19. The Court also found that "the strong public policy and congressional intent evinced in § 1407(g) to prioritize expeditious enforcement of antitrust laws by federal and state governments and the balance of the remaining § 1404(a) factors" counseled against transfer. Id. at 18–19.

Plaintiffs filed an Amended Complaint on April 17, 2023, solely to add nine additional states—Arizona, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, North Carolina, Washington, and West Virginia—as plaintiffs. [Dkt. No. 120] at 1–3, 146–56. On April 28, 2023, the Court heard and denied Google's Motion to Dismiss for Failure to State a Claim. See [Dkt. No. 163]. The parties engaged in extensive fact and expert discovery from March 27, 2023 to March 15, 2024. See [Dkt. No. 69]; [Dkt. No. 546].

On June 11, 2024, Google's Motion to Dismiss the United States' Damages Claim as Moot and to Strike the Jury Demand was granted after the Court found that Google had mooted the damages claim in Count V by tendering a cashier's check for $2,289,751.00, which was the full amount of monetary damages that the United States claimed it had suffered due to Google's alleged anticompetitive conduct, trebled with prejudgment interest. See [Dkt. No. 748] at 20–21; [Dkt. No. 749] at 1. The Court therefore dismissed Count V and, because the remaining claims only requested equitable relief, struck Plaintiffs' demand for a jury trial. See [Dkt. No. 748] at 23.

After Google's Motion for Summary Judgment was denied without prejudice, [Dkt. No. 773], a bench trial was held. The evidence presented during the three-week trial included testimony of thirty-nine live witnesses, deposition excerpts from an additional twenty witnesses, and hundreds of exhibits. Based on this evidence, the Court makes the following findings of fact and conclusions of law.

**II. The Emergence of Digital Advertising**

Successful advertising has long been essential for businesses. Since the days of merchants marketing their wares on papyrus billboards and colorful storefront signs in ancient civilizations, advertisements have been used to expand brand awareness and increase sales. See, e.g., Fred K. Beard, The Ancient History of Advertising, 57 J. of Advertising Rsch. 3, 239–40 (2017). The professionalization of the advertising industry, however, did not begin in earnest until the founding of newspapers and other periodical print publications, which served as timely and efficient means to present sought-after content. See Frank Presbrey, The History and Development of Advertising 35–139 (1929). Their frequency of publication provided significant opportunities for businesses to advertise their latest products and services, as well as for publishers to generate revenue by selling ad space in their publications. Id. at 35–70.

Advertising agencies formed in mid-nineteenth century America to match advertisers to newspaper ad spaces. See Stephen R. Fox, The Mirror Makers: A History of American Advertising and Its Creators 14 (1984). These agencies initially served as brokers between advertisers and newspapers by facilitating the placement of advertisements in available ad spaces. See id. Eventually, they evolved into more holistic service providers by combining creativity and business acumen to run advertising campaigns across multiple print publications, thereby helping their clients achieve marketing objectives. See id. at 33–44.

Over the course of the twentieth century, advertising campaigns came to be delivered through increasingly diverse media. As the development of radio and television enabled the mass distribution of audio and video content, radio jingles and TV commercials emerged as core advertising methods. See id. at 47, 303–18. The continuous nature and geographic segmentation

of these broadcasting media helped advertisers target consumers with greater frequency and specificity.

Little more than half a century after the first television commercial aired, the media and advertising industries were revolutionized by the Internet. The rapid and widespread adoption of the Internet over the past three decades has resulted in a paradigm shift in the way content is created, viewed, and monetized. See Andrew McStay, Digital Advertising 14–15 (2d ed. 2016). The Internet placed a vast and indefinitely growing amount of information at individuals' fingertips. The ease of uploading text, audio, and video content to websites—such as blogs, message boards, forums, question-and-answer pages, and, more recently, social media platforms—has dramatically expanded the amount of information that can be consumed and monetized, and has greatly diversified the sources of its creation. See Defendant's Trial Exhibit ("DTX") 173 at -173. At the same time, search engines and web-based applications have made online content widely accessible to a global audience, empowering anyone with an Internet connection to explore the World Wide Web and find content that matches their needs and interests. See id.

This explosion of the Internet as the world's primary communications channel, combined with the ability to collect granular data about those who search for and access information online, has made the Internet a gold mine for advertisers. With nearly five billion people carrying Internet-connected smartphones and more than thirty websites receiving over a billion visits per month, never before have advertisers been able to reach such broad audiences. See The State of Mobile Internet Connectivity Report 2024, GSMA (Oct. 2024), https://www.gsma.com/r/somic; Most Visited Websites in the World, Semrush, https://www.semrush.com/website/top (last visited Mar. 27, 2025). Moreover, the data-rich nature of the digital environment has made it easier than

ever for publishers to monetize their content. See, e.g., Plaintiffs' Trial Exhibit ("PTX") 792 at -665, -674; Trial Transcript ("Tr.") Sept. 9 AM 107:22–108:16 (Casale (Index Exchange)).[2] Digital advertisers can target Internet users based not only on what content they are viewing, but also on who they are, where they are located, what they are interested in, what they have purchased, and with whom they interact, among a plethora of other attributes. See PTX792 at -665; PTX904 at -543; PTX1674 at -040; Tr. Sept. 13 AM 52:22–53:17 (LaSala (Google)); Tr. Sept. 25 PM 125:25–126:11 (Borgia (Google)). Digital advertisers employ this personalized understanding to place specific advertisements in front of specific users at specific times to maximize their return on advertising expenditures. See PTX792 at -665; PTX904 at -543; Tr. Sept. 11 PM 99:11–22, 105:21–106:15 (Dederick (The Trade Desk)). By 2016, global digital ad spending had surpassed global television ad spending, in large part due to the breadth and depth of consumer targeting available online. See Emanuel Bayer et al., The Impact of Online Display Advertising, 4 Int'l J. of Rsch. in Mktg. 37 (2020) at 789.

Digital advertising has, in turn, fueled the Internet's growth. Some of the world's most popular websites, such as Bing, Facebook, Google, Instagram, MSN, Pinterest, Reddit, Spotify, TikTok, Twitch, Weather.com, WhatsApp, and X, allow users to access much or all of their content and services at no financial cost. See, e.g., The Weather Channel, https://www.weather.com. The revenue that these popular websites generate from selling ad space to advertisers has not only made their owners' free-to-use models sustainable, but has also provided millions and, in some cases, billions of dollars each year for the maintenance and development of these websites. See, e.g., PTX792 at -693; Tr. Sept. 9 AM 53:12–54:12 (Wolfe

[2] For ease of reference, citations to trial and deposition transcripts contain the last name of the witness and the organization with which they are associated.

(Gannett)); Tr. Sept. 18 AM 151:1–20 (Wheatland (Daily Mail)). Smaller online websites have also largely kept their content freely accessible by monetizing it with advertisements, thereby establishing an open digital ecosystem of information. See DTX76 at -477; DTX506 at -306; Tr. Sept. 20 PM 102:6–103:6 (Sheffer (Google)).

Alternative revenue models have also supported the proliferation of online content. Many traditional print media publishers, such as The New York Times, The Wall Street Journal, and The Washington Post, use a hybrid model of subscriptions and advertisements, placing much of their content behind paywalls—digital barriers that limit access to online content to paying customers. See Tr. Sept. 9 AM 53:19–53:21 (Wolfe (Gannett)); Tr. Sept. 10 AM 18:20–20:9 (Layser (News Corp)) (discussing The Wall Street Journal's paywall). Creators of production-quality video content that is expensive to make, such as Disney, HBO, and Netflix, primarily rely on paid subscriptions. See, e.g., Choose Your Plan, HBO Max, https://auth.max.com/product (last visited Mar. 27, 2025). Meanwhile, e-commerce websites such as Nike and Target function much like physical storefronts, recouping their web infrastructure expenses by selling physical goods and services online. See, e.g., Nike, https://www.nike.com (last visited Mar. 27, 2025). And a small minority of large websites have no revenue models at all, including those funded by government, such as healthcare.gov, or by nonprofit donations, such as Wikipedia. See, e.g., Wikipedia, https://en.wikipedia.org (last visited Mar. 27, 2025). Yet despite these alternative approaches, digital advertising has been the lifeblood of the Internet, funding much of its development while providing free access to an extraordinary quantity of content and services.

## III. Digital Advertising Stakeholders

Digital publishers ("publishers") are the organizations and individuals that control websites and publish content on them. See [Dkt. No. 1309] ("Joint Glossary") at 7. Most

sophisticated publishers view selling advertising space on their websites as a major source of income. See Tr. Sept. 9 AM 53:12–54:8 (Wolfe (Gannett)); Tr. Sept. 18 AM 130:11–24 (Wheatland (Daily Mail)).[3]

Digital advertisers ("advertisers") are the organizations and individuals that pay to place advertisements on publishers' websites to promote their goods or services or to present their messages to Internet users. Advertisers vary in size and include small businesses, large corporations, government agencies, charitable organizations, political campaigns, and public interest groups. See Tr. Sept. 10 AM 130:17–131:1 (Friedman (Goodway Group)); Tr. Sept. 25 PM 73:19–25 (Stewart (Google)).[4] More sophisticated advertisers with larger marketing budgets often contract with advertising agencies that specialize in running multi-channel advertising campaigns to buy advertisements on their behalf. See Tr. Sept. 9 PM 54:25–55:7 (Lowcock (IPG)); Tr. Sept. 10 AM 130:11–22 (Friedman (Goodway Group)); Tr. Sept. 13 PM 26:2–12 (Lambert (OMD)); Tr. Sept. 23 PM 71:12–18, 101:4–6 (Oliphant (U.S. Census Bureau)).[5]

[3] Publishers whose employees provided testimony in this litigation include Buzzfeed, Gannett / USA Today, News Corp / The Daily Mail, The New York Times, The Walt Disney Company, and Vox Media. See Designated Deposition Transcript ("Dep.") 78:24–79:19 (Blom (Buzzfeed)); Tr. Sept. 9 AM 49:10–50:7 (Wolfe (Gannett)); Tr. Sept. 10 AM 8:18–23 (Layser (News Corp)); Tr. Sept. 17 PM 114:8–104:23, 129:25–130:5 (Helfand (Disney)); Tr. Sept. 18 AM 125:3–18 (Wheatland (Daily Mail)); Tr. Sept. 26 PM 123:7–22 (Glogovsky (New York Times)); Tr. Sept. 27 AM 5:24–6:9; 9:19–10:2 (Pauley (Vox)).

[4] Advertisers whose employees provided testimony in this litigation include the U.S. Census Bureau and Zulily. Tr. Sept. 23 PM 65:3–66:14 (Oliphant (U.S. Census Bureau)); Tr. Sept. 27 AM 22:22–23:11 (Bumpers (Zulily)).

[5] Advertising agencies whose employees provided testimony in this litigation include Goodway Group, GroupM, GSD&M, IPG / Universal McCann, and OMD. Tr. Sept. 9 PM 53:6–17 (Lowcock (IPG)); Tr. Sept. 10 AM 130:11–16 (Friedman (Goodway Group)); Tr. Sept. 13 PM 25:4–5, 49:3–22 (Lambert (OMD)); Tr. Sept. 17 PM 137:5–138:3 (Schiekofer (GroupM)); Tr. Sept. 19 PM 6:11–20 (Bradbury (GSD&M)).

Advertising technology providers are the organizations that develop digital products and services to help match publishers' ad spaces with advertisers' ads. See Tr. Sept. 9 AM 53:12–54:25, 84:1–84:5 (Wolfe (Gannett)). These products and services, and the companies that develop and operate them, are discussed at greater length in the next section.

## IV. The Technology Behind Digital Advertising

Underpinning the rapid rise of digital advertising is an assortment of web-based technologies that help place advertisements on webpages so that online publishers can monetize their content and advertisers can promote their goods, services, and messages. See Tr. Sept. 9 AM 53:12–54:25, 84:1–5 (Wolfe (Gannett)). These technologies match publishers selling ad space to advertisers buying ad space so that the right advertisement can be placed on the right website in front of the right user at the right time. See PTX581 at -980–83; Tr. Sept. 11 PM 12:6–18 (Ravi (Pls. Expert)). The ad tech industry is best described as having "buy-side" tools used by advertisers to buy digital ads, and "sell-side" tools used by publishers to sell digital ad space. Joint Glossary at 5, 8 (defining buy-side and sell-side); PTX581 at -980–83; Tr. Sept. 11 PM 12:6–18 (Ravi (Pls. Expert)).

### A. The Rise of Programmatic Advertising

In the early days of the Internet, online advertisements were typically sold through "direct deals." See PTX792 at -667; PTX1031 at -527; Joint Glossary at 6. Buyers employed by major brands or the advertising agencies that represented them would negotiate directly with the sales teams of established publishers, such as national newspapers, to place digital ads on the publishers' websites. See Joint Glossary at 6; PTX792 at -670 (stating direct sales are "[i]nventory bought at fixed prices directly from media owners through in-house or external sales teams"). In this way, monetization of publishers' digital content on the early Internet, much

of which was text-based, reflected the advertising industry's roots in newspaper and print advertising. See PTX792 at -670; PTX1031 at -527.

Advertisers and publishers soon realized, however, that the direct-deal approach left much value on the table. See PTX792 at -670; Tr. Sept. 9 AM 63:10–64:2 (Wolfe (Gannett)); Tr. Sept. 10 AM 34:25–36:9 (Layser (News Corp)). Negotiations between sales teams were cumbersome, and the "three martini lunches" that Madison Avenue executives had long relied upon to make ad deals could not keep pace with the instantaneous interactions between publishers and consumers online. PTX1814 at -743; see also Tr. Sept. 9 AM 63:10–64:2 (Wolfe (Gannett)); Tr. Sept. 10 PM 74:6–22 (Lipkovitz (Google)); Sept. 27 AM 64:2–10 (Wheatland (Daily Mail)). Millions of businesses sought to advertise on the Internet, but they did not have anywhere close to the time or resources needed to negotiate individual contracts with each publisher. See Tr. Sept. 9 AM 63:10–19 (Wolfe (Gannett)); Tr. Sept. 9 AM 129:22–13 (Casale (Index Exchange)); Tr. Sept. 9 PM 54:3–55:10 (Lowcock (IPG)); Tr. Sept. 19 PM 9:23–10:25 (Bradbury (GSD&M)). The dynamic nature of the digital domain also posed significant challenges to anticipating how many visits a website would receive, making it difficult for publishers to scope direct deals appropriately. See Tr. Sept. 9 AM 63:10–64:2 (Wolfe (Gannett)). The selling of publisher ad space solely via direct deals therefore resulted in much ad space going unsold. See Tr. Sept. 9 AM 63:10–64:6 (Wolfe (Gannett)); Tr. Sept. 10 AM 34:25–36:9 (Layser (News Corp)). Another disadvantage of direct deals, which involved buying bulk ad space at fixed prices, was that they often made little use of the significant data about Internet users that publishers, advertisers, and intermediaries possessed—leaving one of the largest sources of value of digital advertising, personalized targeting, largely untapped. See DTX1514 at -922–23; PTX792 at -670, -674; PTX1031 at -527.

To address these deficits, advertising technology providers created "programmatic advertising," which automated the matching of advertisers' ads to publishers' webpages. See PTX792 at -669 ("Programmatic advertising is the automation of [the] buying and selling of digital advertising."); Tr. Sept. 10 PM 74:6–22 (Lipkovitz (Google)); Tr. Sept. 17 PM 120:8–13 (Helfand (Disney)). Programmatic advertising, also referred to as "indirect advertising," dramatically improved the effectiveness of digital advertising by allowing publishers to auction the ad space on their websites in real-time to a wide swath of advertisers. Joint Glossary at 5, 7; DTX1514 at -922–23; Tr. Sept. 12 PM 58:25–59:15 (Goel (PubMatic)).

In automating the matchmaking process, programmatic advertising vastly reduced the time that digital advertising professionals spent inking deals with individual publishers, freeing them to devise higher-level campaign strategies. See Tr. Sept. 19 PM 9:23–10:25 (Bradbury (GSD&M)); Tr. Sept. 23 PM 104:11–23 (Oliphant (U.S. Census Bureau)). Programmatic advertising also enabled publishers to sell their ad space (i.e., "inventory") to a much broader range of advertisers, including small and medium-sized businesses, by eliminating the need for direct negotiations and dealmaking. See PTX579 at -509; Tr. Sept. 19 PM 9:23–10:25 (Bradbury (GSD&M)). Moreover, programmatic advertising helped advertisers place ads on a broader array of publisher websites, including on niche pages that catered to users interested in specific products and services. See Tr. Sept. 23 PM 104:11–23 (Oliphant (U.S. Census Bureau)). In addition to improving the matching of ad buyers and ad sellers, programmatic advertising enhanced the matching of advertisements to consumers by greatly increasing advertisers' ability to target specific Internet users. See Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)).

As advertising technology matured, programmatic advertising became more and more effective. Advertisers refined their ability to estimate the value of each impression—each

opportunity for a publisher to place a given ad in a given ad space in front of a given user at a given time—based on factors such as publisher quality, ad space quality, user attributes, and ad relevance. See Joint Glossary at 6–7 (defining "impression"); PTX792 at -665, -674; PTX904 at -543; PTX1674 at -040; Tr. Sept. 9 AM 59:24–60:23 (Wolfe (Gannett)); Tr. Sept. 10 PM 56:15–57:6 (Friedman (Goodway Group)). Publishers developed a deeper understanding of what the impressions they were selling were worth to advertisers, and they became adept at estimating advertisers' willingness to pay for a particular impression. See Tr. Sept. 9 AM 136:1–21 (Casale (Index Exchange)). The net result was that programmatic advertising has enabled advertisers to better reach targeted consumers, and publishers to better monetize their content and earn more advertising revenue. See PTX792 at -665, -674; Tr. Sept. 9 AM 130:14–22 (Casale (Index Exchange)); Tr. Sept. 12 PM 84:25–85:4 (Goel (PubMatic)).

### B. Ad Networks and The Ad Tech Stack

A few core digital advertising tools enabled the rise of programmatic advertising and the increased monetization of online content. At first, publishers and advertisers primarily used "ad networks," third-party software products that sign up advertisers and publishers as their customers, and then match their advertisers' ads with their publishers' inventory. See DTX1514 at -924; PTX579 at -509; Tr. Sept. 9 AM 109:24–110:2 (Casale (Index Exchange)). The advertiser side, or buy-side, of an ad network gave advertisers the ability to create or upload an advertisement's visuals and any accompanying audio, to specify how much the advertiser was willing to pay for the advertisement to be placed on websites of publishers within the ad network, and to control the scope of the advertising campaign. See Joint Glossary at 5–6. The network would, in turn, match these ads to inventory that publishers had placed in the network. DTX1514 at -924. On the publisher side, or sell-side, the ad network gave publishers the ability

to specify where and how ads appear on their websites, as well as to select types of ads based on quality and relevance. See id. Google's ad network was called the Google Content Network.[6] Tr. Sept. 13 AM 10:21–11:5 (Bender (Google)); Tr. Sept. 9 AM 129:1–6 (Casale (Index Exchange)). AdWords is the advertiser-facing side of the Google Content Network, i.e., the Google product through which advertisers buy inventory from publishers that are in the network.[7] See DTX549 at -188; PTX939 at -993; PTX1096 at -609. AdSense is publisher-facing side of the Google Content Network, i.e., the Google product through which publishers sell their inventory to advertisers that are in the network. See DTX549 at -186, -218; PTX939 at -993; PTX1096 at -608–09.[8]

Ad networks provide a simple way to connect advertising demand with publisher inventory, and are now primarily used by smaller advertisers and publishers. See PTX579 at -509; PTX1031 at -484; Tr. Sept. 11 PM 104:25–105:20 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 76:10–77:16 (Goel (PubMatic)). Larger, more sophisticated advertisers and publishers have generally moved away from ad networks and turned to modern ad tech products that facilitate large-scale advertising campaigns and increase their control over where, how, when, and to whom ads are shown. See PTX1031 at -484; Tr. Sept. 10 AM 140:11–141:24, 145:9–19 (Friedman (Goodway)); Tr. Sept. 13 PM 101:5–11 (Boland (Meta)); Tr. Sept. 19 PM 99:6–14

[6] The Google Content Network, or GCN, is also called the Google Display Network, or GDN. See PTX1096 at -609; Tr. Sept. 20 PM 52:22–53:5 (Sheffer (Google)).

[7] Although this opinion will use "AdWords" to describe the advertiser-facing side of GCN, Google rebranded AdWords as Google Ads in 2018. See PTX1096 at -609.

[8] Other ad network providers whose employees testified in this litigation are Criteo and Meta, which operated the Facebook Audience Network. DTX376 at -975; DTX1257 at 4, 10; Tr. Sept. 13 AM 97:13–98:15 (Boland (Meta)); Tr. Sept. 13 PM 158:1–20 (Parsons (Criteo)).

(Lee (Pls. Expert)). These more modern programmatic advertising products are collectively referred to as the "ad tech stack." See, e.g., PTX0551 at -048.

On the buy-side, sophisticated advertisers and their ad agencies have reduced their reliance on ad networks and started using two primary tools to buy ads and execute their advertising campaigns: "advertiser ad servers" and "demand-side platforms." See Joint Glossary at 5; PTX1031 at -483; Tr. Sept. 23 PM 5:11–22 (Stefaniu (Google)). Advertiser ad servers help advertisers manage digital advertising campaigns, serve ads, and track ad performance. For example, advertiser ad servers enable advertisers to see how their ads perform across different publishers, track user activity after interacting with ads (e.g., determine if the user visited the advertiser's website or made a purchase), and adjust their advertising campaigns based on user behavior. See Tr. Sept. 23 PM 5:11–22 (Stefaniu (Google)) (discussing functionality of Google's advertiser ad server); Tr. Sept. 25 PM 49:11–50:3 (Stewart (Google)). Google's advertiser ad server is called Campaign Manager 360, or CM360. See Tr. Sept. 23 PM 5:11–22 (Stefaniu (Google)).

Demand-side platforms provide large advertisers with significant control over the sources of inventory from which they purchase impressions and how they bid on those impressions. See Joint Glossary at 5; PTX1031 at -483; Tr. Sept. 11 PM 104:25–105:20 (Dederick (The Trade Desk)). Demand-side platforms do this, in part, by providing a single interface for advertisers to manage programmatic and direct ad buying, to synthesize data about publisher inventory and users, and to bid into ad exchanges. See Joint Glossary at 5; DTX1514 at -903, -929, -952; Tr. Sept. 10 AM 140:11–141:19 (Friedman (Goodway Group)); Tr. Sept. 11 PM 104:1–107:2 (Dederick (The Trade Desk)); Tr. Sept. 25 PM 83:19–25 (Stewart (Google)). A demand-side platform lets an advertiser control where and when its ads appear and to which user they are

displayed. PTX1031 at -483. Given the complexity of demand-side platforms, advertisers typically delegate day-to-day management of the campaigns they run through these platforms to ad agencies or, for some of the largest advertisers, to in-house teams of digital advertising professionals. See DTX1514 at -947; Tr. Sept. 25 PM 83:3–11 (Stewart (Google)). Google's demand-side platform is known as Display & Video 360, or DV360, and was previously called DoubleClick Bid Manager, or DBM. See Joint Glossary at 6; PTX939 at -991; PTX1031 at -483; DTX1514 at -929, -950–953; Tr. Sept. 12 AM 18:17–21 (Srinivasan (Google)).[9]

"Ad exchanges" serve as the critical intermediary between advertisers' ads and publishers' inventory by facilitating real-time auctions in which advertisers can bid on inventory. See Joint Glossary at 5; PTX1031 at -480–81, -501–02; Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). Ad exchanges do this by aggregating available inventory from publishers, flagging impressions as they become available (i.e., as users visit webpages), integrating with buy-side tools to solicit advertisers' bids for each impression, and evaluating those bids within a fraction of a second to determine auction winners. See PTX1031 at -480, -501–02; Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). As the central transaction platforms for connecting sophisticated advertisers with sophisticated publishers, ad exchanges are involved in much of the world's programmatic advertising. See PTX847; PTX1242; Tr. Sept. 9 AM 63:1–64:6 (Wolfe (Gannett)); Tr. Sept. 19 PM 54:13–22 (Lee (Pls. Expert)). Google's ad exchange is called AdX. Joint Glossary at 5.[10]

[9] Microsoft and The Trade Desk are other companies offering demand-side platforms whose employees testified in this litigation. Tr. Sept. 11 PM 87:21–22, 105:12–14 (Dederick (The Trade Desk)); Tr. Sept. 20 PM 129:12–17 (John (Microsoft)).

[10] Other organizations with ad exchanges whose employees testified in this litigation include Index Exchange, Kargo, Magnite, Microsoft (formerly Xandr and AppNexus), OpenX, and PubMatic. Tr. Sept. 9 AM 106:16–107:3 (Casale (Index Exchange)); Tr. Sept. 12 PM 56:8–57:8 (Goel (PubMatic)); Tr. Sept. 13 AM 5:8–5:21 (Kershaw (Magnite)); Tr. Sept. 17 PM 45:2–46:6

On the sell-side, most sophisticated publishers stopped using ad networks and started using "publisher ad servers" to manage and sell their ad inventory. See Joint Glossary at 8. When a user visits a website, a publisher ad server instantaneously alerts sources of advertising demand that it has an impression for sale, decides in real-time which ad to show the user, and runs the back-end processes to display the ad. See id.; Tr. Sept. 9 AM 68:16–69:25 (Wolfe (Gannett)); Tr. Sept. 9 AM 121:1–16 (Casale (Index Exchange)). Publisher ad servers make it easier for publishers to place multiple sources of advertising demand in competition against each other, as well as to run advertisements pursuant to direct deals with large advertisers. See DTX1016 at -503. Publisher ad servers also enable sophisticated publishers to manage inventory across multiple web pages, set inventory price floors, and create detailed reports on inventory performance. See Tr. Sept. 9 AM 66:1–8 (Wolfe (Gannett)); Tr. Sept. 19 PM 61:18–25 (Lee (Pls. Expert)); Tr. Sept. 23 AM 30:9–31:9 (Korula (Google)). As such, publisher ad servers are "mission-critical" tools for large publishers, Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)), which "couldn't really manage their display advertising revenue without" them. Tr. Sept. 16 AM 22:12–14 (Mohan (Google)). Google's publisher ad server is called DoubleClick for Publishers, or DFP. [11] Joint Glossary at 6; Tr. Sept. 16 AM 27:24–28:7 (Mohan (Google)).[12]

(Cadogan (OpenX)); Tr. Sept. 19 PM 38:11–39:1, 39:15–17 (Shaughnessy (Kargo)); Tr. Sept. 20 PM 121:2–14, 129:9–17; 136:10–12 (John (Microsoft)).

[11] DFP has since been combined with Google's ad exchange, AdX, under a single brand called Google Ad Manager, or GAM. Tr. Sept. 9 AM 66:19–67:3 (Wolfe (Gannett)). Google employees, testifying witnesses, and other industry participants nevertheless refer to Google's publisher ad server as DFP and identify it as a separate product from AdX, as each product serves its own distinct functions. See id.; Joint Glossary at 5; PTX847; PTX1242; PTX1392.

[12] Other organizations with publisher ad servers whose employees testified in this litigation include Equativ, Kevel, and Microsoft. Tr. Sept. 9 PM 116:19–23 (Avery (Kevel)); Tr. Sept. 13 PM 62:11–63:14 (Creput (Equativ)); Tr. Sept. 20 PM 129:12–17 (John (Microsoft)).

These products in the ad tech stack work together to place advertisers' ads on publishers' websites. When a user visits a website, one or more ad exchanges receive a bid request from a publisher ad server that contains information about the impression and provides the amount of time that the exchange has to respond. See PTX1031 at -501–02; Tr. Sept. 9 AM 68:16–69:16 (Wolfe (Gannett)). During this time, which is usually a fraction of a second, each ad exchange that received the bid request runs an auction for the impression, soliciting bids from demand-side platforms, such as DV360, and the advertiser side of ad networks, such as AdWords. See Joint Glossary at 8 (defining "real-time bidding"); PTX1031 at -501–02; Tr. Sept. 9 AM 73:10–25 (Wolfe (Gannett)); Tr. Sept. 12 PM 160:20–161:18 (Kershaw (Magnite)). The ad exchange helps these ad buyers formulate their real-time bids by sharing information about the impression, including the website on which the impression appears, attributes about the user who is visiting the site, and the pricing information that the ad exchange has received from the publisher ad server. See PTX1031 at -480, -486, -501–02; Tr. Sept. 9 AM 68:16–70:13 (Wolfe (Gannett)). Within the extremely short amount of time that it has to respond to the publisher ad server, the ad exchange collects all buy-side bids, determines the highest bid, and shares that bid with the publisher ad server. See PTX1031 at -502; Tr. Sept. 9 AM 68:16–70:13 (Wolfe (Gannett)).

The publisher ad server, in turn, selects the winning bid for the impression based on the bids it has received. See Joint Glossary at 7–8; PTX1031 at -532; Tr. Sept. 9 AM 121:1–16 (Casale (Index Exchange)). Bids that do not meet or exceed the publisher's floor price—the minimum amount of money that the publisher is willing to accept for the impression—are screened out. See PTX1096 at -605; Tr. Sept. 9 AM 148:12–150:24 (Casale (Index Exchange)); Tr. Sept. 9 PM 34:6–11 (Casale (Index Exchange)). Publisher ad servers originally selected the winning bid for an impression in a process called the waterfall, but have since evolved to pitting

exchanges' bids against each other in real-time auctions. See Joint Glossary at 8; PTX520 at -388; PTX1031 at -501–03; PTX1096 at -605; PTX1650 at -042; PTX1677 at -694; PTX1710 at -407; Tr. Sept. 9 AM 148:3–150:12 (Casale (Index Exchange)); Tr. Sept. 12 PM 60:19–62:14 (Goel (PubMatic)). Once a winning bid is selected by the publisher ad server, the advertisement associated with it is served on the publisher's webpage and displayed to the user. See Joint Glossary at 8. If no eligible buyer is found for the impression, the ad space may go unfilled. See Tr. Sept. 17 PM 51:1–15 (Cadogan (OpenX)).

For every programmatic advertising transaction, the companies that develop and operate these ad tech tools extract fees. See PTX794 at -738. Publisher ad servers, ad exchanges, demand-side platforms, advertiser ad servers, and ad networks typically each collect fees from the revenue-generating transactions in which they are involved, which means that ad exchanges and buy-side tools only collect fees when they submit a winning bid and place an ad in front of a user. See id.; Tr. Sept. 9 AM 142:21–143:18 (Casale (Index Exchange)); Tr. Sept. 16 PM 17:15–18:10 (Weintraub (Pls. Expert)). Industry participants often assess the total cost of these fees based on their percentage of the price paid by the advertiser to obtain the underlying impression, and refer to an ad tech tool's percentage-based fees as its "take rate." See PTX1031 at -514; Tr. Sept. 13 AM 59:19–60:6 (LaSala (Google)); Tr. Sept. 9 AM 111:1–12 (Casale (Index Exchange)). Typically, between $20 to $40 of every $100 spent on digital advertising goes to the ad tech companies that develop and operate these tools. See PTX794 at -738; Tr. Sept. 13 AM 59:23–60:1 (LaSala (Google)).

Programmatic digital advertising is remarkable in its speed, frequency, and complexity. Most of the world's popular websites are monetized with programmatic advertisements. Every time a user visits any webpage that runs programmatic advertisements, the bidding process

described above occurs for each advertisement on the page. From start to finish, the process takes no more than the time it takes the webpage to load, which is often well under half a second. See Tr. Sept. 12 PM 160:20–161:16 (Kershaw (Magnite)); Tr. Sept. 12 PM 61:13–62:14 (Goel (PubMatic)); Tr. Sept. 17 PM 54:6–14 (Cadogan (OpenX)). This bidding process occurs many billions of times per day across the Internet. See PTX208 at -544 (stating major ad exchanges represented more than one trillion monthly impressions as of 2014); PTX657 at -351; Tr. Sept. 12 PM 160:20–161:9 (Kershaw (Magnite)) ("We had 250 milliseconds to [run the auction]; so you had to do it quite quickly, and we did it billions of times an hour."). For each impression sold, the ad tech stack examines information about the impression and the associated user, aggregates bids from various advertising sources, places those bids in competition with each other, employs complex bidding and selling strategies, and ultimately causes an ad to be displayed on a webpage for a user.

A simplified visualization of the three ways that advertisers purchase ad inventory from publishers—(1) direct deals, (2) ad networks, and (3) the ad tech stack—is shown below. The major tools that comprise the ad tech stack are placed on a spectrum between advertisers on the buy-side and publishers on the sell-side. The three areas which Plaintiffs claim that Google has monopolized—publisher ad servers, ad exchanges, and the advertiser-facing side of ad networks—are highlighted in orange. The names of the associated Google products are abbreviated in parentheses.




## C. Types of Digital Advertisements

These advertising technologies are used to run "display ads": online ads that engage users with text or image-based marketing content, link to the advertiser's webpage, and often appear in rectangular spaces on publishers' websites. See Joint Glossary at 6 (defining "display advertising"); Tr. Sept. 9 AM 56:17–59:20 (Wolfe (Gannett)); Tr. Sept. 9 AM 113:1–8 (Casale (Index Exchange)) (explaining that display ads are often called banner ads); Tr. Sept. 17 PM 122:17–123:1 (Helfand (Disney)). Users view display ads when they visit websites using web browsers on both personal computers and mobile devices. See Tr. Sept. 9 AM 64:7–19 (Wolfe

(Gannett)). Although these ads are often shown as static images, they can include animations or video clips. See Tr. Sept. 19 PM 15:16–16:10 (Cox (Google)). Display ads that include video content are sometimes referred to as outstream video ads. See id.

Those in the digital advertising industry often draw a distinction between display ads that run on the open web and display ads that run on "walled gardens." See Tr. Sept. 9 PM 60:13–61:1 (Lowcock (IPG)); Tr. Sept. 12 PM 70:25–72:23 (Goel (PubMatic)); Tr. Sept. 19 PM 51:11–21 (Lee (Pls. Expert)). Open-web display ads are display ads that run on websites that use third-party ad tech infrastructure to match advertisers' ads to publishers' inventory. See Tr. Sept. 9 PM 60:13–20 (Lowcock (IPG)); Tr. Sept. 18 AM 136:12–24 (Wheatland (Daily Mail)). Most publishers that run advertisements on their websites, including the vast majority of newspapers and other traditional media organizations, use third-party ad tech tools to sell open-web display inventory because it is cost-prohibitive to build an in-house ad tech stack, particularly for entities whose primary competencies do not involve software engineering. See Tr. Sept. 9 AM 73:1–8 (Wolfe (Gannett)); Tr. Sept. 18 AM 132:7–17 (Wheatland (Daily Mail)); Tr. Sept. 26 PM 141:15–142:13 (Glogovsky (New York Times)).

Walled gardens, conversely, are publishers that control the infrastructure through which advertisers buy and place advertisements on their websites. See Tr. Sept. 9 PM 60:13–20 (Lowcock (IPG)); Tr. Sept. 12 PM 70:25–72:23 (Goel (PubMatic)). Walled-garden publishers maintain their own in-house ad tech and require advertisers to use those tools to buy and place advertisements on the publishers' owned-and-operated web properties. See Tr. Sept. 9 PM 60:13–20 (Lowcock (IPG)); Tr. Sept. 12 PM 70:25–72:23 (Goel (PubMatic)). Large digital technology firms like Amazon, Google, Meta, and Microsoft are more likely to operate their websites as walled gardens, as they possess the rare combination of commercial scale and

technical sophistication to make the development and maintenance of in-house advertising tools feasible. See Tr. Sept. 9 AM 73:1–8 (Wolfe (Gannett)); Tr. Sept. 9 AM 114:7–115:25 (Casale (Index Exchange)); Tr. Sept. 11 PM 160:22–161:3 (Dederick (The Trade Desk)); Tr. Sept. 18 AM 132:7–17, 136:18–22 (Wheatland (Daily Mail)); Tr. Sept. 19 PM 62:1–19, 64:18–25 (Lee (Pls. Expert)).

Although walled-garden publishers sell display ads, they more often focus on alternative digital advertising formats, including social media ads, search ads, and instream video ads. See Tr. Sept. 9 AM 112:1–118:22 (Casale (Index Exchange)) (differentiating display ads on the open web from social, mobile app, and instream video ads); Tr. Sept. 10 AM 157:22–158:19 (Friedman (Goodway Group)); Tr. Sept. 17 PM 138:7–140:23 (Schiekofer (GroupM)). Meta, for example, sells social media ads in a walled-garden environment, requiring advertisers to use Meta's in-house technology to place ads on Facebook and Instagram. See Tr. Sept. 19 PM 62:1–19 (Lee (Pls. Expert)). Search engines including Google Search and Microsoft Bing sell ad space within their respective walled gardens for search ads, which allow advertisers to place ads alongside search results. See PTX764 at -251, -254. Digital streaming providers like Amazon Prime, Google's YouTube, and Disney also use in-house technology to sell space for instream video or connected TV ads, which play before, during, or after video content and are akin to television commercials. Tr. Sept. 19 PM 15:16–16:10 (Cox (Google)); See Tr. Sept. 17 PM 122:9–16, 131:24–132:3, 133:11–13 (Helfand (Disney)); Tr. Sept. 17 PM 138:14–139:11 (Schiekofer (GroupM)).

Social, search, instream video, and other alternatives to open-web display advertising are not limited to walled gardens. For example, open-web publishers that deliver video-based content to their users will often use instream video ads to monetize that content. See, e.g., CNN

Videos, CNN, https://www.cnn.com/videos (last visited Mar. 27, 2025). Publishers additionally use native ads, which consist of sponsored content that appears in the style and format of the content that surrounds it, to increase user engagement. See PTX764 at -259; Tr. Sept. 9 PM 68:20–70:21 (Lowcock (IPG)). Larger open-web publishers often have mobile applications for sharing content with smartphone and tablet users which they monetize using mobile app ads. See PTX764 at -251–52, -260; PTX904 at -549–51.

## V. Google's Activities in Programmatic Advertising

Google evolved from a garage-based startup to a multitrillion dollar company in little more than twenty years. Much of that growth was funded by digital advertising. In keeping with its professed mission to "organize the world's information and make it universally accessible and useful," Google provides many of its key services at no financial cost to Internet users. Tr. Sept. 23 AM 7:22–8:3 (Korula (Google)). These free services include Google's search engine (Google Search), web browser (Chrome), email service (Gmail), mapping tools (Google Maps and Waze), file storage and collaboration service (Google Drive), word processor (Google Docs), translation service (Google Translate) and video sharing platform (YouTube). See DTX527 at -159; Google Products, Google, https://about.google/intl/ALL_us/products/#all-products (last visited Mar. 27, 2025). In exchange, Google collects data from and about the users of these free services, and monetizes that data by selling advertisements targeted to these users. See DTX76 at -479; Tr. Sept. 11 PM 99:11–100:5, 105:21–106:15 (Dederick (The Trade Desk)); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)). Over the past two decades, Google has established increasingly detailed knowledge about the billions of people who have used its products, including by collecting data pertaining to their web browsing, search activity, physical location, demographic characteristics, app usage, communications, shopping activity, and device and network

information. See DTX76 at -479; Tr. Sept. 11 PM 99:11–100:5, 105:21–106:15 (Dederick (The Trade Desk)) (asserting that "Google arguably sits on the most valuable data asset in the world"); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)). Google uses this data to improve the matching of advertisements to users, thereby increasing its advertiser customers' return on ad expenditures. See DTX76 at -479; Tr. Sept. 11 PM 99:11–100:5, 105:21–106:15 (Dederick (The Trade Desk)); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)). As these targeted advertisements provide the company with much of its revenue, Google is fundamentally in the business of advertising. See United States v. Google LLC, 2024 WL 3647498, at *6 (D.D.C. Aug. 5, 2024) ("Google Search") ("The vast majority of [Google parent company] Alphabet's revenues (nearly 80%) come from digital advertisements.").

### A. The Google Content Network

Google's evolution into the data-driven digital advertising enterprise it is today has been powered by its flagship product, Google Search ("Search"). See Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)); Tr. Sept. 11 PM 153:9–19 (Dederick (The Trade Desk)); Tr. Sept. 19 PM 99:18–100:2 (Lee (Pls. Expert)). Since its introduction in 1998, Search has rapidly become the world's most popular tool for retrieving information. See Google Search, 2024 WL 3647498, at *24. With that rise came significant advertiser demand, because Search offered a unique opportunity for advertisers to place digital ads that matched precisely what an Internet user was looking for at that moment. See Tr. Sept. 11 PM 98:19–99:7 (Dederick (The Trade Desk)) (stating that placing ads alongside Search results "really is the most sought-after ad placement"); Tr. Sept. 13 AM 52:18–53:17 (LaSala (Google)); Tr. Sept. 19 PM 99:18–100:2 (Lee (Pls. Expert)). In 2000, to meet this demand, Google launched AdWords, which originated as a self-service advertising platform for buying search ads. Tr. Sept. 20 PM 49:1–10 (Sheffer (Google));

Google Launches Self-Service Advertising Program, News from Google (Oct. 23, 2000), https://googlepress.blogspot.com/2000/10/google-launches-self-service.html.

AdWords grew rapidly, gaining over 100,000 advertiser customers by 2003. See Google Expands Advertising Monetization Program for Websites, News from Google (Jun. 18, 2003) https://googlepress.blogspot.com/2003/06/google-expands-advertising-monetization.html. Although the platform first offered only text-based keyword advertising that appeared alongside Search results, it quickly expanded to offer ads across both Google's owned-and-operated websites and third-party websites. See id.; DTX1514 at -939 (describing how Google's ad platform "[i]ncludes ads on Google search results pages, our network of partner sites, YouTube, Gmail, Maps, Discovery Feed, and apps"); Tr. Sept. 20 PM 49:23–51:4 (Sheffer (Google)).

Google expanded the number of publishers with which its advertisers could place ads by forming strategic partnerships with popular websites such as AOL, CNN, MapQuest, and The New York Times.[13] Google also launched AdSense, a self-service platform on which publishers could serve ads tailored to the content of their webpages. See PTX904 at -549; Tr. Sept. 20 PM 50:16–51:4 (Sheffer (Google)); Google Expands Advertising Monetization Program for Websites, News from Google (Jun. 18, 2003), https://googlepress.blogspot.com/2003/06/google-expands-advertising-monetization.html.

[13] See, e.g., Google Expands Advertising Monetization Program for Websites, News From Google (Jun. 18, 2003), https://googlepress.blogspot.com/2003/06/google-expands-advertising-monetization.html; MapQuest Selects Google to Provide Sponsored Links, News from Google (Jun. 23, 2003), https://googlepress.blogspot.com/2003/06/mapquest-selects-google-to-provide.html; CNN.com Inks Multi-Year Advertising Agreement with Google, News From Google (Aug. 28, 2007), https://googlepress.blogspot.com/2007/08/cnncom-inks-multi-year-advertising_28.html.

By 2007, Google's advertiser-facing AdWords and publisher-facing AdSense, which together comprised the Google Content Network, constituted the largest digital ad network in the world. See Tr. Sept. 16 AM 21:17–22:4 (Mohan (Google)); Tr. Sept. 20 PM 50:16–51:4 (Sheffer (Google)). That year, over one million advertisers used AdWords, with many placing display advertisements on a vast multitude of AdSense publishers' websites. See Miguel Helft, Google: 1 Million Advertisers in 2007, More Now, N.Y. Times (Jan. 8, 2009), https://bits.blogs.nytimes.com/2009/01/08/google-1-million-advertisers-in-2007-more-now.

Google worked to increase its growing ad network's functionality by offering advertisers the ability to insert videos into display ads, as well as to create text-based display ads customized for mobile device-friendly websites.[14] Google also improved its advertisers' ability to run digital advertising campaigns by creating a reporting system that showed where ads were being placed, how often they were being viewed, and how they were driving advertiser page visits and sales. See DTX1514 at -922; Tr. Sept. 20 PM 53:15–23, 112:22–113:12 (Sheffer (Google)); Tr. Sept. 24 AM 33:24–35:3 (Milgrom (Def. Expert).

**B. DoubleClick Acquisition**

In 2008, Google purchased a company called DoubleClick for $3.1 billion to improve Google's ad serving capabilities and to prevent Microsoft from acquiring "the leading ad serving company" and thus becoming "a major competitive threat" to Google's publisher-facing ad tech business. See PTX15 at -990–91 (an email from Google's General Counsel and SVP for Corporate Development to Google's Board explaining that "Google's Rationale for Acquiring

[14] See Google opens new content distribution channel on AdSense, News from Google (Oct. 9, 2007), https://googlepress.blogspot.com/2007/10/google-opens-new-content-distribution_09.html; Google AdSense for Mobile unlocks the potential of the mobile advertising market, News from Google (Sept. 17, 2007), https://googlepress.blogspot.com/2007/09/google-adsense-for-mobile-unlocks_17.html.

DoubleClick" included "accelerat[ing] time to market for our own advertiser and publisher ad serving products" and preventing the "major competitive threat to [] AdSense" posed by a "Microsoft-owned DoubleClick"); PTX1507 at -416. With DoubleClick, Google significantly expanded the third-party publisher base on which it could run its advertisers' ads. See PTX15 at -990–91. DoubleClick's flagship product was the market's leading publisher ad server, DoubleClick For Publishers ("DFP"). PTX14 at -246–48. DFP had a 60% share of the publisher ad serving market, and counted nine of the top ten U.S. websites among its customers. Id. at -246. By acquiring DFP, Google was able to keep the sell-side control that DFP offered out of the hands of Microsoft, Yahoo, and other digital advertising rivals. See PTX15 at -990–91 (stating that "[a]ccess [to indirect] inventory from Double[C]lick's publisher ad server customer base" would help Microsoft "quickly scale its ad network"); PTX41 at -005. Indeed, Google understood that DFP was the "must-call" publisher ad server, PTX611 at -801, and that owning it was critical to winning the "most strategic battle" in the emerging open-web ad tech ecosystem. PTX41 at -005.

Google's bolstering of its publisher-facing business through the DoubleClick acquisition helped it establish a dominant position on both sides of the ad tech stack. Google's ad tech business thus benefited from network effects, as the more advertiser customers Google had, the more publishers wanted to use DFP, and the more publisher customers Google had, the more advertisers wanted to use Google's buy-side services, thereby creating a self-reinforcing positive feedback loop. Tr. Sept. 20 PM 159:10–160:14 PM (John (Microsoft)) (discussing the importance of network effects in open-web display ad tech); see also Tr. Sept. 19 PM 75:3–76:8 (Lee (Pls. Expert)). In the DoubleClick acquisition, Google also obtained a nascent ad exchange,

AdX, that connected the two sides of the ad tech stack by matching advertiser bids with publisher inventory. See Tr. Sept. 16 AM 14:21–15:4 (Mohan (Google)); PTX51 at -723–26.

### C. Connection of AdWords, AdX, and DFP

After acquiring DoubleClick, Google implemented two policies that incentivized both advertisers and publishers to use AdX. First, with limited exceptions, Google made AdX the only ad exchange into which AdWords advertising demand was permitted to bid. See PTX110 at -009; PTX882 at -719; Tr. Sept. 13 PM 67:16–21 (Creput (Equativ)).[15] Second, Google required publishers to use DFP as their ad server if they wanted to access real-time bids from AdX. See PTX116 at -462–63; PTX555 at -115; PTX1031 at -500, -797; Tr. Sept. 9 PM 144:7–145:1 (Avery (Kevel)); Tr. Sept. 13 PM 67:11–15 (Creput (Equativ)).[16]

Through these two policies, AdX became the "glue that seal[ed] DFP" inventory to AdWords demand. PTX41 at -006. AdWords was a singularly powerful source of digital

[15] Beginning in 2015, Google allowed some AdWords demand to bid into non-Google ad exchanges through a program called AWBid. Because AWBid focused on a small set of impressions related to specialized advertising campaigns, AdX remained the "nearly exclusive" source of AdWords demand. PTX639 at -965; PTX1247; see PTX278 at -613; Tr. Sept. 16 PM 132:20–133:16 (Abrantes-Metz (Pls. Expert)) ("[F]rom 2015, approximately only on average 3 percent of impressions transacted from [AdWords] were placed outside of AdX."); Tr. Sept. 13 AM 8:9–19 (Kershaw (Magnite)); Tr. Sept. 10 PM 87:3–7 (Lipkovitz (Google)).

[16] Google offered publishers not using DFP a way to access AdX demand via "AdX Direct," but this product was not an "economically viable substitute to accessing AdX through DFP" because it had rudimentary functionality, did not show the price that AdX was offering, did not provide access to real-time bids, increased latency, and did not permit publishers to place bids from AdX into real-time auctions with bids from other exchanges. Tr. Sept. 27 AM 70:9–24 (Wheatland (Daily Mail)); see also PTX555 at -115; PTX758 at -945; PTX933 at -183 (Google employee suggesting AdX Direct exists in part as a "concept for antitrust"); Tr. Sept. 10 AM 11:23–12:18 (Layser (News Corp)); Tr. Sept. 16 PM 124:5–18 (Abrantes-Metz (Pls. Expert)); Tr. Sept. 17 PM 50:4–51:20 (Cadogan (OpenX)); Tr. Sept. 18 AM 137:2–138:6 (Wheatland (Daily Mail)); Tr. Sept. 23 AM 139:8–17 (Korula (Google)). As a result, AdX Direct generated less than two percent of AdX's revenue. Tr. Sept. 16 PM 124:19–25 (Abrantes-Metz (Pls. Expert)) (stating AdX Direct was "not effective" and "not widely used").

advertising demand. See PTX624 at -169; PTX639 at -965; PTX719 at -004–05; PTX759 at -751. Its ease of use, association with a preeminent Internet company, and ability to place targeted advertisements alongside Search results attracted millions of unique advertisers, including countless small and medium-sized businesses. See PTX624 at -169; PTX719 at 004–05; Tr. Sept. 9 AM 129:22–130:22 (Casale (Index Exchange)); Tr. Sept. 10 AM 121:3–12 (Layser (News Corp)); Tr. Sept. 11 PM 153:6–154:20 (Dederick (The Trade Desk)). Although publishers could offer their impressions on non-Google ad exchanges, large publishers were greatly attracted to the unique advertising demand offered by AdWords, and as a result viewed using DFP as essential because it was the only publisher ad server that could effectively access AdX and, consequently, AdWords demand. See PTX551 at -048. Google recognized the unique attractiveness of its extensive advertiser demand, and its employees understood that limiting access to AdWords demand in this way "compel[led] publishers" to use AdX and DFP. Dep. 108:18–109:3 (Rowley (Google)); see also Tr. Sept. 16 PM 128:21–129:5 (Abrantes-Metz (Pls. Expert)).

**D. First Look**

Google used its control of DFP, the world's most popular ad server for large publishers, to implement additional policies that benefited its ad tech products. With a feature called "First Look," Google required publishers using DFP to offer AdX a first right of refusal for each impression. See PTX551 at -048. In other words, a publisher using DFP had to give AdX the opportunity to buy the publisher's impression before any rival exchanges were permitted to bid for that impression. See Tr. Sept. 12 PM 99:14–22 (Goel (PubMatic)); Tr. Sept. 16 PM 135:19–136:20 (Abrantes-Metz (Pls. Expert)); Tr. Sept. 16 PM 21:23–22:4 (Weintraub (Pls. Expert)). In addition to giving AdX the opportunity to bid before other exchanges, DFP permitted AdX to bid

in real-time, whereas other exchanges were required to make static bids that were set in advance and could not account for contemporaneous information about the value of the specific impression. See PTX373 at -092; PTX1539 at -105; Tr. Sept. 10 AM 39:4–40:24 (Layser (News Corp)); Tr. Sept. 11 AM 104:6–105:13 (Ravi (Pls. Expert)); Tr. Sept. 12 PM 98:19–99:13 (Goel (PubMatic)). AdX received a First Look at DFP impressions even if the publisher preferred other exchanges and wanted to rank them first. Tr. Sept. 10 AM 40:25–41:3 (Layser (News Corp)).

The First Look functionality benefited AdX advertisers, as they could win the auction even when advertisers using rival ad exchanges were willing to pay a higher price for the impression (i.e., when bids from other exchanges offered publishers more revenue for the impression). See PTX551 at -048; Tr. Sept. 10 AM 40:18–24 (Layser (News Corp)). For example, if AdX offered $1.07 CPM[17] for an impression, and that amount met or exceeded the publisher's floor price for the impression, AdX would win the auction before any other exchanges' bids were examined, even if other exchanges were offering $1.10 CPM and $1.08 CPM for the same impression. Tr. Sept. 11 AM 99:24–101:2 (Ravi (Pls. Expert)); see also PTX368 at -315; PTX468 at -551. Thus, under First Look, advertisers using AdX could win the auction even if they did not offer the highest revenue for the impression. See Tr. Sept. 11 AM 99:24–101:2 (Ravi (Pls. Expert)). This inherent inefficiency limited the ability and incentive for advertisers using other ad exchanges to compete on price, and resulted in publishers not obtaining the maximum value for their impressions. See PTX368 at -315; PTX551 at -048;

[17] Display ads purchased programmatically sell, on average, for significantly less than one cent per impression. See Tr. Sept. 19 PM 78:12–13 (Lee (Pls. Expert)). At trial, the parties and witnesses followed the industry convention of discussing prices in cost per thousand impressions (CPM), even when discussing the price of an individual impression. See, e.g., Tr. Sept. 19 PM 21:11–20 (Levitte (Google)).

PTX1539 at -105; Tr. Sept. 10 AM 42:13–21 (Layser (News Corp)); Tr. Sept. 12 PM 86:2–16, 99:14–100:6 (Goel (PubMatic)); Tr. Sept. 16 PM 135:16–137:2 (Abrantes-Metz (Pls. Expert)). The "unfair advantage" that First Look offered Google was built into the software that controlled the auction logic within DFP, and publishers could not toggle it off. PTX1710 at -497; see also PTX1099 at -865–66; PTX1539 at -105.

By giving AdX "an advantage in winning the transaction," Dep. 106:1–21 (Lipkovitz (Google)), First Look "made it difficult" for other exchanges "to compete on a level playing field with AdX," PTX308 at -243, thereby impeding their ability to enter the market, grow, and compete. See Tr. Sept. 16 PM 137:3–12 (Abrantes-Metz (Pls. Expert)). In addition to providing a revenue advantage, First Look also gave Google a data advantage that helped the AdX team train its auction bidding models more effectively. See Dep. 106:1–21 (Lipkovitz (Google)).

Some large publishers expressed frustration with Google policies that benefited Google and its advertiser customers at its publisher customers' expense, but the vast majority of them continued using DFP as their sole publisher ad server. See PTX254 at -238–39; PTX551 at -048; PTX587 at -794; Tr. Sept. 10 AM 10:16–13:2, 26:22–24, 51:19–52:3, 55:6–56:3 (Layser (News Corp)). DFP remained the "defacto, [sic] preferred ad server of choice for 90% of publishers," PTX254 at -238, because of its guaranteed access to the unique AdWords demand sourced through AdX, the high switching costs associated with changing to another publisher ad server, and the lack of competitive alternatives. See PTX110 at -009; Tr. Sept. 10 AM 10:16–13:2, 26:22–24, 51:19–52:3, 55:6–56:3 (Layser (News Corp)).

**E. Admeld Acquisition**

Google continued to pursue strategic opportunities to increase its power and scale in the open-web ad tech ecosystem. In 2011, Google acquired Admeld, a yield manager that helped

publishers decide which ad networks and other demand sources to transact with based on supply, demand, and pricing data. See PTX112 at -975, -979; Tr. Sept. 16 AM 46:24–47:1 (Mohan (Google)). Before acquiring Admeld, Google viewed it as a direct competitor that could "disintermediat[e]" Google's control over advertiser-publisher relationships, PTX56 at -783, that risked "break[ing]" Google's ability to enforce policies such as First Look, PTX88 at -597, and that offered a "better publisher base" and improved audience data integration. PTX112 at -981; see also PTX56 at -780, -788–790.

After acquiring Admeld, Google incorporated some of Admeld's features, such as its network yield management functionality, into AdX and DFP to improve Google's sell-side ad tools. See DTX101 at -109; DTX126 at -563–64, -575; Dep. 86:20–87:23 (O'Kelley (Xandr)). But Google also shut down some of Admeld's features, including its ability to pass real-time AdX pricing into non-DFP publisher ad servers. See PTX141 at -448; PTX159 at -002–04; Tr. Sept. 18 AM 47:3–12 (Abrantes-Metz (Pls. Expert)). Google did so, even though some believed that maintaining this functionality would have required "[m]inimal effort," because allowing AdX to submit real-time bids to publishers using non-Google ad servers would have "[t]ake[n] away a key differentiator for DFP." PTX113 at -804; see also Tr. Sept. 18 AM 47:3–23 (Abrantes-Metz (Pls. Expert)). The deprecation of Admeld features was consistent with Google's pre-acquisition plan to "pick[] up the [yield manager] with the most traction and park[] it somewhere." PTX58 at -800.

**F. Header Bidding and Open Bidding**

By early 2014, AdX had emerged as the world's leading ad exchange and was winning 53% of publisher inventory that DFP made available for auction. PTX174 at -635. Publishers, concerned about Google's dominance, sought to improve competition between AdX and other

exchanges by negating Google's First Look advantage. See PTX587 at -794; PTX1710 at -407; Tr. Sept. 9 AM 152:9–153:7 (Casale (Index Exchange)); Tr. Sept. 9 PM 136:12–19 (Avery (Kevel)). Working together, non-Google industry members and open-source advocates formed an organization called Prebid which developed header bidding, a technical solution that allowed publishers using DFP to solicit real-time bids from multiple ad exchanges. See Joint Glossary at 6; PTX284 at -290; PTX587 at -794; Tr. Sept. 9 PM 136:12–19 (Avery (Kevel)). Specifically, header bidding was a workaround that involved a publisher inserting a string of code into the header of its webpage to solicit bids from multiple ad exchanges and hold fair auctions for the publisher's inventory outside of Google's technical architecture. See Joint Glossary at 6; PTX1677 at -692–93; Tr. Sept. 9 PM 136:12–19 (Avery (Kevel)); Tr. Sept. 12 PM 97:8–98:7 (Goel (PubMatic)). The winning bid in a header bidding auction would often be placed into DFP as a floor price against which AdX would compete. See Tr. Sept. 23 AM 34:23–36:19 (Korula (Google)). Header bidding rapidly gained popularity and achieved widespread adoption by large publishers in 2015. See DTX2085; PTX507 at -218; Tr. Sept. 9 AM 74:24–75:5 (Wolfe (Gannett)); Tr. Sept. 10 AM 45:6–21 (Layser (News Corp)). By introducing head-to-head competition among ad exchanges, header bidding "dramatically increase[d]" publisher revenue. PTX507 at -218; see also PTX587 at -794.

Google was wary of header bidding, seeing it as a risk to its revenue model that relied upon AdX having a real-time First Look at publisher inventory. See PTX234 at -236; PTX433 at -601; PTX587 at -794 (Google email recognizing that header bidding "gives many publishers better yield, so it's a no-brainer for a publisher to adopt it"). Google declined to have AdX participate in header bidding, thereby avoiding direct head-to-head competition between AdX

and other ad exchanges, such as Index Exchange, Magnite, OpenX, and PubMatic. See Tr. Sept. 11 AM 112:19–113:12 (Ravi (Pls. Expert)); Tr. Sept. 13 AM 31:2–21 (Kershaw (Magnite)).

Instead, Google implemented new features and policy changes to counteract the growing threat of header bidding. In 2018, Google developed Open Bidding—a tool that mimicked the functionality of header bidding but occurred within DFP—with the goal of creating a "slightly better" version of header bidding, PTX1543 at -604; Tr. Sept. 9 AM 158:15–159:10 (Casale (Index Exchange)); Tr. Sept. 19 AM 148:8–12 (Bellack (Google)), so that rival exchanges would conduct their bidding within Google's ad tech ecosystem. See Tr. Sept. 19 PM 23:22–24:23 (Levitte (Google)); Tr. Sept. 23 AM 38:19–39:16 (Korula (Google)). In moving rival ad exchanges' bidding to Open Bidding, Google sought to mitigate the competitive pressure those rival exchanges could exert on AdX and DFP. See Tr. Sept. 13 AM 10:19–12:8 (Kershaw (Magnite)). But Open Bidding was not a substitute for header bidding because it discriminated against non-AdX exchanges, including by extracting a 5% fee from their bids, by prohibiting them from submitting any bids that originated from their own demand-side platforms or ad networks, and by requiring them to share their bid data with Google. See Tr. Sept. 9 AM 160:4–23 (Casale (Index Exchange)); Tr. Sept. 13 AM 11:9–12:9 (Kershaw (Magnite)); Tr. Sept. 19 PM 21:21–22:20, 24:9–25:19 (Levitte (Google)).

### G. Last Look

Through a process called Last Look, AdX was able to outbid the winner of the header bidding auction for every impression in DFP. See Tr. Sept. 11 AM 111:18–112:18 (Ravi (Pls. Expert)); Tr. Sept. 11 PM 143:14–22 (Dederick (The Trade Desk)). DFP publishers that wanted to place the winning bid of a header bidding auction in competition with AdX's bids were required to incorporate that winning bid as a price floor in DFP. See Tr. Sept. 16 PM 24:18–25:1

(Weintraub (Pls. Expert)). AdX would then have the unique opportunity to adjust its bid in response to the highest bid from rival ad exchanges. See id.; Dep. 123:6–126:19 (O'Kelley (Xandr)). In what was otherwise a sealed auction, Last Look let AdX "open the envelope for the winning bid, know what the winning bid [wa]s, and be able . . . to bid after everybody else." Tr. Sept. 18 AM 37:7–38:1 (Abrantes-Metz (Pls. Expert)). Being able to view its competitors' bids provided Google and its advertising customers with a "significant informational advantage," PTX816 at -161, that "significantly disadvantage[d] other competitors" in the ad exchange space. PTX1709 at -934; see also Tr. Sept. 11 AM 121:17–21 (Ravi (Pls. Expert)); Tr. Sept. 12 PM 101:24–102:15 (Goel (PubMatic)). Last Look also harmed publishers using DFP, who were not compensated as much as they would have been for their inventory had Google's AdX demand been required to compete with third-party exchanges (i.e., non-Google exchanges) on a level playing field. See Tr. Sept. 11 AM 120:23–121:16 (Ravi (Pls. Expert)). Because AdX could "see all the other bids" with Last Look, it could "just bid 1 cent more," which "harm[ed] publishers" by reducing their revenue in comparison to a situation in which AdX had to bid without knowledge of competing bids. Tr. Sept. 12 PM 101:13–23 (Goel (PubMatic)).

### H. Sell-side Dynamic Revenue Share

Google further expanded AdX's Last Look advantage by using a pricing model called sell-side dynamic revenue share. This dynamic pricing model allowed AdX to adjust its take rate—the percentage fee it charged—on an impression-by-impression basis to "exploit the last look advantage." PTX542 at -335. Although AdX maintained an overall take rate of around 20%, it would lower its take rate below 20% on competitive impressions that had received relatively high offers from third-party exchanges via header bidding. Tr. Sept. 11 AM 114:5–116:16 (Ravi (Pls. Expert)). Selectively lowering its take rate on competitive impressions made

Case 1:23-cv-00108-LMB-JFA Document 1410 Filed 04/17/25 Page 273 of 534 PageID# 103716
PUBLIC

AdX's advertisers more likely to win auctions for those impressions, as publishers ranked bids by the revenue they offered net of fees. See id. AdX would compensate for such temporary losses in revenue by charging a take rate above 20% for impressions where its advertisers faced less competition from third-party exchanges. Id. For example, AdX would charge a 15% or lower take rate for competitive impressions, and a 25% or higher take rate for less competitive impressions, all the while maintaining an average take rate of around 20%. See id. This dynamic approach helped AdX advertisers win more auctions, and caused advertisers using third-party exchanges, including those exchanges that participated in header bidding, to win fewer auctions. See id. Because third-party exchanges did not have Last Look to "see all the bids" and vary their take rate accordingly, they lost scale and revenue from AdX's use of sell-side dynamic revenue share. Dep. 163:9–165:11 (O'Kelley (Xandr)); see also PTX1328; PTX1329; Tr. Sept. 16 PM 28:9–29:3 (Weintraub (Pls. Expert)). Through the advantages provided by Last Look and sell-side dynamic revenue share, Google helped mitigate the risk that header bidding posed to its ad tech products, and enabled AdX to remain the world's largest ad exchange. See PTX819 at -318; PTX1258; PTX1326; Tr. Sept. 16 PM 28:9–29:8 (Weintraub (Pls. Expert)).

**I. Project Poirot**

In 2017, while Google was still facing what some of its employees viewed as "the existential threat posed by Header Bidding" and the concomitant growth of third-party ad exchanges, Google launched Project Poirot. PTX433 at -601; see also PTX284 at -290; PTX545 at -115; PTX786 at -716; PTX1545 at -142. With Project Poirot, Google "shaded," or lowered, bids from its demand-side platform DV360 on impressions offered for sale on non-AdX exchanges. See Tr. Sept. 11 AM 125:24–126:4 (Ravi (Pls. Expert)); Tr. Sept. 17 AM 84:12–

Case 3:26-mc-80209 Document 1-2 Filed 08/24/26 Page 274 of 534 of 115

86:13 (Jayaram (Google)). Publishers more frequently rejected these shaded bids from non-AdX exchanges, which offered them less revenue, and increasingly accepted bids from AdX. See PTX545 at -115; PTX734 at -596 (stating Project Poirot "generate[d] margins by shifting inventory to AdX"); Tr. Sept. 17 AM 84:12–86:13 (Jayaram (Google)). The first version of Project Poirot resulted in advertisers that used DV360 spending an average of 9% more on AdX and 10% less on non-AdX exchanges. See PTX545 at -115; PTX587 at -794. In late 2018, after the second version of Project Poirot was launched, DV360 bids on non-AdX exchanges decreased in value by as much as 90%, resulting in DV360 advertisers dedicating an even higher proportion of their advertising spending to AdX. See Tr. Sept. 16 PM 32:18–33:5 (Weintraub (Pls. Expert)). AdX's main competitors, meanwhile, saw their revenue from DV360 advertisers decrease by an average of 15%. See PTX860 at -683–84. One main ad exchange competitor, OpenX, experienced a 40% decrease in revenue from DV360, which "damaged" the company "very severely" and contributed to 45% of its staff being laid off. Tr. Sept. 17 PM 66:15–67:25 (Cadogan (OpenX)); see also PTX860 at -684; PTX1600 at -011.

**J. Unified Pricing Rules**

By 2019, Google was facing pressure from publishers to improve the transparency and fairness of its advertising auction processes. There was also an increasing belief within Google that its size in the ad tech space and the policies it had implemented to benefit its products across the ad tech stack posed regulatory and "competition concerns." PTX816 at -161. In response, Google agreed to remove Last Look. See id.; Tr. Sept. 23 AM 152:3–153:13 (Korula (Google)). But Google simultaneously introduced Unified Pricing Rules, a policy that prohibited publishers using DFP from setting higher price floors for AdX than for other exchanges. See PTX762 at -291; Tr. Sept. 10 AM 60:3–14 (Layser (News Corp)); Tr. Sept. 18 AM 149:1–8 (Wheatland

(Daily Mail)). Unified Pricing Rules also prohibited DFP publishers from setting higher price floors for Google AdWords demand than for demand from other ad networks or demand-side platforms. See Tr. Sept. 10 AM 119:9–120:2 (Layser (News Corp)).

Google advertised Unified Pricing Rules as consistent with the removal of Last Look, positing that both policy changes would make auctions safer and simpler. See Tr. Sept. 23 AM 93:24–94:9 (Korula (Google)); Sept. 24 AM 134:8–21 (Milgrom (Def. Expert)). Google knew, however, that many publishers using DFP had been setting higher pricing floors for AdX than for other exchanges so that they could reduce their high dependence on Google's ad tech stack. See PTX609 at -146; PTX611 at -792, -802; PTX698 at -021; Tr. Sept. 10 AM 49:16–50:9 (Layser (News Corp)). Google recognized that publisher "revenue diversity" was beneficial, and that publishers were willing to "tolerate some revenue loss in exchange for reduced dependance" on Google. PTX609 at -146; see also PTX469 at -512. Publishers also set higher floor prices on AdX to screen out low-quality ads, which were more likely to originate from smaller advertisers using AdWords. See PTX534 at -306; PTX609 at -146; Tr. Sept. 10 AM 49:25–50:3, 119:9–21 (Layser (News Corp)). Despite its name, Unified Pricing Rules did not require a level playing field between exchanges, as it permitted publishers to set higher price floors on third-party exchanges than on AdX. See Tr. Sept. 10 AM 60:7–14 (Layser (News Corp)); Tr. Sept. 18 AM 149:1–8 (Wheatland (Daily Mail)); Tr. Sept. 23 AM 157:8–158:20 (Korula (Google)).

Some of Google's largest publisher customers were disgruntled with the implementation of Unified Pricing Rules, which reduced their ability to control ad pricing, maintain ad quality, and diversify their sources of revenue. See PTX751 at -120–21; PTX763 at -165–66; PTX1854 at 25:1–6, 55:1–56:20. But these same publishers continued using DFP as their sole publisher ad server, believing that they had "very little" ability to switch given DFP's tie to the unique

advertising demand from AdX and AdWords. Tr. Sept. 18 AM 147:1–12, 150:20–151:9 (Wheatland (Daily Mail)); see also PTX754 at -321; Tr. Sept. 10 AM 51:14–52:7, 53:8–10, 55:6–57:25, 109:23–110:9 (Layser (News Corp)).

Unified Pricing Rules increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges. See DTX768 at -933; PTX819 at -318; Tr. Sept. 12 AM 20:16–20 (Srinivasan (Google)); Tr. Sept. 18 AM 41:20–42:11, 43:8–17 (Abrantes-Metz (Pls. Expert)). For at least one major publisher, The Daily Mail, Unified Pricing Rules also resulted in lower revenue per impression. See PTX1633 at -123. The overall result of Unified Pricing Rules was that Google's ad tech products continued to gain scale in the display advertising space while rival ad tech products lost scale. See PTX1035 at -360; PTX1331; PTX1621 at -158; Tr. Sept. 16 PM 29:18–25, 31:8–15 (Weintraub (Pls. Expert)). This was consistent with what one Google employee said was the "primary objective" of the 2019 changes to DFP: "to help the buyside" of Google's ad tech products, namely AdWords and DV360. PTX763 at -165.

**K. Google's Ad Tech Today**

Since Unified Pricing Rules were implemented in 2019, Google has remained the dominant force in open-web display advertising. On the sell-side, DFP has remained the leading publisher ad server, and AdX has continued to be the leading ad exchange. See PTX1236; PTX1236A; PTX1237; PTX1237A; PTX1238; PTX1238A; PTX1258; PTX1277; PTX1277A; PTX1278; PTX1278A; PTX1314. On the buy-side, DV360 has remained one of the leading demand-side platforms, see Tr. Sept. 12 PM 11:13–21 (Dederick (The Trade Desk)), and AdWords has remained the leading source of small and medium-sized online advertisers, having benefited greatly from being the platform through which advertisers purchase Search ads. See

PTX1243; PTX1243A: Tr. Sept. 9 AM 129:18–130:22 (Casale (Index Exchange)); Tr. Sept. 11 PM 153:6–154:11 (Dederick (The Trade Desk)) (describing the pool of advertisers that use AdWords to purchase Search ads as the "greatest source of demand in the history of advertising").

Google's unparalleled scale in programmatic advertising has given it significant advantages over rival firms. Scale is a crucial factor for ad tech companies' ability to compete because of the importance of big data analytics for optimizing ad tech services and the significant network effects that exist in programmatic advertising. See Tr. Sept. 9 AM 144:20–147:17 (Casale (Index Exchange)); Tr. Sept. 11 PM 110:21–25 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 103:2–21 (Goel (PubMatic)); Tr. Sept. 16 PM 7:9–16:7 (Weintraub (Pls. Expert)). The unmatched scale that Google has achieved across the open-web ad tech stack helps the company test products more quickly and make higher-quality matches between advertisers and publishers. See Tr. Sept. 13 PM 74:13–75:6 (Creput (Equativ)); Tr. Sept. 16 PM 9:15–16:7 (Weintraub (Pls. Expert)); Tr. Sept. 23 PM 136:7–137:2 PM (John (Microsoft)). As ad tech products continue to integrate artificial intelligence and machine learning capabilities, Google's vast repositories of data about advertisers, publishers, and Internet users, combined with the company's scale and technical sophistication, will further benefit its open-web display advertising business. See Tr. Sept. 9 AM 146:4–147:17 (Casale (Index Exchange)); Tr. Sept. 11 AM 138:7–139:8 (Ravi (Pls. Expert)); Tr. Sept. 11 PM 95:18–96:7 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 137:9–19 (Goel (PubMatic)); Tr. Sept. 13 PM 75:7–20 (Creput (Equativ)); Tr. Sept. 20 PM 160:13–161:8 (John (Microsoft)); Tr. Sept. 23 AM 48:13–49:15 (Korula (Google)); Tr. Sept. 23 PM 32:8–12 (Stefaniu (Google)); Tr. Sept. 24 PM 49:15–50:6 (Bjorke (Google)).

## VI. Monopolization Claims

Plaintiffs contend that Google violated Section 2 of the Sherman Act by monopolizing three markets within the open-web display advertising technology ecosystem: the publisher ad server market, the ad exchange market, and the advertiser ad network market. See Amended Complaint at 136–42. Section 2 of the Sherman Act, in relevant part, makes it unlawful to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Considering the purpose of the Sherman Act and its use of broad language, the Supreme Court has determined that it was "enacted for 'the protection of competition, not competitors.'" Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)); see also Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 73 (2021) ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition."); N. Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958). Accordingly, "[t]he purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993); see also Reiter v. Sonotone Corp., 442 U.S. 330, 343 (1979) (suggesting Congress intended the Sherman Act to be a "consumer welfare prescription").

The offense of monopolization "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)); accord E.I.

du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011) ("Kolon"). Plaintiffs bear the burden of proving each element. Kolon, 637 F.3d at 441.

Google disagrees with Plaintiffs' contention that it has willfully acquired and maintained monopoly power in three distinct product markets, and instead claims that the entire digital ad tech ecosystem—which includes publisher ad servers, ad exchanges, ad networks, and other tools that facilitate transactions between advertisers and publishers—should be analyzed as a single, two-sided market. Google also disputes Plaintiffs' focus on open-web display advertising, arguing that ad technology which facilitates the buying and selling of other types of digital ads, such as mobile app ads, social media ads, and instream video ads, should be included in the relevant market. Plaintiffs and Google further clash over the geographic scope of the relevant market, with Plaintiffs arguing that a worldwide market is most appropriate and Google arguing that only the U.S. market should be considered.

Because the scope of the relevant market is central to this litigation, the Court's analysis of Plaintiffs' claims starts "with a preliminary inquiry into market definition, which serves as a tool to determine the defendant's market power." Kolon, 637 F.3d at 441. Defining the relevant market first is crucial here because "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." Ohio v. Am. Express Co., 585 U.S. 529, 543 (2018) ("Amex") (internal quotation and brackets omitted).

**A. Market Definition**

The relevant market is "the area of effective competition." Id. (internal citation omitted). This is often the "arena within which significant substitution in consumption or production occurs." Id. (quoting Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed. 2017)). In other words, a relevant product market is one that includes

"reasonably interchangeable" products from the perspective of the consumers of those products. It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 683 (4th Cir. 2016) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)); accord Kodak, 504 U.S. at 482. Determining the relevant market should be grounded in "commercial realities," Kodak, 504 U.S. at 482, and involves a "pragmatic, factual" analysis, "not a formal, legalistic" one. Brown Shoe, 370 U.S. at 336. As such, courts often consider "practical indicia" of the relevant market, such as "industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. at 325; see, e.g., Regeneron Pharm., Inc. v. Novartis Pharma AG, 96 F.4th 327, 339 (2nd Cir. 2024). Delineating the bounds of the relevant market necessarily involves considering "the relevant product market and the relevant geographic market." Kolon, 637 F.3d at 441; accord Brown Shoe, 370 U.S. at 324.

### 1. Product Markets

#### *a. Publisher Ad Server Market*

The Court finds that publisher ad servers for open-web display advertising constitute a distinct relevant product market. Publisher ad servers for open-web display advertising are uniquely suited for managing ad inventory for large web publishers, are priced differently than other ad tech tools, and are recognized as a distinct product by ad tech industry participants. Consequently, other ad tech tools are not reasonably interchangeable with publisher ad servers. The lack of substitutability between publisher ad servers and alternative tools is evidenced by how successful Google's publisher ad server has been in maintaining dominant market share among the largest open-web publishers. Indeed, the commercial realities of the publisher ad server market suggest that a monopolist could engage in anticompetitive conduct by raising

prices or degrading product quality without seeing significant diminution of its customer base. For these reasons, publisher ad servers for open-web display advertising constitute the area of effective competition and form a relevant antitrust market.

Publisher ad servers for open-web display advertising have a distinct purpose: they help publishers manage and monetize their web ad inventory. Tr. Sept. 9 AM 119:9–21 (Casale (Index Exchange)); Tr. Sept. 16 AM 22:5–14 (Mohan (Google)) ("By definition, publishers couldn't really manage their display advertising without an ad server."). Publisher ad servers do this by offering a number of unique product features to publishers, such as allocating ad inventory between direct sales and programmatic sales; placing ad exchange bids in competition with bids from header bidding, programmatic direct sales,[18] and other ad exchanges; rendering an advertisement on the publisher's webpage for each impression; billing for ads rendered; and providing inventory and revenue analytics. See DTX376 at -940, -943; PTX1572 at -693; Tr. Sept. 9 AM 119:9–121:16 (Casale (Index Exchange)); Tr. Sept. 19 PM 61:18–65:20 (Lee (Pls. Expert)); Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)).

Publisher ad servers, which charge publishers a flat fee per impression sold, are priced differently than ad exchanges, which charge publishers a percentage-based fee per impression sold, and demand-side platforms, which charge advertisers a percentage-based fee per impression purchased. See PTX188 at -963; Tr. Sept. 26 AM 120:20–121:3 (Israel (Def. Expert)). Moreover, publisher ad servers are much less expensive than other ad tech tools. For large open-web publishers, publisher ad server fees typically average about 1% to 2% of the revenue generated by the sale of the impression, which is significantly lower than the double-digit

[18] Programmatic direct sales are a type of programmatic advertising in which a certain amount of a publisher's inventory is reserved for a specific advertiser. See Joint Glossary at 7; Tr. Sept. 10 PM 22:2–14 (Friedman (Goodway Group)).

percentage take rate charged by ad exchanges—the other primary ad tech tool that large publishers use for open-web display advertising. See DTX1977; PTX188 at -963; Tr. Sept. 20 PM 79:13–18 (Sheffer (Google)); Tr. Sept. 26 AM 121:10–16, 132:22–25 (Israel (Def. Expert)) (stating that DFP fees equate to a "take rate[]" of "1.7 percent to 1.3 percent," whereas take rates are around 20% "for an auction run on AdX").

The unique purpose, features, and pricing of the publisher ad server has resulted in its being recognized as a distinct product within the ad tech industry. In the ordinary course of business, Google regularly identified its publisher ad server, DFP, as being a unique product, and the firm has assessed its market share in display web publisher ad serving. See, e.g., PTX15 at -990–91; PTX847 at -261 (identifying DFP alongside other publisher ad servers in a "display ads landscape" chart); PTX946 at -807 (differentiating between AdX and DFP revenue). Google marketed DFP as a distinct product until it rebranded DFP as part of the Google Ad Manager product suite in 2018. See, e.g., PTX847 at -261; PTX993 at -310; see also Tr. Sept. 9 AM 121:20–122:10 (Casale (Index Exchange)). Other technology firms that participate in the ad tech ecosystem, including AppNexus, Equativ, Index Exchange, Meta, and Microsoft, also recognize the publisher ad server as a unique product. See, e.g., DTX1487 at -850–51; PTX580 at -802–05; PTX1709 at -937; Tr. Sept. 9 AM 119:9–122:10 (Casale (Index Exchange)); Tr. Sept. 13 PM 62:11–63:1 (Creput (Equativ)); Tr. Sept. 20 PM 131:5–21 (John (Microsoft)). As do publishers, such as Gannett and News Corp. Tr. Sept. 9 AM 66:1–67:7 (Wolfe (Gannett)); Tr. Sept. 10 AM 30:17–32:7 (Layser (News Corp)). Even Dr. Mark Israel, Google's market definition expert who contended that there was not a relevant market for publisher ad servers, agreed that publisher ad servers are "components" of the ad tech stack that "serve different purposes" from buy-side

tools, ad exchanges, and in-house ad tech used by social media companies. See Tr. Sept. 26 PM 45:9–19, 47:18–48:3 (Israel (Def. Expert)).

Moreover, the commercial realities of the publisher ad server market support the conclusion that a monopolist could engage in anticompetitive conduct without realizing significant customer loss. Dr. Robin Lee, an economics professor and Plaintiffs' market definition expert, provided credible testimony that a hypothetical monopolist of publisher ad servers for open-web display advertising could profitably increase price or degrade quality without the risk of significant substitution due to the lack of close alternative products available to publishers. Tr. Sept. 19 PM 55:10–57:15, 60:4–67:17 (Lee (Pls. Expert)). Indeed, although Google decreased DFP's quality by "plac[ing] restrictions on how publishers could work with rival ad exchanges" (e.g., giving AdX advantages over third-party exchanges with First Look and Last Look) and by removing features that its publishers used (e.g., eliminating variable price floors with Unified Pricing Rules), DFP still maintained 99 of its top 100 publisher customers in the ensuing years. Tr. Sept. 19 PM 66:7–67:11, 68:21–70:1 (Lee (Pls. Expert)); see Sections V(C–G) and V(J), supra. Moreover, Google estimated internally that it could increase net revenue by at least $40 million by raising DFP prices by 20%. PTX611 at -798. Both Google's dominant grip on the publisher ad server market even after ill-received product changes and its internal estimates indicating a lack of customer sensitivity to price increases support the Court's conclusion that publisher ad servers constitute a distinct relevant product market.

Google nevertheless contends that Plaintiffs' focus on publisher ad servers for open-web display advertising is too narrow because publisher ad servers can be used to manage other ad types. For example, Google points out that DFP helps publishers manage not only display ads shown on the open web, but also mobile app ads and instream video ads. Google also observes

that companies operating walled-garden websites with integrated ad tech stacks, such as Amazon and Meta, show display ads on their websites using in-house technology that offers much of the functionality of publisher ad servers.

Although digital advertising is not limited to open-web display advertising, the evidence in the record supports the conclusion that publisher ad servers for open-web display advertising constitute a distinct, relevant market because they are uniquely capable of performing ad-serving functions for websites, which are essential components of news, media, and other online publishers' businesses. Organizations that publish primarily text-based news content online, such as The New York Times or The Wall Street Journal, cannot monetize the primary content on their websites with instream video ads. See Tr. Sept. 10 AM 31:1–17 (Layser (News Corp)); Tr. Sept. 19 PM 59:16–60:3, 62:1–15, 64:4–65:3, 72:1–17 (Lee (Pls. Expert)). Nor can they feasibly forgo monetizing their websites and publish revenue-generating content only through alternative digital channels, such as via mobile apps or social media pages. See Tr. Sept. 27 AM 59:20–60:18 (Wheatland (Daily Mail)); Tr. Sept. 10 AM 31:1–33:2 (Layser (News Corp)); Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)); Tr. Sept. 26 PM 47:18–49:3 (Israel (Def. Expert)) (agreeing that publishers cannot use social media platforms to sell display ad inventory on their websites).

Unlike on the open web, publishers using apps and social media are subject to content regulation by and revenue sharing with the large technology firms that control mobile app stores and social media platforms, such as Apple, Google, Meta, and TikTok. See Tr. Sept. 12 PM 71:18–72:10 (Goel (PubMatic)); id. at 72:24–73:21 (explaining how "the app environment tends to be controlled by a couple of large [operating system and mobile device] providers, like Apple or Google"); Tr. Sept. 27 AM 66:11–17 (Wheatland (Daily Mail)); see, e.g., Community Guidelines, YouTube, https://www.youtube.com/howyoutubeworks/policies/community-

guidelines (last visited Mar. 27, 2025). Monetizing their websites, instead of just their content on app and social media pages, is therefore crucial for publishers who wish to retain a greater degree of editorial independence. The economic sustainability of publishers' open-web properties also benefits those Internet users who would prefer not to have much of the information that they consume online directly captured and regulated by a few large corporations.

It is also infeasible for publishers to shift their users away from their websites to apps or social media pages. See Tr. Sept. 27 AM 59:20–60:18, 65:6–21 (Wheatland (Daily Mail)). Many web publishers rely on users reaching their content via search engines or hyperlinks from other websites, and would only have a fraction of their current users if they required users to download mobile apps or follow them on social media in order to access their content. See id. at 66:2–66:5 ("[I]t is hugely difficult to convert a web user to be a loyal app user . . . 2 percent of our . . . readership is on [our] apps."); Tr. Sept. 10 AM 31:20–33:2 (Layser (News Corp)); Tr. Sept. 19 PM 76:21–77:11 (Lee (Pls. Expert)). Open-web display ads are therefore not reasonably interchangeable with social media, in-app, and instream video ads from the perspective of news, media, and other online publishers. Accordingly, publisher ad servers for social media, in-app, or instream video advertising are not reasonably interchangeable with, or significantly substitutable for, publisher ad servers for open-web display advertising. See Amex, 585 U.S. at 543; Kodak, 504 U.S. at 482 (explaining that interchangeability is assessed from the perspective of the consumer); It's My Party, Inc., 811 F.3d at 683.

Nor are in-house technologies developed by publishers to serve display ads on their websites reasonably interchangeable with publisher ad servers. Building an in-house ad server is "incredibly sophisticated and incredibly complex," and is not within the "core competencies" of

most organizations that publish news or other content online. Tr. Sept. 9 AM 73:1–8 (Wolfe (Gannett)); see also Tr. Sept. 9 AM 125:2–25 (Casale (Index Exchange)); Tr. Sept. 18 AM 132:7–17 (Wheatland (Daily Mail)). The "extremely major investment" required to develop a publisher ad server makes doing so infeasible for companies that do not specialize in enterprise software development. Tr. Sept. 13 PM 82:6–17, 91:8–15 (Creput (Equativ)); see also Tr. Sept. 18 AM 132:7–17 (Wheatland (Daily Mail)). Once built, maintaining an in-house publisher ad server is also difficult given the significant "operational support," "infrastructure[, and] capital resources required" for both day-to-day maintenance and continuous evolution to keep apace with third-party publisher ad servers. Tr. Sept. 26 PM 141:15–142:5 (Glogovsky (New York Times)); see also PTX174 at -633. As a result, very few publishers have successfully developed and used an in-house publisher ad server, and almost all of those publishers are large digital technology companies. See Tr. Sept. 19 PM 65:4–20 (Lee (Pls. Expert)); Tr. Sept. 26 AM 126:5–127:19 (Israel (Def. Expert)) (identifying Amazon, Google, Meta, Reddit, Snapchat, and TikTok as companies that "have their own ad tech, including their own ad server"). Even fewer publishers use their in-house publisher ad servers for open-web display advertising. Instead, they more often use in-house servers to meet site-specific needs, such as serving customized, native ad formats like social media ads or sponsored listings. See Tr. Sept. 9 PM 66:11–67:24 (Lowcock (IPG)); Tr. Sept. 17 PM 122:3–16, 123:12–14, 131:24–132:3, 133:11–13 (Helfand (Disney)); Tr. Sept. 19 PM 68:21–70:1 (Lee (Pls. Expert)); Tr. Sept. 26 AM 66:2–22, 126:5–129:16 (Israel (Def. Expert)). For example, Meta uses in-house ad serving technology to show ads that are "blended well into the experience of Instagram," and Amazon's in-house ad serving technology lets brands pay to "move their [product] listing[s] higher" in Amazon.com's shopping search results. Tr. Sept. 9 PM 128:8–25 (Avery (Kevel)).

Lastly, other technologies capable of serving display ads on open-web publishers' websites are not reasonably interchangeable with—and cannot serve as effective substitutes for—publisher ad servers. For example, the publisher-facing side of an ad network, such as Google AdSense, is not a reasonable alternative for large publishers because an ad network cannot place a variety of advertising demand sources in competition with each other for each impression; instead, an ad network is limited to sourcing bids from advertisers who have signed up for the network. See PTX88 at -603; Tr. Sept. 16 AM 92:24–93:14 (Mohan (Google)); Tr. Sept. 18 AM 202:18–203:16 (Pappu (Google)); Tr. Sept. 27 AM 58:2–6 (Wheatland (Daily Mail)); see also Sections IV(B) and V(A), supra. Therefore, a publisher relying on an ad network alone cannot use that network to display ads sold via direct deals, which remain a significant proportion of large publishers' ad revenue. See Tr. Sept. 10 AM 29:8–30:10 (Layser (News Corp)); Tr. Sept. 20 PM 110:23–111:5 (Sheffer (Google)).

*b. Ad Exchange Market*

The Court also finds that ad exchanges for open-web display advertising constitute a distinct relevant product market. Ad exchanges play a distinct role in the open-web display ad tech stack by connecting publishers using publisher ad servers with advertisers using programmatic buying tools such as demand-side platforms and ad networks. Due to their unique ability to collect and rank ad bids from multiple buying tools in mere milliseconds, ad exchanges are involved in most programmatic open-web display transactions, are recognized as a distinct product by industry participants, and are priced differently than other ad tech tools. Accordingly, there is no other ad tech tool that is reasonably interchangeable with ad exchanges. The lack of substitutability between ad exchanges and alternative tools means that a monopolist could profitably raise prices significantly above competitive levels, as Google determined in a study

that showed its ad exchange price changes had limited effect on its customers' behavior. For these reasons, ad exchanges for open-web display advertising constitute "the area of effective competition" and form a relevant antitrust market. Amex, 585 U.S. at 543.

The ad exchange is the only ad tech tool through which publishers can auction their ad inventory at scale and in real-time to the largest sources of programmatic advertising demand. Advertisers and their ad agencies use demand-side platforms like DV360 and The Trade Desk, or advertiser-facing sides of ad networks like AdWords, to purchase open-web display advertising programmatically. See Joint Glossary at 5–6; PTX1231; Tr. Sept. 11 PM 104:25–105:17 (Dederick (The Trade Desk)); Tr. Sept. 19 PM 30:2–3 (Kim (Google)). These buying tools bid into ad exchanges, which run real-time auctions to rank sources of advertising demand and select winning bids to be sent to a publisher ad server. Joint Glossary at 5; PTX1031 at -480; Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). Although there are ways for advertising demand to circumvent ad exchanges, such as only buying ads from a closed ad network, the majority of programmatic ad spending flows through ad exchanges. See Tr. Sept. 9 AM 63:1–64:6 (Wolfe (Gannett)) (stating that most of Gannett's programmatic inventory is sold via ad exchange auctions); Tr. Sept. 19 PM 54:13–22 (Lee (Pls. Expert)).

Industry participants consider ad exchanges to be a distinct product that they categorize separately from other ad tech tools. See Tr. Sept. 19 PM 81:11–19 (Lee (Pls. Expert)). Google regularly identifies ad exchanges as a distinct product that differs from publisher ad servers, ad networks, and demand-side platforms. See, e.g., DTX435 at -062; PTX847 at -261; PTX1031 at -478–84; PTX1646 at -469–71. Publishers similarly view ad exchanges as a distinct product. See, e.g., Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). As do third-party ad tech developers,

including companies that specialize in creating ad exchanges. See, e.g., Tr. Sept. 9 AM 109:22–111:12, 122:23–123:6 (Casale (Index Exchange)).

The discrete nature of the ad exchange market is reflected in the distinct prices that ad exchanges charge publishers. Ad exchanges typically charge publishers a percentage of the total winning bid for each impression, while publisher ad servers typically charge publishers a flat fee per impression sold and demand-side tools charge advertisers directly. See Section VI(A)(1)(a), supra. Moreover, given the unique role that ad exchanges play in holding real-time auctions to identify the highest advertiser bids, ad exchanges charge much higher fees than publisher ad servers do, often taking between 10% and 20% of revenue from the winning bid. See Tr. Sept. 13 AM 43:7–17; Tr. Sept. 26 AM 120:20–121:16, 132:17–25 (Israel (Def. Expert)).

Because ad exchanges have unique functionality—as reflected by their distinct pricing structure and the industry's recognition of them as a distinct product—other ad tech tools are not reasonably interchangeable or substitutable with ad exchanges. Although ad networks are another tool for connecting advertisers to publishers, the sophisticated publishers who receive the majority of open-web display advertising revenue do not view ad networks as substitutes for ad exchanges because ad networks offer very limited control and are unable to place bids from disparate demand sources in competition with each other. See PTX88 at -603; PTX1646 at -469–71; Tr. Sept. 18 AM 202:18–203:16 (Pappu (Google)); Tr. Sept. 20 PM 110:23–25 (Sheffer (Google)); Tr. Sept. 27 AM 58:4–6 (Wheatland (Daily Mail)).[19]

[19] "Supply path optimization" tools also offer a way to bypass ad exchanges by connecting advertiser buying tools and publisher ad servers directly. See DTX1544 at -698; Tr. Sept. 19 PM 78:22–79:19 (Lee (Pls. Expert)). But, unlike ad exchanges, these tools do not conduct auctions, are not focused on open-web display advertising, serve many fewer customers, and are not focused on serving publishers' interests. See Tr. Sept. 11 PM 117:6–118:14 (Dederick (The Trade Desk)); Tr. Sept. 19 PM 78:22–79:19 (Lee (Pls. Expert)). That is why the leading developers of supply path optimization tools do not consider them to be viable alternatives to ad

Direct deals with advertisers are also not reasonable substitutes for ad exchanges, given the distinct advantages of programmatic advertising. <u>See</u> Section IV(A), <u>supra</u>. As an internal Google document observes, it would be "highly unlikely" for programmatic advertising to shift to direct deals, in part due to the "[e]fforts required to make and maintain direct connections." PTX978 at -625; <u>see also</u> Tr. Sept. 10 AM 33:5 –36:9 (Layser (News Corp)); Tr. Sept. 18 AM 135:15–136:3 (Wheatland (Daily Mail)); Tr. Sept. 19 PM 78:1–21 (Lee (Pls. Expert)).

The conclusion that ad exchanges lack reasonable substitutes is bolstered by economic analysis suggesting that a monopolist of open-web display ad exchanges could charge anticompetitive prices without significant substitution. For example, an internal Google study projected that a 25% decrease in the price AdX charged would have limited impact on AdX's market share, indicating customer stickiness and inelastic demand. <u>See</u> PTX188 at -979, -012–17; <u>see also</u> Tr. Sept. 19 PM 82:22–85:15 (Lee (Pls. Expert)) (stating PTX188 shows that for "publishers representing over 70 percent of AdX's gross revenue," Google calculated that "their elasticity or expected elasticity is one or less," meaning those publishers would be unlikely to switch away from AdX due to an increase in price). Publishers have particularly inelastic demand for ad exchanges given their inability to turn to alternative tools for placing demand sources in competition with each other and for maximizing the monetization of their web inventory. <u>See</u> Tr. Sept. 19 PM 73:24–74:22, 82:22–85:15 (Lee (Pls. Expert)); <u>see also</u> Tr. Sept. 18 PM 36:14–19 (Simcoe (Pls. Expert)). Therefore, a monopolist for open-web display ad exchanges could likely charge supracompetitive prices[20] without seeing customers switch to rival

exchanges for bidding on open-web display ads. <u>See</u> Tr. Sept. 11 PM 118:5–14 (Dederick (The Trade Desk)); Tr. Sept. 12 PM 154:12–24 (Goel (PubMatic)).

[20] Supracompetitive prices are prices above those that could be sustained in a competitive market. Tr. Sept. 16 PM 129:22–130:2 (Abrantes-Metz (Pls. Expert)).

products in sufficient numbers to constrain the monopolist's prices. See Tr. Sept. 18 PM 7:13–8:3 (Simcoe (Pls. Expert)); Tr. Sept. 19 PM 81:20–82:14, 85:1–89:12 (Lee (Pls. Expert)).

Google contends that Plaintiffs' expert Dr. Lee drew the ad exchange market too narrowly by focusing only on exchanges that facilitate the sale of open-web display inventory. But just as with publisher ad servers, ad exchanges that facilitate the sale of only instream video, mobile app, or social media ads are not helpful for publishers seeking to monetize their open-web display inventory. See PTX764 at -251–54, -259–61 (Google document categorizing its "display web" business as distinct from its "display app," "search," "native web," and "video instream" businesses); Tr. Sept. 9 AM 112:1–118:22 (Casale (Index Exchange)). For example, a publisher of a text-based website that does not host video content cannot use an ad exchange that runs auctions solely for instream video ads to monetize the ad inventory on its website, because instream video ads are akin to television ads and designed to run inside a website's video player. See Tr. Sept. 9 AM 117:12–118:22 (Casale (Index Exchange)); Tr. Sept. 19 PM 53:4–18, 64:23–25 (Lee (Pls. Expert)). To monetize its display ad inventory, the publisher must instead use an ad exchange that facilities the sale of open-web display ads. See Tr. Sept. 9 AM 117:12–118:22 (Casale (Index Exchange)); Tr. Sept. 19 PM 53:4–18, 64:23–25 (Lee (Pls. Expert)). And so the only other products that are reasonably interchangeable with an ad exchange that facilitates the sale of open-web display ads are other ad exchanges that facilitate the sale of open-web display ads.

*c. Advertiser Ad Network Market*

The Court finds that Plaintiffs have failed to show that advertiser ad networks for open-web display advertising constitute a relevant product market. In proposing a market for "advertiser ad networks," Plaintiffs use a term that is not common in the digital advertising

industry and unduly exclude the publisher-facing side of two-sided ad networks. Moreover, the segmentation of advertiser ad networks for open-web display advertising as its own market is inconsistent with the substitution that occurs from the perspective of advertisers between open-web display ads and other types of display ads, including in-app and walled-garden display ads.

Ad networks were created to connect publishers' inventory with advertisers' ads by aggregating advertisers and publishers within a single, two-sided platform. See Sections IV(B) & V(A), supra; Tr. Sept. 10 PM 28:8–21, 29:5–7 (Friedman (Goodway Group)); Tr. Sept. 16 PM 47:15–25 (Weintraub (Pls. Expert)). In performing this connection, ad networks "typically represent[] both the interests of the publisher or media, as well as the marketer or the advertisers." Tr. Sept. 9 AM 109:22–110:8 (Casale (Index Exchange)). Considering solely the advertiser-facing portion of an ad network, which is Plaintiffs' position, would unduly ignore that ad networks intermediate between two groups, benefit from indirect network effects, and compete for transactions with other two-sided platforms. See Amex, 585 U.S. at 534–46.

In accordance with their two-sided nature, "ad networks" are typically referred to as a single product by industry participants, who generally do not draw a distinction between "advertiser ad networks" and the publisher-facing side of ad networks. See, e.g., Tr. Sept. 9 AM 109:22–110:8 (Casale (Index Exchange)); Tr. Sept. 10 AM 139:23–140:6 (Friedman (Goodway Group)); Tr. Sept. 11 PM 102:24–104:24, 105:21–106:15, 156:21–157:19 (Dederick (The Trade Desk); Tr. Sept. 20 PM 54:4–13 (Sheffer (Google)). For example, industry participants generally consider AdWords, which is the advertising-facing side of Google's ad network, and AdSense, the publisher-facing side of its ad network, to be the two components of Google's ad network—the Google Content Network. See DTX259 at -090, -092; Tr. Sept. 12 PM 14:3–24 (Dederick (The Trade Desk)). Plaintiffs' expert Dr. Weintraub recognized that each ad network has a buy-

side component that serves the network's advertisers and a sell-side component that serves the network's publishers. See Tr. Sept. 16 PM 47:15–25, 110:21–24 (Weintraub (Pls. Expert)). And Dr. Lee, who selected the term "advertiser ad networks" in setting out his proposed market definitions, testified that he had not heard the term before this litigation. Tr. Sept. 20 AM 137:12–15 (Lee (Pls. Expert)).

As previously discussed, in the modern programmatic advertising business, the closed two-sided ad network has faded from prominence. See Tr. Sept. 10 PM 33:14–34:14 (Friedman (Goodway Group)) (quoting Friedman for the proposition that ad networks have been obsolete since 2012). Sophisticated digital advertisers and publishers have "moved more towards programmatic versus . . . a more simple transactional network model." Tr. Sept. 17 PM 126:13–17 (Helfand (Disney)); see also Section IV(A–B), supra. The rise of programmatic advertising has resulted in large and sophisticated advertisers using demand-side platforms like Google's DV360 instead of advertiser-facing sides of ad networks as their primary buying tools. See DTX1508 at -876; PTX579 at -509; Tr. Sept. 10 AM 141:20–24 (Friedman (Goodway Group)); Tr. Sept. 11 AM 24:6–13, 40:5–41:2 (Bender (Google)).[21] Large and sophisticated open-web publishers, similarly, have used ad exchanges like AdX and publisher ad servers like DFP, instead of the publisher-facing sides of ad networks like AdSense, to source and place ads on their websites. See PTX88 at -603; Tr. Sept. 18 AM 202:18–203:16 (Pappu (Google)); Tr. Sept. 20 PM 110:23–25 (Sheffer (Google)); Tr. Sept. 27 AM 58:4–6 (Wheatland (Daily Mail)). Small

[21] Although large advertisers use demand-side platforms, which offer them more customization of and control over their ad campaigns, as their primary buying tools, see Section IV(B), supra, many large advertisers also use AdWords as a secondary buying tool because of its ability to predict when users will click on ads, its proprietary sell-side data that enables audience targeting, and its ability to manage campaigns that combine open-web display ads with Search, YouTube, and Gmail ads. See DTX1514 at 950–53; Tr. Sept. 19 PM 101:23–103:4 (Lee (Pls. Expert)); Tr. Sept. 26 PM 85:22–87:13 (Israel (Def. Expert)).

and medium-sized advertisers and publishers, conversely, primarily use ad networks like the Google Content Network. See PTX1235; Tr. Sept. 19 PM 99:6–12 (Lee (Pls. Expert)).

This evolution has resulted in AdWords emerging as open-web publishers' primary source of small and medium-sized businesses' advertising. Over four million advertisers use only AdWords to purchase open-web display advertising. See PTX1231. Instead of confining these advertisers to AdSense websites, AdWords bids into Google's ad exchange, AdX, and places ads on websites that operate outside of the Google Content Network (i.e., websites that use publisher ad servers to manage their inventory). See PTX333 at -486. In doing so, AdWords provides large publishers with a unique source of revenue from smaller advertisers that lack the scale and sophistication to use demand-side platforms as their ad buying tools. See PTX290 at -983; PTX624 at -169; Tr. Sept. 18 AM 121:21–122:12 (Abrantes-Metz (Pls. Expert)).

Plaintiffs, through their market expert Dr. Lee, contend that this evolution means that a relevant market exists for "advertiser ad networks." Plaintiffs observe that small and medium-sized advertisers lack the sophistication to operate a demand-side platform or the means to hire an ad agency to operate one on their behalf. Therefore, according to Plaintiffs, the advertiser side of ad networks—principally, the AdWords side of the Google Content Network—provides the only place for these less sophisticated advertisers to reach users with open-web display ads. And because the Google Content Network no longer operates as a closed network, they argue that it would ignore commercial realities to place AdWords within a two-sided market instead of viewing it primarily as a buying tool that participates in programmatic advertising and reaches publishers' inventory across the open web.

These arguments have some merit. But even if the buy-side of ad networks were categorized as constituting a distinct market, that does not explain why such a market should be

limited to open-web display advertising. Substantial trial evidence showed that advertisers reallocate resources among different digital advertising channels based on perceived return on advertising expenditures. See, e.g., Tr. Sept. 23 PM 117:25–119:8 (Hardie (U.S. Census Bureau)) ("Ultimately, advertisers are following eyeballs. They are trying to reach people wherever they are."). Advertisers are often "agnostic" as to particular platforms or channels, id. at 118:15–119:21, and focus more on how "the audience [i]s responding to the ad" rather than on through what method or format the advertisement is delivered. Tr. Sept. 23 PM 83:11–84:7, 85:3–86:11, 92:6–10 (Oliphant (U.S. Census Bureau)). When one ad format or channel shows better return on investment, advertisers and the ad agencies that represent them will shift ad spending to that different format or channel to optimize performance. See id. at 92:11–14; Tr. Sept. 9 PM 93:1–21 (Lowcock (IPG)); Tr. 10 PM 6:11–7:7 (Friedman (Goodway Group)) (stating marketers "should not be biased toward one medium or another"); Tr. Sept. 27 AM 24:21–27:7, 29:14–30:2 (Bumpers (Zulily)). Moreover, the data-rich nature of the digital environment allows advertisers to measure the outcomes of their campaigns and quickly reallocate resources across channels to maximize effectiveness. See DTX439 at -414; Tr. Sept. 25 PM 28:6–30:1 (Stewart (Google)).

Cross-channel optimization is not limited to large advertisers; smaller advertisers that use AdWords reallocate advertising spending across channels. For example, Courtney Caldwell, the owner of a beauty tech start-up, testified that she shifted ad spending from AdWords to Instagram based on the relative user engagement and campaign performance that she experienced on each platform. See Tr. Sept. 25 PM 9:9–10:11 (Caldwell (ShearShare)). In addition to smaller advertisers having easy access to social media and other channels, automated tools are increasingly facilitating the reallocation of advertising budgets across channels without manual

Case 3:20-cv-00869-JFA Document 1-2 Filed 08/24/25 Page 59 of 115

involvement. For example, AdWords' Performance Max uses artificial intelligence to buy ads across multiple channels—including open-web display ads, walled-garden display ads on Google's owned-and-operated properties, in-app ads, and instream video ads. See DTX1248 at -406–07; Tr. Sept. 25 PM 34:12–22 (Stewart (Google)). Although advertisers using Performance Max may opt out of channels, Google has warned that doing so "will limit performance." DTX1248 at -420. Meta offers a similar automated cross-channel buying tool, which typically outperforms campaigns that run on only one of its available channels. See DTX498 at -913. Given the ease and benefits of allocating advertising spending across channels, Plaintiffs' assertion that advertiser ad networks for open-web display ads constitute a relevant market is unpersuasive.

By contrast, as discussed above, the market for publisher ad servers and the market for ad exchanges are each properly limited to tools that facilitate open-web display transactions. In those two markets, the publisher is the primary consumer of the ad tech tools and is focused on monetizing channel-specific inventory; whereas in the proposed market for advertiser ad networks, the advertiser is the consumer and is focused on reaching users regardless of which channel they are using. As the Supreme Court has held, interchangeability is assessed from the perspective of the consumer. See Kodak, 504 U.S. at 482. It is therefore appropriate to find that the proper scope of the proposed advertiser ad network market should include other buying tools that enable advertisers to purchase digital advertisements in reasonably interchangeable formats, including walled-garden display ads, in-app ads, and social media ads. Because Plaintiffs have

failed to consider ad networks that facilitate buying ads in these alternative channels in their market definition, they have failed to properly define the ad network market.[22]

*d. Google's Contention that the Entire Ad Tech Ecosystem Fits within a Two-Sided Market*

Relying heavily on Amex, a Supreme Court decision that stated that "in two-sided transaction markets," such as the market for credit-card networks, "only one market should be defined," 585 U.S. at 546, Google claims that the digital ad tech ecosystem constitutes a single two-sided market. In Amex, the Supreme Court held that American Express, Discover, MasterCard, and Visa compete with each other in a single two-sided market because it found that credit-card networks are two-sided transaction platforms that can only compete with other two-sided transaction platforms. Id. at 544–46. Google invokes Amex to contend that all ad tech tools should be placed in a single market for the purposes of this litigation because all of them exist to facilitate matches between advertisers and users viewing ads on digital platforms. In support of this position, Google cites its market expert Dr. Israel, who testified that any analysis of competition within the ad tech industry should be conducted using a single two-sided market. See Tr. Sept. 26 AM 37:13–38:18, 42:11–20 (Israel (Def. Expert)).

The Court finds this argument unpersuasive. Distinct products should not be grouped into a single omnibus market simply because they work together to achieve the same overarching purpose. Although Google correctly argues that, under Amex, both sides of a two-sided

[22] Other courts have segmented digital ad buying tools by the types and formats of ads that they transact. See, e.g., Fed. Trade Comm'n v. IQVIA Holdings Inc., 710 F. Supp. 3d 329, 367–68 (S.D.N.Y. 2024) (defining demand-side platforms for health care professional programmatic advertising as a relevant market, and excluding social media and healthcare-focused websites as not reasonably interchangeable); Google Search, 2024 WL 3647498, at *65 ("The court finds that Plaintiffs have established two relevant markets—search advertising and general search text advertising."). The weight of the evidence presented in this trial, however, clearly supports the conclusion that walled-garden display ads, in-app display ads, and social media ads are reasonably interchangeable with open-web display ads for many AdWords advertisers.

transaction platform should be considered in defining a market, many of the ad tech products at issue in this trial do not fit within Amex's definition of two-sided transaction platforms. Defining an omnibus market to include buy-side tools built for advertisers that compete with other buy-side tools built for advertisers—and sell-side tools built for publishers that compete with other sell-side tools built for publishers—would ignore commercial realities and contradict the bedrock principle of antitrust law that any Sherman Act inquiry must focus on the protection of competition, not competitors.

As previously explained, the distinct products that comprise the ad tech ecosystem are not reasonably interchangeable. A publisher cannot use a demand-side platform to render ads on its website. See Joint Glossary at 5; Tr. Sept. 9 AM 131:3–23 (Casale (Index Exchange)); Tr. Sept. 25 PM 75:23–25 (Stewart (Google)). An advertiser cannot use a publisher ad server to bid into ad exchanges and purchase ad inventory. See Joint Glossary at 8; Tr. Sept. 20 PM 78:4–25 (Sheffer (Google)); Tr. Sept. 9 AM 66:1–8 (Wolfe (Gannett)). Uncontroverted trial testimony established that advertiser buying tools, ad exchanges, and publisher ad servers each serve distinct functions, are priced differently, and cannot be substituted for each other. See Section VI(A)(1)(a–c), supra. And the advertisers who are the customers of buy-side tools such as demand-side platforms are largely distinct from the publishers who are the customers of sell-side tools such as publisher ad servers.

Dr. Israel's assessment that the digital advertising tools at issue must be considered as part of a single market disregards Amex's explicit limitation of its holding to two-sided *transaction* platforms, as opposed to two-sided platforms more broadly. Compare 585 U.S. at 546 ("[I]n two-sided transaction markets, only one market should be defined.") with id. at 544 ("To be sure, it is not always necessary to consider both sides of a two-sided platform."). The

Supreme Court was clear that "[t]he key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." Id. at 535; see also id. at 545.[23] The Supreme Court explicitly differentiated credit-card networks from "[n]ontransaction platforms" such as "newspaper[s] that sell[] advertising" in determining that the former should be assessed as a two-sided market and the latter as a one-sided market; it stated that credit-card platforms "are different" because they "facilitate a single, simultaneous transaction between participants." Id. at 545 & 546 n.9. In other words, "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder. It cannot sell transaction services to either cardholders or merchants individually." Id. at 545. The Court in Amex accordingly found that "[e]valuating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition" because "[o]nly other two-sided platforms can compete with a two-sided platform for transactions." Id. at 546.

In contrast to credit-card networks, most of the core ad tech products at issue in this litigation do not fit within this definition of a two-sided transaction platform. For example, a publisher ad server sells transaction-related services, such as inventory management, bid evaluation, ad rendering, and sales performance tracking, only to publishers, and does not simultaneously sell any services to advertisers. Cf. id. 545 (Two-sided transaction platforms "cannot make a sale unless both sides of the platform simultaneously agree to use their services."). And unlike in the credit-card network market, it is not "[o]nly other two-sided

[23] More specifically, in the credit card context, when an American Express cardholder uses the card to purchase a product from a merchant, the cardholder is billed by American Express for the price of the product, and the merchant is paid by American Express the price of the product minus a service charge. See id. at 533.

platforms [that] can compete with" publisher ad servers "for transactions." Id. at 546. Google's primary competitors in the open-web publisher ad server space, such as Equativ and Kevel, do not operate two-sided transaction platforms, but rather specialize in serving only publishers and do not offer buy-side advertising tools. See, e.g., Tr. Sept. 13 PM 62:11–14, 62:22–63:1 (Creput (Equativ)); Tr. Sept. 9 PM 116:19–23, 119:6–21 (Avery (Kevel)). Cf. Amex, 585 U.S. at 546 ("A credit-card company that processed transactions for merchants, but that had no cardholders willing to use its card, could not compete with Amex.").

The same is true for demand-side platforms, which Google contends are part of a broader two-sided market for digital advertising. Demand-side platforms are not two-sided transaction platforms because they "sell transaction services," such as ad inventory search, audience targeting, centralized ad buying, and real-time bidding, "to [advertisers] individually," and do not simultaneously sell any services to publishers. Amex, 585 U.S. at 545. Moreover, demand-side platforms do not "compete" "for transactions" with "[o]nly other two-sided platforms." Id. Rather, demand-side platforms serve only advertisers and compete with other advertiser-facing tools. See Joint Glossary at 5; Tr. Sept. 10 AM 140:11–18 (Friedman (Goodway Group)). For example, one of the largest demand-side platforms, The Trade Desk, is run by a company that does not serve publishers and does not operate its own two-sided network. See, e.g., Tr. Sept. 11 PM 87:21–88:13, 105:12–14 (Dederick (The Trade Desk)) ("[O]ur company exclusively represents the interests of advertisers and ad buyers.").

The Court recognizes that there are aspects of the digital advertising ecosystem, such as ad exchanges, that resemble two-sided transaction platforms. Despite sometimes being referred to as "supply-side platforms" in the industry, the core function of ad exchanges is to match advertiser demand with publisher inventory. See Joint Glossary at 5 (defining ad exchange as

"[a] tool that connects owners of digital content where people see ads ('publishers'), who have ad inventory to sell, with advertisers looking to place ads."); PTX1031 at -480–81 (explaining how the term supply-side platform refers to the publisher-facing tools within an ad exchange, even though "both names are used interchangeably" as industry shorthand); Tr. Sept. 9 AM 67:8–18 (Wolfe (Gannett)). Unlike publisher ad servers and demand-side platforms, ad exchanges "cannot make a sale unless both sides of the platform [i.e., the publishers selling impressions and the advertisers buying impressions] simultaneously agree to use their service." Id. at 545. Moreover, "[o]nly other two-sided platforms can compete with" ad exchanges "for transactions." Id. at 546. For these reasons, in analyzing whether Google has monopoly power, the Court will "[e]valuat[e] both sides" of the ad-exchange market. Id.[24]

Antitrust analysis of the digital advertising industry is thus conducted much the same way as is antitrust analysis of the consumer payments industry. In each industry, a diverse set of products exist to match (i.e., enable transactions between) buyers and sellers. The shared high-level purpose of these products, however, is far too broad for defining an antitrust market. Rather, courts delineate the "the area[s] of effective competition" to define the relevant markets within an industry. Amex, 585 U.S. at 543; see also FTC v. Staples, Inc., 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("The mere fact that a firm may be termed a competitor in the overall

[24] Although they resemble two-sided transaction platforms, ad exchanges differ somewhat from the credit-card networks at issue in Amex because ad exchanges do not merely provide technology to facilitate transactions between buyers and sellers, but also function as auction houses by evaluating multiple potential buyers and selecting the buyer with the highest willingness to pay. See Joint Glossary at 5; Section IV(B), supra. Indeed, ad exchanges primarily exist to place multiple buyers in competition with each other for available inventory, whereas credit-card networks primarily exist to make it easier for a buyer to pay a seller after the two parties have independently found each other and decided to conduct a transaction.

marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.").

One consideration for defining areas of effective competition is the channels through which transactions occur. In analyzing the consumer payments industry, courts have found that there is a credit-card market that does not include debit cards, private-label credit cards, checks, or digital payment apps, even though each is "an option for payment by consumers." United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 337–38 (S.D.N.Y. 2001); see also Amex, 585 U.S. at 547 ("[W]e will analyze the two-sided market for credit-card transactions."); In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2024 WL 1556931, at *11 (E.D.N.Y. Apr. 10, 2024) ("[C]redit-card transactions and other payment methods (e.g., cash or checks) are not reasonable substitutes for debit-card transactions."). In digital advertising, there are similar distinctions between direct deals, ad network advertising, programmatic advertising, and walled-garden advertising, even though each is a channel through which advertisers purchase ad space on publishers' websites. Two recent opinions have defined relevant antitrust markets in the digital advertising industry with significant channel specificity. Google Search, 2024 WL 3647498, at *89 (holding that "general search text advertising [i]s a relevant product market"); Fed. Trade Comm'n v. IQVIA Holdings Inc., 710 F. Supp. 3d 329, 356 (S.D.N.Y. 2024) (finding that healthcare professional programmatic advertising is a relevant market).

Google has recognized the importance of not unduly placing all its digital advertising products at issue into a single market. In another federal court, Google argued that combining the "distinct" products in the ad tech ecosystem into one market would be improper given that some products such as demand-side platforms "are used only by advertisers," whereas others such as publisher ad servers "are used only by publishers." Mot. to Dismiss, In re Google Digital

Advertising Antitrust Litig., 5:20-cv-3556, 2021 WL 7083558, at *6 (N.D. Cal. Jan. 15, 2021). In Google's own words, "[a]lthough business practices impacting the products and services offered to *publishers* surely could have important consequences for *advertisers,* that is not sufficient, absent other allegations not made here, to support the broad overarching services market." Id. at *5 n.2 (emphases in original).[25]

The nature of commercial competition also requires courts to avoid classifying products as part of two-sided transaction platforms merely because they help customers on one side of a transaction-facilitating industry improve their capacity to transact. Courts have found that buy-side consumer payments products that facilitate credit-card transactions—such as checking accounts, consumer loan services, bill splitting apps, and digital wallets—are not reasonably interchangeable with credit-card networks and are not to be analyzed within the credit-card network market. See Amex, 585 U.S. at 537 (stating "Amex, Visa, MasterCard, and Discover are the four dominant participants in the credit-card market" and identifying the four firms as controlling 100% of the market); see also Visa, 163 F. Supp. 2d at 327 (defining the "U.S. credit and charge card industry" as only including these "four significant network services competitors"). The same is true on the sell-side of the consumer payments industry. Courts have not included merchant-facing products such as point-of-sale terminals and digital payment

[25] Google made this argument in its motion to dismiss a putative antitrust class action brought by advertisers who used Google's services to purchase display and search ads. See In re Google Digital Advertising Antitrust Litig., 5:20-cv-3556, 2021 WL 7083558, at 6 (N.D. Cal. Jan. 15, 2021); id. [Dkt. No. 52] at 2–3. The district court granted the motion to dismiss with leave to amend, in part due to its agreement with Google that plaintiffs' proposed relevant market "improperly include[d] services for both advertisers and publishers." In re Google Digital Advertising Antitrust Litig., 5:20-cv-3556, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021). Before an amended complaint was filed, the civil action was consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the Southern District of New York. See id. [Dkt. No. 157] at 8–9.

gateways from companies like Fiserv, Shopify, Square, and Stripe in the two-sided credit-card network market because they are not reasonably interchangeable with credit-card networks. See 585 U.S. at 537; see also Brown Shoe, 370 U.S. at 325 ("[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."). This case law makes clear that just because two-sided transaction platforms reside at the heart of an industry that matches buyers and sellers does not mean that every industry product that helps facilitate those matches must be analyzed within an industry-wide, two-sided market. Rather, products that serve economic actors on one side of the industry and can be sustainably sold by firms that specialize only in that side of the industry—such as publisher ad servers that serve publishers and demand-side platforms that serve advertisers—are to be analyzed in markets that consist of reasonably interchangeable products on that side of the industry.

Because Plaintiffs have shown that there are two relevant product markets, one for publisher ad servers for open-web display advertising and another for ad exchanges for open-web display advertising, the geographic scope of these markets must be determined.

2. Geographic Market

To determine the relevant geographic scope of a market, courts consider the "area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices." It's My Party, 811 F.3d at 682 (quoting Kolon, 637 F.3d at 441) (ellipses in original). "The commercial realities considered when defining the relevant geographic market include: where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant

and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product." Kolon, 637 F.3d at 442–43.

Although Plaintiffs and Google agree that the United States is a suitable geographic market, Plaintiffs contend that a worldwide[26] market is optimal for assessing Google's conduct, which "crosse[d] country boundaries and affect[ed] customers worldwide." Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)). The Sherman Act does not authorize federal courts to "regulate the competitive conditions of other nations' economies." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 (1986). Rather, the "foremost concern" of federal antitrust law is the "protection of Americans"—here, American publishers, advertisers, and Internet users. Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 314 (1978). But to meet this concern, courts frequently look beyond our nation's shores in delineating the competitive boundaries of increasingly globalized markets. See, e.g., United States v. Eastman Kodak Co., 63 F.3d 95, 109 (2d Cir. 1995) (affirming district court's definition of a worldwide geographic market for film). Considering global markets is particularly common in cases involving software products that can be distributed around the world with a single click. See, e.g., United States v. Microsoft, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc); In re Google Play Store Antitrust Litig., 2024 WL 4438249, at *4 (N.D. Cal. Oct. 7, 2024); United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1164 (N.D. Cal. 2004).

The Court finds that the worldwide market as defined by Dr. Lee is the relevant geographic market for both the open-web display publisher ad server market and open-web

[26] The term "worldwide," as used by Dr. Lee and adopted in this opinion, excludes countries where the operation of ad tech companies is substantially restricted by government censorship of the Internet (e.g., China) or U.S. economic sanctions (e.g., Iran). See Tr. Sept. 19 PM 122:6–9 (Lee (Pls. Expert)).

display ad exchange market. The globally networked nature of the Internet has resulted in worldwide competition among ad tech providers, with the speed of light serving as a primary impediment to intercontinental ad serving. See Tr. Sept. 11 AM 124:18–22 (Ravi (Pls. Expert)). "[C]ustomers interact across country boundaries" and "supplier competition is global." Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)). Many U.S.-based advertisers target international Internet users, and many international advertisers target U.S.-based users, including by advertising on U.S.-based publishers' webpages. See id. at 123:7–124:22; PTX904 at -553. Similarly, advertisers bid to target international users who visit U.S.-based publishers' pages, and Americans consume digital content from international publishers. See PTX904 at -553; Tr. Sept. 9 AM 111:15–25 (Casale (Index Exchange)); Tr. Sept. 19 PM 123:7–124:22 (Lee (Pls. Expert)). Ad tech providers, in turn, have built global infrastructure and often manage, price, sell, and track performance of their products globally. See DTX1524 at 5–6; PTX946 at -807; Tr. Sept. 9 AM 111:17–25, 142:6–21 (Casale (Index Exchange)); Tr. Sept. 9 PM 117:19–118:1 (Avery (Kevel)); Tr. Sept. 19 AM 119:25–120:5 (Bellack (Google)); Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)). Google, for example, charges consistent ad exchange fees worldwide, and often tests and implements product and policy changes, including much of the conduct at issue in this litigation, on a global basis. See PTX326 at -837; PTX1099 at -866–67; PTX1199; Tr. Sept. 16 PM 20:21–21:10 (Weintraub (Pls. Expert)); Tr. Sept. 19 PM 126:13–127:3 (Lee (Pls. Expert)).

Google disagrees that a worldwide market is applicable, curiously contending that the "smallest relevant market principle" should govern in the same filing in which it claimed that there is an omnibus product market for the entire ad tech ecosystem. See [Dkt. No. 1375] (Google's Proposed Findings of Fact – Redacted Version) at 359 (quoting Tr. Sept. 20 AM 98:15–99:6 (Lee (Pls. Expert)). Google observes that over 70% of U.S. sell-side revenue comes

from U.S. advertisers, and points to regulatory, cultural, and language differences between global regions. See DTX358 at -010–11; PTX904 at -553; Tr. Sept. 20 AM 99:7–24 (Lee (Pls. Expert)); Tr. Sept. 25 AM 19:23–20:18 (Chevalier (Def. Expert)); Tr. Sept. 26 AM 110:1–18 (Israel (Def. Expert)). In part due to these distinctions, Google structures some of its ad tech business units regionally, and its strategy teams have considered the United States as a distinct market in their competitive analyses. See, e.g., DTX399 at -465; DTX733 at -396; DTX758 at -024; PTX657 at -328–30.

Google's arguments are unpersuasive in light of the global nature of digital advertising. The World Wide Web publishers that are Google's customers for these two products compete for global audiences and advertising dollars. See, e.g., Tr. Sept. 18 AM 125:9–12 (Wheatland (Daily Mail)). Publisher ad servers and ad exchanges are "market[ed]" globally. Kolon, 637 F.3d at 442. They are not "cumbersome[]" or "perishab[le]" physical products with high "shipping costs." Id. at 442–43. Moreover, despite some variance in regulatory regimes, the balance of evidence at trial did not establish that supply-side competitors face substantially different "regulatory requirements impeding" the sale of their publisher ad servers and ad exchanges across countries within the worldwide market as defined by Dr. Lee. Id. at 442; see Tr. Sept. 9 PM 117:19–118:1 (Avery (Kevel)); Tr. Sept. 13 PM 63:3–7 (Creput (Equativ)); Tr. Sept. 16 PM 20:21–21:6 (Weintraub (Pls. Expert)). Although publisher-facing ad tech providers sometimes break down their sales numbers by region, they often view themselves as competing globally. See, e.g., Tr. Sept. 9 AM 116:15–20 (Casale (Index Exchange)); Tr. Sept. 20 PM 153:17–24 (John (Microsoft)); see also Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 495 (4th Cir. 1986) (citing Justice Frankfurter for the proposition that the relevant geographic market is "the area in which buyers or sellers of the relevant product effectively compete"). Therefore, under

the factors set out by the Fourth Circuit in Kolon, the Court finds that the relevant geographic market for both publisher ad servers for open-web display advertising and ad exchanges for open-web display advertising is worldwide. 637 F.3d at 442–43.

**B. Monopoly Power**

"Monopoly power is the power to control prices or exclude competition." Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co., 748 F.3d 160, 173 (4th Cir. 2014) ("Kolon II") (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)). A plaintiff can show that a defendant had monopoly power in a relevant antitrust market either directly or indirectly. See Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 998 (9th Cir. 2023); Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3d Cir. 2007); Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 500 (2d Cir. 2004); Microsoft, 253 F.3d at 51. Direct proof of monopoly power includes evidence that a defendant profitably charged supracompetitive prices. See Microsoft, 253 F.3d at 51. Indirect proof is derived "from the structure and composition of the relevant market." Broadcom, 501 F.3d at 307; see, e.g., Grinnell, 384 U.S. at 571.

One factor often cited as indirect proof of monopoly power is market share. "The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market." Grinnell, 384 U.S. at 571; see also United States v. Swift & Co., 286 U.S. 106, 116 (1932) (Cardozo, J.) ("[S]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past."). But case law varies as to what percentage is dispositive. Compare, for example, the following: defendants found to possess monopoly power typically control at least 70% of the market, Kolon, 637 F.3d at 451 (citing White Bag Co. v. Int'l Paper Co., 579 F.2d 1384, 1387 (4th Cir. 1974)); there is "no minimum percentage" necessary to prove monopoly power indirectly, Google Search, 2024 WL

3647498, at *76; although a "market share of less than 60% during the relevant period does not necessarily foreclose a finding of monopoly power," it does "weigh heavily against such a finding," Kolon II, 748 F.3d at 174; and "absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization," Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489 (5th Cir. 1984). The Supreme Court has held, however, that a market share of "87% . . . leaves no doubt that the . . . defendant[] ha[d] monopoly power." Grinnell, 384 U.S. at 571.

Courts are more willing to infer monopoly power from high market share when there are "high barriers to entry." Kolon II, 748 F.3d at 174; see Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 762 F.3d 1114, 1123–26 (10th Cir. 2014). This is because the true measure of monopoly power lies not in a firm's high market share, but in its ability to maintain that share. United States v. Syufy Enters., 903 F.2d 659, 665–66 (9th Cir. 1990); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 591 n.15 (1986). In assessing barriers to entry that enhance "durability of the defendant's market power," Kolon, 637 F.3d at 451, courts have considered "factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market." Broadcom, 501 F.3d at 307. In the digital services context, the network effects begot by scale and the previous failed entry of a well-resourced rival have been cited as additional indicators of high barriers to entry. See, e.g., Microsoft, 253 F.3d at 55–56; Klein v. Facebook, Inc., 580 F. Supp. 3d 743, 780–81 (N.D. Cal. 2022); In re Google Play Store, 2024 WL 4438249, at *6; Google Search, 2024 WL 3647498, at *78, *111–13.

1. Publisher Ad Server

Plaintiffs have proven that Google possesses monopoly power in the publisher ad server for open-web display advertising market. Google's publisher ad server DFP has a durable and "predominant share of the market" that is protected by high barriers both to entry and expansion. Grinnell, 384 U.S. at 571. This conclusion is reinforced by evidence that Google has acted to degrade DFP's features without fear that its customers would switch to alternative publisher ad servers.

Dr. Lee's market calculations showed that in 2022, Google had a 91% market share of the worldwide publisher ad server market for open-web display advertising as measured by the number of impressions served. PTX1278; PTX1278A; see also PTX1236; PTX1236A. From 2018 through 2022, Google's share of this worldwide market held steady between 91.0% and 93.5%, and its U.S. market share stayed between 86.5% and 92.3%. PTX1278; PTX1278A. Dr. Lee's analysis is relatively consistent with Google's internal estimates, which assessed DFP to have between 84% and 90% market share at different points over the past decade. See PTX254 at -238 ("[W]e are the defacto, [sic] preferred ad server of choice for 90% of publishers."); PTX604 at -314; PTX767 at -775; PTX946 at -807. Industry participants perceive DFP to be the "dominant" publisher ad server, Tr. Sept. 9 PM 150:4–11 (Avery (Kevel)); Tr. Sept. 19 PM 39:18–20 (Shaughnessy (Kargo)), with some even referring to Google as having a monopoly in the publisher ad server market. PTX758 at -946; PTX1709 at -933–34. Within Google, a DFP engineering manager speculated that "losing some market share" would have the "positive" effect of "demonstrating to regulators that viable alternatives exist / we're not a monopoly." PTX949 at -481.

The significant barriers to entry and expansion that exist in the publisher ad server market make DFP's high market share durable. As multiple witnesses testified, including those from Gannett, Index Exchange, The Daily Mail, and The New York Times, building a publisher ad server is a complex, resource-intensive process, even for a large corporation. See Section VI(A)(1)(a), supra (citing witnesses); see also PTX581 at -977, -983; PTX1572 at -699–700; Tr. Sept. 19 PM 68:25–70:1 (Lee (Pls. Expert)); Tr. Sept. 20 PM 23:18–25:4 (Lee (Pls. Expert)). Perhaps more importantly, it is very challenging to gain publisher ad server customers. Publishers almost always use a single ad server for open-web display ads because operating two or more publisher ad servers would not be practical due to challenges with forecasting, integration, and latency (i.e., the delay in an ad being displayed to a user, which is increased by data having to be sent between multiple publisher ad servers). See PTX949 at -481–82; Tr. Sept. 10 AM 14:8–11, 15:16–17:24 (Layser (News Corp)); Tr. Sept. 17 PM 133:2–10 (Helfand (Disney)); Tr. Sept. 18 AM 138:20–139:23 (Wheatland (Daily Mail)); Tr. Sept. 20 PM 151:7–152:22 (John (Microsoft)). To gain market share from DFP, a rival would have to convince publishers to stop using DFP and switch to the rival's publisher ad server. This, however, is very difficult to do. As the evidence showed, publisher ad servers are "sticky" products that take "a lot of work" to change. Dep. 216:1–13, 305:14–20 (Lipkovitz (Google)); see also PTX114 at -049. In the words of a former Google and DoubleClick executive, switching publisher ad servers "[t]akes an act of God to do" and is a "nightmare" because "[n]othing has such high switching costs." PTX1814 at -745. A publishing executive described his experience switching ad servers as a year-long process that was "akin to . . . changing the tires on the race car mid race." Tr. Sept. 9 AM 70:20–71:25 (Wolfe (Gannett)). These assessments are consistent with general industry sentiment. See, e.g., DTX404 at -134; PTX114 at -049; PTX1572 at -694; Tr. Sept. 10

AM 27:11–28:20, 108:2–20 (Layser (News Corp)); Tr. Sept. 13 AM 89:3–22 (LaSala (Google)); Tr. Sept. 16 AM 13:2–14 (Mohan (Google)).

The large difficulties that publishers face in switching ad servers are exacerbated by the lack of meaningful alternatives to DFP. See Tr. Sept. 9 AM 70:20–23 (Wolfe (Gannett)); Dep. 305:14–20 (Lipkovitz (Google)). It is no wonder, then, that open-web publishers very rarely switch from DFP to another ad server, even when Google makes product changes with which they disagree. See PTX882 at -717; PTX1854 at 25:1–11, 36:5–37:20, 44:1–14, 52:11–16; Tr. Sept. 9 PM 122:19–123:12; 135:19–136:2 (Avery (Kevel)); Tr. Sept. 10 AM 51:24–55:3, 109:23–110:16 (Layser (News Corp)); Tr. Sept. 17 PM 46:25–50:3 (Cadogan (OpenX)); Tr. Sept. 19 PM 66:7–70:1 (Lee (Pls. Expert)). Recognizing this dynamic, many once-large rival ad servers have either left the ad serving business entirely (e.g., OpenX), or sought to compete in channels other than open-web display advertising (e.g., Kevel). See PTX758 at -945; Tr. Sept. 9 PM 120:21–122:18, 126:5–128:22 (Avery (Kevel)) (describing Kevel's pivot to native ads and sponsored listings due to its inability to compete with DFP in open-web display); Tr. Sept. 17 PM 46:4–48:16, 51:18–52:20 (Cadogan (OpenX)). Even Meta shut down its project to build a publisher ad server due to the significant barriers to gaining scale in a market dominated by Google. See PTX1709 at -934; Tr. Sept. 13 PM 100:20–24, 128:21–129:21 (Boland (Meta)).

Google has acted in accordance with its dominant market position and these high barriers to entry and expansion. For example, Google degraded some DFP features, such as by removing publishers' ability to set a higher price floor on AdX as part of its Unified Pricing Rules update, despite negative publisher feedback. See PTX1854 at 25:1–11, 36:5–37:20, 44:1–14, 52:11–16; Tr. Sept. 10 AM 51:24–55:3, 109:23–110:16 (Layser (News Corp)); Tr. Sept. 19 PM 66:7–20 (Lee (Pls. Expert)). In estimating the impact of this change, Google was not concerned about

whether publishers would switch away from DFP, and publishers did not switch despite other publisher ad servers allowing variable price floors. See PTX1035 at -360; Tr. Sept. 9 PM 135:19–136:9 (Avery (Kevel)); Tr. Sept. 10 AM 52:23–53:7 (Layser (News Corp)). Moreover, although Google has not exercised its monopoly power to raise DFP's prices, the company has internally estimated that the "market w[ould] bear" a price increase and projected that a 10% to 20% increase in DFP fees "could have a substantial positive impact on . . . overall profitability." PTX712 at -648.

Google contests that Unified Pricing Rules and other actions that allegedly degraded DFP's product quality constitute direct evidence of monopoly power, arguing that Dr. Lee did not show what DFP's quality would have been in a but-for competitive world and therefore failed to provide a way to measure whether Google's alleged degradations rendered DFP's quality below a competitive level. See Tr. Sept. 20 AM 146:4–23 (Lee (Pls. Expert)); Tr. Sept. 26 AM 117:15–118:1 (Israel (Def. Expert)). The Court agrees that examples of customer-disfavored product changes, without evidence that overall product quality decreased, are insufficient direct evidence of monopoly power. But the lack of airtight direct evidence is immaterial here. DFP's 91% share of the worldwide market "leaves no doubt" as to Google's monopoly power, particularly when viewed in light of the high barriers to entry and expansion in the publisher ad server market. Grinnell, 384 U.S. at 571. Plaintiffs' evidence that Google exercised this market power to harm its publisher customers, while not definitive in isolation, only reinforces this conclusion.

2. Ad Exchange

Plaintiffs have proven that Google possesses monopoly power in the ad exchange for open-web display advertising market. Google's AdX has long been the dominant exchange for facilitating open-web display advertising. For over a decade, Google has charged durable

supracompetitive prices for AdX—taking 20% of each open-web display transaction—and has exhibited an unwillingness to lower AdX's take rate even as the market matured and other ad exchanges reduced their prices. Despite the availability of lower priced exchanges, customers generally have not left AdX due to Google's substantial market power in the ad exchange market. That market power has been fortified by high barriers to entry that resulted from Google's scale and network effects across the open-web display ecosystem. Accordingly, Google has maintained a high share of the open-web display ad exchange market, with AdX having a market share roughly nine times greater than that of its next-largest competitor.

AdX's charging a durable 20% take rate for well over a decade is direct evidence that Google has possessed monopoly power in the open-web display ad exchange market. See PTX1199; Tr. Sept. 13 AM 42:16–21, 43:15–17 (LaSala (Google)); Tr. Sept. 19 PM 81:20–82:9 (Lee (Pls. Expert)). Google employees recognized that AdX's 20% take rate was higher than that of rival ad exchanges like IndexExchange, Magnite, and Xandr, which often charged closer to 10%. See PTX188 at -013; PTX686 at -044; PTX712 at -646; PTX719 at -004–05; Tr. Sept. 18 AM 220:7–221:3 (Pappu (Google)); Dep. 165:21–167:5 (O'Kelley (Xandr)). But Google has profitably maintained AdX's 20% take rate, even when other exchanges further decreased their take rates. See PTX1199; Tr. Sept. 18 AM 134:3–12 (Wheatland (Daily Mail)) (explaining that AdX's "20 percent" take rate was "around double" the take rate that The Daily Mail paid to other exchanges); Tr. Sept. 18 AM 220:7–221:3 (Pappu (Google)). At the same time, Google has refused to negotiate AdX's take rate with almost all of its customers, only offering minimal discounts to a handful of very large publishers. PTX549 at -079, -086 (showing that only six of AdX's 3,815 largest publisher customers received discounts); Tr. Sept. 10 AM 150:8–23, 152:7–19 (Friedman (Goodway Group)) (testifying that Google refused to negotiate take rates, unlike

rival exchanges); Tr. Sept. 13 AM 42:25–43:17, 67:11–13 (LaSala (Google)); Tr. Sept. 27 AM 6:24–7:25 (Pauley (Vox)).

Google employees have recognized the durability of AdX's pricing by describing how the exchange's market power left both publishers and advertisers with very little choice but to keep using it. See PTX188 at -979, -013–17; Tr. Sept. 19 PM 82:15–84:25 (Lee (Pls. Expert)). For example, in 2014, an internal Google study projected that a 25% decrease in AdX's take rate would have limited impact on its customer retention. See PTX188 at -979, -013–17; see also Tr. Sept. 19 PM 82:15–84:25 (Lee (Pls. Expert)). A few years later, after a non-Google industry consortium embraced header bidding to mitigate Google's dominance across the ad tech stack, Google considered reducing AdX's 20% take rate. See PTX421 at -227; PTX423 at -043–44; Dep. 258:16–21 (Lipkovitz (Google)). But an internal study showed that reducing the take rate "d[id]n't win many queries compared to the profit lost," and the sales team "d[id] not think" such a reduction would "help them win deals." PTX417 at -758; see also PTX421 at -227; PTX423 at -043–44. This study proved prescient. Google has never reduced its overall 20% take rate and has continued to deny discount requests, yet AdX's customers have not left and AdX has not lost market share. See PTX639; PTX1258; Tr. Sept. 13 AM 49:15–20 (LaSala (Google)). As further evidence of Google's power in the ad exchange market, a competing ad exchange conducted experiments over the years to reduce its take rate, including at one point setting its take rate to zero, but found only a "nominal, at best, effect on win rate." Tr. Sept. 9 AM 138:8–139:17 (Casale (Index Exchange)). Competitors' "inability to constrain [AdX's] pricing" constitutes direct evidence of Google's monopoly power in the ad exchange market. McWane, Inc. v. FTC, 783 F.3d 814, 832 (11th Cir. 2015).

Broader industry dynamics also support the conclusion that Google's maintenance of AdX's 20% take rate required monopoly power. As programmatic advertising emerged in the late 2000s through mid-2010s, firms in the space could command a substantial premium for their innovative products due to the significant advantages programmatic advertising offered over direct deals and the complex technology infrastructure required to run billions of real-time auctions each day. See Section IV(A–B), supra. But by 2017, a Google product director observed that ad exchange "margins [we]re coming down, way down, because the technology, demand and supply that [ad exchanges] offer ha[d] been commoditized to a large extent." PTX562 at -259–61. Google employees repeatedly questioned the viability of AdX's take rate, often stating that the product was no longer worth 20%. See, e.g., PTX612 at -035 (Google publisher-side executive stating "I don't think there is 20% of value in comparing two bids" and questioning whether AdX should "continu[e] to extract irrationally high rent"); see also PTX198 at -703; PTX562 at -259–60; PTX639 at -965; Tr. Sept. 18 AM 220:13–221:3, 228:11–229:12 (Pappu (Google)). Nevertheless, Google has maintained AdX's 20% take rate for over a decade and has kept a relatively steady share of the ad exchange market. See PTX1199A; PTX1199B; PTX1258; Tr. Sept. 13 AM 42:16–21, 43:15–17 (LaSala (Google)). Google's ability to maintain AdX's 20% take rate under these market conditions is further direct evidence of the firm's sustained and substantial power in the open-web display ad exchange market. Tr. Sept. 19 PM 81:20–82:14 (Lee (Pls. Expert)).

Google and its market expert Dr. Israel contest this conclusion. They maintain that Google's long-standing 20% take rate originated well before the firm had any alleged monopoly power, and that Google's decision not to raise prices is indicative of a lack of monopoly power. They also criticize Dr. Lee for not defining what prices would have been in a competitive

market, and for not factoring in the quality of AdX versus the quality of other exchanges when comparing their respective prices.

None of Google's arguments undermines the Court's conclusion that AdX's durable 20% take rate constitutes direct evidence of monopoly power. The steadiness with which Google has charged a 20% fee in a rapidly maturing market involving transactions with minimal variable costs, the repeated recognition by Google employees that the services AdX provided were no longer worth 20% of publisher revenue, and the strong evidence that customers were unable to switch from AdX even when other ad exchanges lowered their prices all support the finding that AdX charged supracompetitive prices. See Tr. Sept. 19 PM 81:20–84:25 (Lee (Pls. Expert)). As other courts have found, prices that remain consistent or fall over time may still indicate monopoly power, so long as those prices are supracompetitive. See Allen-Myland, Inc. v. Int'l Bus. Machs. Corp., 33 F.3d 194, 211 (3d Cir. 1994); Red Lion Med. Safety, Inc. v. Ohmeda, Inc., 63 F. Supp. 2d 1218, 1229 (E.D. Cal. 1999).

Another direct sign of monopoly power is that Google has used its market power in adjacent segments of the ad tech ecosystem to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges. See Tr. Sept. 18 AM 121:10–122:12 (Abrantes-Metz (Pls. Expert)). On the buy-side, Google's policies made AdX the only ad exchange that had "exclusive access to [AdWords]," PTX290 at -983, which publishers highly valued as "a large and unique demand source." Tr. Sept. 16 PM 128:21–129:5 (Abrantes-Metz (Pls. Expert)). Google has largely limited AdWords' exchange bidding to AdX despite internal recognition that allowing AdWords to bid on other exchanges would be valuable for AdWords' advertiser customers. See PTX198 at -703; Tr. Sept. 18 AM 13:5–14:1 (Spencer (Google)). By so limiting AdWords, Google has ensured that publishers would view AdX as a "must call"

exchange. Dep. 220:12–16, 222:4–17, 226:24–227:4 (Lipkovitz (Google)); see also Tr. Sept. 9 AM 76:9–77:7, 104:9–23 (Wolfe (Gannett)); Tr. Sept. 10 AM 62:12–18 (Layser (News Corp)); Tr. Sept. 12 AM 43:7–12 (Srinivasan (Google)). The unique advertising demand from AdWords has helped Google maintain the power to keep charging AdX publishers a 20% take rate. See PTX639 (Google sell-side executive stating that "[i]f [AdWords] bought liberally through all 3PEs [i.e., third-party exchanges], I think the 20% would crater.").

On the sell-side, Google's power in the two-sided ad exchange market and its power in the publisher ad server market have been mutually reinforcing. See PTX551 at -048. For example, Google limited AdX to send real-time bids only to DFP, thereby forgoing a desirable AdX feature for non-DFP publishers to entrench the firm's monopoly power in the publisher ad server market. See PTX128 at -045–47; PTX1031 at -500. Google did so despite requests by customers of other publisher ad servers to access AdX's real-time bids. See, e.g., Tr. Sept. 9 PM 139:13–140:24 (Avery (Kevel)). This was one of the reasons why publishers felt they had to use DFP to obtain effective access to AdX and, consequently, to AdWords' unique demand. See Section VI(B)(1), supra; see also Tr. Sept. 9 AM 104:9–23 (Wolfe (Gannett)); Tr. Sept. 10 AM 12:19–13:2 (Layser (News Corp)). Once DFP had obtained near-total market share, Google combined DFP and AdX under a single publisher-facing product, Google Ad Manager, which further intertwined DFP and AdX. See PTX1031 at -500 ("Google Ad Manager is the only way to access [AdX] as a publisher."). These practices on both the advertiser buy-side and publisher sell-side are evidence that Google could set its terms of dealing with its customers "without considering rivals[,]" and constituted behavior that is "difficult to explain unless" Google had monopoly power. Microsoft, 253 F.3d at 57–58.

AdX's relatively high and durable market share is consistent with the Court's conclusion that Google has monopoly power in the open-web display ad exchange market. Dr. Lee found that, from 2018 to 2022, AdX was the exchange for 63% to 71% of the worldwide open-web display transactions among the ad exchanges that produced data for this litigation, and he estimated that AdX handled between 54% and 65% of the market's total transactions. See PTX1258; Tr. Sept. 19 PM 90:14–92:19 (Lee (Pls. Expert) (discussing PTX1258)). AdX's market share has remained durable over time. See PTX1258; PTX1314; Tr. Sept. 16 PM 12:5–24 (Weintraub (Pls. Expert)). Moreover, AdX's share of the worldwide ad exchange market was roughly nine times larger than the share held by Google's next-largest competitor, which had only 6% of the market. See PTX1237; PTX1237A; PTX1238; PTX1238A; Tr. Sept. 13 PM 72:9–18 (Creput (Equativ)); Tr. Sept. 19 PM 94:3–94:22 (Lee (Pls. Expert)); see also United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) (stating "the size and strength of competing firms" is a key consideration in evaluating monopoly power). It is no surprise, then, that numerous industry participants testified that AdX had the dominant position in the ad exchange market. See, e.g., Tr. Sept. 9 AM 135:8–12 (Casale (Index Exchange)); Tr. Sept. 10 AM 156:18–157:4 (Friedman (Goodway Group)); Tr. Sept. 13 AM 20:3–16 (Kershaw (Magnite)); Tr. Sept. 13 PM 72:9–18 (Creput (Equativ)); Tr. Sept. 17 PM 87:17–21 (Cadogan (OpenX)); Tr. Sept. 27 AM 7:8–25 (Pauley (Vox)).

Google argues that AdX's market share is insufficiently high to establish monopoly power, particularly given that its market share is lower when calculated by its percentage of total fees received instead of by its percentage of transactions processed, or when based on U.S.-only instead of worldwide data. See PTX1258, PTX1259. This argument fails because, as previously explained, worldwide, not U.S., market share is the appropriate geographic market for measuring

the area of competition. See Section VI(A)(2), supra. Moreover, transactions processed (i.e., the number of impressions sold on the exchange), not fees received, are the best measure of market share and power because they "speak to scale advantages" from data and indirect network effects "that different exchanges have." Tr. Sept. 19 PM 91:3–19 (Lee (Pls. Expert)); see also Amex, 585 U.S. at 537 (using transaction volume to assess market share).

The Court recognizes that Google's relatively high market share alone is not dispositive of whether the firm has monopoly power in the ad exchange market. Indeed, in different circumstances, a market share between 50% and 70% would not necessarily suggest that a firm had monopoly power. See Kolon II, 748 F.3d at 174. But here, the direct evidence of AdX charging durable and supracompetitive prices, in combination with its maintaining a market share nine times that of its next closest rival, provides strong support for the conclusion that Google has possessed and still possesses monopoly power in the open-web display ad exchange market.

This conclusion is buttressed by the evidence of AdX's high barriers to entry and expansion. Scale and network effects are crucial for ad exchanges because these exchanges exist to create matches between publisher inventory and advertiser demand. See Tr. Sept. 9 AM 143:19–145:13 (Casale (Index Exchange)); Tr. Sept. 16 PM 8:25–19:9 (Weintraub (Pls. Expert)); Tr. Sept. 19 PM 75:3–76:8 (Lee (Pls. Expert)). Ad exchanges benefit not only from having large groups of customers on both sides of the platform, but also from processing a high number of transactions. See Tr. Sept. 9 AM 135:17–137:21, 145:14–147:17, 160:24–161:4 (Casale (Index Exchange)); Tr. Sept. 16 PM 8:25–19:9 (Weintraub (Pls. Expert)). Such economies of scale help mitigate the significant capital expenditures required to build an ad exchange. See Tr. Sept. 17 PM 55:25–56:8 (Cadogan (OpenX)); Tr. Sept. 16 PM 17:15–18:21 (Weintraub (Pls. Expert)).

Case 3:26-cv-00280 Document 1-2 Filed 01/24/26 Page 34 of 115

Large groups of customers also provide exchanges with auction and targeting data that can be used to run rapid experiments on the effects of price and quality changes, to train machine learning algorithms, and to improve publisher-advertiser matching. See Tr. Sept. 9 AM 135:19–139:17, 145:14–147:17 (Casale (Index Exchange)); Tr. Sept. 13 PM 74:13–75:6 (Creput (Equativ)); Tr. Sept. 16 PM 13:2–16:16 (Weintraub (Pls. Expert)); Tr. Sept. 23 PM 136:7–137:2 PM (John (Microsoft)) (stating scale is necessary for match quality). In sum, the high barriers to entry and expansion that protect AdX's dominant position in the open-web display ad exchange market are further evidence of its monopoly power.

The Court therefore agrees with Dr. Lee that "the totality of evidence is consistent with substantial and sustained market power on the part of AdX." Tr. Sept. 20 AM 111:20–22 (Lee (Pls. Expert)). Direct pricing evidence shows that Google "could profitably price significantly above competitive levels because enough customers would keep buying those products and not go elsewhere." Tr. Sept. 19 PM 50:2–6 (Lee (Pls. Expert)). Trial evidence also shows that Google placed limitations on AdX and adjacent products' functionality in ways that indicated it had substantial market power. Moreover, AdX's relatively high market share, viewed in conjunction with the high barriers to entry and expansion that exist for ad exchanges, supports the conclusion that Google has had and continues to maintain monopoly power.

Having found that Google has monopoly power in two relevant markets within the open-web display advertising ecosystem, the worldwide market for publisher ad servers and the worldwide market for ad exchanges, the next issue is whether Google willfully acquired and maintained this monopoly power.

### C. Willful Acquisition or Maintenance of Monopoly Power

For Google to be found liable under Section 2 of the Sherman Act, Plaintiffs must prove that the company engaged in "the willful acquisition or maintenance of [monopoly] power." Kodak, 504 U.S. at 481 (quoting Grinnell, 384 U.S. at 570–71). Plaintiffs cannot prevail if Google acquired its monopoly power through "conduct [that] is procompetitive and thus increases consumer welfare," such as by having developed "a superior product" or grown due to "business acumen," Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, 111 F.4th 337, 353 (4th Cir. 2024), or if Google's monopoly power has resulted from other "valid business reasons," Kodak, 504 U.S. at 483, or "historic[al] accident." Duke Energy, 111 F.4th at 353 (quoting Grinnell, 384 U.S. at 571). Rather, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (emphasis in original).

In determining whether a company's conduct is anticompetitive, courts consider the conduct's effect on competitors, its "impact on consumers," and "whether it has impaired competition in an unnecessarily restrictive way." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 & n.1 (1985). "Some 'common forms' of anticompetitive conduct are tying, exclusive dealing, predatory pricing, and defrauding regulators or consumers." Chase Mfg., Inc. v. Johns Manville Corp., 84 F.4th 1157, 1170 (10th Cir. 2023) (quoting Novell, Inc. v. Microsoft Corp., 731 F.3d 1604, 1072 (10th Cir. 2013)). A monopolist may offer procompetitive justifications for seemingly anticompetitive conduct, but may still be liable under Section 2 of the Sherman Act if the plaintiff can "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Microsoft, 253 F.3d at 59.

Anticompetitive conduct "comes in many different forms that cannot always be categorized." Duke Energy, 111 F.4th at 354; see also Novell, 731 F.3d at 1072; In re EpiPen Mktg., Sales Pracs. & Antitrust Litig., 44 F.4th 959, 982 (10th Cir. 2022). For some forms of anticompetitive conduct, such as "predatory pricing, refusing to deal, price fixing, or dividing markets," courts have "developed tests for analyzing such claims." Duke Energy, 111 F.4th at 354. But "when a court is faced with allegations of a complex or atypical exclusionary campaign," the "alleged anticompetitive conduct must be considered as a whole" instead of "in manufactured subcategories." Id. 354–55; see also Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). A holistic assessment of whether a monopolist's conduct "harm[ed] the competitive *process* and thereby harm[ed] consumers" is thus the touchstone for determining whether a monopolist alleged to have engaged in an exclusionary campaign violated Section 2 of the Sherman Act. Duke Energy, 111 F.4th at 355 (quoting Microsoft, 253 F.3d at 58) (emphasis in original); see also NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998); Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 453 (7th Cir. 2020).

Plaintiffs allege that Google engaged in a series of anticompetitive acts to acquire and maintain its monopoly power. These acts generally fall into three categories: (1) establishing a dominant position across the ad tech stack through the acquisitions of DoubleClick and Admeld; (2) tying DFP to AdX to lock publishers into exclusively using Google's sell-side ad tech tools rather than those offered by competitors; and (3) leveraging its tied ad tech tools to engage in a series of acts that diminished rivals' scale, thwarted their ability to compete, and harmed customers. The Court takes each in turn, while recognizing that the ultimate conclusion of

Case 3:26-mc-80024-… Document 1-2 Filed 01/21/26 Page 87 of 115

whether Google violated Section 2 turns on whether the company's conduct, when considered as a whole, harmed competition and therefore harmed consumers. See Duke Energy, 111 F.4th at 354–55; Microsoft, 253 F.3d at 58.

1. Acquisitions of DoubleClick and Admeld

The Court finds that Plaintiffs have failed to show that the DoubleClick and Admeld acquisitions were anticompetitive. Although these acquisitions helped Google gain monopoly power in two adjacent ad tech markets, they are insufficient, when viewed in isolation, to prove that Google acquired or maintained this monopoly power through exclusionary practices.

The 2008 acquisition of DoubleClick gave Google the largest publisher ad server, DFP, and provided the company with a nascent ad exchange for matching DFP publishers with AdWords advertisers. See PTX14 at -246; PTX15 at 7; PTX41 at -006; Dep. 69:15–70:9, 72:13–74:15 (O'Kelley (Xandr)). Google knew that acquiring DFP and connecting it to AdWords using an ad exchange would increase Google's scale, network effects, and power across the ad tech ecosystem. See PTX14 at -278; PTX41 at -006; PTX51 at -726; PTX551 at -048; Tr. Sept. 13 AM 7:21–8:4 (Kershaw (Magnite)). According to Plaintiffs, Google paid $1 billion more than its corporate strategy team's valuation of DoubleClick to secure sell-side infrastructure and to prevent another large technology company from standing between Google's buy-side business and publishers. Compare PTX15 at 11 (Google's estimation that acquiring DoubleClick would provide the company with $1.5 billion to $2.2 billion in net present value) with PTX1507 at -414 (stating Google paid $3.1 billion for DoubleClick); See also PTX41 at -005 (discussing how DoubleClick acquisition mitigated risk that Google's buy-side business would be "disintermediated" by a non-Google publisher ad server).

Case 3:26-cv-10802-JFA Document 1-2 Filed 08/24/26 Page 83 of 115 PUBLIC

Even assuming Plaintiffs are correct in their assessment of Google's strategy, they have not shown that the acquisition of DoubleClick was anticompetitive. Plaintiffs do not assert that Google had monopoly power in any of the relevant markets when it acquired DoubleClick. Indeed, the DoubleClick acquisition occurred at a time when Magnite (then known as Rubicon), Microsoft, OpenX, and Yahoo were vigorous participants in open-web display advertising markets. See PTX22 at 14. The acquisition was reviewed and cleared by the Federal Trade Commission by a four to one vote after a determination that "Google's proposed acquisition of DoubleClick is unlikely to substantially lessen competition."[27]

Nor did the 2011 acquisition of Admeld constitute anticompetitive conduct. Plaintiffs argue that the Admeld acquisition was problematic because Google intentionally acquired a "key competitor[]," PTX88 at -597, and then terminated its core yield management functionality, thereby ending a competitive threat to Google's sell-side businesses. See Section V(B), supra. According to Plaintiffs' expert Dr. Abrantes-Metz, the Admeld acquisition reduced competition in both the ad exchange and publisher ad server markets for open-web display advertising. Tr. Sept. 18 AM 46:4–48:22 (Abrantes-Metz (Pls. Expert)).

It is true that Admeld, along with Magnite and PubMatic, was one of the three leading yield managers in 2011, and that Google had identified Admeld as being its "largest concern," PTX88 at -597, because it had a "stronger product offering" and "better publisher base" than its

[27] Fed. Trade Comm'n Closes Google/DoubleClick Investigation, FTC (Dec. 20, 2007), https://www.ftc.gov/news-events/news/press-releases/2007/12/federal-trade-commission-closes-googledoubleclick-investigation. This conclusion can be challenged with the benefit of hindsight, as it has been by one of the FTC commissioners who initially reached it. See Steve Lohr, This Deal Helped Turn Google Into an Ad Powerhouse. Is That a Problem?, N.Y. Times (Sept. 21, 2020), https://www.nytimes.com/2020/09/21/technology/google-doubleclick-antitrust-ads.html. But it would be a substantial step to find that an acquisition violated the Sherman Act after it was reviewed and approved by federal antitrust regulators.

competitors. PTX112 at -981; see also PTX85 at -717. As a leading yield manager, Admeld threatened to undermine Google's strategy to "own the tag," i.e., to control which advertising demand sources would be used to "monetize [indirect] inventory for a publisher." PTX56 at -788. But evidence shows that Google did not merely buy Admeld to sideline it; rather, Google sought to fill a gap in its portfolio and drew upon Admeld's engineers and technology to rebuild some of Admeld's capabilities within AdX and other aspects of Google's ad tech architecture. See DTX126 at -572–75; PTX60 at -489; PTX112 at -979; Tr. Sept. 16 AM 108:23–109:17, 112:14–113:24 (Mohan (Google)). In doing so, Google at least partially improved the effectiveness of AdX, which before the Admeld acquisition "was struggling to win business" due to being "very expensive," "inflexible," and "[not] great at optimizing for yield." Dep. 86:20–87:23 (O'Kelley (Xandr)). The Admeld acquisition also provided Google with "the skill set and the knowledge [it] needed to make the AdX value proposition more compelling." Id. Acquiring technology and talent to offer customers a more flexible, affordable, and effective product is not anticompetitive when motivated by "valid business reasons." Kodak, 504 U.S. at 483. That may be one reason why the Antitrust Division of the U.S. Department of Justice chose not to pursue legal action against Google for its Admeld acquisition after conducting an investigation that "obtained extensive information from Google, Admeld and a wide range of market participants."[28]

[28] See Statement of the Dep't of Justice's Antitrust Div. on Its Decision to Close Its Investigation of Google Inc.'s Acquisition of Admeld Inc., U.S. Dep't of Justice (Dec. 2, 2011), https://www.justice.gov/opa/pr/statement-department-justices-antitrust-division-its-decision-close-its-investigation-google. In a pre-trial order, the Court prohibited Google from introducing "evidence or argument about antitrust enforcers' review, comments, and decisions not to challenge Google's acquisitions" of DoubleClick and Admeld so that the parties would focus their arguments at trial on the merits of these acquisitions, [Dkt. 1303] at 1; however, the Court has taken judicial notice of the fact that the acquisitions were approved by antitrust regulators. See United States v. Garcia, 855 F.3d 615, 621 (4th Cir. 2017) (stating that courts "routinely take

Because Plaintiffs have not shown that Google's acquisitions of DoubleClick and Admeld constituted anticompetitive conduct, the Court next examines Plaintiffs' claim that Google tied DFP to AdX, and then used its power in the products' two adjacent markets to harm competition at consumers' expense.

2. Tying DFP to AdX

"[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another." N. Pac. Ry. Co., 356 U.S. at 11. Accordingly, "the essential characteristic" of unlawful tying is "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984); see also It's My Party, 811 F.3d at 684. "Tying suppresses competition in two ways: First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement." It's My Party, 811 F.3d at 684 (internal quotation omitted).

Tying is per se unlawful under Section 1 of the Sherman Act, which prohibits unreasonable restraints on trade. Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 683 (4th Cir. 1992). To prove a tying claim, a plaintiff must establish four elements: "(1) the existence of two separate products, (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party), (3) the seller's possession of sufficient economic power in the tying product

judicial notice of information contained on state and federal government websites"). That such approval was given when the acquisitions occurred does not prohibit a finding that the use of these acquisitions over time has resulted in violations of the Sherman Act.

market to restrain competition in the tied product market, and (4) a not insubstantial impact on interstate commerce." Id. (citing Hyde, 466 U.S. at 12–16). Although tying under Section 1 "do[es] not require that the defendant have a monopoly" in "the market for a tying product," U.S. Steel Corp. v. Fortner Enter., Inc., 429 U.S. 610, 620 (1977), tying by a monopolist can satisfy the anticompetitive conduct element under Section 2 of the Sherman Act. See Viamedia, 951 F.3d at 468–69 (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 777, at 325 (4th ed. 2015)); Microsoft, 253 F.3d at 84–85 (considering tying allegations under both Section 1 and Section 2); Md. & Va. Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 463 & n.8 (1960) (stating that Sections 1 and 2 "closely overlap, and the same kind of predatory practices may show violations of all"). When a defendant facing a tying claim is a monopolist, courts consider whether the tie "contribute[d] significantly to the maintenance or creation of monopoly power . . . even though it [wa]s unilaterally imposed." Viamedia, 951 F.3d at 469.

Here, Plaintiffs allege that Google tied DFP, its publisher ad server, to AdX, its ad exchange. Specifically, Plaintiffs cite to Google's technical and policy restrictions that prohibited publishers from receiving real-time bids from AdX (the tying product) unless they also used DFP (the tied product). These restrictions, according to Plaintiffs, compelled publishers to use DFP, not because they viewed it as a superior product, but rather due to Google's exploitation of its control over AdX's preeminent position in the open-web display ad exchange market. Partly as a result, Plaintiffs claim that DFP became, and has remained, the dominant publisher ad server for open-web display advertising.

Plaintiffs have proven the four elements of their tying claim. First, publisher ad servers and ad exchanges are "two separate products" that are not reasonably interchangeable. Serv. &

Case 3:20-cv-08123-JD Document 1-2 Filed 08/26/24 Page 329 of 534 PageID# 103772

Training, 963 F.2d at 683; see Section VI(A)(1–2), supra. Publisher ad servers and ad exchanges serve different functions, use different pricing structures, and are recognized as different products by industry participants. See Section VI(A)(1–2), supra. Moreover, there is "sufficient demand for the purchase of [publisher ad servers] separate from [ad exchanges]" such that there is a "distinct product market" for publisher ad servers. Serv. & Training, 963 F.2d at 684 (quoting Hyde, 466 U.S. at 121–22); see Section VI(A)(1–2), supra (identifying a product market for publisher ad servers and a distinct product market for ad exchanges). Google's rebranding DFP and AdX under a unified name, Google Ad Manager, cannot overcome these "market realities." Alston, 594 U.S. at 93.

Second, the policy and technology restrictions that Google has placed within AdX "condition[ed] purchase of the tying product [AdX] upon purchase of the tied product [DFP]." Serv. & Training, 963 F.2d at 683. The function of an ad exchange is to match publishers with advertisers by facilitating real-time auctions for publishers' inventory. See Section IV(B), supra. An ad exchange does this by aggregating advertisers' bids for each available impression, then submitting the best of those bids to the publisher ad server with the goal of outbidding competing bids from other ad exchanges. See id. Access to real-time bids from AdX is considered particularly valuable by publishers because of the unique advertising demand that AdX receives from the millions of advertisers who exclusively use AdWords. See Sections V(A) & VI(B)(2), supra. By restricting AdX's submission of real-time bids only to DFP, and by not allowing AdX to provide real-time bids to other publisher ad servers, Google made AdX ineffective at its core function when used by publishers who did not also use DFP. See Section IV(B), supra. In practice, therefore, Google's restriction of AdX's real-time bidding to DFP required Google's publisher customers who wanted to use AdX's core feature to use DFP. This coercive policy

made purchasing DFP, the tied product, together with AdX, the tying product, "the only viable economic option" for publishers who wanted to gain effective real-time access to AdWords, which they could only accomplish by using AdX. Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc., 670 F. Supp. 1313, 1324 (D. Md. 1986); see also Tire Sales Corp. v. Cities Serv. Oil Co., 637 F.2d 467, 473 (7th Cir. 1980); Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1752b (4th ed. 2020) (defining a tie as the improper imposition of "conditions that explicitly *or practically* require buyers to take the second product if they want the first one") (emphasis added).

As discussed previously, overwhelming evidence has established that it is not economically feasible for publishers to use multiple publisher ad servers. See Section VI(B)(1), supra. For all practical purposes, then, Google's tying DFP to AdX communicated to publishers that if they used a rival publisher ad server, they would be shut out of AdX's core functionality. This coercive pressure was akin to a "threat[] to stop selling needed products to its customers if they bought from a new market entrant offering a superior product for less money"—conduct a court found to be anticompetitive in Chase Mfg. 84 F.4th at 1173; see also Lorain Journal Co. v. United States, 342 U.S. 143, 154 (1951) (deeming anticompetitive a local newspaper's refusal to sell advertising space to customers who advertised on a local radio station); Viamedia, 951 F.3d at 471 (finding monopolist's "refusing to deal with [its customers'] chosen intermediary had the [anticompetitive] effect of forcing them into much less desirable relationships" with the monopolist).

Google staff understood the coercive power of the AdX-DFP tie. For example, a Google sell-side manager told his leadership that "AdX can serve as a tool to pull publishers onto [D]FP." PTX114 at -049. Google decided against "giv[ing] AdX to non-[D]FP partners," and

instead worked to "'lock in' impressions by offering [D]FP to publishers with full AdX dynamic allocation" (i.e., real-time bidding), id., so that Google could maintain "a key differentiator for DFP." PTX113 at -804; see also PTX159 at -003 (Google employee stating that he was "more of the mindset of getting folks to flip to DFP" to access real-time AdX bids as opposed to offering such bids on third-party exchanges). Google made this decision despite acquiring Admeld's technology for offering real-time bids to publishers using third-party ad servers, PTX159 at -002–04, which was a capability that Google had beta tested and which some at the company believed would have taken "[m]inimal effort" to implement at scale. PTX113 at -804; see also Tr. Sept. 18 AM 47:3–12 (Abrantes-Metz (Pls. Expert)). By tying DFP to AdX, Google took advantage of its "owning the platform, the exchange, and a huge network" of advertising demand, which a senior Google manager analogized to "Goldman or Citibank own[ing] the NYSE [i.e., the New York Stock Exchange]." PTX367 at -464.

Google's publisher customers similarly understood the coercive power of the AdX-DFP tie. They "felt locked-in by dynamic allocation in DFP, which only gave AdX [and not other exchanges the] ability to compete" with real-time bids. PTX587 at -794. That is why industry participants worked together to create header bidding, a technical workaround that partially diminished the power of the AdX-DFP tie. See id.; PTX1710 at -407; Dep. 111:7–114:2 (O'Kelley (Xandr)); see also Section V(F), supra. But header bidding has failed to erode DFP's dominance because subsequent Google product changes such as Last Look enhanced the power of the AdX-DFP tie. See Sections V(G) and VI(B)(1), supra. Open-web publishers were therefore stuck using DFP, even if they would have preferred to use a different publisher ad server.

Case 3:26-cv-01080-VC Document 1-2 Filed 02/24/26 Page 95 of 115

Google argues that publishers who used AdX were free to use a publisher ad server other than DFP, and those that used DFP did not necessarily have to use AdX. But by prohibiting publishers that used a non-DFP ad server from having access to the essential AdX feature of real-time bidding by AdWords advertisers, Google effectively has "coerce[d] the abdication of [publishers'] independent judgment as to the 'tied' product's merits and insulate[d] it from the competitive stresses of the open market." Hyde, 466 U.S. at 13 (quoting Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 605 (1953)). The unique value of real-time access to AdWords through AdX has essentially forced Google's publisher customers "into the purchase of a tied product that the[y] either did not want at all, or might have preferred to purchase elsewhere on different terms." It's My Party, 811 F.3d at 684 (quoting Hyde, 466 U.S. at 12). The high degree of effort that Google has used to insulate DFP from the competitive stresses of the open market is sufficient to satisfy the second element of the tying test, particularly as the central focus of the overall inquiry is whether Google's actions harmed competition and therefore harmed consumers.

Third, Google has possessed "sufficient economic power in the tying product market to restrain competition in the tied product market." Serv. & Training, 963 F.2d at 683. The Court has found that Google has monopoly power in the open-web display ad exchange market because AdX charges supracompetitive prices, is nine times larger than the next largest ad exchange, and is protected by high barriers to entry and expansion. See Section VI(B)(2), supra. Such proof of monopoly power in the tying product market is more than sufficient to show that Google has had the requisite level of economic power to establish the third element of a tying claim. See U.S. Steel, 429 U.S. at 620; In re Deere & Co. Repair Serv. Antitrust Litig., 703 F. Supp. 3d 862, 909 (N.D. Ill. 2023).

A primary source of Google's monopoly power in the ad exchange market is AdWords' uniquely large and diverse array of advertising demand. See Sections V(A, C) & VI(B)(2), supra. Google has been able to amass this unparalleled group of mostly small and medium-sized advertisers in large part due to the dominance of Search, which another district court has found to be the source of Google's monopoly power in the markets for general search services and general search text ads. See Google Search, 2024 WL 3647498, at *75, *89–91 (D.D.C. Aug. 5, 2024); see also Tr. Sept. 11 PM 153:6–154:20 (Dederick (The Trade Desk)); Tr. Sept. 13 AM 7:21-8:4 (Kershaw (Magnite)); Tr. Sept. 19 PM 99:18–100:2 (Lee (Pls. Expert)). By effectively restricting the unique advertising demand offered by AdWords advertisers to AdX, Google has ensured that publishers would lose significant revenue if they did not use AdX. See Section VI(B)(2), supra; Dep. 108:19–109:3 (Rowley (Google)) (admitting AdWords demand "compel[led] publishers to work with" Google's sell-side products). Google's monopoly power in the open-web display ad exchange market, bolstered by its significant Search-derived power on the buy-side of the digital advertising industry, constitutes "sufficient economic power in the tying product market to restrain competition in the tied product market." Serv. & Training, 963 F.2d at 683.

Fourth and finally, the tying of AdX and DFP has had a "not insubstantial impact on interstate commerce." Serv. & Training, 963 F.2d at 683. "Wholly apart from market characteristics, a prerequisite to application of the Sherman Act is an effect on interstate commerce." Hyde, 466 U.S. at 37 n.5 (O'Connor, J., concurring). Like in Hyde, "[i]t is not disputed that such an impact is present here." Id. AdX and DFP are used by publishers across the United States and worldwide. See Section VI(A)(2), supra. And the AdX-DFP tie, which facilitates the billions of dollars of revenue that AdX generates annually, has a large and

substantial impact on interstate commerce. See PTX1710 at -407. Cf. It's My Party, Inc. v. Live Nation, Inc., 88 F. Supp. 3d at 490 (suggesting $200,000 is a "not insubstantial" amount of interstate commerce). Because they have established these four elements, Plaintiffs have shown that Google has engaged in unlawful tying under Section 1 of the Sherman Act.

Google's tying of DFP to AdX also violates Section 2 of the Sherman Act because it "contribute[d] significantly to the maintenance or creation of monopoly power . . . even though it [wa]s unilaterally imposed." Viamedia, 951 F.3d at 469. As Google employees recognized, the "value of Google's ad tech stack is less in each individual product, [than] in the connections across all of them." PTX551 at -048 (emphasis omitted). To deepen these connections, Google "artificially handicap[ped] [its] buyside ([AdWords]) to boost the attractiveness of [its] sellside (AdX)," PTX110 at -009, by effectively limiting its programmatic open-web advertisers in AdWords to bidding for inventory from publishers that used AdX and DFP. Google did this despite knowing that its advertiser customers would benefit from AdWords' bidding for open-web display ad inventory on non-Google exchanges. See PTX198 at -703. Indeed, the leadership of Google's buy-side team "want[ed AdWords] to buy into all auctions regardless of what the AdX margin is." Id. But Google limited where its advertisers could bid to "[p]rotect [DFP's] position" as the dominant "operating system for publishers globally" and to disincentivize publishers from switching away from DFP. DTX76 at -477; see also Section VI(B)(1), supra.

The limitations on AdWords and AdX expanded Google's dominance in the publisher ad server market, with rival publisher ad servers exiting the market and DFP maintaining more than 90% market share from 2018 through 2022. See Section VI(B)(1), supra; Tr. Sept. 11 PM 153:6–154:11 (Dederick (The Trade Desk)). Even though some industry participants thought Google's

DFP "wasn't the best ad server," almost "every other publisher ad server either went out of business or was sold for scrap" because Google has "destroyed all competition" in the ad server market through its AdX-DFP tie and associated activities. Dep. 74:17–75:21 (O'Kelley (Xandr)); see also PTX758 at -946 (Kevel founder and CEO James Avery stating in a 2019 email that "[a]lmost every [publisher] ad server has gone out of business because of this integration between AdX and [DFP]. [P]ublishers may want to use another ad server but they would end up giving up a chunk of revenue from AdX. It turns out monopolies are pretty effective.").

By forcing Google's publisher customers to use a product they would not necessarily have otherwise used, by making it difficult for rival publisher ad servers to compete on the merits, and by significantly reducing rivals' market share, the tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising. Accordingly, the AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act. See Viamedia, 951 F.3d at 471–75; LePage's Inc. v. 3M, 324 F.3d 141, 154–57, 159–63 (3rd Cir. 2003) (en banc); Microsoft, 253 F.3d at 64–67, 78–80.

### 3. Entrenching Monopoly Power with Anticompetitive Actions

Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests. These changes decreased product quality and harmed competition by further entrenching Google as the dominant company in open-web display advertising. Google made these changes, despite customer complaints, by exploiting its durable monopoly power in the open-web display ad exchange and publisher ad server markets. The changes are further

evidence that Google has engaged in "anticompetitive conduct," Trinko, 540 U.S. at 407, by its "willful acquisition or maintenance of [monopoly] power." Kodak, 504 U.S. at 481.

The first of these anticompetitive policies was First Look, which required publishers using DFP to offer AdX a first right of refusal for each impression. See Section V(D), supra (citing PTX551 at -048). First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers. See id. If Google did not have monopoly power in the ad exchange or publisher ad server markets, then running a fundamentally unfair auction process to preference its own ad exchange over third-party ad exchanges might have been a permissible design choice. But Google's use of its monopoly power to impose artificial technical limitations that made it harder for customers to do business with rivals, instead of competing on the merits by "making [its ad exchange] more attractive to customers," constituted anticompetitive conduct. Microsoft, 253 F.3d at 65. Moreover, Google's "bundling of its [AdX and DFP] products . . . reinforced the exclusionary effect" of First Look. LePage's, 324 F.3d at 162.

Google's Last Look was another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process. This DFP feature, which gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid, harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies. See Section V(G), supra. That is why three experts testified that Last Look was anticompetitive. See Tr. Sept. 11 AM 120:23–121:21 (Ravi) (Pls. Expert)) (testifying Last Look created inefficiencies, reduced publisher revenue, and reduced the amount of impressions non-Google exchanges were able to win); Tr. Sept. 18 AM 39:4–14, 40:2–41:3 (Abrantes-Metz (Pls. Expert)) (testifying Last Look was exclusionary); Tr.

Sept. 20 PM 7:1–8 (Lee (Pls. Expert)) (testifying Last Look involved Google using its market power in the publisher ad server market to diminish the competitiveness of rivals in the ad exchange market).

The anticompetitive effects of Last Look have been compounded by Google's sell-side dynamic revenue share. See Section V(H), supra. By using the Last Look informational advantage to vary AdX fees and win impressions that it would have lost in a fair auction, Google has further enhanced AdX's market power at the expense of rivals, thereby reducing competition and harming its publisher customers' ability to diversify their revenue sources away from Google. See id.[29]

In an environment of increased regulatory and "competition concerns," PTX816 at -161, Google eventually eliminated its Last Look advantage. See Section V(J), supra. But in implementing Unified Pricing Rules, Google simultaneously took away publishers' ability to set higher price floors on AdX than on third-party exchanges, which was a primary tool that publishers had used to maintain revenue diversity and to mitigate Google's dominance of the ad exchange market. See id. Publishers viewed Unified Pricing Rules as not in their best interests, but felt stuck using DFP given its tie to AdX. See PTX1854 at 25:1–11, 36:5–37:20, 44:1–14, 52:11–16; Tr. Sept. 10 AM 51:24–55:3, 109:23–110:16 (Layser (News Corp)). Unified Pricing Rules is another example of Google exploiting its monopoly power and tying arrangement to

[29] Project Poirot also enhanced AdX's market power by adjusting some of DV360's bids in a way that preferenced AdX over third-party ad exchanges. See Section V(I), supra. But Project Poirot occurred within DV360, a Google ad buying tool which is not within any of the relevant antitrust markets, and the evidence suggests that Project Poirot was a reasonable method for protecting Google's advertiser customers from third-party ad exchanges that were running unfair auctions. See Tr. Sept. 11 PM 53:2–54:4 (Ravi (Pls. Expert)); Tr. Sept. 19 AM 137:14–138:5 (Bellack (Google)); Tr. Sept. 24 AM 115:16–25 (Milgrom (Def. Expert)). Therefore, the Court does not consider Project Poirot as part of the anticompetitive conduct through which Google willfully acquired and maintained its monopoly power.

restrict its customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers. Under these circumstances, Unified Pricing Rules constituted anticompetitive conduct because it involved Google using its coercive monopoly power to deprive its publisher customers of a choice that they had previously exercised to promote competition. See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 652–54 (2d Cir. 2015); Lorain Journal, 342 U.S. at 154.

4. Google's Contention that Refusal to Deal Precedent Precludes Liability

One of the primary legal defenses that Google has raised in this litigation is that its actions to build and shape an integrated ad tech infrastructure, including the tying of DFP to AdX and the subsequent use of that tie to preference Google products over rival products, cannot result in antitrust liability under the "refusal to deal" doctrine articulated by the Supreme Court in Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 409 (2004), and reaffirmed in Pacific Bell Telephone Co. v. LinkLine Communications, Inc., 555 U.S. 438, 448 (2009). In Trinko, the Supreme Court held that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" 540 U.S. at 408 (quoting United States v. Colgate & Co., 250 U.S. 300, 307 (1919)) (alteration in original). The Court provided three reasons for this rule. First, firms should be incentivized to "establish[] infrastructure that renders them uniquely suited to serve their customers," even if doing so causes them to gain monopoly power. Id. at 407. Second, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." Id. at 408.

Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." Id.

The Supreme Court also recognized in Trinko that "the right to refuse to deal with other firms" is not "unqualified." Id. (quoting Aspen Skiing, 472 U.S. at 601). It identified Aspen Skiing as "[t]he leading case for § 2 liability based on refusal to cooperate with a rival," id., and described how the evidence in that case supported the conclusion that the defendant forwent the "short-run benefits" of dealing with a rival "because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." Id. at 409 (quoting Aspen Skiing, 472 U.S. at 608). Yet the Trinko decision described Aspen Skiing as being "at or near the outer boundary of § 2 liability," and warned that courts should exercise caution in recognizing exceptions to the general rule that firms have no obligation to deal with rivals. Id. at 408–09. When it decided LinkLine four years later, the Supreme Court stated that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing," although in doing so, the Court reacknowledged the "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability." 555 U.S. at 448 (citing Aspen Skiing, 472 U.S. at 608–11). In a recent Sherman Act Section 2 case, the Fourth Circuit identified an "important distinction" between Trinko and Aspen Skiing: Trinko involved assessing the defendant's conduct in a regulated market, where courts should apply antitrust laws more cautiously given "the existence of a regulatory structure designed to deter and remedy anticompetitive harm," whereas Aspen Skiing did not involve a regulated market. Duke Energy, 111 F.4th at 363 (quoting Trinko, 540 U.S. at 412).

The refusal to deal doctrine in Trinko does not apply to Google's conduct at issue. Courts have declined to "extend[] a refusal-to-deal-with-rivals analysis" to anticompetitive restraints

that a monopolist places on its customers, as opposed to its competitors. Chase Mfg., 84 F.4th at 1173; see also Kodak, 504 U.S. at 463 n.8; Lorain Journal, 342 U.S. at 152–53. Courts have also "contrast[ed]" the "[r]efusal to deal doctrine" from "a monopolist's more direct interference with rivals," such as "limit[ing] the abilities of third parties to deal with rivals (exclusive dealing)" or "requir[ing] third parties to purchase a bundle of goods rather than just the ones they really want (tying)." Novell, 731 F.3d at 1072, 1076. Here, Google has engaged in tying that effectively has compelled its publisher customers to use DFP if they want to use AdX and receive real-time bids from AdWords advertisers. See Section VI(C)(2), supra. This tying has had the anticompetitive effect of limiting Google's publisher customers' choice of publisher ad server for reasons other than competition on the merits. See id. Moreover, the tie increased Google's scale, decreased rivals' scale, caused some rivals to exit the publisher ad server market, and harmed competition, customers, and Internet users. See id. Although such tying, like other anticompetitive and restrictive conditions on customers, can be conceptualized as a "conditional refusal[] to deal," that does not mean it should be assessed as a "simple refusal to deal" with rivals, which was the alleged harm in Trinko. Viamedia, 951 F.3d at 453. Rather, as the Supreme Court reasoned in Kodak, even if the refusal to sell a product to rivals could "be characterized as a unilateral refusal to deal," the sale of a tying product to "third parties" on the "condition that they buy" a tied product does not fit within the ambit of the refusal to deal exception to antitrust liability. 504 U.S. at 463 n.8. That is why a tying claim "does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." Viamedia, 951 F.3d at 472.

Beyond the unsuitability of the refusal to deal doctrine to Google's tying of DFP to AdX, two other aspects of Google's conduct differ significantly from the conduct at issue in Trinko. Unlike in Trinko, Google's ad tech business has not operated in a highly regulated industry in

which state and federal regulators require the leading firms to share access to capital-intensive infrastructure. Cf. 540 U.S. at 402–04. Rather, Google's ad tech products operate in markets where there is no industry-specific "regulatory structure designed to deter and remedy anticompetitive harm" or otherwise "perform[] the antitrust function." Id. at 412. Moreover, like in Aspen Skiing but unlike in Trinko, Plaintiffs presented evidence that Google sacrificed "short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor[s]." Trinko, 540 U.S. at 409 (quoting Aspen Skiing, 472 U.S. at 608) (ellipses in original). For example, after acquiring Admeld, Google shut down its feature of providing real-time bids to third-party exchanges. See Section V(E), supra. Google's decision to shut down this feature was consistent with the strategy to "pick[] up the [yield manager] with the most traction and park[] it somewhere." PTX58 at -800. Google also refused to implement real-time bidding outside of its ad tech infrastructure despite its buy-side team emphasizing the benefits that doing so would have for its advertiser customers. See Section VI(C)(2), supra.

Given all these significant differences, the Court finds that the refusal to deal doctrine articulated in Trinko does not protect Google from antitrust liability in this civil action. As established above, Google conducted anticompetitive tying to maintain its monopoly power, and thereafter engaged in a series of exclusionary acts that compounded harms to customers and competition in the two ad tech markets at issue.

5. Google's Contention that Its Conduct is Protected by Procompetitive Justifications

Google also contends that the actions Plaintiffs have challenged were procompetitive product design choices made for valid business reasons, and therefore cannot serve as a basis for subjecting the firm to antitrust liability. Specifically, Google claims that its challenged actions

improved safety and privacy, countered fraud, reduced latency, promoted investment, and decreased prices.

A defendant shown to have engaged in exclusionary conduct to maintain a monopoly may avoid Section 2 liability by proving that the conduct was done for "valid business reasons." Kodak, 504 U.S. at 483; see LePage's, 324 F.3d at 163. Accordingly, procompetitive rationales may justify "an otherwise per se illegal tying arrangement." Mozart Co. v. Mercedes-Benz of N. Am., Inc., 833 F.2d 1342, 1348 (9th Cir. 1987). A court must assess the "validity and sufficiency of each claimed [procompetitive] justification." Kodak, 504 U.S. at 483; see also Duke Energy, 111 F.4th at 362, 365; Viamedia, 951 F.3d at 464; Microsoft, 253 F.3d at 66. Because pretextual and unsubstantiated justifications are not "valid," Kodak, 504 U.S. at 483; see Actavis, 787 F.3d at 658; McWane, 783 F.3d at 841–42, courts may give "greater weight to the contemporaneous statements contained in the company's internal records, than [to] later trial testimony in which [its] employees declined to ratify those statements." Google Search, 2024 WL 3647498, at *41 n.2; see also United States v. U.S. Gypsum Co., 333 U.S. 364, 395–400 (1948). In assessing whether proffered procompetitive justifications are "sufficient," Kodak, 504 U.S. at 483, courts frequently "balance the restriction's anticompetitive harms against its procompetitive benefits." Epic Games, 67 F.4th at 994; see Alston, 594 U.S. at 96–97; Microsoft, 253 F.3d at 59, 66; FTC v. Qualcomm Inc., 969 F.3d 974, 991 (9th Cir. 2020).

Google has failed to proffer a sufficient procompetitive justification for its AdX-DFP tie, as each procompetitive benefit it alleged was either invalid or significantly outweighed by the tie's anticompetitive effects. Google contends that the integration of its products across the ad tech stack, including the AdX-DFP tie, reduced spam, fraud, malware, latency, and other quality issues; however, Google documents show that the buy-side AdWords team, which was

responsible for ensuring its advertiser customers had their ads published without undue latency on high-quality websites that were not fraudulent, Tr. Sept. 13 AM 73:6–8 (LaSala (Google), internally advocated for AdWords to buy on most other ad exchanges because those exchanges had "acceptable levels" of spam and fraud, PTX199 at -240–41, that were "comparable" to the spam and fraud levels on AdX, PTX835 at -867. See also Tr. Sept. 17 PM 24:1–20 (Jayaram (Google)). These other exchanges submitted real-time bids to third-party publisher ad servers, just as AdX would have if AdX and DFP were not tied. And so Google's buy-side team "d[id] not like the idea of AdWords being given a disadvantage compared to the other buyers in order to strengthen the publisher pitch (e.g. uphold the 20% margin [on AdX])." PTX198 at -703. But the sell-side managers within Google shut down the plan to let AdWords bid on third-party exchanges for fear that it would undermine AdX and DFP's dominance among publishers. See PTX116 at -462–63. Google therefore "artificially handicapp[ed] [its] buyside ([AdWords]) to boost [its] sellside (AdX)." PTX110 at -009; see also PTX41 at -005–06 (stating bundling DFP, AdX, and AdWords was to obtain "access to [publisher] inventory" and to win "the most strategic battle [which wa]s about the publisher platform"); PTX183 at -717 (stating AdWords' exclusivity on AdX was "purely [a] decision to hold back a set of advertisers ([AdWords] customers) in order to promote [AdX]"); Tr. Sept. 17 AM 21:3–16 (Jayaram (Google)). Instead of reducing spam, fraud, and malware for its customers, the AdX-DFP tie "greatly weaken[ed] [AdWords'] position in the market," PTX110 at -009, to entrench AdX as the dominant ad exchange and DFP as the dominant publisher ad server. See DTX85 at -539 (documenting internal Google projection that permitting AdWords to bid on rival exchanges would cause "AdX [to] lose 20% to 30% of its publishers" and "DFP [to] lose 20% of its publishers").

Nor were any security or quality concerns on the sell-side sufficient to justify the AdX-DFP tie. Numerous industry participants and customers testified that Google did not have lower levels of spam, fraud, or malware than other reputable ad tech providers. See Tr. Sept. 9 AM 157:1–9 (Casale (Index Exchange)) (stating header bidding posed no greater risk of fraud or malware than bidding within Google's ad tech stack); Tr. Sept. 10 AM 46:13–47:13 (Layser (News Corp)) (stating AdX was not better than other ad exchanges at preventing fraud, malware, or spam, and that publishers used third-party software to mitigate malware and spam); Tr. Sept. 10 AM 153:23–154:16 (Friedman (Goodway Group)) (stating all large ad exchanges provide "similar quality inventory to . . . any of the other ones"); Tr. Sept. 27 AM 74:5–75:1 (Wheatland (Daily Mail)). This evidence, therefore, showed that the proffered spam, fraud, latency, and other quality justifications of the AdX-DFP tie were either pretextual or, at best, incidental to the primary purpose of the tie, which was to acquire and maintain market power in the open-web ad exchange and publisher ad server markets. To the extent these quality justifications have any validity, they were significantly outweighed by the anticompetitive effect of the AdX-DFP tie, through which Google has driven nearly all competitors out of the publisher ad server market and secured a durable market share of over 90%.

Google's procompetitive justifications for the actions it took to entrench its monopoly power and strengthen the AdX-DFP tie similarly fall short. Google claims that First Look and Last Look increased revenue for Google's publisher customers and gave advertisers more opportunities to bid on inventory. Some aspects of "Dynamic Allocation," such as the addition of AdX as a new source of advertiser demand to publisher customers and the "process that allow[ed] AdX to provide real-time bids," did increase publishers' revenue substantially. Tr. Sept. 18 AM 53:3–54:12 (Abrantes-Metz (Pls. Expert)); see also Tr. Sept. 24 AM 58:14–62:5

(Milgrom (Def. Expert)) (citing DTX117 at -415 and DTX80 at -322). But Plaintiffs have not argued that these aspects of Dynamic Allocation were anticompetitive. See Tr. Sept. 18 AM 53:3–54:12 (Abrantes-Metz (Pls. Expert)). Rather, the anticompetitive aspect of Dynamic Allocation was First Look, i.e., Google's preferencing AdX over non-Google ad exchanges within DFP, which resulted in less revenue for publishers, fewer impressions going to the advertisers who were willing to pay the most for them, enhanced AdX market power, and reduced competition in the ad exchange market. See Sections V(D) and VI(C)(3), supra; see also Tr. Sept. 11 PM 71:18–23 (Ravi (Pls. Expert)) ("[T]he advertiser willing to pay the highest price may not get [an impression] as a result of first look."); Tr. Sept. 16 PM 135:16–139:1 (Abrantes-Metz (Pls. Expert)) (describing how First Look was exclusionary and harmed publishers).

Last Look, which was implemented after Google had established dominance in the ad exchange and publisher ad server markets, similarly did not provide publishers with as much revenue as they would have received in a fair auction. The advantage that Last Look provided to AdX enabled AdX to win auctions despite offering less than its advertisers were willing to pay. See Section V(G), supra (citing Tr. Sept. 12 PM 101:13–23 (Goel (PubMatic))). For example, if an AdX advertiser was willing to bid $1.50 CPM for an impression but non-AdX advertisers were only offering $1.00 CPM, then in a fair auction, AdX would win the auction and pay the publisher $1.50 CPM. See id. But because Last Look let AdX "open the envelope for the [highest] bid [among the non-AdX advertisers], know what the winning bid [wa]s, and be able . . . to bid after everybody else," AdX could bid $1.01 CPM and still win the auction, resulting in the publisher receiving $0.49 CPM less than it would have in a fair auction. Tr. Sept. 18 AM 37:7–38:1 (Abrantes-Metz (Pls. Expert)). This advantage, which Google was only able to implement because of AdX and DFP's market power, reduced publisher revenue, decreased

rivals' scale, dampened ad exchange price competition, and further entrenched Google's market power in the two adjacent product markets. See PTX438 at -478; PTX1709 at -934; Sept. 18 AM 39:4–41:3 (Abrantes-Metz (Pls. Expert)).

Google contends that Last Look was procompetitive because publishers using header bidding could choose not to request a bid from AdX, and so they would only activate Last Look if doing so increased their revenue. See Tr. Sept. 24 AM 74:18–25 (Milgrom (Def. Expert)). But given AdX's monopoly power in the ad exchange market, this offer was a "Hobson's choice;" it was not financially viable for large publishers to forgo using AdX and the access it offered to the unique advertising demand from AdWords. Viamedia, 951 F.3d at 435. Google therefore did not establish any valid and sufficient procompetitive justifications for Last Look.

The exclusionary nature of sell-side dynamic revenue share similarly cannot be shielded by the proffered procompetitive justifications. Google argues that sell-side dynamic revenue share helped create matches for impressions that would not have sold to any advertisers without it. See DTX212 at -484. But the primary purpose of sell-side dynamic revenue share was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage. See Sections V(H) and VI(C)(3), supra. That is why a Google engineer stated that sell-side dynamic revenue share was "just yet another way for AdX to exploit the last look advantage," and observed that "AdX gets to pay high and win whenever AppNexus [another ad exchange] is present with a high CPM, and can pay low when AppNexus bids low. AppNexus in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids." PTX542 at -335. Therefore, just as with Last Look, Google's proffered procompetitive justification for sell-side dynamic revenue share was pretextual.

Google contends that its Unified Pricing Rules established a level playing field for advertisers, simplified the ad tech bidding landscape for publishers, improved matches, and increased publisher revenue. Google knew that publishers were "rational[] when they decide to diversify their source[s] of revenue[]" by setting higher price floors for bids coming through AdX than for bids coming through other ad exchanges, because doing so "help[ed] them to keep Google at bay and put pressure on [Google] (similar to any industry)." PTX469 at -512. Google also knew that some publishers set higher price floors on AdX to "protect" their businesses, as they had "the perception that undesirable ads on AdX (primarily from AdWords unclassified advertisers) [were] correlated with low" revenue and posed quality issues. PTX609 at -146; see also PTX611 at -802; PTX715 at -429-001; Tr. Sept. 10 AM 49:25–50:3, 119:9–21 (Layser (News Corp)) (stating that setting higher floors on AdX resulted in higher quality ads). Nevertheless, Google imposed Unified Pricing Rules—which prohibited publishers using DFP from setting higher price floors for bids coming through AdX—at the request of the "Ad[X] team," who wanted to use the termination of Last Look "as an opportunity to significantly limit the ability of publishers to set floor prices per buyers." PTX762 at -291; see Section V(J), supra. This is strong evidence that Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications of helping its publisher customers simplify their decision-making, receive better matches, and increase revenue. Moreover, despite its name, Unified Pricing Rules did not stop publishers from setting higher price floors for third-party exchanges than for AdX. See Tr. Sept. 10 AM 60:7–14 (Layser (News Corp)); Tr. Sept. 18 AM 149:1–8 (Wheatland (Daily Mail)); Tr. Sept. 23 AM 157:8–158:20 (Korula (Google)). Unified Pricing Rules was thus targeted at enhancing AdX's control over DFP publishers' revenue streams, as opposed to simplifying publishers' decision-making. That is why Google's publisher

customers concluded that Unified Pricing Rules was not in their best interest and challenged its implementation. See PTX751 at -120–24; PTX1854 at 25:1–11, 55:1–13; Tr. Sept. 10 AM 50:17–52:7 (Layser (News Corp)).

In addition to proffering procompetitive justifications for individual product and policy changes, Google makes the overarching argument that all of these changes are shielded from antitrust liability because they involved product design choices. See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 998–99 (9th Cir. 2010) ("Design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct."); Microsoft, 253 F.3d at 65 ("As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes."). Google's decade-long campaign of exclusionary conduct, however, is not properly characterized as a series of product design choices. As the Fourth Circuit made clear in Duke Energy, courts must avoid unduly divvying up a "complex or atypical exclusionary campaign" into "manufactured subcategories" and justify the actions using "specific conduct tests." 111 F.4th at 354–55; see also Alston, 594 U.S. at 101 (stating a defendant is not permitted to "relabel a restraint [on trade] as a product feature and declare it immune from" antitrust scrutiny). It would not be accurate to classify the tying of two separate products, or the subsequent decisions that Google made to manipulate auction rules and restrict customer choice in markets in which the firm had monopoly power, as mere choices of product design. What is more, "[j]udicial deference to product innovation . . . does not mean that a monopolist's product design decisions are per se lawful." Microsoft, 253 F.3d at 65. Indeed, "product redesign is anticompetitive when it coerces consumers and impedes competition," which Google's actions did here. Actavis, 787 F.3d at 652; accord Allied Orthopedic Appliances,

592 F.3d at 998. The AdX-DFP tie, for example, "ha[d] the effect of significantly reducing usage of rivals' products" (i.e., publisher ad servers) by "discouraging," "deterring," and "preventing" publisher customers from using alternatives to DFP. Microsoft, 253 F.3d at 65–66; see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019) (holding that product design combined with "associated conduct," including "tying agreements" and "product disparagement," can be exclusionary because its "overall effect" is "to coerce consumers to purchase [the defendant's product] over [competitors' products], rather than to compete on the merits").

In sum, Plaintiffs have shown that Google engaged in "willful acquisition or maintenance of [its monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" by tying DFP to AdX and committing a series of exclusionary and anticompetitive acts to entrench its monopoly power in two adjacent product markets. Kodak, 504 U.S. at 481 (quoting Grinnell, 384 U.S. at 570–71). The procompetitive justifications that Google proffers for its anticompetitive conduct are both invalid and insufficient, and any procompetitive benefits of this conduct were far outweighed by its anticompetitive effects. Therefore, Google cannot evade liability under Sections 1 and 2 of the Sherman Act.

## VII. Plaintiffs' Request for Sanctions

Plaintiffs have alleged that Google should be sanctioned under Federal Rule of Civil Procedure 37(e) because it failed to take reasonable steps to preserve internal communications, resulting in the systemic spoilation of potentially relevant evidence. Specifically, Plaintiffs ask the Court to infer that deleted internal communications were unfavorable to Google on factual issues that were in dispute in this litigation, including market definition, monopoly power,

Google's intent, the anticompetitive nature of Google's conduct, and the harm Google's conduct caused to its competitors and customers. See Fed. R. Civ. P. 37(e)(2)(A) (stating that, in certain circumstances, a court may presume that electronically stored information lost by a party was unfavorable to that party).

Google's internal messaging application deleted records of chats between employees unless an employee explicitly turned on "chat history," and the application's user interface made it difficult for employees to turn on chat history for every conversation they had. See Tr. Sept. 11 AM 33:1–12, 88:13–89:17 (Bender (Google)); Tr. Sept. 13 AM 121:23–124:3 (LaSala (Google)). Chat deletions occurred when employees discussed substantive topics at issue in this litigation and continued after the federal government began an antitrust investigation into Google's conduct. See, e.g., Tr. Sept. 17 AM 103:11–20 (Jayaram (Google)). Cf. Gerlich v. U.S. Dep't of Justice, 711 F.3d 161, 171 (D.C. Cir. 2013) (holding that the "duty of preservation" was "triggered . . . by a reasonably foreseeable Department [of Justice] investigation"). Some employees who received litigation holds failed to turn on their chat history despite being instructed to, resulting in their communications being deleted. See Tr. Sept. 13 AM 131:24–133:19 (LaSala (Google)) (discussing PTX992, in which a Google executive under a litigation hold agreed with his subordinate that a topic was "too sensitive for email" and thus should be discussed via auto-deleted chats). Indeed, Google employees regularly used this "off the record" chat functionality, PTX1777 at 14, for discussions of "legally sensitive" topics that they did not want to be preserved, PTX1033 at -656. See also PTX851 at -549; Tr. Sept. 11 AM 33:1–12, 88:13–89:17 (Bender (Google)).

Google employees and executives also misused the attorney-client privilege. For example, Kent Walker, an attorney who served as Google's President of Global Affairs and

oversaw the company's legal team, marked an email in which he asked his colleagues for reactions to a New York Times article as "privileged." PTX864 at -424; see Tr. Sept. 13 AM 76:23–77:16 (LaSala (Google)). Other Google executives and employees routinely labeled emails as attorney-client privileged even though the emails clearly did not involve privileged communications. See, e.g., PTX864 at -422–25; PTX884 at -249; PTX997 at -389; Tr. Sept. 12 AM 151:2–152:16 (Srinivasan (Google)); Tr. Sept. 13 AM 71:18–72:2, 76:23–78:13 (LaSala (Google)); Tr. Sept. 19 AM 128:10–129:7, 129:17–130:22 (Bellack (Google)) (discussing PTX719 and PTX1507).

Google's systemic disregard of the evidentiary rules regarding spoliation of evidence and its misuse of the attorney-client privilege may well be sanctionable. But because the Court has found Google liable under Sections 1 and 2 of the Sherman Act based on trial testimony and admitted evidence, including those Google documents that were preserved, it need not adopt an adverse inference or otherwise sanction Google for spoliation at this juncture. As in Google Search, the Court's decision not to sanction "should not be understood as condoning Google's failure to preserve chat evidence." 2024 WL 3647498, at *134.

## VIII. Conclusion

Plaintiffs have proven that Google has willfully engaged in a series of anticompetitive acts to acquire and maintain monopoly power in the publisher ad server and ad exchange markets for open-web display advertising. For over a decade, Google has tied its publisher ad server and ad exchange together through contractual policies and technological integration, which enabled the company to establish and protect its monopoly power in these two markets. Google further entrenched its monopoly power by imposing anticompetitive policies on its customers and eliminating desirable product features. In addition to depriving rivals of the ability to compete,

this exclusionary conduct substantially harmed Google's publisher customers, the competitive process, and, ultimately, consumers of information on the open web. Accordingly, Google is liable under Sections 1 and 2 of the Sherman Act.

For the foregoing reasons, by an Order to be issued with this Memorandum Opinion, Count III (monopolization of the advertiser ad network market) will be dismissed, and the parties will be ordered to submit a joint proposed schedule for briefing and arguing their positions as to the remedies that should be imposed in light of Google have been found liable for monopolization of the publisher ad server market (Count I), monopolization of the ad exchange market (Count II), and unlawful tying of AdX and DFP (Count IV).

Entered this 17th day of April, 2025.

Alexandria, Virginia

/s/ LMB

Leonie M. Brinkema
United States District Judge

# EXHIBIT D

**Eisar Lipkovitz**

Excerpts from EDVA Trial Evidence – September 10, 2024 (PM)

| No. | Pinpoint | Subject | Relevance |
|---|---|---|---|
| 1. | 72:10- 75:16 | Mr. Lipkovitz's role and tenure at Google, including as the lead engineer for the display and video team for Google. | Para 82 of the Commissioner's Amended Notice of Application alleges that "programmatic open web display advertising" sets the boundaries of the relevant product markets. |
| 2. | 75:17-76:7 | Publisher ad servers and their functionality. | Paras 86 of the Commissioner's Amended Notice of Application alleges that "Publisher Ad Servers" is a "relevant product market", in which "Google offers DFP as a product in this market". |
| 3. | 76:8-76:22 | Describing the "buy-side" and "sell-side", confirming that Google offered products on both sides, and Mr. Lipkovitz having responsibility for Google's products on both sides. | Paras 86, 93 and 100 of the Commissioner's Amended Notice of Application alleges that "Publisher Ad Ad Servers", "Advertiser Ad Networks" and "Ad Exchanges" are "relevant product markets" in which Google offers DFP, Google Ads and AdX as products. |
| 4. | 76:23-77:12 | Small advertiser would not be advised to use DV360 given its cost and because some features wouldn't be useful for small advertisers. | Para 95 of the Commissioner's Amended Notice of Application alleges that "[c]ompared to other ad buying tools (e.g., DSPs), advertiser ad networks generally provide a more easy-to-use, turnkey or automated experience". |
| 5. | 77:13- 80:12 | Substantial fixed costs of the ad server business and the value to Google in running its ad server, including that Google's goal was to compete in every auction. | Para 127 of the Commissioner's Amended Notice of Application alleges that "there are significant barriers to entry and expansion in ad tech markets, including the Publisher Ad Server market".<br><br>Para 173 of the Commissioner's Amended Notice of Application alleges that "Google leveraged DFP's substantial market power to funnel transactions to AdX". |

| | | | |
|---|---|---|---|
| 6. | 80:13-81:16 | Last Look and how it was asymmetric and problematic from an advertiser's standpoint. | Paras 178 and 182 of the Commissioner's Amended Notice of Application allege that Last Look gave AdX an advantage. |
| 7. | 81:17- 85:24 | Google Ads was not permitted to buy inventory offered by third-party ad exchanges including because of the potential revenue loss to Google and concerns about making third party exchanges more attractive partners for publishers. Also, how AdX was the only place where Google Ads demand was available, and Google Ads being able to bid on third party ad exchanges would increase auction pressure and clearing prices on those exchanges. | Para 159 of the Commissioner's Amended Notice of Application alleges that "[w]ithout the tie between Google Ads and AdX, Google understood that publishers would avail themselves of rival ad tech tools".<br><br>Para 168 of the Commissioner's Amended Notice of Application alleges that Google's "must have advertiser demand (on Google Ads) is accessible only through its ad exchange (AdX)". |
| 8. | 85:25-87:7 | AWBid, including scope, impact, and functionalities. | Para 162 of the Commissioner's Amended Notice of Application alleges that "[i]n 2016, Google began allowing a limited portion of its advertiser demand to bid outside of AdX", which was an initiative known as AWBid. |
| 9. | 87:8-96:9 | Header bidding technology, including its users, its functionality, adoption, benefits and drawbacks, and impacts. Also, how header bidding made it easier for publishers to work with multiple ad exchanges and allowed them to have more access to inventory. | Para 177 of the Commissioner's Amended Notice of Application alleges that "[h]eader bidding allowed publishers to send ad requests and receive real-time bids from multiple ad exchanges outside of Google's DFP (and Dynamic Allocation)". |
| 10. | 96:20-98:11 | Google Ads' differentiated demand and smaller advertisers that don't buy on DSPs. | Para 93 of the Commissioner's Amended Notice of Application alleges "Advertiser ad networks" is a relevant product market and that "Google offers Google Ads as a product in that market". |

| | | | |
|---|---|---|---|
| | | | Para 197 of Google's Response alleges that "demand side platforms cannot be differentiated from 'advertiser ad networks'". |

**Brad Bender**

Excerpts from EDVA Trial Evidence – September 11, 2024 (AM)

| No. | Pinpoint | Subject | Relevance |
|---|---|---|---|
| 1. | 8:4-13:4 | Mr. Bender's professional history including his work for DoubleClick, and his role working on Google's buy-side, including working on products like DV360 and Google Ads. Also, his role working on sell-side including on products like GAM. | Paras 86, 93 and 100 of the Commissioner's Amended Notice of Application allege relevant markets for "Publisher ad servers", "Advertiser ad networks", and "Ad exchanges", in which Google offers DFP, Google Ads and AdX as products. |
| 2. | 13:5-23:19 | Former DoubleClick CEO David Rosenblatt's overview of Google's display strategy, including the value of owning the ad server and getting a first look at each impression. Also, switching costs associated with publisher ad servers.<br>Documents: PTX1814 (GOOG-AT-MDL-B-004389742) | Para 151 of the Commissioner's Amended Notice of Application alleges that "DFP grant[ed] AdX advantageous access to its ad inventory over rival exchanges through its Dynamic Allocation feature, which gave AdX an exclusive 'first look' and later 'last look' bid advantage".<br><br>Para 123 of the Commissioner's Amended Notice of Application alleges that 'Google faces weak competitive constraints due to high barriers to entry, high switching costs, and the prevalence of publishers who 'single home'". |
| 3. | 23:24-26:6 | Google Ads and its features, including that it is a simpler, turnkey solution. | Para 95 of the Commissioner's Amended Notice of Application alleges that "[c]ompared to other ad buying tools (e.g., DSPs), advertiser ad networks generally provide a more easy-to-use, turnkey or automated experience". |

| | | | |
|---|---|---|---|
| 4. | 27:23-30:8 | Header bidding being developed because publishers felt locked in by Dynamic Allocation in DFP.<br>Document: PTX587 (GOOG-DOJ-05276794) | Paras 58 and 177 of the Commissioner's Amended Notice of Application allege that, "[p]artly to circumvent Google's restrictions (i.e., Dynamic Allocation/First Look) [...], in or around 2015, publishers began adopting a technology called 'header bidding'", which "led to a substantial increase in publisher ad revenue". |
| 5. | 33:24-36:1 | Header bidding giving many publishers better yield.<br>Document: PTX587 (GOOG-DOJ-05276794) | Para 177 of the Commissioner's Amended Notice of Application alleges that, "[p]artly to circumvent First Look, in or around 2015, publishers began adopting a technology called 'header bidding'", which "led to a substantial increase in publisher ad revenue". |
| 6. | 36:19-41:19 | Mr. Bender being a proponent of Google Ads buying on third party exchanges and the purpose of AWBid. Also, differences between DV360 and Google Ads. | Para 160 of the Commissioner's Amended Notice of Application alleges that Google's buyside "was unhappy" with the decision to restrict Google Ads to bid only into AdX.<br><br>Para 197 of Google's Response alleges that "demand side platforms cannot be differentiated from 'advertiser ad networks'". |
| 7. | 81:24-82:10 | The distinction between a walled garden and the open web. | Para 82 of the Commissioner's Amended Notice of Application alleges that "programmatic open web display advertising" sets the boundaries of the relevant product markets. |

# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------x

| | | |
|---|---|---|
| UNITED STATES, et al., | : | Civil Action No.: |
| | : | 1:23-cv-108 |
| Plaintiffs, | : | |
| versus | : | Tuesday, September 10, 2024 |
| | : | Alexandria, Virginia |
| GOOGLE LLC, | : | Day 2 p.m. |
| | : | Pages 1-107 |
| Defendant. | : | |

---------------------------x

The above-entitled bench trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 2:00 p.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS: GERARD MENE, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

JULIA TARVER WOOD, ESQUIRE
AARON TEITELBAUM, ESQUIRE
JEFFREY VERNON, ESQUIRE
KATHERINE CLEMONS, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW
Washington, D.C. 20530
(202) 894-4266

(State of VA) TYLER HENRY, ESQUIRE
OFFICE OF THE ATTORNEY GENERAL
OFFICE OF THE SOLICITOR GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

A P P E A R A N C E S:

| | |
|---|---|
| FOR THE PLAINTIFFS:<br>(State of CA) | ELLIOTT DIONISIO, ESQUIRE<br>OFFICE OF THE CALIFORNIA ATTORNEY GENERAL<br>300 South Spring Street<br>Suite 1700<br>Los Angeles, California 90013<br>(213) 269-6681 |
| (State of NY) | MORGAN FEDER, ESQUIRE<br>OFFICE OF THE NEW YORK ATTORNEY GENERAL<br>28 Liberty Street<br>20th Floor<br>New York, New York 10005<br>(212) 416-8262 |
| FOR THE DEFENDANT: | CRAIG REILLY, ESQUIRE<br>LAW OFFICE OF CRAIG C. REILLY<br>209 Madison Street<br>Suite 501<br>Alexandria, Virginia 22314<br>(703) 549-5354 |
| | JUSTINA SESSIONS, ESQUIRE<br>FRESHFIELDS BRUCKHAUS DERINGER, LLP<br>855 Main Street<br>Redwood City, California 94063<br>(212) 277-4000 |
| | JEANNIE RHEE, ESQUIRE<br>WILLIAM ISAACSON, ESQUIRE<br>MARTHA GOODMAN, ESQUIRE<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>2001 K Street, NW<br>Washington, D.C. 20006<br>(202) 223-7300 |
| COURT REPORTER: | RHONDA F. MONTGOMERY, CCR, RPR<br>Official Court Reporter<br>United States District Court<br>401 Courthouse Square<br>Alexandria, Virginia 22314<br>(703) 299-4599<br>RMontgomery@courtreport.net |

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiff:

JAY FRIEDMAN

Direct examination by Ms. Clemons ........4
Cross-examination by Ms. Goodman ..........5
Redirect examination by Ms. Clemons .......49

EISAR LIPKOVITZ (read)

Direct examination by Ms. Wood ............72

EISAR LIPKOVITZ (by video).................107

MISCELLANY

Proceedings September 10, 2024 ............4
Certificate of Court Reporter .............107

THE COURT: Most important -- we just need one copy that's highlighted for the reader. I can jump around, but he can't.

MR. TEITELBAUM: Understood, Your Honor.

MS. WOOD: We'll just use these paper clipped. I apologize. We'll put them in binders for you properly.

THE COURT: For the record, this is excerpts of the deposition of Eisar Lipkovitz. He was under oath when he gave his testimony. So let's go.

DIRECT EXAMINATION

BY MS. WOOD

Q Could you provide your full name for the record?

A Sure. It is Eisar Lipkovitz.

Q Okay. I'd like to discuss your time being employed at Google. When did you join Google?

A August 2, 2004.

Q You remember it pretty clearly. Is that a -- does that date stick out in your mind?

A I have an affliction of having an extremely good memory. I'm not bragging, but, you know, it's actually different for me to -- not to remember stuff, you know; so...

Q Yeah. I appreciate that.

So what were your -- what was your initial job when you joined Google?

A I have joined what was later called search infrastructure team. I was working on the search engine, and I was managing a team initially that was in charge of what was called Google Web Server, and pretty quickly thereafter, it expanded to sort of managing the crawling and indexing team. And, you know, over time it became sort of a larger scope, all of it.

And so the infrastructure is what makes search possible.

Q So, Mr. Lipkovitz, are you an engineer? Correct?

A I am by trade.

Q And what does that -- I mean, so what does that mean that -- your day-to-day responsibilities, what are the -- I should ask, what are the general responsibilities of an engineer at Google? What types of projects might you work on?

A You know, it's just all over the place, and all of it changed over time. And in my case, because I start at a manager, it's a little bit different. But in general, it's writing code, reviewing code, maintaining systems, writing design --

THE LAW CLERK: I have a duplicate. I have a bunch of --

MS. WOOD: You have page 3 of 26?

THE LAW CLERK: I have -- oh, here we are. Sorry.

A So as I said, writing, design, documents, participating in meetings and so forth.
Q Are engineers at Google involved in strategic decisions?
A It changed over time. When I joined, quite a bit, yes.
Q When you talk about programmatic, what do you mean by "programmatic"?
A You know, it's a buzz word that I don't know, you know, who made it up. And it was a pretty important one, especially when I joined.
The industry was moving away -- or "away" is not the right word. Prior to programmatic, the vast majority of ads, you know, being sold online, at least by dollars, I should say, were direct sold. An advertiser and a publisher would have a relationship, and they would agree, you know, to a contract and buy units, roughly how TV advertising is sold today.
And programmatic was an attempt to sort of get it more efficient and sort of automated and, you know, use technology to minimize the number of people needed to talk and salespeople and martinis and, you know, all that stuff. That's probably the highest level.
MS. WOOD: This is later.
BY MS. WOOD
Q Okay. That makes sense. So after 2016, summer 2016,

you were the lead engineer for the display and video team for Google?
A That is correct.
Q You had responsibility for all Google's display business on the engineering side; is that correct?
A It is correct.
Q How many people were in the display and video organization all together?
A It changed over time, but I would like to say somewhere between 2,500 to 3,500-ish.
Q Okay. And were you sitting on the top of that org chart?
A As I mentioned, we had, you know, multiple partners, depending on the time. I was probably -- by head count, I had the majority of them because engineers is the bulk of that organization from head count.
Q What is a publisher, as you understand it?
A I mean, you know, it starts with a generic definition of publisher, which was a commonplace in media. But in the context of ads, it is an entity that is trying to monetize, make money for media by placing ads next to their content. And they use technology or, you know, some sort of online ability to do that, to do so.
Q Okay. And what types of technology might a publisher use?

A You kind of have to start with an ad server, which is effectively a piece of software that lets you manage the inventory of slots on, you know, your webpage. So that's probably the most important aspect.
Q Do publishers use an ad server for both direct and remnant sales?
A Yes, they do.
Q Okay. Are you familiar with the terms "buy side" and "sell side"?
A Yes. So, traditionally speaking, buy side is referring to the advertiser-facing products and sell side to the publisher-selling product -- facing products.
Q Did Google have ad tech tools which it offered to the sell side?
A Yes.
Q And did you have ad tech tools which you offered to the buy side?
A Yes, we did.
Q Okay. Did you -- I guess after summer 2016, did you have responsibility for Google's products on both the buy and sell sides?
A I did.
Q If I'm a small advertiser spending $1,000 a month with DVM --
MS. WOOD: And, Your Honor, I'll just represent to

the Court, that is DV360 --

BY MS. WOOD

Q -- would DVM be an option for me?

A "Option" meaning what? Like where is the decision?

Q Would it make sense for me to work on DVM?

A I would not advise it.

Q Why not?

A Because, like, all the benefits exist on DVM would be extremely useless for you.

Q How so?

A You know, if we have to charge you for support, you'll spend more money on that than whatever you spend on media.

Q Does the ad server business have substantial fixed cost?

A Yeah. I think it is -- you know, the biggest one is probably the technology R&D team, right, and payroll for that. You know, you may need some sales and support to support the customers, and then you have some infrastructure costs, you know, to have the actual ad server. Right? It's usually software as a service, you know.

The ad tech company hosted everything and had the production assistants. They have to have ops people. Sometimes they have data centers, whatever.

THE LAW CLERK: Do I continue?

MS. WOOD: Go ahead.

A Okay. That's a good question. It was a debate, right? I think there were sort of multiple reasons. Right? One is, you know, we had a team. Right? And you get into this dynamic that I see everywhere that Google probably works where, you know, it's hard to cancel a thing and the team would advocate for it. Right? And you know, some type of job security.

And to be clear, these people would not lose their job, you know. It's hard to lose your job at Google. It's just literally their vested interest, right, one.

Two, a lot of the customers of DFP were large publishers. Many of them are large media companies. Right? So you know, Google did not want the anger pissing them off.

And I think, three, you know, it is providing value. And, you know, we tried so sort of contain the cost. I don't think we are making any profit of that. Right? But it's some sort of a public service, you know, to continue kind of boosting the ecosystem. It's just hard, you know, when you're a large company, to stop doing something.

Q Was there value specifically to Google in running the ad server?

A Yeah. So the team -- there were people, you know, when I was referring back to the first argument. Right? The team wasn't just, you know -- when we are doing job security or self-preservation, right, they would argue that's a

strategic value of having access to inventory.

Q What do you mean by "access to inventory"?

A So, you know, I think our goal was to give advertisers -- you know, we had multiple constituents, right, at a super high level, right, advertisers, users, and publishers.

My point of view was always that advertisers sort of have the highest allegiance because they're actually paying. And what advertisers want is they want to have access to users, right? And we wanted to give them the best product, which means, you know, it's easy to use and it gives the best performance. But, you know, you still need to have access to as many users as possible. So in that regard, yes, DFP was helpful.

Q How was it helpful in providing access to users?

A Yeah. So I think there is two ways to think about access to users or impressions, right?

One is having a relationship, right, with every publisher to the extent it is possible and having an opportunity to compete on every impression of that particular publisher. And, you know, first one is easy, right?

So you want to have a relationship whether you are returning a network or you're running an SSP with all publishers, right? So you don't want to anger them. You

want to offer them a product that they will be happy with.

And secondly is having some influence over the decisioning, right? So at the end of the day, the ad server -- because at the end of the day, somebody has to show the ad, right? And the ad server is making the final decision, right?

And our goal is to compete at every potential auction that exists, which we felt is good in two ways.

One is, you know, give our advertisers access. And two, by definition, increases the publisher revenue, right, because every impression you won -- if you didn't win, right, the publisher would make less money.

Q Are you familiar with last look?

A I heard this expression being used, yes.

Q What do you understand last look to refer to?

A I think what people were referring to is some opportunity, kind of at the end after everybody else bid on the impression, to try to beat the -- you know, the best price or whatever.

Q While you were in -- from 2014 to 2018, did Google offer AdX last look in DFP?

A I think that -- I think it's a publisher-friendly feature, right, because if you give anybody, no matter who it is, an opportunity to match whatever price, like any auction, right, at the end of the day, the seller will make

more money, right?

Because I just think it's more problematic from an advertiser standpoint, depending on how it's being done, and it gets complicated who is actually benefiting from this. When user with preferential treatment, you know, it is a very complex topic.

So I really, A, first don't remember all the details. B, I think it's very hard to say exactly whether it's good or bad, right? It just felt somewhat asymmetric. I wasn't excited about it.

Q And did DFP offer any other SSPs --

MS. WOOD: SSPs being another term for exchanges, Your Honor.

BY MS. WOOD

Q -- did DFP offer any other SSPs last look?

A I do not know.

Q When you first joined Google's display team in 2014, am I right that GDN --

MS. WOOD: Which we're calling at this trial, Your Honor, Google Ads.

BY MS. WOOD

Q -- am I right that GDN, or Google Ads, was not permitted to buy inventory offered by third-party SSPs?

MS. WOOD: I'm adding "or exchanges." That's what we're referring them to in this trial.

THE WITNESS: That is correct.

BY MS. WOOD

Q So GDN, meaning Google Ads, was not permitted to buy inventory from programmatic, correct?

A I'm not a fan of the words "permitted" because it did become a debate while I was there. But it did not, yes.

Q Okay. Why?

A Well, you know, there is some -- they are somewhat, I consider, religion, which, you know, maybe was justified by supposedly business reasons. And there was some actual arguments that were, you know, fairly objective, right, but just harder to quantify.

Like, let me start with the second one. GDN was especially, you know, a fairly simple product for, you know, advertisers that don't need a lot of control. I understand that you mentioned earlier smaller, but it's difficult because it's -- some -- a large advertiser don't need control.

However, there were concerns that if those advertisers placed ads on third-party SSPs, they may end up being shown into, you know, like, in context, those are the types that we don't want. And then spam.

So let me explain these two issues, right? So, you know, if you're Coca-Cola, you know, you might not want to be a place where your ads are showing on some porn site

or whatever or -- you know, or some websites that have some political point of view you don't agree with, you know. All these things become a real issue.

You know, a few years back, right -- oh, yeah. And there were people on the GDN team who felt this is an incredible, important thing. And the only way to ensure, because we know who the publisher is, is to make sure through our -- you know, the Google network, including AdX, where we have a direct relationship with these publishers, right? So we know who they are. We can authenticate which pages they are, what they look like, and stuff like that.

Spam is another issue. It's, again, an advertiser-friendly position that -- you know, by spam, I mean it's a case where the impression actually was not shown to anybody like a real person, right? So there's some types of middleman that would manufacture impressions, right, to collect revenue and essentially to advertisers of money, right?

And AdX and, you know, other Google technologies had a little bit better SDKs and some special JavaScripts that will be better at detecting this sort of -- type of activity, right? That's what the genesis of that.

The counterargument was, well, you know, some advertisers are willing to take risks. Why can't we offer that? And that was getting into some internal debate. But

that's sort of, you know, how things evolve.

And to be honest, you know, it was the way things just sort of evolved, right? So at some point, this became a topic of debate. So it's not that anything was prohibited, but that's sort of how we got there.

Q Were there financial considerations in GDN or Google Ads bidding on third-party exchanges?

A Yes. I think that when Google bids on a third-party exchange, they would not make sell-side margin.

Q What do you mean by "sell-side margin"?

A So when the impression was bought through AdX, AdX took a cut of the payout from the advertisers to the publisher. It's considered sell-side margin.

Q Was there concern that GDN or Google Ads bidding on third-party exchanges would make third-party exchanges more attractive partners for publishers?

A There are often people that express that concern, yes.

Q Who in particular expressed that concern?

A Generally speaking, people that were on the sales, you know, the sort of -- the partnership sales team that worked with those publishers.

Q Would Jonathan Bellack express those concerns?

A He did.

Q What did -- if you recall, what specific concerns did Jonathan Bellack raise?

A You know, what you just said. And, you know, I think we talked about it earlier, right? Like the exclusivity in core of GDN or AdWords and in AdX.

Q Can you explain that concept -- that last concept about the exclusivity of GDN or Google Ads and AdX a little bit more.

THE LAW CLERK: Do I start with the "he said" quote that's before the A?

MS. WOOD: Yes.

A Okay. He said, quote, he likes and -- you know, and I think the people and the sort of partnership team were even stronger in that respective to make the claim that AdX is the -- in quote, the only place where GDN or AdWords demand is exposed.

Q Why was that important?

A Because it's some sort of like, in quote, a winning argument with the publisher. I didn't agree with that.

Q Had GDN or Google Ads bid on third-party exchanges, would it have increased their auction pressure?

A It would, yes. By definition, any additional buyer would have this impact.

Q Would it have increased the clearing price of those third-party exchanges?

A It could.

Q What is capital A, capital WBid, one word. What is

AWBid?
A So I think it stands for AdWords bidding. And the idea was to extend AdWords' ability to buy on other exchanges, which is a topic we discussed, you know, in the last ten minutes at length.
Q Were there proponents of AWBid within Google?
A Yes.
Q Who were the proponents of AWBid?
A So it's effectively -- I mean, the biggest one was Oren Zamir, who reported to me at the time. And he was sort of the head of the remarketing -- you know, we called it remarketing; here, it's called retargeting -- where he felt -- and I agree with him -- that that's an area where the benefit for advertisers is actually quite clear.
Q Why was there significant benefits for advertisers?
A Yeah. We -- because, you know, fundamentally, advertisers have a budget, right? And so there is a limit to how many impressions they are actually going to buy, right? And most impressions are similar with one exception.
For retargeting advertisers, they had all the data. And, you know, our technology supported it. That shows that anyplace you can catch a user, right, that is subject to retargeting increases your chance of a click and a conversion.
So it is a type of advertising where more is

better, much more than, you know, any other type of targeting.

Q Is -- so are you saying remarketing was a small part of GDN or Google Ads demand?

A If counted by number of impressions, yes.

Q Was AWBid limited to remarketing targeting?

A Yes.

Q Who was --

MS. WOOD: And skipping pages.

BY MS. WOOD

Q Who was using header bidding technology?

A That was a mix of -- so publishers were using the technology, but how they got introduced to that was sort of all over the place. So sometimes Criteo would come in and, you know, say I want to put my tag on the page. And the publishers are like, well, why should we give you exclusive access? Fine, put the header bidding there.

Sometimes -- could be one of the SSPs that you mentioned or a network. I mean, Criteo is a network that would come and say, you know, like, why are you giving all these impressions just for one SSP? Could be Google or anybody else. We would like to -- right. So they would go and introduce.

At some point, there were some vendors that were, like, selling header bidding technology, right, because

there's some configuration you can do with that and whatnot.
Q So in some way, was the publisher directly calling the SSP or exchange via the header bidding code?
A Yes. You can say calling usually multiple SSPs, yes.
Q Did header bidding allow that call to happen without DFP being involved?
A I believe there was a possibility that can happen, yes.
MS. WOOD: And then there's some skipped pages.
BY MS. WOOD
Q Well, why would publishers adopt the technology if it was so crappy?
A So let's talk about what's crappy about it first, and then I think it will help you understand the question -- the answer, right?
The worst part of it, in my opinion, was the fact that it made the page render a lot slower because it had to execute the sequence. It was very inefficient. It was complicated. So it slowed down your browser even, right?
And because it was a bargain, people, they feel like -- they make mistakes sometimes. You didn't get any ads, right? So the user experience was pretty bad. Some publishers -- and what I mean by that is, like, the page would reload. It would take a very long time for the page to render or you would get, like, broken links.
Some publishers didn't care about, right, or at

least -- let me be more specific. The person who put the header bidding tag was somebody trying to show their boss they're making more money, you know. And the person that was in charge of the content or the CEO of the publisher didn't even realize what was going on.

The second issue was -- that's one dimension. The second one is around fraud and billing. So this is something we didn't talk about, but it's an important one.

You know, a publisher needs to know how they are owed because they sold their impression. If you're working with an exchange or an SSP in general, you know, your ad server knows who you sold an impression to. And then you can go work with that party to make sure how much you owe.

With header bidding, there was a lot done with the client. There was no paper trail. So you had to have a lot of trust. So it's one of those things where you think you're making more money, but then, when you tried to collect it, you realize you're not. That was another big factor.

So those two in particular were ones where the people making decision didn't even have enough visibility. And all they focus about is the fact that they have increased the auction pressure by having more buyers.

Now, the last point, which is very subtle, has to do with what is the actual value prop of having another SSP.

Some of them had -- were running auctions that were not clean, either first-class auction or something you don't even understand. It wouldn't be clear with their margin, and the net effect was that it was trying to deal with that, right, whether they're Google advertisers or other DSP advertisers.

Initially, it worked. But then advertisers became more sophisticated. They started bidding against themselves. They start realizing what DSP do what things. And I think the value of header bidding diminished over time.

Q Given that, why did header bidding adoption grow so rapidly?

A I think the concept of having multiple parties compete in the impression is actually pretty good. And I think publishers were sort of desperate forever. They'll try it.

Q Did it also -- this will be a more complicated question.

A Sure.

Q Did it increase the amount of inventory third-party SSPs, meaning exchanges, were seeing?

A It must have, yes.

Q Why must it have?

A Because anyplace that you put a header bidding tag prior to that, there was only one SSP getting it. Now, more

than one. So definitionally add more impression for every SSP.
Q Is there a value in seeing more inventory for SSPs or exchanges?
A There is.
Q What is that value?
A I mean, firstly, you know, you would have a larger denominator, right? So you might increase your numerator so you get more revenue.
Second, you can tell your buyers on the exchange that you have more inventory or you have access to publisher X, Y, Z.
Q So let me just make sure I understand. Was the argument that publishers -- header bidding made it easier for publishers to switch to other SSPs or exchanges? Am I understanding your testimony right?
A I think in the long run -- and when you say "switch," switch what, right? You need to be more specific. I think what header bidding did is it exposed them, made it easier for them to work with multiple SSPs at the same time, which can then lead to discovering some things that they like more about a particular product or a more aggressive sales strategy that will eventually lose because Google caused Google to lose the entire account.
Q It's the SSPs, meaning exchanges, that are competing

with AdX, correct?
A Correct.
Q And the header bidding is allowing those SSPs or exchanges to have more access to inventory, correct?
A That is correct, yes.
Q It's allowing those SSPs or exchanges to develop direct relationships with publishers, correct?
A Yeah.
Q Sorry. I was answering Julie. I'll restate the question.
And header bidding is allowing SSPs or exchanges to develop direct relationships with publishers, correct?
A It lowers the barriers of entry, yes.
Q Could header bidding have ultimately allowed non-Google SSPs or exchanges to see as many impressions as AdX?
A Theoretically speaking, yes.
Q What is it about access to inventory that increases the competitiveness of the SSP or exchange?
A You know, it's pretty simple, right? Like, you can compete on different things if you're an SSP. Having the most impressions is -- you know, is pretty easy for people to measure even, right?
Q But I guess I'm struggling to understand how that translates into competitiveness. Does it make AdX a better place to buy?

A Yes.
Q Why does that make AdX a better place to buy?
A I mean, at some level because you don't need to buy in other places, right? Because you get everything you need there. Let me give you an analogy, right?
So Amazon has the Marketplace, right? They send the products from Amazon. Sometimes they allow other merchants to put their products on Amazon, right? So you, as the consumer, at some point, like -- you know, I'm just going to go to Amazon. Why would I even go to Google or go into other websites and do comparison shopping? It's not just worth my time because I know Amazon has everything, or whatever.
Q So I'm just trying to understand SSP or exchange competition a little bit better being a lawyer, not somebody that deals with this every day.
A No, I get it.
Q Earlier we talked about SSPs or exchanges compete on the amount of demand on the -- the amount of demand buying on their SSP, correct?
So the demand you have on your exchange --
A Yeah.
Q -- the more -- I'm sorry.
So the more demand you have on your exchange --
A Yeah.

Q -- the more competitive your exchange is, is that correct?

A It's more competitive for publishers, but yes.

Q Is it -- is your testimony that there's also competition for access to inventory? Let me start again.

Do SSPs compete for access to inventory?

A They do.

Okay. Let me make maybe a slight suggestion, right? If we go back to the marketplace -- could be eBay, Amazon. It doesn't actually matter, right?

It's always a two-sided marketplace. There are buyers and sellers. And you get into this sort of virtual cycle thing where, if you find a way to make it more attractive to buyers, now you're competitive towards buyers. You will then use that to go to tell sellers you should sell here because I have more buyers.

And then you're going to go back to buyers and say I just got more sellers; you should buy here and shouldn't buy anywhere else.

So you get the dynamic that, you know, more parties -- doesn't matter if it's buyers and sellers -- have this virtual cycle that makes the whole thing sort of more competitive.

Q And header bidding here is undermining the network effects of offering more inventory to advertisers, correct?

A Let me think about it.
Yeah, you can say that. It is essentially back to commoditization. Yeah, it is reduced to the network effect, you can say.
Q Is it lowering AdX's differentiated value proposition for advertisers?
A Yes, it could.
Q Is it increasing other SSPs', meaning exchanges', value proposition to advertisers?
A Yes, it could.
Q Is it increasing other networks' value to advertisers?
A It could.
Q And together it's commoditizing the SSP or exchange level of the stack, correct?
A It does. But it does create a lot of new products.
Q Okay. I mean, is it fair to say that the network effects -- AdX no longer has differentiated network effects compared to its competitors due to header bidding?
A I wouldn't say "any longer." I think it will have --
Q I didn't get your answer.
A Yeah. Let me repeat myself.
I wouldn't say it no longer has a network effect. I think it weakens it.
Q Okay. But it strengthens other SSPs' or exchanges' network effect?

A Yes. But you also have the opposite scenario, right, where somebody was exclusively, you know, sort of speak with one SSP and, because of header bidding, now AdX has access.
Q Does it also put pricing pressure on AdX?
A What do you mean by "pricing pressure"? Pricing of what?
Q Did it put pressure on AdX to reduce its revenue share?
A We have not lowered the rev shares, to my knowledge. So I don't know. I mean, I can speculate.
Q Was a concern that the commoditization of the SSP or exchange would lead to a pricing war?
A I think we were in some sort of pricing war that we refused to participate in, right? That probably made it worse.
Q How did you refuse to participate in a pricing war?
A You know, you just lose customers instead of lowering prices.
Q Did Google lose shares as a result?
A I don't know.
Q Why -- first of all, did you understand GDN or Google Ads to have differentiated demand?
A Yes.
Q And why was its demand differentiated?
A Because primarily -- because primarily, of all the technology that essentially Bamen and Ali's team build,

right, to produce ROI you know the advertisers want, right? And, you know, we don't -- we don't buy *USA Today*. We don't care, you know, where -- from a GDN lens where you buy the things.

We just look at based on availability of signals and based on some of technologies, right, and based on some restrictions we have and where we want to buy and whatnot, right? So yes, in that regard, it is a differentiated demand.

Q And I know that we keep going over this point, but is there a group of advertisers that only buys on GDN or Google Ads and don't buy anywhere else? I mean -- oh, sorry.

A And don't buy where else? I mean, that's a very broad question.

Q On the DSPs.

A I believe there is a large category of usually small advertisers don't buy on DSPs. I do believe those, especially now, would buy on FAN and Amazon. Why wouldn't they?

Q Okay. That's helpful.

Is there anyone else those small advertisers could buy other than FAN and Amazon?

A I think some of the networks probably offer self-service products, you know, like in Amobee or Criteo is still in business, right? And I don't think, you know --

wait.

And I don't know what, you know, the reason Criteo doesn't have small advertisers is because of the complexity of what I told you earlier, but probably have a long-tail product.

MS. WOOD: Thank you very much. I appreciate your assistance.

THE COURT: All right. Now I'll take the afternoon break until 4:30.

MS. WOOD: Thank you.

(Brief recess taken.)

THE COURT: Ms. Wood.

MS. WOOD: All right. Yes, Your Honor. So now we -- the litigation deposition of Mr. Lipkovitz was actually videotaped unlike the investigation deposition, which is why we read that one in. So now we're prepared to play the video of Mr. Lipkovitz's deposition. I believe the run time is approximately an hour and 16 minutes.

THE COURT: Is it repetitive of what we just had read in?

MS. WOOD: It should not be, no, Your Honor.

THE COURT: All right.

MS. WOOD: There are two limited instances where I believe Google wants to maintain an objection. So we'll just pause the video at that point. You should have in

front of you the binder, and we'll note the page and the line number where the question was asked. I don't believe there was an objection at the time. I think there's an objection now.

THE COURT: Just so I know, what's the page we're talking about?

MS. RHEE: Actually, Your Honor. To make everything efficient and not to have to pause, the first one is on page 127 of the deposition, and it's lines 12 through 14.

THE COURT: The question is, "Did you think it was part of the culture in the group at that time?"

MS. RHEE: Correct, and the answer is, "Correct."

THE COURT: Well, it's simply his opinion about the culture at Google. It's one person's opinion. I don't think that's enough to add much to the case one way or the other, and it really is not appropriate. So I will strike lines 12 through 14.

MS. WOOD: Your Honor, may I respond?

THE COURT: Very quickly.

MS. WOOD: I would just, again, underscore that this is the director of engineering who was the head of display at the time. So I don't believe it would be appropriate to characterize it as just one person at Google. This was the person in charge of the display group and

engineering at Google.

THE COURT: But you've already said it was intellectually dishonest in my opinion. You're getting in with --

MS. RHEE: Of course, we're not objecting to that line. So we understand.

THE COURT: Right.

MS. RHEE: And then similarly, we have a very similar objection to page 196, Your Honor, lines 13 through 15.

THE COURT: That's all right because I think he --

MS. RHEE: Correct, Your Honor. We're not objecting to that.

THE COURT: Well, you have to read above that. So his answer, "Well, you know, I think it's within our right to do that, but it's not a solution would propose."

Then the question was, "Why is it not a decision that you would propose a solution you would propose?"

And he said, "It's sort of lazy."

I mean, that's all right because I think he's --

MS. RHEE: Correct, Your Honor. We're not objecting to that. It's then just the add-on point where it really just goes to the --

MS. WOOD: Are you at 196, line 8, Your Honor?

THE COURT: I'm sorry. I was at 195. 196,

line 8?

MS. WOOD: Yes, Your Honor. It's obviously responsive to the things discussed on 195.

THE COURT: Well, I am letting 195 in.

MS. RHEE: Well, we didn't object, Your Honor, to 195.

THE COURT: I'm sorry. What is your objection to?

MS. RHEE: Page 196, Your Honor, lines 13 through 15.

THE COURT: I'm allowing that in.

Okay. Let's go.

MS. WOOD: They're in your binder, Your Honor.

THE COURT: All right.

(Video played.)

MS. WOOD: Okay. We pause here. It's just pausing to take out the objection.

(Video played.)

MS. WOOD: It's PTX 399.

(Video played.)

MS. WOOD: That's PTX 1520.

(Video played.)

MS. WOOD: This is PTX 395.

(Video played.)

MS. WOOD: This is PTX 3467.

THE COURT: Thank you.

(Video played.)

(Video ended.)

THE COURT: Perfect timing.

MS. WOOD: Your Honor, may I just move a few exhibits in? Or I'm happy to do that in the morning as well.

THE COURT: I think we need to do it in the morning because I am concerned. My view is, if we're not using all of an exhibit, only those portions that we're actually using should be going into the permanent record of the case. So several of these exhibits, you were only taking portions of them.

So what I'm going to ask you to do, again, because I'm not formally admitting them at this time so you don't have the 10:00 tomorrow morning problem. Okay?

MS. WOOD: Thank you, Your Honor.

THE COURT: But these exhibits that we've talked about during this deposition -- we'll do that other stuff in a second -- I want you to make sure, first of all, that Ms. Rhee agrees with what you're doing. Redact them. All right? And then we'll put the redacted ones into the formal record.

MS. WOOD: So redact everything that was not discussed?

THE COURT: Exactly.

MS. WOOD: Understood, Your Honor.

THE COURT: All right. However, I think there are some other exhibits that were admitted today.

MS. WOOD: Yes, Your Honor.

THE COURT: Actually we still have a problem with something as well. Remember there was one -- where is it?

MS. WOOD: PTX 754?

THE COURT: I think that's it.

So Katie is going to read to you the exhibits other than the ones we discussed during this deposition. We're going to read the exhibits that we believe have been admitted. And there's one that I think only a portion of it comes in. All right?

MS. WOOD: The only other question I have, and I'm happy to do it in the morning instead, but we had talked about Mr. Lipkovitz was one of the individuals that we had agreed would not need to come in person; and, in exchange for that, we would, obviously, play his deposition.

But we also have some additional exhibits that were not played at his deposition. These have not been objected to by defense counsel, is my understanding. And I would like to move those into evidence. But I can do that in the morning.

THE COURT: No. Let's get that done tonight.

Hold on a second.

All right. Well, first, let's have Katie read the ones that we believe are in. Okay?

THE COURTROOM DEPUTY: PTX 754, DTX 404, DTX 382, DTX 655.

MS. WOOD: Yes. And I have in my notes, Your Honor, for PTX 754, only the laser email comes in, not the top email.

THE COURT: Correct. Okay. Thank you.

So those are the exhibits that were admitted today.

Were there any new demonstratives, or yesterday did you upload all the demonstratives?

MS. WOOD: There were no demonstratives for plaintiff.

MS. RHEE: No new demonstratives for Google.

THE COURT: All right.

MR. ISAACSON: Martha Goodman had the one where the red box went around.

MS. RHEE: Oh, sorry. Apologies. There was the additional --

THE COURT: That was done actively in court.

MS. RHEE: Correct.

THE COURT: Have you got a screenshot of that?

MS. RHEE: Yes, we have a screenshot, Your Honor.

THE COURT: What number is that?

MS. RHEE: That will be Friedman Demonstrative 1.

THE COURT: Okay. So that needs to be put on the web tonight. All right.

MS. RHEE: It will. And I thank my colleagues for reminding me.

THE COURT: That's great. So that takes care of that piece of housekeeping.

So tomorrow the first thing we'll do is get the exhibits worked out.

Then are you still -- I have on my list Arnaud Creput. That's to be a reading; is that correct?

MS. WOOD: So, Your Honor, tomorrow morning is one of those mornings where we accommodated a Google former employee for a specific start time. So that will be at 9:00, first thing, Brad Bender.

THE COURT: All right. And he is a government witness. So --

MS. WOOD: Yes, he is, Your Honor. He's an adverse witness, but yes. And so that will be at 9:00.

And then what I think we will do is defer the Creput read-in to a later time, which we can negotiate with Google. It's ready to go, but we also have other -- a live witness, Professor Ravi. We may be calling Mr. Zeng. We'll let Google's counsel know tonight a final decision on whether we're calling Mr. Zeng or saving him for rebuttal.

THE COURT: All right.

MS. WOOD: Then we do have some additional videos. And then later in the afternoon, Mr. Dederick will be the first live witness for tomorrow.

THE COURT: Again. I just want a list. Tomorrow morning is fine.

MS. WOOD: Thank you, Your Honor.

THE COURT: Tomorrow is Wednesday. Let me just give you a heads-up. Wednesday and Thursday normal start time, 9:00. We'll go all day.

Friday morning, because I have now a couple of matters on my civil docket, we're going to start at 9:30. All right. So you can go to the bank on that.

Right now it looks as though Monday and Tuesday of next week, we can definitely start at 9:00. I'll let you know if something changes, but right now we're keeping it under control.

All right. I think that takes care of everything.

MS. WOOD: Do you want me to move the Lipkovitz additional ten in or do that in the morning?

THE COURT: There's no objection at all?

MS. RHEE: No.

THE COURT: All right. Let's get them in, then; then you can just post them tonight. All right.

MS. WOOD: So there are six exhibits that relate

to the subject of the tie between Google Ads and AdX.

THE COURT: All right.

MS. WOOD: The first one is PTX 183.

THE COURT: Go ahead.

MS. WOOD: The second one is PTX 264.

THE COURT: Okay.

MS. WOOD: PTX 290, PTX 330, PTX 443, PTX 1510.

Then there are two exhibits that relate to the AdX take rate. They are PTX 417, PTX 562.

The next relates to header bidding, PTX 533. And the last in association with Mr. Lipkovitz relates to barriers of entry to the advertiser ad network, and that's PTX 195.

THE COURT: All right. All of those exhibits are also in evidence at this point. All right. So they will also be posted before 10:00 tomorrow morning. Correct?

MS. WOOD: Thank you, Your Honor.

THE COURT: Anything further on this case? If not, we'll recess Court for the evening.

MS. WOOD: Thank you.

(Proceedings adjourned at 6:02 p.m.)

----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/

Rhonda F. Montgomery, CCR, RPR

# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

----------------------------x

| | |
|---|---|
| UNITED STATES, et al., Plaintiffs, | Civil Action No.: 1:23-cv-108 |
| versus | Wednesday, September 11, 2024<br>Alexandria, Virginia |
| GOOGLE LLC, Defendant. | Day 3 a.m.<br>Pages 1-147 |

----------------------------x

The above-entitled bench trial was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 8:59 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:
GERARD MENE, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

JULIA TARVER WOOD, ESQUIRE
AARON TEITELBAUM, ESQUIRE
JEFFREY VERNON, ESQUIRE
MICHAEL FREEMAN, ESQUIRE
DAN GUARNERA, ESQUIRE
MICHAEL WOLIN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW
Washington, D.C. 20530
(202) 894-4266

(State of VA)
JONATHAN HARRISON, ESQUIRE
OFFICE OF THE ATTORNEY GENERAL
OFFICE OF THE SOLICITOR GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704

A P P E A R A N C E S:

FOR THE PLAINTIFFS: (State of CA)
ELLIOTT DIONISIO, ESQUIRE
OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
300 South Spring Street
Suite 1700
Los Angeles, California 90013
(213) 269-6681

FOR THE DEFENDANT:
CRAIG REILLY, ESQUIRE
LAW OFFICE OF CRAIG C. REILLY
209 Madison Street
Suite 501
Alexandria, Virginia 22314
(703) 549-5354

JEANNIE RHEE, ESQUIRE
WILLIAM ISAACSON, ESQUIRE
BRYON BECKER, ESQUIRE
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7300

COURT REPORTER:
STEPHANIE M. AUSTIN, RPR, CRR
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, Virginia 22314
(607) 743-1894
S.AustinReporting@gmail.com

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

TABLE OF CONTENTS

WITNESSES

On behalf of the Plaintiffs:

BRAD BENDER

Direct examination by Mr. Freeman .........5
Cross-examination by Ms. Rhee .............42
Redirect examination by Mr. Freeman .......74

RAMAMOORTHI RAVI

Direct examination by Mr. Vernon ..........91

EXHIBITS

On behalf of the Plaintiff:
Admitted

Number 587 ................................28
Number 1736 ...............................31
Number 1814 pgs 742 to 750(later modified).42
Number 1814 ...............................74
Number 1780 ...............................93
Number 551 ................................104
Number 542, Bates 335 .....................119
Number 1040 ...............................145

On behalf of the Defendant:
Admitted

Number 1508 ...............................43
Number 549 ................................54
Number 259 ................................57
Number 129 ................................61
Number 705 ................................132
Number 697 ................................145

MISCELLANY

Proceedings September 11, 2024 ............4
Certificate of Court Reporter .............147

P R O C E E D I N G S

THE DEPUTY CLERK: Civil Action Number 1:23-cv-108, United States of America, et al. versus Google LLC.

Will counsel please note their appearance for the record, first for the plaintiff.

MR. HARRISON: Good morning, Your Honor. Jonathan Harrison on behalf of the Virginia Attorney General's Office here representing the plaintiff states.

With me today is Elliott Dionisio from the California Attorney General's office.

THE COURT: Good morning. We've got you first today, that's good.

MS. WOOD: We decided it was their turn.

THE COURT: Yes.

MS. WOOD: Good morning, Your Honor. Julia Tarver Wood from the Department of Justice on behalf of plaintiffs. With me are my colleagues Aaron Teitelbaum, Michael Freeman, Dan Guarnera, Michael Wolin, and of course Mr. Mene from the U.S. Attorney's Office.

THE COURT: Good morning.

MS. RHEE: Good morning, Your Honor. Jeannie Rhee for Google. I think you know the usual cast of characters. But I also want to do note for the record Bryon Becker is joining me at counsel table today.

THE COURT: Good morning. And I think before we get started today, just recognition that today is September 11th. And some of you may know that the only trial of that case occurred in this very courtroom where you're sitting today. All right.

We'll now proceed with the case.

MR. FREEMAN: Plaintiffs would call Brad Bender.

THE DEPUTY CLERK: Can you raise your right hand.

Thereupon,

BRAD BENDER,

having been called as a witness on behalf of the plaintiffs and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

(Time noted: 9:01 a.m.)

THE DEPUTY CLERK: Thank you.

MR. FREEMAN: Good morning, Your Honor. Michael Freeman.

May I proceed?

THE COURT: Yes, sir.

DIRECT EXAMINATION

BY MR. FREEMAN:

Q Good morning, Mr. Bender. We haven't met. My name is Michael Freeman. I work with the United States Department of Justice.

Good morning.

A Good morning.
Q Could you please state your name, spelling both your first and last name.
A My name is Brad Bender, B-R-A-D B-E-N-D-E-R.
Q I want to talk to you just very briefly about prior testimony in this case and a related case that you had previously given.
You were deposed in October of 2020; is that right?
A That sounds right.
Q Now, at the time you were still employed by Google?
A That's correct.
Q Now, at that deposition you were represented by counsel for you and Google; is that right?
A That's correct. I was represented by Google in-house counsel as well as outside counsel for Google.
Q And then much more recently in June of this year, 2024, you were also deposed about Google's ad techs in the MDL; is that right?
A That's correct.
Q And you were represented by counsel at that deposition as well?
A That's correct.
Q And again, that was counsel for Google and yourself; right?

A That's correct.
Q At that deposition in June of 2024, you were no longer employed at Google?
A That's correct.
Q Prior to your June 2024 deposition, did you meet with Google's counsel prior to prepare for that deposition?
A I would have, you know, met with both the outside counsel and Google counsel, yes.
Q Just so we're clear about when you say Google's outside counsel, you mean just like a private law firm still representing Google; right?
A That's correct, yeah.
Q Okay. Do you hold Google stock?
A I do.
Q And is the estimated value at least over $1 million?
A That's fair.
MR. FREEMAN: Your Honor, at this time we seek permission pursuant to Rule 611(c) to proceed with leading questions as this witness has identified with the adverse party, that being Google.
THE COURT: Any objection?
MS. RHEE: No, Your Honor.
THE COURT: I don't mind telling counsel you can do that. I've always distrusted testimony that comes in in response to leading questions so be careful.

MR. FREEMAN: Understood, Your Honor. Thank you.

THE COURT: All right.

BY MR. FREEMAN:

Q All right. So I'd like to start with some of just your professional background, which we can run through fairly quick, but you started working in digital advertising for a company called DoubleClick; right?

A That's right.

Q What was DoubleClick?

A DoubleClick was an Internet advertising solutions company.

Q And did DoubleClick provide tools to web publishers?

A Sure.

Q Just prior to the acquisition by Google, who was the CEO of DoubleClick?

A That would have been David Rosenblatt.

Q And what were some of the main tools that DoubleClick had prior to the acquisition?

A Can you -- can you restate the question?

Q Sure. What I'm trying to get at is did DoubleClick offer -- what tools did it offer a publisher, a web publisher?

A There were a myriad of products on offer to web publishers.

Q Is one of -- is one of the products that was offered go

by the acronym DFP?
A That's true at the time.
Q And DFP would be considered a publisher ad server?
A That's fair.
Q Also, DoubleClick had a product called an ad exchange; is that right?
A That's correct.
Q You came to work for Google after the acquisition of DoubleClick in roughly 2008; right?
A That's right.
Q And once you were officially part of Google, you spent some of your early days helping to -- joint strategy planning to integrate DoubleClick with Google; is that fair?
A That's a fair characterization, yeah.
Q Again, shortly after joining Google did you take any leadership role in what I'll call the buy-side of digital display advertising?
A I would characterize it slightly differently. I was -- I was asked to take the leadership on helping build a display network to support advertisers and marketers, which would be a subset of the full buy-side offerings that Google had at the time.
Q Okay. We will -- we'll get to that ultimately, but again, you shortly after joining Google, you were then working with advertisers and marketers in those products;

right?
A That's true.
Q What I'm trying to make a distinction, at that time you were not working with publishers; right?
A That's correct, yeah.
Q In particular, did you eventually get a promotion while you were on -- with Google on the buy-side to take on more responsibility?
A Yes. I was asked to take on more responsibility over my tenure.
Q Did you get a promotion strictly to take more responsibility on the buy-side or the buy ad tools; right?
A If my recollection serves, the promotions may or may not have been tethered to the expansion of my scope.
Q I want to just talk briefly about some of the products that you were responsible for.
One of them would be a demand side platform known as DV360; is that right?
A That is one of the names that it went by over my tenure.
Q And another one I know went through another, you know, rebranding was originally maybe Google Content Network; is that right?
A Yes. That's -- that was the original name.
Q And then it changed to Google Display Network?

A Once we had built display features into it, we rebranded it, the Google Display Network.
Q And then eventually Google Display Network became under the umbrella of what is known as Google Ads; is that right?
A That's fair. Yep.
Q After about four years of working for Google, did you also gain responsibility for what I'll call sell-side products within digital display advertising?
A I don't think that timing is accurate.
Q Okay. In roughly what year do you think you took over responsibility for what I'll call sell-side products?
A I believe that was 2018.
Q What products did you gain responsibility for on the sell-side once you took that responsibility?
A That would -- at that time would have included the Google Ad Manager, which was a rebrand of what historically would have been DFP. It would have included AdSense and it would have included the exchange.
Q Where you took over responsibility for the sell-side, did you lose responsibility on the buy-side?
A I did not.
Q So at least beginning in 2018, you were in charge of products both that advertisers used and products that publishers used?
A That's correct.

Q I just want to finish up briefly your time at Google and then we'll kind of go back.
You eventually left Google display advertising to go to Google news; is that right?
A That's correct.
Q And that was roughly November of 2019?
A Yes.
Q And I think we talked about it, you then left Google in its entirety in November of 2022; is that right?
A That's correct.
Q And just so I have my timeline correct about your time at Google, you were in display advertising from shortly after the acquisition in 2008 to roughly 2019; is that right?
A That's correct.
Q Okay. I want to go back then to your time just prior to Google acquiring DoubleClick.
The CEO that you mentioned, David Rosenblatt, did he also come over and was a Google employee after the acquisition?
A Yes. I believe he was.
Q All right. There's going to be a binder and a screen, so whatever is more comfortable for you, but I want you to flip to in the binder that's going to be handed to you, the exhibits.

A Okay.

Q So I'm going to talk to you in PTX language, that's what the tabs are.

A Okay.

Q So in PTX 1814, so it would be towards the end of that particular binder.

THE COURT: Is there any objection to 1814?

MS. RHEE: No, Your Honor.

THE COURT: All right. Are you going to use the whole exhibit or just portions of it?

MR. FREEMAN: Just portions of it, Your Honor.

THE COURT: All right. So we'll follow the rule we talked about yesterday, that is only those portions being discussed will be the actual evidence in the case.

MR. FREEMAN: Well, just so -- I should clarify. There's no, like, additional email that's included. There's only one email of this particular exhibit.

What I meant by that is I will only be referencing portions of that email, but it is only a singular email.

THE COURT: Basically are you going to be relying on the pages that end in 742 to 788 or -- yeah, 788? In other words, is the entire document coming in?

MR. FREEMAN: That would be our intention but specifically, if the Court is not inclined, at least to 750, the actual email itself.

THE COURT: Is there any objection to the whole document going in?

MS. RHEE: Your Honor, with this witness given that he is literally only on the top portion of the email and that is for which he is the speaker, we don't have any objection.

With respect to what really is essentially an attachment to that email, it's just in email form, totally depends on what this witness -- or what the examination will be.

THE COURT: All right. Well, let's get started on the top part first.

MR. FREEMAN: Okay.

BY MR. FREEMAN:

Q Like I said, you can look at your binder or the screen, whatever is easiest for you.

Just to orient ourselves about this particular document, this is an email from you, Mr. Bender, in January of 2009; right?

A That's correct. It looks to be.

Q And you sent this email then to -- you sent it to one group and then cc'd another group. That being you sent it to the display GCN as we talked about, the network, engineering leads; is that right?

A That's who's on the to line, correct.

Q Then you also copied the GCN PMs or product manager team as well?
A That's correct.
Q And the subject of this particular email says, David Rosenblatt's overview of Google display strategy; right?
A That's the subject listed here, yes.
Q When Mr. Rosenblatt came over from DoubleClick to Google, was he then working in Google's display advertising business?
A I don't recall exactly where David was situated organizationally after he came across. He wasn't in an operational role as far as I recall.
Q But his duties weren't with the search engine; right?
A I don't actually know where he spent his time over that tenure. But I do know he wasn't in an operational role.
Q Well, in 2009, you shared his overview of Google's display strategy; right?
A That's accurate, yes.
Q And in particular, this, referring to the first paragraph, you sent it to your two teams because in your words, you found that it to be worthwhile to get his perspective; right?
A If you would give me a minute, I'd like a chance to review the document and then we can answer further questions about it. Thank you.

Q Absolutely.

I could see you turn the page, Mr. Bender.

What I was referring to was just that introductory paragraph that you put on this particular email.

A Sure. Yeah. I don't know who else can see the exhibit, so it appears as if I have forwarded notes taken by a colleague about a talk that David had given in Europe, and that this is basically a notes document of that talk.

Q Right. And that talk, though, was to Google, that being GCN display and YouTube sales team, so it was an internal presentation; right?

A It looks to be an internal presentation, that's correct.

Q And what you were forwarding, your words before, sharing his display strategy was you characterize it as it was worthwhile to get his perspective?

A Those are the words I used here, yes.

Q I then want you to flip to page -- three pages on that particular document, and there will be a heading at the bottom that will say, value of the platform.

A Okay. I see that.

Q So Google's display strategy, at least in 2009, was that the value of the platform by owning the primary ad server allowed the network to have a first look at each impression; right?

A That is what is written here.
Q Not only what is written but also what you shared with your team?
A That's correct.
Q And part of the value of owning the platform, and just so we're clear here we're talking about the publisher ad server; right?
A I believe so.
Q Well, do you see in the first paragraph under value of the platform, in the second sentence, it says: "It turns out that the most efficient way to access that inventory is by owning the primary ad server."
A I see that.
Q So the platform that is being discussed in this particular paragraph is the publisher ad server?
A That makes sense.
Q And for Google, that meant DFP?
A Yes. That would be the ad server name at the time.
Q And part of that -- of the value of owning DFP, was that there were huge switching costs; right?
A I don't personally know. There's a comment here that says that. I wasn't necessarily spending time on that side of the business to know.
Q And the origin of Google's interest in DoubleClick is because Google was having difficulty making their own

publisher ad server; right?
A Well, I don't know. I wasn't on the Google side to -- in terms of how they decided to acquire DoubleClick.
Q I'm sorry.
If you look at the second sentence of the last -- on the very bottom of this particular page, page 3, it says: "The origin of Google's interest was Google was way ahead intellectually but was having trouble building its own primary ad -- if you go to the next page -- server"; right?
A Okay.
Q And so the value of owning DFP to Google was that it could acquire inventory to monetize their network in this particular case going by GCN; right?
A That's what's written here.
Q That's what's written and what you shared to your team?
A That's correct. I shared these verbal comments with my team.
Q Going back to the switching cost, that switching your publisher ad server is a nightmare; right?
A I wouldn't characterize it that way. I don't have personal experience with that.
Q Okay. Well, on page 4 of this particular exhibit about, you know, a fourth of the way down, there's an asterisk in the question and then do you see a second asterisk in the question?

A I'm sorry, are we on the previous page we were on?
Q Page 4. So if you look at the very bottom, there's like a bunch of string of numbers where it says -- it will end in 745.
A Okay. 745. Okay. Okay.
Q And then there's an asterisk in the question and then right below that there's an asterisk in the question.
A Okay.
Q And in that particular question is: "Is it sustainable to be ahead on the exchange if you don't have the platform"; right?
A I see. I see the -- I see the area that you're talking about, uh-huh.
Q And it says, asterisk David, it says: "My view is nothing really matters but the platform, nothing has such high switching cost. If there's a better network or exchange, you can switch it. Switching platforms is a nightmare"; right?
A Yeah, it looks like that was David's commentary there.
Q And he further says: "It takes an act of God to do it"; right?
A It seems like an overstatement.
Q I'm sorry, I missed that. It seems like what?
A Overstatement.
Q An overstatement.

Did you say in your first paragraph to your team that be careful, there's overstatements in here?
A I said that they would find it interesting.
Q And you also said it was worthwhile?
A To get his perspective.
Q And so at no point when you sent it to your two teams did you put any caution about, you know, things you disagree with?
A Not in this email.
Q I want to go then to the other side on the network, just at the very bottom of that particular exhibit, still on page 4 ending in 745 where it says, Implications for the network; do you see that? The very bottom. It's in bold on the left-hand side.
A Oh, I see it. It's just the title.
Q Just the title.
A Okay, yeah.
Q Okay. If you go then over to the next page, that the ad exchange that DoubleClick had that Google acquired was comparable to building the New York Stock Exchange or the London Exchange?
A I see the -- I see the area you're referencing, yep.
Q You shared with your team that what Google has created is what's comparable to the New York Stock Exchange or the London Stock Exchange?

A Any time you're trying to describe a complex system, metaphors or analogies can be helpful to understanding. It's clear that we weren't building another financial exchange. So definitionally, it is a metaphor, and that's how I took it at the time and my team would have taken it.
Q Understood.
And so in other words, Google was intending to do to display what Google did to search; right?
A I wouldn't agree with that characterization but that is what's here.
Q Again, though, you didn't share that with your team that you disagreed with anything in here; right?
A I forwarded the whole of the notes intact.
Q With no words saying that you disagreed with any portion of it?
A I would have shared a variety of things with my team, some of which I agreed with; some of which I disagreed with.
At the beginning of the email, it noted that we had a GCN vision meeting occurring the following week where we might have had discussion about all of these things.
Q And if you go to the next page, so ending in four -- or 747, excuse me, do you see that?
When talking about the Google content network, so staying on the financial analogy or metaphor, is that the GCN, the advertising ad network, was like Goldman in

relationship -- as Goldman in relationship to the New York Stock Exchange; right?

A David himself says: "This isn't a perfect analogy."

Q Right. But it is an analogy?

A It is one analogy that one could use.

Q And the analogy is that Google would be both Goldman and own the New York Stock Exchange?

A As a metaphor, at a very high level, I think it's useful to simplify a very complex dynamic. The reality is, these things are very different when you get to a deeper level.

Q And in particular, though, the way it was structured is that Google was hedged a bit. Meaning that if another network turns out to be better, Google still makes money; right, through the exchange?

A That is what's written here.

Q And when we're talking about the exchange, we're talking about Google's AdX; right?

A That would be -- that would be what he would be referring to, yes.

Q We can get to this later, but the take rate of AdX was 20 percent; right?

A That -- that sounds right.

Q And that was consistent throughout your time at Google display?

A I believe so.
Q And then if you go just two more pages up to page 8 of the actually document but it ends, if you're looking at the bottom right, in 749.
Are you with me?
A 749. Uh-huh.
Q So the goal of Google's display strategy in 2009 was that if you executed on these things, you would be able to crush other networks and that's the goal; right?
A So I would disagree with that.
Q That's what you sent to your team, describing it as a worthwhile read, was the ultimate goal was to crush other networks?
A Again, I called it an interesting read. It would have been something we discussed, and this would not have been how I felt about it at the time.
Q Not only did you say it was interesting, though, we've gone over this, you also said it was worthwhile to read?
A I did.
Q I want to then jump to your time in terms of the buy-side when you were just overseeing the buy-side products.
A Okay.
Q So we've talked about it. There was I know different names but DV360 was one of them, and then ultimately was a

network, which is now under the umbrella of Google Ads; right?
A That's right.
Q Okay. I just know all the name changes can get confusing all the time.
So I just want to establish some of the differences between those two things, the ad network and the demand-side platform.
A Okay.
Q Okay. And so Google Ads you have previously described as simpler or a turnkey solution; is that right?
A Yes. That was one of the value propositions we tried to build on the network.
Q And the advertising ad network typically paid Google by a cost-per-click basis; is that right?
A So advertisers and marketers were able to describe their objectives in the interface, and then had the opportunity to pay in various ways. Cost-per-click was one of those ways. They could also pay cost per view, cost per acquisition, cost per mille or CPM.
There were multiple ways, but I would say the majority way that these advertisers and marketers chose to bid was on a cost-per-click basis, and so then they would pay only if their advertisement received a click.
Q At the time your took responsibility for the ad

network, were advertisers using the ad network purchasing inventory on third-party exchanges?
A At the time I took over responsibility, I -- no, I don't think so.
Q Meaning kind of the inverse of that question then, meaning when you took over, the ad network was only buying inventory on things coming through Google's AdX?
A I wouldn't characterize it that way.
Q How would you characterize it?
A There were multiple sources of inventory for the network. The starting point would have been the AdSense tags that existed on many publishers across the web. When the ad exchange came across with the acquisition, that was another place that an integration was made. Over time there was backfill from the AdMob network, there's backfill from YouTube.
So there was a variety of inventory sources over time that were available to buyers who were using the network.
Q Appreciate that.
So the only exchange used by the ad network when the time you took over -- I know it changes which we'll get to -- the time you took over, was only using the exchange of AdX; is that fair?
A The initial exchange that the network was integrated

into was the exchange, yes. That came across in the acquisition.

Q And that is different than DV360, meaning at the time you took over DV360, DV360 was buying inventory on third-party exchanges.

A That's correct.

Q During your time when you were in a leadership role on what I'll call the buy-side, did publishers start using a technology called header bidding?

A I believe they did during that time frame.

Q And header bidding allowed publishers and advertisers to bid on inventory without using any of Google's products; right?

A That sounds right.

Q And some of the inventory from header bidding then was made available on third-party exchanges; right?

A I believe that's accurate.

Q And if an inventory was sold by header bidding through a third party exchange, okay; are you with me?

A Yep.

Q Then that meant that Google's AdX wouldn't be able to use or take their take rate; right?

A That -- that sounds right.

Q When DV360 was purchasing inventory made available on third-party exchanges, did Google implement any spam or

cybersecurity filters?
A I don't -- I don't recall.
Q Do you recall any effort within digital display advertising to have in-house, let's start with, spam filters?
A So generally, yes.
Q And did those spam filters also apply to DV360 when they were buying on third-party exchanges?
A Yeah, that's what I don't -- I don't recall.
Q So you're saying it's possible that Google was permitting advertisers to buy on third-party exchanges with no spam filter?
A I think part of the value proposition of DV360 is that it's a conduit for advertisers to be able to buy across multi exchange. And there's an understanding there that if something fraudulent or spammy happens in those cases, that the -- you know, that would be -- the onus would be on the advertiser.
Q Were you ever told that DV360's or customers using DV360 were providing a huge chunk of revenue to publishers using header bidding?
A I believe I may have been, yes.
Q And you can go back either to the screen or -- this is PTX 587.
THE COURT: Any objection to 587?

MS. RHEE: Court's indulgence. No, Your Honor.

THE COURT: All right. It's in.

(Plaintiffs' Exhibit Number 587 admitted into evidence.)

BY MR. FREEMAN:

Q I want to start then with the email about midway or just past, on the first page, where it says forward message but from Jonathan Bellack; do you see that?

A I do.

Q So this email was sent on March 16th of 2018 to you?

A Yes.

Q Who is Jonathan Bellack?

A Jonathan Bellack is a product director at this time responsible for the sell-side platform.

Q When you took responsibility over the sell-side or products within the sell-side, did Mr. Bellack report to you?

A Yeah, he would have when that team rolled over to me.

Q In particular, in this email he communicates to you that a huge chunk of publisher header bidding revenue is Google demand going outside our ecosystem; right?

A I see that's the way he characterizes it, yes.

Q Okay. And then just above it is from the same day, you know, later that afternoon you see 12:59 from you; do you see where I am?

A I see my forward of the email, yes.

Q And you forward the email then to you say Payam; do you see that?
A I do.
Q And then I think we can connect the dots, that it's Payam Shodjai? Apologies if I'm mispronouncing his last name.
A That's who I was forwarding it to, yes.
Q And who is or who was Payam to you?
A So Payam was responsible -- so it was another product director on my team responsible for the bid manager product.
Q And the bid manager product would have then been at least a subset of the DV360 product that we're talking about?
A That's correct.
Q So you forward to Payam and your response was: "This seems pretty broken"; do you see that?
A I do.
Q So what you thought was broken was that Google was a huge chunk of publisher header bidding revenue outside your ecosystem; right?
A By this time we had a better understanding of some of the problems with header bidding, and so having things flow to header bidding inventory would have been broken in my mind.
Q And then you see then at the top email Payam responds

to you, and says: "Agree, this is broken"; do you see that?
A I do.
Q And the problem that he identifies with header bidding is that it merely exists; right?
A That is what is written here, yeah.
Q And in particular he says: "The origin of header bidding is because publishers felt locked in by Dynamic Allocation in DFP"; right?
A Again, it's not my email, so that is his characterization, which I don't necessarily agree with.
Q Did you respond to that and say you disagree with it?
A I don't recall.
Q Well, let's talk about your potential response then.
You used Google's chats as you were an employee at Google; is that right?
A Sure. On occasion.
Q And, in particular, you used chats for substantive purposes; right?
A I wouldn't say that. I generally wouldn't use chats for substantive conversations.
Q Were you ever contacted then in this particular litigation to ask that question of whether you used chats for substantive purposes?
A I believe I was. I was surveyed, and I would have said something to the same effect.

Q So your testimony is that you did not use chats for substantive purposes, that's what you're saying?
A I said I generally wouldn't use chats for substantive purposes. If there was something substantive, it would have come up in another form factor, an email, a document, a meeting.
Q So you're saying if the result communicated to the Department of Justice was you used occasionally substantive chats, that would have been an inaccurate representation?
A I'm saying in general, I wasn't using chats for substantive conversations.
Q But you were using chats then, to some degree, for substantive purposes?
A I would say it's possible that there was something like that, but likely we would have moved those to another form factor, such as a meeting, a document or an email.
Q Well, let's remove the doubt and look at PTX 1736.
THE COURT: Any objection?
MS. RHEE: No, Your Honor.
THE COURT: All right. It's in.
(Plaintiffs' Exhibit Number 1736 admitted into evidence.)
BY MR. FREEMAN:
Q Are you with me?
A I am.
Q Do you see the format of PTX 1736 is not like an email

but like a chat; right?
A It looks like a chat, yes.
Q And you're discussing in this chat with Payam, the same person who was on the email that we just looked at; right?
A That's correct.
Q Now, I don't want to get into specifics necessarily, but you would agree this is a substantive chat; right?
A And the history would have been on to capture this substantive chat; correct?
Q Well, we can talk about that.
So would you agree, though, let's start here of this substantive -- you agree that you were communicating with Payam substantively in PTX 1736; right?
A This was fact-finding, as far as I can tell. And then we would have had this discussion again where later on I say it's worth reopening.
Q I have a simple question. 1736 is a substantive chat; right?
A It seems to be.
Q Okay. And, in particular, were you ever notified by Google, or were you aware that you were to preserve chats pursuant to a litigation hold?
A I would have been, sure.
Q When did you become aware that you were to preserve chats pursuant to a litigation hold?

A In -- I believe in October 2019 I would have received a litigation hold related to this matter.
Q And a default setting then for chats for you was history off; right?
A I would have left the defaults at whatever it was set to.
Q So did you take any affirmative steps to turn history on in order to save substantive chats?
A I -- I don't recall, by the way.
Q But you don't recall taking any affirmative step to save substantive chats?
A That's fair.
MR. FREEMAN: Your Honor, I think we already did this, but we would seek the full admission of 1736.
THE COURT: It's in evidence.
MR. FREEMAN: I must have missed it. We would seek the admission of 1736.
THE COURT: Yeah. It's in.
MR. FREEMAN: Okay. Thank you.
BY MR. FREEMAN:
Q I'd like then to go back to the email that we were discussing.
A Can you remind me of the number?
Q Yeah. PTX 587.
A Thank you.

Q And so back to Payam indicating that "header bidding was born because publishers felt locked in by Dynamic Allocation"; right?
A That that's his language here.
Q And Payam indicated that header bidding gives many publishers better yield; right?
A Again, his language in this email.
Q Yield is more money; right?
A That's right.
Q And so it was a no-brainer for a publisher to adopt header bidding; right?
A Yeah. Again, that's what he writes here.
Q And at the time, at least in 2018, Google was having difficulty having distinction between what is header bidding inventory and what is non header bidding inventory?
A I believe that's true.
Q So one of the proposed solutions to the rise of header bidding, do you see where -- "but none were going to be silver bullets"; right?
A I see that section, yeah.
Q And the first one that Payam suggests is Exchange Bidding, also known as EB; right?
A Yep.
Q What is Exchange Bidding?
A I don't recall to give you a good definition.

Q You don't recall that Exchange Bidding was then allowing for more purchases in real time?
A That -- that sounds right. It's been a number of years since I was involved in the business, so ...
Q And the problem that Payam identifies with Exchange Bidding is "it stems the bleeding"; right?
A I see. I see that's what he writes here.
Q "And Google thinks it's better to cannibalize ourselves than to see others take share from us"; right?
A Yeah. I don't know what he meant by that.
Q But the problem with Exchange Bidding was that it had too low of a margin of 5 percent; right?
A Yeah. Again, this is -- this is what Payam's writing here.
Q Well, Payam worked for you; right?
A He did.
Q And this is him communicating in real time his thoughts to his boss -- that being you -- in 2018; right?
A That's true.
Q And he would have done his best at that particular time to be truthful and accurate with you; right?
A That's fair.
Q And the low Exchange Bidding margin of 5 percent is significantly different than AdX's take rate of 20 percent; right?

A That sounds accurate.

Q You were also a proponent or advocate of the advertising ad network -- of the advertising ad network buying on third-party exchanges; right?

A That's true.

Q And just one point of clarification before we move on.

One of the proposed solutions for -- to stem header bidding was Poirot; right?

(Reporter interrupted for clarification.)

MR. FREEMAN: Poirot. Sorry. P-O-I-R-O-T.

THE WITNESS: I don't -- I don't recall.

BY MR. FREEMAN:

Q But that was at least -- do you still have PTX 587 in front of you?

A I do.

Q That was one of the suggestions that Payam made?

A It's listed here. Poirot, from what I can recall, was related to how do you handle first-price auctions.

Q Going back to -- you were a proponent or advocate, however you would describe it, of the ad network buying on third-party exchanges?

A I was, yes.

Q And you continued to be like that through your time at Google Display?

A I believe I, yeah, kept that stance.

Q And you kept that stance of advocating for the ad network to buy on third-party exchanges knowing that at least some header bidding inventory was being made available on those third-party exchanges?
A I -- I wouldn't characterize it that way.
Q Well, we just went over, through PTX 587, that you were told that header bidding inventory was being made available on third-party exchanges; right?
A So the date of the email we just looked at was 2018. My advocacy for the AdWords bidder started before that, likely before the phenomenon of header bidding existed. And one of the -- one of the concerns we had with buying into third-party exchange environments from the network was protecting the network buyers from spam and fraudulent inventory. So building up those defenses was paramount to, you know, enable us to do that rollout.
Q That's why I asked you, though, that your position on the ad network buying on third-party exchanges remained consistent, and you said correct.
A I would say largely consistent. My understanding of the dynamic certainly evolved over my tenure.
Q But at no point did you advocate that the advertising ad network or the demand-side platform should no longer bid on third-party exchanges; right?
A That's fair.

Q So back to my question, which is: Even after being told that header bidding inventory is made available on third-party exchanges, you wanted to bring in more of Google's customers into the third-party exchanges?
A I -- I wouldn't characterize it that way.
Q Well, adding customers using the ad network to third-party exchanges, that would be increasing the number of buyers; right?
A Potentially.
Q And so, potentially, you were advocating then for more buyers to bid on header bidding inventory on third-party exchanges?
A What I'm saying is temporally, I am not sure about what you just said.
Q But temporally, like you said, you never advocated to pull out of bidding on third-party exchanges?
A That -- that is -- that is fair.
Q Even after receiving the email of 587; right?
A That's fair.
Q And just so we can put a name to it because there's so many names and acronyms in this case, the actual product of rollout of the ad network buying on third-party exchanges was AWBid or A-W-B-I-D; right?
A Yes, that's correct. It would have previously been called XBid.

Q X standing for cross exchange?
A Correct.
Q But the rollout of the product AWBid, did that allow the advertising network to bid on any inventory on third-party exchanges?
A No.
Q What did it limit it to? What type of inventory, is my question.
A So the initial rollout of AWBid was focused on the remarketing use case.
Q Just at a high level, can you describe what remarketing advertising is?
A Sure. There are many ways remarketing could be used. I'd say the exemplar use case is a -- a user who's using a browser like Chrome, goes to a website, puts something into their shopping chart and then doesn't make the purchase. And what this technology will do is establish two lists of browser IDs, the ones who landed on the shopping cart page, and also the ones who landed on the thank-you-for-purchasing page. And what you can do is a Boolean operation where you remove the IDs that had successfully completed the purchase, you're left remaining with a set of very interested, you know, browser IDs in effect. And what remarketing does is where you see those browser IDs in your advertising, you could reach them with a specific message, hopefully helping

complete the purchase.
Q And, again, when AWBid was launched, it allowed for bidding Google's customers to bid on third-party exchanges but only in the context of remarketing inventory?
A As it relates to the network, yeah. Customers who were using that front door. Google customers could use the network and/or DBM or, you know, DV360. If they wanted to buy multi-exchange, they could use DV360; and if they wanted the more turnkey solution, they could use the network for that.
Q Just one point of clarification to make sure -- because there's so many acronyms.
You said using DV360 was the more -- the buyer had more control over what they purchased; is that fair? Less automated is what I'm trying to get at.
A I would say DV360 enabled buyers to buy across that full range of third-party exchange inventory, and they would manage those campaigns themselves but did also use some automation.
Q And then when you talk about the network, I think we've already established that that is under the umbrella of Google Ads now?
A Right. Google Ads' customers largely would come into the AdWords interface, set up their campaign objectives. If their campaign type was remarketing type, in those cases,

those campaigns could run across the third-party exchanges that we had integrated with.

THE COURT: And if they were not interested in remarketing, then what?

THE WITNESS: If they were not interested -- on the network side? They would run across the side swath of inventory that we already had available there.

THE COURT: And stayed within the Google network.

THE WITNESS: It would have been AdSense, the AdExchange, AdMob backfill, YouTube backfill, yeah.

BY MR. FREEMAN:

Q At the time you left Google display advertising, was what you just described true, meaning Google Ads -- just for clarity, Google Ads could buy in third-party exchanges, but only in the context we've just gone over?

A As far as my recollection, that's true.

MR. FREEMAN: One moment, Your Honor.

(Pause.)

MR. FREEMAN: Your Honor, I have nothing further.

Just for clarity, PTX 1814, we move the first nine pages for it to be -- meaning the full email, but as Ms. Rhee has already indicated, we are not seeking to admit the attachments.

THE COURT: All right. Hold on one second. So the first nine pages stop at one Bates stamp number? 57, is

that right?

MR. FREEMAN: For completeness, it would be 750, but 750 merely just has Mr. Bender's email address on it. But that would not be an attachment.

So we would move from 742 to 750, but not any pages after 750, which are the attachments.

THE COURT: Let me make sure everybody agrees with that then. So 742 to 750, that is what is in for Exhibit 1814 and nothing more; right?

MR. FREEMAN: That's correct, Your Honor.

THE COURT: All right. Very good.

MR. FREEMAN: Thank you. We pass the witness.

(Plaintiffs' Exhibit Number **1814 pgs 742 to 750 (later modified) admitted into evidence.)**

CROSS-EXAMINATION

BY MS. RHEE:

Q Good morning, Mr. Bender.

A Good morning.

Q My name is Jeannie Rhee, I represent Google, and I will be asking you a couple of questions this morning; okay?

A Yep.

THE COURT: Do we have books for ...

MS. RHEE: Oh, of course, Your Honor.

THE COURT: All right. Ms. Rhee.

BY MS. RHEE:

Q Now, Mr. Bender, I just want to go back to the beginning.

When you joined Google in 2008, just from your direct examination we take it that you were working on Google's buy-side tools?

A From early on after I joined, I was working on the development of what became the Google Display Network.

Q And that's now Google Ads?

A Yes.

Q And, to your knowledge, does Google Ads enable the purchase of ads that appear in apps?

A Yes, it would.

Q And what about native ads?

A Yes as well.

Q And what about the purchase of instream video ads?

A Yes, that's true. Uh-huh.

Q So if I could direct your attention to the binder in front of you, and it's tab 1.

MS. RHEE: And for the record, that's DTX 1508.

THE COURT: Is there any objection to Defense 1508?

MR. FREEMAN: No, Your Honor.

THE COURT: All right. It's in.

(Defense Exhibit Number 1508 admitted into evidence.)

BY MS. RHEE:

Q And if I could direct your attention to Slide 8 of this deck.

MS. RHEE: And Mr. Spalding, with your assistance, actually. Thank you.

THE COURT: And that's Bates ending 863; is that right?

MS. RHEE: Yes, Your Honor.

THE COURT: All right.

BY MS. RHEE:

Q Now, Mr. Bender, where you see a graphic in front of you, you see at the top there's a box that's labeled DV3; do you see that?

A Sure.

MS. RHEE: And the box actually that is the white one over there. Thank you.

BY MS. RHEE:

Q And, again, is that just shorthand for DV360?

A Yes, that would be. Uh-huh.

Q Okay. And then the next box is Google Ads, which we've just been talking about; right?

A That's right.

Q Okay. And then the third box is AdX buyers; do you see that?

A I do.

Q And what are AdX buyers?

A So those are buyers into the ad exchange. That could be other networks, it could be agency trading desks, those types.
Q And now when you see the lines going down to the boxes at the bottom -- let's go through each of the boxes at the bottom in turn; okay?
A Sure.
Q Okay. So the first box is non-Google.
What does that represent?
A There may be more there than I'm aware of, but certainly as it relates to the Google Ads' case, that would be the third-party exchanges that remarketing was able to run on.
Q And with respect to the next box, AdMob, what is that?
A Sure. AdMob is an app network, and Google Ads had the ability to run into those environments as well.
Q Because Google Ads can serve and transact mobile app transactions; is that right?
A Yes.
Q Okay. And then AdX, we've already talked about that.
And what is AdSense, the box there at the bottom?
A Yeah. AdSense, what I was referring to earlier, that's a separate tag that many publishers across the Internet have installed in order to get advertising from Google.
Q And now when you see all the various lines in many,

many different colors, let's try to take each one of them in turn. Okay.

So starting with DV360, when you look at this graphic, is DV360 able to connect to the non-Google exchanges?

A Yes. That would be the case.

Q And then, similarly, D360 allows its buyers to connect with AdMob; is that right?

A Correct.

Q And similarly with AdX; is that right?

A Yes.

Q And then finally with AdSense; is that right?

A That's correct.

Q Okay. And then turning to Google Ads, similarly is Google Ads, through cross exchange bidder or AWBid, able to connect with non-Google exchanges?

A That's correct.

Q Okay. And what about AdMob?

A Yes.

Q Okay. And what about AdX?

A Yes.

Q And what about AdSense?

A Certainly.

Q Okay. And finally, the AdX buyers. So those buyers who are connecting through AdX, are they able to buy on

AdMob?
A It appears so.
Q And what about AdX?
A Certainly.
Q And what about AdSense?
A They can there as well.
Q Okay. So now, Mr. Bender, you remember being asked on your direct examination about DV360 versus what was formerly the Google Display Network and now is referred to as Google Ads; do you remember those questions?
A Sure.
Q Okay. Now, what did you mean by the value proposition of DV360 versus an advertiser who would choose to go and purchase on the network?
A There are -- you know, our customers broadly on the buy-side are agencies, marketers who have a variety of goals, and depending on those goals, some choose to use Google Ads; some choose to use DV360, or, you know, DBM, and some choose to multi-home, which is used in both, and we saw a lot of customers doing that.
But what we wanted to do was help point customers appropriately to basically the best what we call front door for their goals.
Q And when you say the best front door, what do you mean by that?

A Depending on the campaign, you know, you may be an agency who has a wide variety of clients, and there are some clients that want to deploy a more turnkey optimized campaign, and in those cases, we may suggest to them that they use Google Ads.

There may be other customers who really are optimizing for broad reach who want to manage those campaigns themselves and run in a multi-exchange environment, and those customers we would point to use DBM, and then there are customers, like I say, multi-home, they find there's value in both, and over time they learn how to set those up so that they're as complementary as possible.

Q Now, you talked about how, at least at the outset when DV360 was built out at Google, that if advertisers choose DV360, the value proposition was something to the effect -- if I'm remembering your direct testimony, the onus is on the advertiser to make sure that they took care of the quality of the inventory on the other side.

Have I gotten that correct?

A Yeah, that's fair.

Q And why was the value proposition, at least with respect to the onus of making sure that the quality of the third-party inventory was what the advertiser wanted, why was that different at the network?

A Yeah. So maybe it's worthwhile just talking for a

second about the nature of a platform relative to a network. Because I think that historically there was a deal that would have been done between a publisher website and an individual advertiser. And they may have used the DoubleClick ad server on the buy-side to send those tags over to the publisher ad server, which may or may not have been the DoubleClick ad server. But really the media on which that's all transacting are outside of any certainly Google media.

So that's -- it just -- from a philosophy standpoint, things on the platform are set up to just enable those transactions to happen broadly.

When it comes to advertisers coming to AdWords or, you know, the network in this case, the -- there's a bit of a different expectation that we had helped set, which was that we would enable these advertisers and marketers to best reach their business goals, whatever they may be, and I laid some of those out earlier. And part of that is that they would be running in an unsafe, high-quality inventory. That was part of the value proposition. And so I hope I answered your question there.

THE COURT: I want you to follow up. I thought you were going to make a clear distinction between platforms and networks.

THE WITNESS: Sure. I could go into more detail

there.

THE COURT: Yeah.

THE WITNESS: So maybe going back a step in the history of a network, which is --

THE COURT: Well, a network consists of several platforms?

THE WITNESS: So I would explain it slightly differently.

THE COURT: All right.

THE WITNESS: So historically if an advertiser wanted to sell some sports shoe, they would potentially have to reach out to many publishers individually, tens, hundreds of publishers, and just the transactions there would be individual, they would be negotiating with each of them for the rate to run on their site, and then they would have to send them an ad tag. And so there's a lot of overhead, just historically, in terms of how that worked. It's more similar even to how magazines used to work as far as these individual publishers.

So the notion of a network was just to help simplify that part of buying, where the publishers would make some of their available -- some of their inventory, rather, available for aggregation. And so then an advertiser would just have to come to a single network and say I want to buy, you know, in your sports vertical. And

this network may have a sports vertical, a travel vertical. And that represents, itself, maybe 100 sites. But instead of having to transact with 100 different sites, they could share one single tag.

So that's kind of what really the historical part of a network is, and then, you know, we added capabilities at Google to improve it beyond that. But that's kind of the historically kind of perspective.

A platform is really, you know, a term that's used. It's a mechanism for enabling ad serving, but it doesn't necessarily have to do with the media at all. So, you know, many websites -- you know, CNET had its own ad server. And so, you know, when somebody comes -- an advertiser comes and asks to run a campaign, they would traffic it in their ad server, and it would run on the appropriate days.

THE COURT: But the server is basically -- loosely spoken, that's the platform.

THE WITNESS: That's right, yeah. And I would say it's kind of independent, just as far as these publishers and advertisers who are using a platform can think of it as their instance of a proprietary technology.

THE COURT: Got it.

BY MS. RHEE:

Q Just following up on the Court's question.

Mr. Bender, when you talk about the historical origin of the network and the aggregation of publisher inventory, what, if anything, did Google do to curate or call or ensure the quality of that publisher inventory made available on the network?

A So there's a lot of work done there. You know, I'd say from when I started at Google, there was even just what we would call parity functionality that needed to be built for Google such that the network that we had would even work for display advertising buyers, and part of that was ensuring that the inventory was safe and of high quality.

And so that would have been work that carried forward throughout my entire tenure, because the bad actors in the ecosystem of course were continuing to evolve, and so in order to be able to maintain quality, that work, you know, fighting spam, fighting fraud, you know, continued throughout.

Q Now I want to turn your attention to O&O, otherwise known as owned and operated properties.

Are there examples of owned and operated buying tools that are available in the market?

A Sure.

Q And can you think off the top of your head about what some of those might be?

A Sure. So to buy Facebook, you would go to their buying

tool. That's where they make their site available for targeting.

Q And does Amazon have a buying tool available if there is one?

A Amazon would have one as well, yeah.

Q And so if a Google Ads' advertiser feels like it is not reaching its campaign goal or objective using Google Ads, are they free to choose to switch their spend to any of the other ad-buying tools out there, including Facebook and Amazon?

A Oh, yeah. Absolutely.

Q And in the time that you were at Google, how often would you see that phenomenon?

A I would say fairly frequently. It's a very competitive ecosystem. The players would have evolved over my tenure. But certainly, yeah, advertisers can move their money elsewhere if they want.

Q And does that include smaller advertisers? Are they in any way prohibited from choosing to buy through Facebook or Amazon?

A Yeah, certainly not, as far as I'm aware.

Q I want to direct your attention to DTX 549, and that is tab 2 in the binder in front of you.

THE COURT: Any objection to 549?

MR. FREEMAN: No, Your Honor.

THE COURT: All right. It's in.

(Defense Exhibit Number 549 admitted into evidence.)

BY MS. RHEE:

Q And, in particular, I want to direct your attention to page 24 of this AdWords display overview.

You see this is a slide that is -- and if you just turn and flip two pages beforehand under the section called market and competitive landscape.

A Yeah, I see that.

Q Okay. So let's actually just look at --

MS. RHEE: Thank you so much. Could we make that even a little bit bigger for eyes? Thank you.

BY MS. RHEE:

Q Now, this is a projection into 2020, as well as it looks like a historical overview; is that fair?

A That seems to be what this slide is, yes.

Q Okay. And on the key code of this graphic, you see the green represents Google, the various shades of green down there?

A Right. Yeah.

Q And you see the blue represents FB, Facebook; is that right?

A Yeah. That would stand for Facebook. Uh-huh.

Q Okay. There is an orange reference to Amazon, and we'll get to why you don't see it in the graphic.

A Uh-huh.
Q And then the purple is Criteo; do you see that?
A I do.
Q And the red is other; is that right?
A Yes, that looks right.
Q And then there are some bullets to accompany this graphic, and the first bullet says: "Google's share in display is expected to stay largely flat"; do you see that?
A Yeah, I do.
Q And with a 19 percent CAGR. Is that compound annual growth rate?
A That would be, yes.
Q Okay. Is that consistent with what you observed during your time in the display ad business in terms of Google's share?
A Yeah. I don't have any reason to dispute this.
Q And, in fact, when we look at the graphic, it looks like that green slope is very gently sliding down.
A Yes.
Q Okay. Now, what about the blue -- because you see the bullet point that starts with FB; right?
A Right.
Q And does it say here: "FB is poised to outpace the market at 24 percent compound annual growth, growing to a 56 percent share by 2020"; is that right?

A Yeah, that's what it says. Uh-huh.
Q And is that consistent with your observation of the competitive landscape while you were in the display --
A That is definitely consistent.
Q And then when you look at the graphic, you see the blue part of this graphic going up?
A Yep.
Q Okay. And then, finally, you see the last bullet, which is 46 percent of the 2017 market -- because this is a 2017 doc -- is managed by others largely fragmented, Amazon poses a new threat, but they are still expected to remain very small through 2020; you see that?
A Yeah, I do. Okay.
Q And, hence, we don't see a whole lot of the orange, because in 2017, Amazon was just arriving on the horizon; is that right?
A Yeah, that's fair. Yeah.
Q Okay. So now similarly, let's turn --
THE COURT: I'm sorry. Let me ask you a question.
Do you know whether this is directed to U.S. market or world market, if you know?
THE WITNESS: Yeah, I -- I don't know. There are -- I see some footnotes here that are possibly helpful, but I don't believe I put together this slide.
THE COURT: If you can read that footnote, you

have incredible vision.

Does anybody know, for the record?

MS. RHEE: Your Honor, we will get back to you very shortly while we continue the examination for efficiency sake. Is that all right?

THE COURT: Yes. Thank you.

MS. RHEE: Okay.

BY MS. RHEE:

Q Now, Mr. Bender, if I could direct your attention to DTX 259, hopefully tab 3 in your binder.

A Got it.

THE COURT: Any objection?

MR. FREEMAN: No objection, Your Honor.

THE COURT: All right. It's in.

(Defense Exhibit Number 259 admitted into evidence.)

MS. RHEE: So now if we could go to page 4 of that slide. And again, for -- thank you, Mr. Spalding. Okay.

BY MS. RHEE:

Q And now this is a -- an assessment in the summer of 2015. If you could see the bottom of the competitive analysis internal to the company; is that right?

A Yes, that looks to be.

Q Okay. And the top here begins with -- at the very top of the white box: The programmatic competitive landscape is comprised of competitors with two types of solutions,

management and measurement. Just paraphrasing to make this go faster. Do you see that?

A Yeah. I do. Yeah.

Q Okay. So if I could direct your attention, Mr. Bender, to the management players. You see --

MS. RHEE: And, Mr. Spalding, maybe if you could make that -- yeah. Just to make sure that people can read it. Okay.

BY MS. RHEE:

Q Okay. So in the paren, it says: "Players we compete against for share"; do you see that, Mr. Bender?

A Yeah, I do.

Q What does that mean?

A My take and what I'm seeing here is this is a representative sample of -- because the competitive space in display and video advertising is very large. Many competitors, you know, on the order of hundreds. But this would have been, you know, a subset of those kind of used to highlight the competitors in these areas, more on like what we would consider the media side, which should be, you know, where our network, what I was talking about before, would play. And then on ad tech, that would be where, you know, some of our platform solutions would compete.

Q And now, in fact, if I could direct your attention to the paren at the bottom of the second column where it says

"list not exhaustive."
A Right. I agree with that.
Q "Highly saturated competitive space."
Is that consistent with what you were just explaining for us?
A Yes. Absolutely.
Q Okay. And also to the much smaller note at the bottom, it says: "This segmentation is not meant to be entirely comprehensive."
A Right.
Q "Competitors here are representative only, and they've been selected for analysis based on size of threat," and so on; do you see that?
A I do. I see that.
Q Okay. And is that consistent with what you just explained for us?
A Yeah. That's very consistent with what I just said.
Q Okay. And is this competitive analysis, at least in the summer of 2015, consistent with your experience of the competitive landscape while you were in the Google display ads business?
A It certainly is. I was saying before, the shape of which competitors were strongest at any given point in time certainly evolved over my tenure. This feels accurate to me.

Q During your time in the display business at Google, Mr. Bender, was there ever a point in time in which the competitive landscape felt less competitive and not more competitive?
A No.
Q So I now want to switch topics since some portion of your direct examination was talking about AWBid or cross exchange bid; do you remember that?
A I do. Yes.
Q Okay. Now, at Google when a product is piloted or launched in full, is there a documentation called a products requirement document or PRD?
A Yes, there usually would be.
Q Okay. And is that customary and the practice at Google?
A Yeah. I would say broader than Google, software development techniques use PRDs, and they were used at Google.
Q So I want to direct your attention to DTX 129, and, again, hopefully tab 4 in your binder.
A Okay.

THE COURT: Any objection to Defense 129?

MR. FREEMAN: We do object to this, Your Honor, on hearsay grounds. It did not appear to be written by Mr. Bender. His name appeared nowhere on this document as

far as I can see.

THE COURT: Have you seen this document before?

THE WITNESS: I have.

THE COURT: I mean, not because you're getting ready for litigation. But, I mean, during your course at Google, do you --

THE WITNESS: I don't recall.

THE COURT: Have you seen documents like this?

THE WITNESS: Certainly.

THE COURT: I'm going to allow it in.

Overruled. Go ahead.

(Defense Exhibit Number 129 admitted into evidence.)

BY MS. RHEE:

Q So now before we look at just some specific portions of this document, Mr. Bender, based on your direct examination, I take it that you were a proponent of AWBid; is that right?

A I was, and my views did evolve over my time.

Q That's exactly what I was going to follow up on.

When you say that your views about AWBid, despite being a proponent throughout, evolved over time.

Can you explain to the Court why they evolved?

A I'd say, to start, when you're operating a buy-side network, there's a naive idea that incremental inventory is a good thing. And I would say that's true, but not true if that inventory is spammy or fraudulent or, you know,

nefarious in some way. And, you know, I would say that was part of my education as we were pursuing this pilot was to -- you know, to understand the work that we were required in order to try to run incremental inventory sources that potentially had those types of issues.

Q So if I could direct your attention to page 3 of this document under Roman Numeral V, brand safe protections; do you see that?

A Yeah.

Q And you see as part of this PRD to launch the AWBid pilot, there is an explanation that AWBid will require a brand safe list of domains and publishers to protect GDN for low quality or unsafe content; do you see that?

A I do.

Q And why is that?

A Well, the expectation of advertisers and marketers that are running campaigns on the network was that they would run efficient and effective campaigns that would run on brand-safe high-quality inventory. And so it was important that we solve that issue on their behalf.

Q And just to back up so the Court can maybe understand the context here.

Why is it easier to ensure when it's entirely contained within Google, within the network, to provide quality and safety of the inventory for your advertisers

versus integrating to a third-party exchange?
A So I'm not an expert at the art of brand safety, but I can give a high-level, which is --

MR. FREEMAN: Your Honor, I'm going to object on hearsay grounds. He just said he does not know. He has no personal knowledge.

THE COURT: Do you have personal knowledge?

THE WITNESS: Sure. I've been in meetings where this is discussed. I'm just -- I'm not a technical expert in this space.

THE COURT: Given his experience in the industry, I'm going to allow him. He's not an expert, he's just a person who's got experience in the industry talking about his experience and his understanding.

Overruled. Go ahead.

BY MS. RHEE:
Q If you could please --
A Sure.
Q -- answer for the Court.
A Yeah. So basically in order to be able to detect whether fraud or spam is happening on an inventory, you need to be able to evaluate that inventory. And so the teams underneath ad quality and brand quality worked on these types of kind of filters and sniffers to be able to evaluate the inventory that was flowing through either of the ad

exchange or through AdSense, and that would be capability that was built out over time.

That capability didn't exist as it related to inventory that was available on these third-party exchanges. So those capabilities of being able to do the spam filtration, being able to detect fraud, et cetera, that was an incremental engineering build that was required in order to kind of ensure that same kind of level of safety and quality.

Q So with respect to the AWBid pilot launch, in light of what you just said, Mr. Bender, was there a reason, and, if so, why focus on remarketing?

A Yeah. Well, as mentioned earlier, you know, part of the value of remarketing is finding these browser IDs very shortly after they've potentially abandoned the shopping cart. That's the most likely time that they will then return to complete that purchase.

So there was a high value of being able to see browser IDs in more places to that remarketing use case, and so that kind of value tradeoff -- understanding that there would be incremental work in order to support it -- it was deemed valuable enough to do this for this targeting type.

Q So now I want to fast-forward after the pilot launch to DTX 230, and that is tab 5 in your binder.

THE COURT: Any objection to 230?

MR. FREEMAN: Yes, Your Honor. Objection on hearsay and double hearsay grounds. There's comments all throughout this attributed to no one.

MS. RHEE: So if I may lay a foundation, Your Honor.

THE COURT: Go ahead.

BY MS. RHEE:

Q You see in your binder DTX 230 is titled AWBid Publisher Quality Investigation; is that right?

A I see that, yes.

Q Now, when you were at Google, did you and your team, or the team that you oversaw, routinely conduct investigations into the quality of ad traffic and then actually report out the findings of that investigation in the ordinary course of running your business?

A That absolutely would have been the case, and especially for a project like AWBid.

Q And when you say "especially for a project like AWBid," why is that?

A Well, there was a concern that the inventory that was available on these third-party exchanges had higher degrees of spam, higher degrees of fraud, and understanding that better would have been important for us to be able to determine the work that we would need to put in in order to safely run on that supply.

MS. RHEE: Your Honor, at this time Google would seek to admit DTX 230.

MR. FREEMAN: We still object, Your Honor. There's still a double hearsay problem.

THE COURT: Yeah. Yeah. I'm going to sustain the objection for this one.

BY MS. RHEE:

Q So now I'd direct your attention to DTX 545 then. And right now I think we don't have it in the binder, but if we might pull it up on the screen.

A Okay.

MS. WOOD: Do you have a copy for us, Counsel?

MS. RHEE: I do in --

THE COURT: Defense 545?

MS. RHEE: Yes. DTX 545.

THE COURT: And that's not in this book; is that right?

MS. RHEE: No, Your Honor. Given the Court's ruling, I'm going to use another document.

THE COURT: All right. I need to see it as well.

MS. RHEE: Yes, of course.

THE COURT: Is there any objection to 545?

MR. FREEMAN: Yes, Your Honor. A similar objection. There are notes in the summary on page 2 that are not attributed to anyone, including Mr. Bender. A

double hearsay problem.

MS. RHEE: Your Honor, first of all, we're seeking to admit the slide itself, and we can lay a foundation.

THE COURT: Well, see if you can lay a foundation.

BY MS. RHEE:

Q You see the slide that is DTX 545, Mr. Bender?

A I do.

Q Now, is this something that you actually had direct knowledge and participation in?

A I would have been on top of these types of materials, yeah.

Q And, in fact, was this an update to your boss?

A I --

MR. FREEMAN: Objection, Your Honor. Leading in terms of foundation.

THE COURT: What does the word "custodian" mean? Not the people who are cleaning the building. So tell me why you are using that term.

THE WITNESS: I -- you can --

MS. RHEE: No. No. No. This is a question to you.

THE WITNESS: Oh, for me.

I believe this would have been sourced out of my collection of documents. So this would have been in my document file that the legal teams have access to.

THE COURT: So I'm not even sure I understand this. You've got a time created. Something was created in October of 2017, and then there's -- something was modified in March of 2018.

I mean, have you seen this kind of structure before on communications at Google?

THE WITNESS: Yeah. This appears to be metadata about the file.

THE COURT: Right. So the -- it was initially created in 2017, and several months later there was some additions made to it or corrections?

THE WITNESS: That's possible.

THE COURT: I'm going to sustain the objection.

MS. RHEE: So using the documents just to refresh recollection and not to move them in --

MR. FREEMAN: Objection, Your Honor.

THE COURT: We haven't got a foundation yet. You haven't asked the question to which he was unable to answer. All right.

Sustained.

BY MS. RHEE:

Q You previously just testified to having a particular concern with respect to the quality of ad traffic that was coming in from third-party exchanges after the AWBid pilot launch, just to level set to where we dropped off before all

of the more technical discussion about documents; do you remember that?

A That's correct. Yes, that's correct.

Q Okay. Now, do you recall having your team do some investigation around the quality of ad traffic that was coming through the third-party exchanges after the AWBid launch?

A That would have been something that we reviewed, yes.

Q And what, if anything, do you remember about those investigative findings or what the team was seeing after the AWBid pilot launch with respect to the quality of inventory coming in from third-party exchanges versus the quality of inventory that already existed on the network?

A So my recollection serves that there were instances of spam and fraud detected in those additional source of inventory, and in order to protect our customers, there would be incremental engineering work required in order to, you know, ensure that safety.

Q And when you say that there were instances, is this a one-off? A two-off? One single piece of inventory here? One single inventory there?

A Yeah, no. My recollection would be that it was fairly widespread.

Q Now, when you left the display ad business in 2019, I believe your testimony on direct is you left in November; is

that right?
A That's correct.
Q And after you left, even though you stayed at Google for a little while longer, did you have any involvement in the display ads business?
A No.
Q So I want to direct your attention to what the government showed you with respect to a 2016 chat. Do you recall that Q and A with the government attorney?
A I -- we talked about a bunch of things, but I'll take a look.
Q Just to be helpful, it's PTX 1736.
A Okay.
MS. RHEE: If we can just again highlight the date at the top there. Okay.
BY MS. RHEE:
Q In 2016, Mr. Bender, what, if anything, did you know about any DOJ or state attorney general investigation?
A I wouldn't have.
Q And to your knowledge, are you aware of whether or not there even was one?
A No.
Q And in this communication with Mr. Shodjai here when you wrote the chat, was there any intention on your part to keep the subject of the chat away from regulatory scrutiny

or investigative discovery?
A No.
Q And finally just with respect to Mr. Shodjai, at that point in time, how many employees reported to you?
A On the order of 50.
Q And when you were part of the display ads business, at any point in time did all of the employees who reported to you agree with each other?
A No.
Q And when employees wrote to you with their thoughts, what, if anything, did that reflect of your views?
A It would have been information to me, but, you know, like I said earlier, anything substantive would have been discussed in other formats, whether it was a document or a meeting, to, you know, make decisions about.
Q And at Google when you were there, especially in the display ads business, was there a robust discussion about topics of disagreement?
MR. FREEMAN: Objection, Your Honor. Vague. Robust.
THE COURT: No. We know what robust means. No. Overruled.
BY MS. RHEE:
Q If you could answer the question.
A Yeah, I would say so. We had very active discussions

of ranges of options, you know, some of which were never pursued.

Q Now, I want to direct your attention to this document that the government talked to you at length about in the direct examination, and that is PTX -- apologies, let me find it -- 1814.

Now if we could start at the very top again just so we can orient everybody to the date.

A Yep.

Q In January of 2009, how long had you been at Google?

A I believe we joined in April 2008. So just shy of a year.

Q So if I've done my math correctly, is that eight months or so?

A Sounds right.

Q Okay. And when you answered, you said that "we" had been at Google just shy of a year or eight months.

Who's the "we" in that answer?

A Oh. Well, anyone who would have come across with the acquisition. So that would include, you know, someone like David.

Q Okay. And on direct examination, you talked about how Mr. Rosenblatt, when he came over to Google at this time eight months in, I believe you said on direct, he did not have an operational role; is that right?

A That's my recollection, yeah.
Q Okay. What do you mean by an operational role?
A So my understanding is he didn't have a team, nor was he, you know, responsible for day-to-day decisions for the business. But he -- I think he was there to lend advice to ensure that the acquisition, you know, was successful until he left.
Q And when did he leave, if you remember?
A I don't recall, but I -- it's likely around the year mark of the acquisition. So it would have been likely around April of that year.
Q Okay. So after this email, is it your best recollection that he left very shortly thereafter?
A Yeah, that's fair.
Q Okay. Now, directing your attention to just what you wrote in this email, you said: "It's a long read, but when you have a chance, it's worthwhile to get his perspective."
Who is the "his" in that sentence that you wrote?
A That would refer to David. So it would be David's perspective.
I would just note, it seems like I also attached a recent analyst's report, which would be yet another perspective, the idea being giving some of my team members some additional perspectives in advance of a meeting that I was having the following week.

Q And when you say another attachment, is that the attachment that the government referred to in the examination that they did not take you through?
A I -- that may be the case.
Q Okay. And --
MS. RHEE: I think with that, Your Honor, I would pass the witness back.
THE COURT: All right. Any redirect?
MR. FREEMAN: Yes, Your Honor.
Before I get started, there was an insinuation as if we were hiding some part of 1814, so we move to admit all of it, Your Honor, including the attachments.
THE COURT: Any objection? Because you did open the door, to some degree.
MS. RHEE: No objection, Your Honor.
THE COURT: All right. So we'll change the ruling. So all of 1814 is in evidence.
(Plaintiffs' Exhibit Number 1814 admitted into evidence.)
MR. FREEMAN: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FREEMAN:
Q I want to start with one of the exhibits you were talking about on cross-examination, DTX 1508. It should be the first tab of the binder that you were given.
A Yeah. I got it.

Q The first one is starting with that first page, which we talked about before.

Your name is nowhere near -- I'm sorry. Not on the custodian field?

A That is correct, yep.

Q Nor is your name on the all custodian field?

A Correct.

Q And, in fact, throughout this entire exhibit -- which I believe is 22 pages -- your name does not appear anywhere; right?

A I haven't reviewed the full document, but that may be the case.

Q Okay. We can look at the first opening slide.

Your name doesn't appear as the author of this particular slide deck, and there's no author on it; right?

A That's true. Yep.

Q Okay. And then, in particular, you were shown page 8 of this exhibit; right? And you were --

A Yes, I recall that, yep.

Q And you walked through various questions about this particular graph that we're talking about; right?

A Yep.

Q And in particular, there's questions that this graph shows a direct line from Google Ads to non-Google; do you see the blue line?

A I do.
Q That is not -- that pattern is not the same in terms of quantity of inventory; right? Of the other lines.
A I believe that's true.
Q And it makes no distinction, this graph, between remarketing inventory and all other buckets of inventory; right?
A That's fair. Yep.
Q So it overly simplifies it to show all buckets of inventory as the same?
A That's your characterization.
Q I'm asking you what distinction are they making.
A It's not my graphic, so I don't know.
Q Well, you testified in great detail about it in cross-examination, and now you don't know?
A What I was saying is, I could identify that DV3 does run on non-Google and AdMob and AdX and AdSense. Just the words on this page, it's helpful from that standpoint, but I wasn't asked about any other detail, of which I don't claim to have further detail.
Q And, in particular, if you could then go to DTX 549, which is tab 2. Just starting on the first page. This is a slide deck, right, that was marked confidential and privileged; right?
A Okay.

Q Correct?
A It says it there, yes.
Q And was it Google's practice to mark slide decks as confidential and privileged even though there were business decisions being discussed?
A I don't think so.
Q You don't think so.
So then take your time in DTX 549 and show me where a legal question is being asked.
MS. RHEE: Your Honor, this is the exhibit that the government objected to for which we were not able to ask any questions of the witness.
MR. FREEMAN: I don't believe that's correct.
MS. RHEE: I apologize, Your Honor.
THE COURT: That's not, yeah.
BY MR. FREEMAN:
Q Maybe we can go to page 3.
The agenda for this particular slide deck says: Evolution of value proposition, 2017 revenue, customers, competitive landscape, products, and display strategy and forecast; right?
A I see that, yeah.
Q Right. And nothing on there says legal or legal question?
A Not on this agenda side, that's correct.

Q And so when you said it was not the practice at Google to mark things as confidential and privileged for business decisions, this is just the anomaly; is that what you're saying?
A That is not what I said.
Q Okay. What did you say?
A I don't believe I said much. I can talk to -- the training that happened would have helped educate people about the appropriate use of attorney/client privilege. It may or may not have been universally adopted.
Q And the training you're talking about was called Communicate With Care; is that what you're referring to?
A Yep.
Q And the instructions you got through Communicate With Care was to mark things as confidential and privileged for sensitive topics?
A As far as I recall, it would have been largely in two buckets. One is if you have a question for a lawyer, you would try to ensure that the appropriate lawyer was on the email, and insofar as that was legal kind of communication, that would be privileged.

There were other cases when there was work product that was directed by the legal team, and that would be another case where I think attorney/client privilege would have been warranted.

Q But then there's a third bucket, as indicated in DTX 549, of marking things privileged where the agenda were business decisions; right?
A Again, you asked me about the training. That's what I recall from the training.
Q Okay.
A So I don't believe the -- I don't remember if the training included anything like what you're talking about.
Q In particular, if you can go to page 14. There's a pie graph you should see.
A Uh-huh.
Q And do you see AWBid there on the right-hand side of 6.1 percent?
A I do.
Q So that line that you were shown in the previous exhibit -- and we can pull it up if you want in 1508 -- that line only represented 6.1 percent of AdWords display inventory sources?
A The way this reads to me is that this is a spend figure, not necessarily an inventory quantity figure.
Q So the spend figure of AWBid was only 6.1 percent; right?
A That's what's written here, yep.
Q And then going then to the graphic that you spent some time on on page 24 of DTX 549.

A Yes, I see that.
Q First off, you didn't make this graph; right?
A I don't believe I did.
Q And you don't remember any of the underlying data to support this graph; right?
A No. I see the footnotes the same as you.
Q And this graph that you testified about, these are mere projections; right? Not actual statistics?
A If my recollection serves, this would have included actual data per these sources up through maybe 2017, and then the projection would be beyond that.
Q So this is only Google's in-house projection of the market in 2019 and in 2020?
A I believe it would be projections including 2018 as well.
Q So the last three years on the right-hand side of the X axis, if you're with me, are projections, not data?
A That sounds -- that sounds right based on my understanding.
Q And then moving to DTX 259, in particular page 4 you spent some time on.
A Okay. Yeah.
Q And there were some questions related to -- I believe it was phrased in the questions and on the slide as the competitive landscape; right? Correct?

A That's what it's called on the slide, yes.
Q And you stated that this was a fair representation of the competitive landscape as you understood it?
A I believe if we look at the record, I was saying the set of competitors was much larger than what this slide includes. But this is a, you know, representative sample at the time, and that feels fair to me.
Q All right. But you didn't make this slide; right?
A No.
THE COURT: What do you understand the term "media agnostic" to mean?
THE WITNESS: So in my mind, this would be more of a -- the ad tech players. So more similar to that platform that I was talking about earlier where they weren't necessarily managing media themselves, but other media players were using their technology to enable ad serving in some form.
THE COURT: Versus the tech titans in the first column?
THE WITNESS: Yeah. The first column, constituency would have had their own media to manage as well.
BY MR. FREEMAN:
Q Just to follow up on the Court's question, what do you understand, in the first column under tech titans, garden

potential, what does that mean?
A There's a term that gets used in a variety of ways, the distinction between the open web and a walled garden. A walled garden can mean a variety of things, actually.
But in some cases, it's a set of media that you can only access through a log-in, would be an example of -- it's not on the open web, it's not necessarily searchable on the open web. The purchase of that inventory by buyers may also be a proprietary kind of user interface like we were talking about with Facebook as an example.
Q Your understanding of the competitive landscape as you testified on cross was much different than you testified three months ago in June of 2024; right?
A I -- I don't recall.
Q Do you recall just in June of this year stating that you didn't know how the technology of header bidding worked; right?
A I -- yeah. I believe I said something similar today.
Q And you stated that you didn't know who participated in header bidding?
A Off the top of my head, that's correct. That would have been publishers who were implementing that, which is a different set of folks in general from some of the names listed on this slide.
Q Well, in particular when we talk about parts of this

slide, you were asked what -- whether other exchanges are non-Google exchanges, to which you said you didn't know; right?
A I don't know. I don't recall the exact question I was asked.
Q Sure.
A I was trying to ask it -- and answer, you know, factually based on my information on that day.
Q So you didn't know who participated in header bidding three months ago?
A Yeah. Off the top of my head, I couldn't tell you the list of publishers that were participating.
Q You didn't know whether Facebook allowed advertisers to buy inventory on their website three months ago; right?
A That doesn't sound right, but we could take a look at the transcript.
Q Okay. So behind you is a binder -- a different binder.
THE COURT SECURITY OFFICER: This one, Counsel?
MR. FREEMAN: Yeah. The one that says deposition testimony.
BY MR. FREEMAN:
Q There's two tabs of your depositions, the one that says MDL deposition tab.
A Yeah.
Q And we'll start with -- on page 55.

A Yep.
Q On line 17 you were asked a question: "What categories PubMatic -- what categories are PubMatic and Rubicon in"; do you see that?
A Yep. I do.
Q Does reading your answer refresh your recollection of you didn't know whether they were exchanges; they were just merely on the sell-side?
A Yeah. I said they were on the sell-side, and I didn't recall if they had an exchange.
Q And then staying on that page on page 55 at the beginning -- at the very top, you see you were asked about Criteo?
A Uh-huh.
Q "Is Criteo a rival exchange?" Do you remember what you said there?
A I could read it back. It says: "I wouldn't characterize them that way."
Q And then it says: "Are they a rival ad-buying tool?"
A And I stand by this answer: "They were focused, as far as I can recall, on helping buyers reach their campaign objectives."
Q And then in particular: "Would you describe Criteo as an ad-buying tool?" And your response is you didn't know?
A Yeah. I said: "I think they were another solution

that advertiser marketers used to help reach their campaign objectives."

Q Yeah. So you didn't know what tools Criteo offered three months ago?

A They offered a solution. You can call it a tool. But I didn't know their specific tools. Advertisers would use Criteo to try to reach their business objectives. They were very competitive in their remarketing space.

Q Okay. And going back to page 49.

A Uh-huh.

Q Starting on line 19, you were asked a question: "Facebook doesn't allow advertisers to use GDN to buy web inventory on Facebook's page; is that right?" And you said you didn't know; right?

A Yeah. I think that was a question of whether GDN itself could buy on Facebook, and my answer is I'm not sure. Yeah.

Q All right. So even though you're in charge of the buy-side, including GDN for years, your testimony three months ago is that you didn't know whether you could buy Facebook inventory?

A I'd say over my tenure, things evolve. It's possible that some of that inventory was available in one of these new places that we bought, and I wouldn't want to testify inaccurately.

Q Right. So three months ago you testified you didn't know; right?

THE COURT: Counsel, it's been repeated. Move on.

MR. FREEMAN: Understood.

BY MR. FREEMAN:

Q Moving on to you answered a lot of questions about brand safety in particular to AWBid; right?

A Uh-huh.

Q But there were spam problems or ad fraud problems within Google's products; right?

A There would have been.

Q Right. So there was problems in spam coming through Google's AdX?

A That sounds right.

Q Are you familiar with an actor group called 3Ve, but spelled 3-V-E?

A Not offhand.

Q And going back to PTX 587.

A Uh-huh.

Q This is an email exchange we talked about discussing header bidding revenue going outside the ecosystem?

A Uh-huh.

Q And so when you, Mr. Bellack and Mr. Shodjai were discussing in real time the problems with header bidding on third-party exchanges, there's no discussion at all about

brand safety; right?
A That would have been well known, but it's not here in the doc.
Q There was no discussion about spam inventory being on third-party exchanges?
A Not in this email.
Q And the only problem that the three of you leadership roles at Google, was the problem was that header bidding exists; right?
A I don't agree with that.
Q You don't agree that, in real time, that's what was said?
A I -- we can see that that's what Payam wrote.
Q That's right.
A But I can also say I don't agree with that.
Q But there's nothing within this email that you indicated when you forwarded to Payam that you disagreed with any fact?
A His -- this is a response from Payam to me.
Q There's nothing in PTX 587 that talks about what you're talking about; right?
MS. RHEE: Your Honor, at this point that's --
THE COURT: Sustained.
BY MR. FREEMAN:
Q You talked about briefly chats on cross-examination.

Just how many chats did you intentionally preserve after you were given a litigation hold in 2019?
A Well, I would note I believe I got the litigation hold in October, and I left the ads team in November. So from --
Q That's not my question.
A That context is important.
I was not on the ads team for very long. And, as previously noted, I didn't generally engage in substantive conversations over chat. So I don't recall toggling it on, because if I -- you know, I would be following the instruction, but I also would have generally not been engaging in substantive chat.
Q So you don't recall whether you ever saved anything after receiving the litigation hold of chats?
A I think I've already answered that question.
Q I don't think you have.
THE COURT: We're not going to have an argument.
Just so we're clear, when did you get the litigation hold?
THE WITNESS: I believe it was October of 2019.
THE COURT: And you left in November of 2019?
THE WITNESS: That's correct.
THE COURT: All right. From the time you got the litigation hold to the time you left, did you do anything to change the default option on your system?

THE WITNESS: I don't believe I did.

THE COURT: So you didn't just switch -- as I understand, it's basically switching a button to go from erase, or whatever it's called, to history, you didn't do that?

THE WITNESS: No. I would have -- I left the defaults as is.

THE COURT: Why?

THE WITNESS: In general, I wasn't engaging in substantive conversations over chat. And so the way I would use chat, because we were geographically dispersed, it's more like bumping into someone in the hall and saying, hey, we should talk.

THE COURT: Yeah. But didn't the litigation hold say save everything?

THE WITNESS: I believe it said if you engage in substantive conversation, then you should save it.

THE COURT: Down the road, for the record, you can give me the litigation hold documents; all right?

MR. FREEMAN: Yes, Your Honor.

THE COURT: What the instructions were to the people.

MR. FREEMAN: Yes, Your Honor.

THE COURT: All right.

MR. FREEMAN: I have nothing further, Your Honor.

THE COURT: All right. Is there any recross?

MS. RHEE: No, Your Honor.

THE COURT: All right. This is the perfect time, we'll take our morning break.

Does anyone anticipate calling this witness again during the course of the trial?

MR. FREEMAN: No, Your Honor.

THE COURT: How about from Google's standpoint?

MS. RHEE: No, Your Honor.

THE COURT: All right. Then, Mr. Bender, you are now excused as a witness. That means you may stay and watch the proceedings or leave, but you're not to discuss your testimony with any witness who has not yet testified.

All right. And we'll take our morning break. We'll start up again at 11:30. Thank you.

(A recess was taken.)

THE COURT: All right. Are we all set for the next witness?

MR. VERNON: Good morning, Your Honor. Jeff Vernon for the United States.

Plaintiffs call Professor Ravi.

THE COURT: All right.

THE DEPUTY CLERK: Can you raise your right hand.

Thereupon,

RAMAMOORTHI RAVI,

objection, we'll have to hear it at that point; all right?

MR. VERNON: Yes, Your Honor.

THE COURT: All right. So we've completed the direct examination. It is now 1:00, so this is a good time to take the break.

Professor, you'll need to be back here in your seat by 2:00. We'll give you a card so that you can get through the line a little bit faster. Make sure you give it back to the court security officer when you come back.

Anything further? No. All right. We're on recess.

(Court recessed for lunch at 12:58 p.m.)

----------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

Stephanie Austin
______________________________

Stephanie M. Austin, RPR, CRR

# EXHIBIT G

**From:** Gay, Alexander (CB/BC)
**To:** Eisar Lipkovitz
**Cc:** McLean, Kristen (she, her | elle, la) (CB/BC); Fletcher, Joella (CB/BC); Kelly, Mallory (she, her | elle, la) (CB/BC); Bartlett, Evelyn (she, her | elle, la) (CB/BC)
**Subject:** RE: Request for Call: Canada Competition Bureau
**Date:** November 5, 2025 2:49:00 PM

Thank you for the reply.

I did see your testimony in the US case and I so enjoyed it. We are directing the very same case here in Canada. I would need your testimony, no different from what was said in the US. A few ways we could do it to reduce the burden on you. We are schedule for trial in Jan 2027. But we do need to nail down the evidence. Zoom works well for me. Name a time and we will send an invite.

Kind regards,

Alex

---

**From:** Eisar Lipkovitz <lipkovitz@gmail.com>
**Sent:** November 5, 2025 2:45 PM
**To:** Gay, Alexander (CB/BC) <Alexander.Gay@cb-bc.gc.ca>
**Subject:** Re: Request for Call: Canada Competition Bureau

Thanks for reaching out. I am traveling for business this week and next one.

Happy to chat, preferably zoom, it would be off the record conversation and I might need the advice of a legal counsel later but I am ok starting with understanding the context and what you are hoping to accomplish.

How urgent is this?

On Wed, Nov 5, 2025 at 2:10 PM Gay, Alexander (CB/BC) <Alexander.Gay@cb-bc.gc.ca> wrote:

> Dear Mr. Lipkovitz:
>
> I am counsel to the Attorney General of Canada and represent the Commissioner of Competition in connection with an Application that has been commenced before the Canadian Competition Tribunal against Google. The Application concerns an allegation that Google has abused its dominant position in the AdTech sector—an allegation like the action brought by the U.S. Department of Justice in the U.S. District Court for the Eastern District of Virginia and for which you testified.

We would like to arrange a short call to discuss your testimony, which we believe is relevant to our Application. Let us know a convenient time for a call via MS Teams or Zoom. We are happy to accommodate any time that is convenient for you.

Alexander Gay

613-296-4470
alexander.gay@cb-bc.gc.ca

# EXHIBIT H

**From:** Burke, Katie Ann (she, her | elle, la) (CB/BC) on behalf of Gay, Alexander (CB/BC)
**To:** brad.bender@gmail.com
**Subject:** Request for Call: Canada Competition Bureau
**Date:** November 5, 2025 2:11:00 PM

Dear Mr. Bender:

I am counsel to the Attorney General of Canada and represent the Commissioner of Competition in connection with an Application that has been commenced before the Canadian Competition Tribunal against Google. The Application concerns an allegation that Google has abused its dominant position in the AdTech sector—an allegation like the action brought by the U.S. Department of Justice in the U.S. District Court for the Eastern District of Virginia and for which you testified.

We would like to arrange a short call to discuss your testimony, which we believe is relevant to our Application. Let us know a convenient time for a call via MS Teams or Zoom. We are happy to accommodate any time that is convenient for you.

Alexander Gay

613-296-4470
alexander.gay@cb-bc.gc.ca

# EXHIBIT I

Ministère de la Justice
Canada

Department of Justice
Canada

Bureau de la concurrence
Services juridiques

Competition Bureau Legal Services

Place du Portage, Tour I
22e étage
50 rue Victoria
Gatineau (Québec)
K1A 0C9

Place du Portage, Phase I
22nd Floor
50 Victoria Street
Gatineau (Québec)
K1A 0C9

**VIA EMAIL**

February 12, 2026

Patrick F Linehan, Partner
Steptoe
1330 Connecticut Ave, NW
Washington, DC 20036 USA
202-429-8154
plinehan@steptoe.com

Dear Mr. Linehan:

**RE** | ***Commissioner of Competition v Google Canada and Google LLC*, CT-2024-010**

I am counsel for the Attorney General of Canada and I act for the Commissioner of Competition in the above-referenced matter. I am writing to see whether we can secure your cooperation in securing the evidence of a former Google employee for which you act.

The proceeding that has been commenced in Canada by the Commissioner of Competition concerns an allegation that Google has abused its dominant position in the AdTech sector – an allegation that is similar to the complaint brought by the U.S. Department of Justice in the U.S. District Court for the Eastern District of Virginia and for which your client, Eisar Lipkovitz, testified.

The Commissioner of Competition would require that this former employee testify in the Canadian proceeding. We would like to arrange a short call to discuss options to secure this testimony on a voluntary basis and in a manner that minimizes additional burden to your client. Kindly advise us if you are available to meet and if there is a convenient time for a call via MS Teams or Zoom. We are happy to accommodate any time that is convenient for you.

Yours truly,



Ryan Caron
Counsel, Competition Bureau Legal Services
Department of Justice Canada

cc Alexander Gay, General Counsel, Competition Bureau Legal Services
Katherine Rydel, Counsel, Competition Bureau Legal Services

# EXHIBIT J

Ministère de la Justice
Canada

Department of Justice
Canada

Bureau de la concurrence
Services juridiques

Competition Bureau Legal Services

Place du Portage, Tour I
22e étage
50 rue Victoria
Gatineau (Québec)
K1A 0C9

Place du Portage, Phase I
22nd Floor
50 Victoria Street
Gatineau (Québec)
K1A 0C9

**VIA EMAIL**

February 12, 2026

Amy B. Manning, Partner
McGuireWoods
77 West Wacker Dr, Suite 4100
Chicago, IL 60601-1818 USA
312-750-8904
amanning@mcguirewoods.com

Dear Ms. Manning:

**RE** | ***Commissioner of Competition v Google Canada and Google LLC***, **CT-2024-010**

I am counsel for the Attorney General of Canada and I act for the Commissioner of Competition in the above-referenced matter. I am writing to see whether we can secure your cooperation in securing the evidence of a number of former Google employees for which you act.

The proceeding that has been commenced in Canada by the Commissioner of Competition concerns an allegation that Google has abused its dominant position in the AdTech sector – an allegation that is similar to the complaint brought by the U.S. Department of Justice in the U.S. District Court for the Eastern District of Virginia and for which your clients, Rahul Srinivasan, Bryan Rowley, Brad Bender, Scott Spencer, and Payam Shodjai, testified.

The Commissioner of Competition would require that these former employees testify in the Canadian proceeding. We would like to arrange a short call to discuss options to secure this testimony on a voluntary basis and in a manner that minimizes additional burden to your clients. Kindly advise us if you are available to meet and if there is a convenient time for a call via MS Teams or Zoom. We are happy to accommodate any time that is convenient for you.

Yours truly,



Ryan Caron
Counsel, Competition Bureau Legal Services
Department of Justice Canada

cc | Alexander Gay, General Counsel, Competition Bureau Legal Services
Katherine Rydel, Counsel, Competition Bureau Legal Services

# EXHIBIT K

**Competition Tribunal** **Tribunal de la Concurrence**

Citation: *Canada (Commissioner of Competition) v Google Canada Corporation and Google LLC*, 2026 Comp Trib 30
File No.: CT-2024-010
Registry Document No.: 376

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

BETWEEN:

**Commissioner of Competition**
(applicant)

and

**Google Canada Corporation and Google LLC**
(respondents)

Date of hearing by videoconference: June 23rd, 2026
Before: Justice Andrew Little (Chairperson)
Date of order: June 25th, 2026

**ORDER FOR COMMISSION AND LETTERS ROGATORY**

[1] **FURTHER TO** an application filed by the Commissioner of Competition ("**Applicant**") on November 28, 2024, against Google Canada Corporation and Google LLC ("**Respondents**") under section 79 of the *Competition Act*, RSC 1985, c C-34 ("**Competition Proceeding**");

[2] **AND FURTHER TO** a motion made by the Applicant for leave to examine Eisar Lipkovitz in the United States of America, on oath or solemn affirmation for use in the hearing of the Competition Proceeding;

[3] **AND FURTHER TO** a request by the Applicant for the issuance of a Commission and Letter of Request;

[4] **AND PURSUANT TO** section 8 of the *Competition Tribunal Act*, RSC 1985, c 19 (2nd Supp);

[5] **AND CONSIDERING** the motion materials filed by the Applicant; the submissions of counsel for the Applicant and the Respondents, including in the Applicant's motion record filed on May 5, 2026, in subsequent correspondence to the Tribunal, and at a hearing on June 23, 2026; and that, other than the matters raised and discussed at the hearing, the Respondents did not oppose this motion;

[6] **AND RECOGNIZING** that, by a Bifurcation and Scheduling Order dated May 7, 2025, the hearing of the Competition Proceeding is scheduled for the period between January 25, 2027 and March 8, 2027 ("**Hearing Period**"), and that the parties' and the Tribunal's objective is that the testimony contemplated by this Order will occur during the Hearing Period, with at least 10 days advance notice to the individual and at a time(s) and location(s) convenient to the individual having regard to their permanent residence

**THEREFORE THE TRIBUNAL ORDERS THAT:**

[7] Mr. Justice Andrew D. Little, Justice of the Federal Court and Chairperson of the Competition Tribunal ("**Tribunal**"), is appointed as Commissioner, and any additional Tribunal Member(s) that the Tribunal may designate are appointed as additional Commissioner(s), to take, out of court, the evidence of Eisar Lipkovitz for use at the hearing of the Competition Proceeding;

[8] The testimony of Eisar Lipkovitz will be taken, out of court, at one or more locations in the United States of America, on a date no later than March 8, 2027, as the United States District Court may direct, so that the Commissioner is able to observe and participate by videoconference, or alternatively, in person, and make any required evidentiary rulings;

[9] The Registrar prepare and issue a commission, in the form set out in **Schedule A** to this Order, naming Mr. Justice Andrew D. Little, Justice of the Federal Court and Chairperson of the Tribunal, as Commissioner, and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s);

[10] The Registrar prepare and issue letters rogatory, in the form set out in **Schedule B** to this Order, addressed to the judicial authorities of the United States of America, requesting the issuing of such process as is necessary to compel Eisar Lipkovitz to attend and be examined before the Commissioner.

DATED at Ottawa, this 25th day of June, 2026.

SIGNED on behalf of the Tribunal by the Chairperson

(s) Andrew D. Little

**Schedule A**

**CT-2024-010**

**THE COMPETITION TRIBUNAL**

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

**BETWEEN:**

**COMMISSIONER OF COMPETITION**

**Applicant**

**- and -**

**GOOGLE CANADA CORPORATION AND GOOGLE LLC**

**Respondents**

**COMMISSION**

**TO:** Mr. Justice Andrew D. Little, and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s)

**YOU HAVE BEEN APPOINTED A COMMISSIONER** for the purpose of taking evidence in the proceeding now pending before the Competition Tribunal in Court File No. CT-2024-010 by order of the Competition Tribunal on June 25, 2026.

**YOU ARE GIVEN FULL AUTHORITY** to do all things necessary for taking evidence in the order authorizing this Commission.

In carrying out this Commission, you are to follow the terms of the attached order and the instructions contained in this Commission.

**THE COMMISSION** is signed and sealed by order of the Competition Tribunal.

| | |
|---|---|
| Date | Issued by |

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

**Schedule B**

**CT-2024-010**

**THE COMPETITION TRIBUNAL**

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

**BETWEEN:**

**COMMISSIONER OF COMPETITION**

**Applicant**

**- and -**

**GOOGLE CANADA CORPORATION AND GOOGLE LLC**

**Respondents**

**LETTERS ROGATORY**

**TO THE JUDICIAL AUTHORITIES OF** the United States District Court for the Northern District of California:

**PROCEEDINGS ARE PENDING** in Canada's Competition Tribunal between the Commissioner of Competition and Google Canada Corporation and Google LLC pursuant to the *Competition Act* in Court File No. CT-2024-010 ("**Competition Proceeding**").

**IT HAS BEEN SHOWN TO THIS TRIBUNAL** that it appears necessary for the purpose of justice that witnesses residing or located within your jurisdiction be examined there.

**THIS TRIBUNAL HAS ISSUED A COMMISSION** to the Honourable Mr. Justice Andrew D. Little, Justice of Canada's Federal Court and Chairperson of the Competition Tribunal and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s) ("**Commissioner**"), providing for the examination of Eisar Lipkovitz, who is a former Google employee, in the United States of America.

**YOU ARE REQUESTED** in furtherance of justice, to cause Eisar Lipkovitz to appear before the Commissioner by means ordinarily used in your jurisdiction, if necessary to secure attendance, and to answer questions under oath or solemn affirmation.

**YOU ARE ALSO REQUESTED** to authorize that Eisar Lipkovitz be examined, cross-examined and re-examined on any fact or subject matter relevant to the Competition Proceeding.

**YOU ARE ALSO REQUESTED** to permit the Commissioner to conduct the examination of the witness in accordance with practices and procedures under Canadian law, including the *Competition Tribunal Act*, *Competition Tribunal Rules*, *Canada Evidence Act*, and the Commission issued by this Tribunal.

**THIS LETTER ROGATORY** is signed and sealed by order of the Tribunal made on ___________, 2026.

| | |
|---|---|
| ______________________________ | ______________________________ |
| Date | Issued by |
| | **THE REGISTRAR**<br>**COMPETITION TRIBUNAL**<br>333 Laurier Avenue West, 17th Floor<br>Ottawa, ON K1A 0G7<br>Canada |

**COUNSEL OF RECORD:**

For the applicant:

**Commissioner of Competition**

Alexander M. Gay
John Syme
Katherine Rydel
Derek Lechinsky
Sanjay Kumbhare
Evelyn Bartlett
Adam Rossiter
Ryan Caron

For the respondents:

**Google Canada Corporation and Google LLC**

Kent E. Thomson
Elisa Kearney
Chenyang Li
Chantelle Cseh
Chanakya Sethi
Alisa McMaster

# EXHIBIT L

**Competition Tribunal** **Tribunal de la Concurrence**

File No.: CT-2024-010
Registry Document No.: 376

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

BETWEEN:

**Commissioner of Competition**
(applicant)

and

**Google Canada Corporation and Google LLC**
(respondents)

**COMMISSION**

**TO:** Mr. Justice Andrew D. Little, and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s)

**YOU HAVE BEEN APPOINTED A COMMISSIONER** for the purpose of taking evidence in the proceeding now pending before the Competition Tribunal in Court File No. CT-2024-010 by order of the Competition Tribunal on June 25, 2026.

**YOU ARE GIVEN FULL AUTHORITY** to do all things necessary for taking evidence in the order authorizing this Commission.

In carrying out this Commission, you are to follow the terms of the attached order and the instructions contained in this Commission.

**THE COMMISSION** is signed and sealed by order of the Competition Tribunal.

| | |
|---|---|
| June 25, 2026 | Phaneuf, Guillaume Digitally signed by Phaneuf, Guillaume Date: 2026.06.25 14:03:33 -04'00' |
| Date | Issued by |

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

# EXHIBIT M

**Competition Tribunal** **Tribunal de la Concurrence**

File No.: CT-2024-010
Registry Document No.: 376

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

BETWEEN:

**Commissioner of Competition**
(applicant)

and

**Google Canada Corporation and Google LLC**
(respondents)

**LETTERS ROGATORY**

**TO THE JUDICIAL AUTHORITIES OF** the United States District Court for the Northern District of California:

**PROCEEDINGS ARE PENDING** in Canada's Competition Tribunal between the Commissioner of Competition and Google Canada Corporation and Google LLC pursuant to the *Competition Act* in Court File No. CT-2024-010 ("**Competition Proceeding**").

**IT HAS BEEN SHOWN TO THIS TRIBUNAL** that it appears necessary for the purpose of justice that witnesses residing or located within your jurisdiction be examined there.

**THIS TRIBUNAL HAS ISSUED A COMMISSION** to the Honourable Mr. Justice Andrew D. Little, Justice of Canada's Federal Court and Chairperson of the Competition Tribunal and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s) ("**Commissioner**"), providing for the examination of Eisar Lipkovitz, who is a former Google employee, in the United States of America.

**YOU ARE REQUESTED** in furtherance of justice, to cause Eisar Lipkovitz to appear before the Commissioner by means ordinarily used in your jurisdiction, if necessary to secure attendance, and to answer questions under oath or solemn affirmation.

**YOU ARE ALSO REQUESTED** to authorize that Eisar Lipkovitz be examined, cross-examined and re-examined on any fact or subject matter relevant to the Competition Proceeding.

**YOU ARE ALSO REQUESTED** to permit the Commissioner to conduct the examination of the witness in accordance with practices and procedures under Canadian law, including the *Competition Tribunal Act*, *Competition Tribunal Rules*, *Canada Evidence Act*, and the Commission issued by this Tribunal.

**THIS LETTER ROGATORY** is signed and sealed by order of the Tribunal made on June 25, 2026.

June 25, 2026
Date

Phaneuf, Guillaume
Digitally signed by Phaneuf, Guillaume
Date: 2026.06.25 13:57:20 -04'00'
Issued by

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

# EXHIBIT N

**Competition Tribunal** **Tribunal de la Concurrence**

Citation: *Canada (Commissioner of Competition) v Google Canada Corporation and Google LLC*, 2026 Comp Trib 28
File No.: CT-2024-010
Registry Document No.: 374

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

BETWEEN:

**Commissioner of Competition**
(applicant)

and

**Google Canada Corporation and Google LLC**
(respondents)

Date of hearing by videoconference: June 23rd, 2026
Before: Justice Andrew Little (Chairperson)
Date of order: June 25th, 2026

**ORDER FOR COMMISSION AND LETTERS ROGATORY**

[1] **FURTHER TO** an application filed by the Commissioner of Competition ("**Applicant**") on November 28, 2024, against Google Canada Corporation and Google LLC ("**Respondents**") under section 79 of the *Competition Act*, RSC 1985, c C-34 ("**Competition Proceeding**");

[2] **AND FURTHER TO** a motion made by the Applicant for leave to examine Brad Bender in the United States of America, on oath or solemn affirmation for use in the hearing of the Competition Proceeding;

[3] **AND FURTHER TO** a request by the Applicant for the issuance of a Commission and Letter of Request;

[4] **AND PURSUANT TO** section 8 of the *Competition Tribunal Act*, RSC 1985, c 19 (2nd Supp);

[5] **AND CONSIDERING** the motion materials filed by the Applicant; the submissions of counsel for the Applicant and the Respondents, including in the Applicant's motion record filed on May 5, 2026, in subsequent correspondence to the Tribunal, and at a hearing on June 23, 2026; and that, other than the matters raised and discussed at the hearing, the Respondents did not oppose this motion;

[6] **AND RECOGNIZING** that, by a Bifurcation and Scheduling Order dated May 7, 2025, the hearing of the Competition Proceeding is scheduled for the period between January 25, 2027 and March 8, 2027 ("**Hearing Period**"), and that the parties' and the Tribunal's objective is that the testimony contemplated by this Order will occur during the Hearing Period, with at least 10 days advance notice to the individual and at a time(s) and location(s) convenient to the individual having regard to their permanent residence;

**THEREFORE THE TRIBUNAL ORDERS THAT:**

[7] Mr. Justice Andrew D. Little, Justice of the Federal Court and Chairperson of the Competition Tribunal ("**Tribunal**") is appointed as Commissioner, and any additional Tribunal Member(s) that the Tribunal may designate are appointed as additional Commissioner(s), to take, out of court, the evidence of Brad Bender for use at the hearing of the Competition Proceeding;

[8] The testimony of Brad Bender will be taken, out of court, at one or more locations in the United States of America, on a date no later than March 8, 2027, as the United States District Court may direct, so that the Commissioner is able to observe and participate by videoconference, or alternatively, in person, and make any required evidentiary rulings;

[9] The Registrar prepare and issue a commission, in the form set out in **Schedule A** to this Order, naming Mr. Justice Andrew D. Little, Justice of the Federal Court and Chairperson of the Tribunal, as Commissioner, and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s);

[10] The Registrar prepare and issue letters rogatory, in the form set out in **Schedule B** to this Order, addressed to the judicial authorities of the United States of America, requesting the issuing of such process as is necessary to compel Brad Bender to attend and be examined before the Commissioner.

DATED at Ottawa, this 25th day of June, 2026.

SIGNED on behalf of the Tribunal by the Chairperson

(s) Andrew D. Little

**Schedule A**

**CT-2024-010**

**THE COMPETITION TRIBUNAL**

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

**BETWEEN:**

**COMMISSIONER OF COMPETITION**

**Applicant**

**- and -**

**GOOGLE CANADA CORPORATION AND GOOGLE LLC**

**Respondents**

**COMMISSION**

**TO:** Mr. Justice Andrew D. Little, and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s)

**YOU HAVE BEEN APPOINTED A COMMISSIONER** for the purpose of taking evidence in the proceeding now pending before the Competition Tribunal in Court File No. CT-2024-010 by order of the Competition Tribunal on June 25, 2026.

**YOU ARE GIVEN FULL AUTHORITY** to do all things necessary for taking evidence in the order authorizing this Commission.

In carrying out this Commission, you are to follow the terms of the attached order and the instructions contained in this Commission.

**THE COMMISSION** is signed and sealed by order of the Competition Tribunal.

| | |
|---|---|
| Date | Issued by |

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

**Schedule B**

**CT-2024-010**

**THE COMPETITION TRIBUNAL**

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

**BETWEEN:**

**COMMISSIONER OF COMPETITION**

**Applicant**

**- and -**

**GOOGLE CANADA CORPORATION AND GOOGLE LLC**

**Respondents**

**LETTERS ROGATORY**

**TO THE JUDICIAL AUTHORITIES OF** the United States District Court for the Northern District of California:

**PROCEEDINGS ARE PENDING** in Canada's Competition Tribunal between the Commissioner of Competition and Google Canada Corporation and Google LLC pursuant to the *Competition Act* in Court File No. CT-2024-010 ("**Competition Proceeding**").

**IT HAS BEEN SHOWN TO THIS TRIBUNAL** that it appears necessary for the purpose of justice that witnesses residing or located within your jurisdiction be examined there.

**THIS TRIBUNAL HAS ISSUED A COMMISSION** to the Honourable Mr. Justice Andrew D. Little, Justice of Canada's Federal Court and Chairperson of the Competition Tribunal and any additional Tribunal Member(s) that the Tribunal may designate as additional

Commissioner(s) ("**Commissioner**"), providing for the examination of Brad Bender, who is a former Google employee, in the United States of America.

**YOU ARE REQUESTED** in furtherance of justice, to cause Brad Bender to appear before the Commissioner by means ordinarily used in your jurisdiction, if necessary to secure attendance, and to answer questions under oath or solemn affirmation.

**YOU ARE ALSO REQUESTED** to authorize that Brad Bender be examined, cross-examined and re-examined on any fact or subject matter relevant to the Competition Proceeding.

**YOU ARE ALSO REQUESTED** to permit the Commissioner to conduct the examination of the witness in accordance with practices and procedures under Canadian law, including the *Competition Tribunal Act*, *Competition Tribunal Rules*, *Canada Evidence Act*, and the Commission issued by this Tribunal.

**THIS LETTER ROGATORY** is signed and sealed by order of the Tribunal made on __________, 2026.

| | |
|---|---|
| Date | Issued by |

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

**COUNSEL OF RECORD:**

For the applicant:

**Commissioner of Competition**

Alexander M. Gay
John Syme
Katherine Rydel
Derek Lechinsky
Sanjay Kumbhare
Evelyn Bartlett
Adam Rossiter
Ryan Caron

For the respondents:

**Google Canada Corporation and Google LLC**

Kent E. Thomson
Elisa Kearney
Chenyang Li
Chantelle Cseh
Chanakya Sethi
Alisa McMaster

# EXHIBIT O

**Competition Tribunal** **Tribunal de la Concurrence**

File No.: CT-2024-010
Registry Document No.: 374

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

BETWEEN:

**Commissioner of Competition**
(applicant)

and

**Google Canada Corporation and Google LLC**
(respondents)

**COMMISSION**

**TO:** Mr. Justice Andrew D. Little, and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s)

**YOU HAVE BEEN APPOINTED A COMMISSIONER** for the purpose of taking evidence in the proceeding now pending before the Competition Tribunal in Court File No. CT-2024-010 by order of the Competition Tribunal on June 25, 2026.

**YOU ARE GIVEN FULL AUTHORITY** to do all things necessary for taking evidence in the order authorizing this Commission.

In carrying out this Commission, you are to follow the terms of the attached order and the instructions contained in this Commission.

**THE COMMISSION** is signed and sealed by order of the Competition Tribunal.

| | |
|---|---|
| June 25, 2026 | Phaneuf, Guillaume — Digitally signed by Phaneuf, Guillaume Date: 2026.06.25 13:43:42 -04'00' |
| Date | Issued by |

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

# EXHIBIT P

**Competition Tribunal** **Tribunal de la Concurrence**

File No.: CT-2024-010
Registry Document No.: 374

**IN THE MATTER OF** the *Competition Act*, RSC 1985, c C-34;

**AND IN THE MATTER OF** certain conduct of Google Canada Corporation and Google LLC relating to the supply of online advertising technology services in Canada;

**AND IN THE MATTER OF** an application of the Commissioner of Competition for one or more orders pursuant to section 79 of the *Competition Act*.

BETWEEN:

**Commissioner of Competition**
(applicant)

and

**Google Canada Corporation and Google LLC**
(respondents)

COMPETITION TRIBUNAL · TRIBUNAL DE LA CONCURRENCE

## LETTERS ROGATORY

**TO THE JUDICIAL AUTHORITIES OF** the United States District Court for the Northern District of California:

**PROCEEDINGS ARE PENDING** in Canada's Competition Tribunal between the Commissioner of Competition and Google Canada Corporation and Google LLC pursuant to the *Competition Act* in Court File No. CT-2024-010 ("**Competition Proceeding**").

**IT HAS BEEN SHOWN TO THIS TRIBUNAL** that it appears necessary for the purpose of justice that witnesses residing or located within your jurisdiction be examined there.

**THIS TRIBUNAL HAS ISSUED A COMMISSION** to the Honourable Mr. Justice Andrew D. Little, Justice of Canada's Federal Court and Chairperson of the Competition Tribunal and any additional Tribunal Member(s) that the Tribunal may designate as additional Commissioner(s) ("**Commissioner**"), providing for the examination of Brad Bender, who is a former Google employee, in the United States of America.

**YOU ARE REQUESTED** in furtherance of justice, to cause Brad Bender to appear before the Commissioner by means ordinarily used in your jurisdiction, if necessary to secure attendance, and to answer questions under oath or solemn affirmation.

**YOU ARE ALSO REQUESTED** to authorize that Brad Bender be examined, cross-examined and re-examined on any fact or subject matter relevant to the Competition Proceeding.

**YOU ARE ALSO REQUESTED** to permit the Commissioner to conduct the examination of the witness in accordance with practices and procedures under Canadian law, including the *Competition Tribunal Act*, *Competition Tribunal Rules*, *Canada Evidence Act*, and the Commission issued by this Tribunal.

**THIS LETTER ROGATORY** is signed and sealed by order of the Tribunal made on June 25, 2026.

| | |
|---|---|
| June 25, 2026 | Phaneuf, Guillaume — Digitally signed by Phaneuf, Guillaume Date: 2026.06.25 13:50:28 -04'00' |
| Date | Issued by |

**THE REGISTRAR**
**COMPETITION TRIBUNAL**
333 Laurier Avenue West, 17th Floor
Ottawa, ON K1A 0G7
Canada

# EXHIBIT Q

This site is best viewed with Google Chrome or Mozilla Firefox.

Contact Us | Twitter | YouTube | Français



Home / About the Court / Members of the Court / Judges / The Honourable Andrew D. Little

Pages

- The Honourable Alan S. Diner - Chief Justice
- The Honourable Martine St-Louis - Associate Chief Justice
- The Honourable Jocelyne Gagné
- The Honourable Catherine M. Kane
- The Honourable Yvan Roy
- The Honourable Michael D. Manson
- The Honourable Cecily Y. Strickland
- The Honourable Glennys L McVeigh
- The Honourable Simon Fothergill
- The Honourable Denis Gascon
- The Honourable Richard F. Southcott
- The Honourable Patrick K. Gleeson
- The Honourable Ann Marie McDonald
- The Honourable Roger R. Lafrenière
- The Honourable William F. Pentney
- The Honourable Shirzad S. Ahmed
- The Honourable Sébastien Grammond
- The Honourable Paul Favel
- The Honourable John Norris

# The Honourable Andrew D. Little

Justice Andrew D. Little was appointed to the Federal Court on April 28, 2020. He also serves as a judicial member and Chair of the Competition Tribunal.

As a lawyer, Justice Little worked at law firms in Toronto and, for over a decade, in Calgary. He provided advocacy and advice in a wide variety of litigation and regulatory matters, including competition and consumer protection cases, contract, tort and commercial disputes, and domestic, international and investor-state arbitrations. From 2013 to 2015, he was seconded to the Department of Justice, serving as General Counsel at the Competition Bureau. He appeared at all levels of the Federal, Ontario and Alberta courts, as well as the Supreme Court of Canada, the Competition Tribunal, and many domestic and international arbitral tribunals.

While in law practice, Justice Little was a frequent speaker, writer, and presenter on competition/antitrust law, administrative law, contracts, arbitration, and legal developments in appeal courts. He was a guest lecturer on administrative law at the law schools at the University of Calgary and the University of Toronto. From 2000 to 2007, he taught an upper-year litigation course at the Faculty of Law, University of Calgary.

Justice Little is a graduate of Queen's University, Dalhousie Law School, and Balliol College, Oxford. He served as law clerk for Madam Justice Claire L'Heureux-Dubé at the Supreme Court of Canada in 1990-91.

Norris

The Honourable Nicholas McHaffie

The Honourable Janet M. Fuhrer

The Honourable Christine Pallotta

**The Honourable Andrew D. Little**

The Honourable Angela Furlanetto

The Honourable Lobat Sadrehashemi

The Honourable Avvy Yao-Yao Go

The Honourable Mandy Aylen

The Honourable Guy Régimbald

The Honourable Ekaterina Tsimberis

The Honourable Anne M. Turley

The Honourable Negar Azmudeh

The Honourable Phuong T.V. Ngo

The Honourable Allyson Whyte Nowak

The Honourable Angus G. Grant

The Honourable Julie L. Blackhawk

The Honourable Michael Battista

The Honourable Benoit M. Duchesne

The Honourable Love Saint-Fleur

The Honourable Meaghan M. Conroy

The Honourable Danielle Ferron

The Honourable Andrew J. Brouwer

The Honourable Darren R. Thorne

The Honourable François Joyal

The Honourable Giuseppina D'Agostino

Date modified: 2022-11-15

**About the Court**

Jurisdiction
Careers
Liaison Committees
Reports and Statistics

**Law and Practice**

Acts and Rules
Practice Guides
Procedural Charts
Procedural Roadmaps
Court Costs
Deadlines Calculator
Checklists

**Online Access**

Forms
E-Filing
E-Motion
E-Order

**Representing Yourself**

Finding Legal Help
Practice Guides
Procedural Charts
Procedural Roadmaps
Checklists
Court Costs
Deadlines Calculator
Resolving Your Case
Registry

**Court Files and Decisions**

Court Files
Decisions
Hearing Lists
General Sittings
Summer Recess
Calendar of Hearings

**Media**

Administration of the Court
Court Files
Decisions
Calendar of Hearings

**Resources**

Registry
Court Costs
Procedural Charts
Procedural Roadmaps
Resolving Your Case
Finding Legal Help
Checklists

| Important Notices | Disclaimer | Contact Us | Feedback